Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless
Association and USTelecom – The Broadband
Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable
Association*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
505 Montgomery Street, Suite 1300
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs American Cable
Association, CTIA – The Wireless
Association, NCTA – The Internet &
Television Association, and USTelecom –
The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiff NCTA – The Internet
& Television Association*

*Pro hac vice* motion to be filed

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>    Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>    Defendant. | Case No. _____<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: _____<br>Time: _____<br>Courtroom: _____<br>Judge: _____ |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    The Internet ........................................................................................... 3

    B.    Federal Regulation and Deregulation of Broadband Internet Access Service ....... 4

        1.    The FCC's 2015 Order ............................................................... 4

        2.    The FCC's 2018 Order ............................................................... 5

    C.    SB-822 Adopts Rules That Conflict with the 2018 Order ................... 6

ARGUMENT ...................................................................................................................... 7

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 8

    A.    Federal Law Preempts SB-822 ........................................................... 8

        1.    The 2018 Order Expressly Preempts SB-822 ........................... 8

        2.    SB-822 Conflicts with Congress's Prohibition on Common Carrier Regulation of Information Services and Private Mobile Services .......... 10

    B.    SB-822 Violates the Dormant Commerce Clause ............................... 12

        1.    SB-822 Regulates Extraterritorially ....................................... 12

        2.    SB-822 Unduly Burdens Interstate Commerce ....................... 14

II.    SB-822 WILL SUBJECT PLAINTIFFS' MEMBERS TO IMMEDIATE AND IRREPARABLE HARM ........................................................................................ 16

III.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION ........... 20

CONCLUSION ................................................................................................................. 21

1

# TABLE OF AUTHORITIES

Page

**CASES**

*ACLU v. Johnson*,
194 F.3d 1149 (10th Cir. 1999)............................................................13, 15

*American Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003)..................................................................13

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046(9th Cir. 2009)........................................17, 18, 20, 21

*Arizona Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014)............................................................20

*Arkansas Elec. Co-op. v. Arkansas Pub. Serv. Comm'n*,
461 U.S. 375 (1983).............................................................................9

*Bell Atl. Tel. Cos. v. FCC*,
206 F.3d 1 (D.C. Cir. 2000) ..............................................................3

*BellSouth Telecomms., LLC v. Metropolitan Gov't of Nashville & Davidson Cty.*,
2017 WL 5641145 (M.D. Tenn. Nov. 21, 2017) ...............................10

*Bibb v. Navajo Freight Lines, Inc.*,
359 U.S. 520 (1959)...........................................................................15

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
476 U.S. 573 (1986)....................................................................12, 14

*California v. FCC*,
39 F.3d 919 (9th Cir. 1994)................................................................10

*California Hosp. Ass'n v. Maxwell-Jolly*,
776 F. Supp. 2d 1129 (E.D. Cal. 2011)..............................................21

*California Pharmacists Ass'n v. Maxwell-Jolly*,
563 F.3d 847 (9th Cir. 2009), *vacated and remanded on other grounds
sub nom. Douglas v. Independent Living Ctr. of S. Cal., Inc.*,
565 U.S. 606 (2012).....................................................................16, 20

*CallerID4u, Inc. v. MCI Commc'ns Servs. Inc.*,
880 F.3d 1048 (9th Cir. 2018).....................................................8-9, 11, 16

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984).............................................................................9

*Cellco P'ship v. FCC*,
700 F.3d 534 (D.C. Cir. 2012) ...........................................................11

*Charter Advanced Servs. (MN), LLC v. Lange*,
– F.3d –, 2018 WL 4260322 (8th Cir. Sept. 7, 2018) .......................10

ii

*Citicorp Servs. Inc. v. Gillespie*,
  712 F. Supp. 749 (N.D. Cal. 1989) .......................................................................16

*City of New York v. FCC*,
  486 U.S. 57 (1988) ....................................................................................................9

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) ..................................................................................................14

*Dish Network L.L.C. v. Ramirez*,
  2016 WL 3092184 (N.D. Cal. June 2, 2016) ....................................................18, 20

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ....................................................................................8

*Estate of Graham v. Sotheby's Inc.*,
  860 F. Supp. 2d 1117 (C.D. Cal. 2012) ..................................................................12

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ..................................................................................................9

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ................................................................................................10

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ..................................................................................................11

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ..................................................................................16

*Nation v. City of Glendale*,
  804 F.3d 1292 (9th Cir. 2015) ................................................................................11

*National Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ................................................................................14

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................................10

*National Collegiate Athletic Ass'n v. Christie*,
  926 F. Supp. 2d 551 (D.N.J.), *aff'd sub nom. National Collegiate Athletic
  Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013) ......................16-17

*National Collegiate Athletic Ass'n v. Miller*,
  10 F.3d 633 (9th Cir. 1993) ..............................................................................12, 14

*National Fed'n of the Blind v. United Airlines Inc.*,
  813 F.3d 718 (9th Cir. 2016) ....................................................................................9

*New York State Comm'n on Cable Television v. FCC*,
  669 F.2d 58 (2d Cir. 1982) .......................................................................................9

*North Dakota v. Heydinger*,
  825 F.3d 912 (8th Cir. 2016) ..................................................................................13

*Odebrecht Constr., Inc. v. Secretary, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013)................................................................17, 21

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970) ...............................................................................14, 16

*Pioneer Military Lending, Inc. v. Dufauchard*,
  2006 WL 2053486 (E.D. Cal. July 21, 2006) .........................................16, 17

*Planned Parenthood Ariz., Inc. v. Betlach*,
  899 F. Supp. 2d 868 (D. Ariz. 2012).............................................................21

*PSINet, Inc. v. Chapman*,
  362 F.3d 227 (4th Cir. 2004).........................................................................13

*Publius v. Boyer-Vine*,
  237 F. Supp. 3d 997 (E.D. Cal. 2017)...........................................................13

*Reid v. Johnson & Johnson*,
  780 F.3d 952 (9th Cir. 2015)...........................................................................9

*Reno v. ACLU*,
  521 U.S. 844 (1997) .........................................................................................3

*Southern Pac. Co. v. Arizona ex rel. Sullivan*,
  325 U.S. 761 (1945) .......................................................................................15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001).........................................................17, 18, 20

*Textile Unlimited, Inc. v. A..BMH & Co.*,
  240 F.3d 781 (9th Cir. 2001).....................................................................3, 21

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990).....................................................................17, 21

*Union Pac. R.R. Co. v. California Pub. Utils. Comm'n*,
  346 F.3d 851 (9th Cir. 2003).........................................................................16

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012)......................................................................21

*United States v. California*,
  314 F. Supp. 3d 1077 (E.D. Cal. 2018)....................................................16, 21

*United States v. Locke*,
  529 U.S. 89 (2000)............................................................................................9

*US West Commc'ns, Inc. v. Hamilton*,
  224 F.3d 1049 (9th Cir. 2000), *as amended on reh'g* (Sept. 13, 2000) ........9, 11, 16

*US West Commc'ns, Inc. v. Jennings*,
  304 F.3d 950 (9th Cir. 2002)........................................................................8, 9

*USTelecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016) ................................................................3

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) ...........................................3, 10, 11, 12

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................8


**CONSTITUTIONS, STATUTES, REGULATIONS, AND RULES**

**<u>Federal</u>**

U.S. Const. art. I, § 8, cl. 3 (Commerce Clause)...............................2, 7, 12, 14, 16, 17

U.S. Const. art. VI, cl. 2 (Supremacy Clause) ................................7, 17, 20

Communications Act, 47 U.S.C. § 151 *et seq.*:

  § 152(a) ...................................................................................................9

  § 152(b) ...................................................................................................9

  § 153(51) .................................................................................................10

  § 230(b)(2) ...............................................................................................4

  § 332(c)(1)(A) ..........................................................................................10

  § 332(c)(2) ...............................................................................................10

  § 402(a) ...............................................................................................3, 8

  § 1302(a) ...................................................................................................4

28 U.S.C. § 2342(1) ...............................................................................3, 8

47 C.F.R. § 8.1(a) (2018) ..........................................................................7

47 C.F.R. § 8.1(b) (2018) ..........................................................................11

47 C.F.R. § 8.3 (2016) ...............................................................................7

E.D. Cal. L.R. 231(d)(3) ............................................................................3

**State**

Cal. Const. art. IV, § 8(c)(1) ...................................................................................7

Cal. Civ. Code:

    § 3100(b) ...................................................................................11, 12

    § 3100(e) ...................................................................................17

    § 3100(m) ...................................................................................7

    § 3101 ...................................................................................7

    § 3101(a) ...................................................................................7

    § 3101(a)(1) ...................................................................................7

    § 3101(a)(2) ...................................................................................7

    § 3101(a)(3) ...................................................................................7, 21

    § 3101(a)(4) ...................................................................................7

    § 3101(a)(5) ...................................................................................7, 20, 21

    § 3101(a)(6) ...................................................................................7, 20, 21

    § 3101(a)(7) ...................................................................................7

    § 3101(a)(8) ...................................................................................7

    § 3101(a)(9) ...................................................................................7, 18, 21

    § 3101(b) ...................................................................................7

    § 3102 ...................................................................................7

    § 3104 ...................................................................................19, 20

**ADMINISTRATIVE DECISIONS**

2018 Order:
Declaratory Ruling, Report and Order, and Order,
*Restoring Internet Freedom*, 33 FCC Rcd 311 (2018),
*petitions for review pending*, *Mozilla Corp. v. FCC*,
No. 18-1051 *et al.* (D.C. Cir.) ...........................................................*passim*

2015 Order:
Report and Order on Remand, Declaratory Ruling, and Order,
*Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601
(2015) ...................................................................4, 5, 6, 7, 8, 11, 12, 15

**OTHER AUTHORITIES**

AT&T, About Data Free TV,
    https://www.att.com/esupport/article.html#!/u-verse-tv/KM1131836 ........................... 19

Cal. Assembly Comm. on Communications & Conveyance, SB-822
    (Aug. 22, 2018), https://bit.ly/2RfXJAw ............................................................... 6

N.Y. Exec. Order 175 (signed Jan. 24, 2018), https://on.ny.gov/2LBkRGY ............................ 14

National Conference of State Legislatures, Net Neutrality Legislation in States
    (Oct. 1, 2018), https://bit.ly/2y58AVb ................................................................. 14

Press Release, *Senator Wiener to Introduce Net Neutrality in California*
    (Dec. 14, 2017), https://bit.ly/2IwASwH ............................................................. 6

Press Release, *Senators Wiener and De Leon and Assemblymembers Santiago
    and Bonta Announce Agreement on California Bill with Strongest
    Net Neutrality Protections in the Country* (July 5, 2018), https://bit.ly/2QoftbL .................... 6

Sponsored Data from AT&T,
    https://www.att.com/att/sponsoreddata/en/index.html ............................................ 19

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction

## INTRODUCTION

On September 30, 2018, California enacted SB-822, the "California Internet Consumer Protection and Net Neutrality Act of 2018," which is scheduled to take effect on January 1, 2019.  Through SB-822, California seeks to regulate Plaintiffs' members' provision of broadband Internet access service ("BIAS"), the interstate communications service that enables users to access and transmit information across the country and around the world.  In doing so, the State purposefully acts to undermine federal law.  SB-822 not only reimposes regulations that the Federal Communications Commission ("FCC") had adopted in 2015 but then *rescinded* in 2018, but also imposes regulations that the FCC considered and rejected in 2015.  And it does so in conflict with both the FCC's 2018 Order[1] and the federal Communications Act.

Plaintiffs are trade associations whose members offer BIAS to customers in California and across the country.  Plaintiffs and their members support an open Internet, which benefits their customers and, therefore, the broadband businesses in which they, collectively, have invested billions of dollars.  Plaintiffs' members, either on their own or through the associations, have made public commitments to preserve core principles of Internet openness, and the FCC's 2018 Order ensures that those commitments are enforceable.  This case, therefore, is not about whether the Internet will remain open.  Instead, this case is about California's effort to nullify federal law by imposing state-specific rules on an interstate communications service that the FCC — under both Democratic and Republican administrations — has held must be subject to a single, uniform set of federal rules, rather than a patchwork of state-by-state regulation.

Plaintiffs are likely to prevail on the merits of their claim that SB-822 is unlawful.  First, federal law preempts SB-822.  The FCC expressly "preempt[ed] any state . . . measures that would effectively impose rules or requirements that [the agency] ha[d] repealed or decided to refrain from imposing . . . or that would impose more stringent requirements for any aspect of broadband service that we address in this order."  2018 Order ¶ 195.  SB-822 is such a state measure.  In addition, the FCC's conclusion that BIAS is an interstate service statutorily

---

[1] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311 (2018) ("2018 Order"), *petitions for review pending*, *Mozilla Corp. v. FCC*, No. 18-1051 *et al.* (D.C. Cir.).

immune from common carrier regulation — twice over in the case of mobile BIAS services — independently preempts SB-822, which seeks to impose common carrier obligations on those services.  SB-822 also stands as a clear obstacle to the federal policy of ensuring a uniform, light-touch regulatory framework for BIAS, free from common carrier, utility-style regulation.

Second, SB-822 violates the dormant Commerce Clause.  It is "impossible or impracticable for [BIAS providers] to distinguish between intrastate and interstate communications over the Internet" and, therefore, "not . . . possible for [one state] to regulate the use of a broadband Internet connection for *intrastate communications* without also affecting the use of that same connection for *interstate communications*."  2018 Order ¶ 200 & n.744.  SB-822 thus regulates extraterritorially, controlling BIAS providers' activities outside California.  SB-822 also unduly burdens interstate commerce.  The FCC found that the regulations that SB-822 seeks to reimpose generate "approximately zero" benefits and impose significant "private and social costs," including "decreases in investment [that] are likely to result in less deployment of service to unserved areas and less upgrading of facilities in already served areas," harming consumers.  *Id.* ¶¶ 308-312.

Because SB-822 is unconstitutional, Plaintiffs' members would be irreparably harmed if subjected to that unconstitutional law during the pendency of this litigation.  In addition, specific provisions of SB-822 would cause further irreparable harm to Plaintiffs' members.  First, SB-822 imposes ambiguous restrictions on interconnection arrangements between Plaintiffs' members and both Internet content providers ("edge providers") and other Internet network operators.  It is not clear how these vague provisions will be interpreted and applied, but they create substantial marketplace uncertainty and incentives for the inefficient routing of Internet traffic that will harm Plaintiffs' members.  SB-822 has already led to the breakdown of negotiations between a BIAS provider and two large edge providers.  Second, SB-822 would outlaw some of Plaintiff CTIA's members' "zero rating" offerings, which benefit consumers by exempting certain Internet traffic from counting against their monthly data allowance.  The invalidation of these service offerings would irreparably harm Plaintiffs' members, costing them customers and goodwill, as well as revenues that cannot be recovered from the State.

1          Finally, the balance of equities favors injunctive relief.  A preliminary injunction would

2   "preserv[e] the status quo and prevent[ ] the irreparable loss of rights before judgment."  *Textile*

3   *Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001).  The Internet will remain

4   open under that status quo, as the 2018 Order protects the open Internet through a disclosure

5   regime.  *See* 2018 Order ¶¶ 240-245.  As noted above, Plaintiffs' members have made public

6   commitments to preserve core principles of Internet openness, which are fully enforceable by

7   the Federal Trade Commission ("FTC") and state attorneys general, acting consistently with

8   federal law.  *See id.* ¶¶ 142, 196, 242, 244.  A preliminary injunction will also ensure the

9   primacy of federal law by preventing California's attempt to nullify the FCC's 2018 Order even

10  as it appeals that decision in the D.C. Circuit, which has exclusive jurisdiction to hear

11  challenges to the 2018 Order.  *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a).[2]

12                                          **BACKGROUND**

13       **A.      The Internet**

14          The Internet is a network of computer networks delivering traffic between servers and

15  end users located around the world.  *See Reno v. ACLU*, 521 U.S. 844, 849 (1997).  Among the

16  companies that build and operate different parts of this network are Internet service providers

17  ("ISPs"), including Plaintiffs' members.  ISPs have invested billions of dollars to deploy not

18  only the high-speed links that connect consumers' homes and smartphones to the ISPs'

19  networks, but also the ISPs' servers and networks that give those consumers the capability of

20  sending and receiving information to and from other parts of the Internet.  *See Verizon v. FCC*,

21  740 F.3d 623, 629 (D.C. Cir. 2014).

22          The FCC and courts have long recognized that Internet access is an interstate (and

23  international) communications service, because, among other reasons, "a substantial portion of

24  Internet traffic involves accessing interstate or foreign websites."  *Bell Atl. Tel. Cos. v. FCC*,

25  206 F.3d 1, 5 (D.C. Cir. 2000); *see* 2018 Order ¶ 199 & nn.739-742; *see also USTelecom Ass'n*

26  *v. FCC*, 825 F.3d 674, 730-31 (D.C. Cir. 2016) (affirming FCC's jurisdictional determination).

27  ─────────────────────

28          [2] Plaintiffs do not seek to present oral testimony at a hearing.  *See* E.D. Cal. L.R.
    231(d)(3).

1   Indeed, even when a person views a single web page, her browser will retrieve content from

2   multiple servers located around the country or the world.  *See* 2018 Order ¶ 200.  Accordingly,

3   it is "impossible or impracticable for ISPs to distinguish between intrastate and interstate

4   communications over the Internet or to apply different rules in each circumstance," and ISPs

5   "could not comply with state or local rules for intrastate communications without applying the

6   same rules to interstate communications."  *Id.*

7   **B.     Federal Regulation and Deregulation of Broadband Internet Access Service**

8        In 1996, Congress made clear that it is "the policy of the United States to preserve the

9   vibrant and competitive free market that presently exists for the Internet and other interactive

10  computer services, unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), as well as

11  to encourage the deployment of broadband Internet access capabilities by "remov[ing] barriers

12  to infrastructure investment," *id.* § 1302(a).  For nearly two decades, the FCC consistently

13  implemented that federal policy through a "light-touch approach to the Internet" that rejected

14  "sweeping regulation of Internet service providers."  2018 Order ¶ 9; *see id.* ¶¶ 10-16.  That

15  "successful light-touch bipartisan framework . . . promoted a free and open Internet and, for

16  almost twenty years, saw it flourish."  *Id.* ¶ 18.

17       *1.     The FCC's 2015 Order*

18       In 2015, the FCC temporarily deviated from that longstanding approach when it

19  reclassified BIAS as a "telecommunications service" and mobile BIAS as a "commercial mobile

20  service" subject to common carrier regulation under Title II of the federal Communications Act.

21  2015 Order[3] ¶¶ 25, 189, 388.  With that newly asserted authority, the FCC adopted a series of

22  proscriptive rules against blocking, throttling, and paid prioritization of Internet traffic.  2015

23  Order ¶¶ 15, 16, 18.  The FCC also adopted an "Internet Conduct Standard," prohibiting BIAS

24  providers from "unreasonably disadvantag[ing]" or "unreasonably interfer[ing]" with end users'

25  access to Internet content, and content providers' access to end users.  *Id.* ¶ 21.  The FCC

26  acknowledged that these rules constituted common carrier regulation.  *See id.* ¶¶ 288-296.

27  _____

28  [3] *See* Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) ("2015 Order").

1    In connection with the Internet Conduct Standard, the FCC considered a ban on "zero

2   rating" — a service, analogous to toll-free telephone service, that allows a content provider to

3   pay for its customers' data usage so that the usage does not count toward the customers'

4   monthly data usage allowance.  *See id.* ¶ 151.  The FCC rejected claims that it should ban zero

5   rating generally or any particular zero rating offering, observing that these offerings "could

6   benefit consumers and competition."  *Id.* ¶ 152.  The FCC instead held that it would assess such

7   offerings on a case-by-case basis.  *See id.*

8    The FCC also rejected claims that it should affirmatively regulate the terms and

9   conditions on which BIAS providers interconnect their networks with other network operators

10   and edge providers, including by adopting specific rules governing interconnection or banning

11   payments.  In lieu of a proscriptive approach, the FCC opted for "case-by-case" review of such

12   agreements for "reasonable[ness]."  *Id.* ¶¶ 202-206.  The FCC recognized that, in asserting

13   authority to regulate these interconnection arrangements, it was imposing common carrier

14   obligations on BIAS providers.  *See id.* ¶ 204.

15    2.    *The FCC's 2018 Order*

16    In the 2018 Order, the FCC "reinstate[d]" the "light-touch information service

17   framework" that had applied before the 2015 Order.  2018 Order ¶ 2.  The FCC again classified

18   BIAS as an interstate "information service" and mobile BIAS as a "private mobile service,"

19   both statutorily immune from common carriage regulation.  *See id.* ¶¶ 2, 18, 65.  The FCC also

20   eliminated the proscriptive rules and Internet Conduct Standard, finding that the "costs of these

21   rules to innovation and investment outweigh any benefits they may have."  *Id.* ¶ 4; *see also id.*

22   ¶¶ 87-154, 239, 246-267.  And the FCC rescinded the 2015 Order's case-by-case oversight of

23   BIAS providers' interconnection arrangements, finding that "competitive pressures in the

24   market for Internet traffic exchange . . . undermine the need for regulatory oversight."  *Id.* ¶ 170.

25    In place of the 2015 Order's "utility-style regulation of the Internet," *id.* ¶ 2, the FCC

26   relied on "transparency" to "protect Internet freedom . . . more effectively and at lower social

27   cost," *id.* ¶ 208.  The FCC expressly required BIAS providers to disclose, publicly and clearly,

28   any practices that block, throttle, or prioritize traffic for payment or to benefit an affiliate,

5

1   among other things.  *See id.* ¶¶ 218-223.  These disclosures, the FCC found, would enable the

2   FTC and states to "enforce any commitments made by ISPs," including the commitments that

3   ISPs have made to manage their networks in line with open Internet principles.  *Id.* ¶¶ 141-142.

4   The FCC also rescinded additional disclosure obligations that the 2015 Order had imposed,

5   finding that they imposed costs in excess of their benefits.  *See id.* ¶¶ 214-215, 224-226.

6   The 2018 Order also confirmed the FCC's longstanding (and bipartisan) determination

7   that BIAS is a "predominantly interstate" communications service that must be governed by "a

8   uniform set of federal regulations, rather than by a patchwork that includes separate state and

9   local requirements."  *Id.* ¶¶ 194, 199; *see also* 2015 Order ¶ 433 (announcing the FCC's "firm

10  intention" to preempt state actions "that would conflict with the federal regulatory framework or

11  otherwise frustrate federal broadband policies").  The FCC, therefore, expressly "preempt[ed]

12  any state or local measures that would effectively impose rules or requirements that [the FCC

13  has] repealed or decided to refrain from imposing in this order or that would impose more

14  stringent requirements for any aspect of broadband service" addressed in that order.  2018 Order

15  ¶ 195.  Preemption is necessary, the FCC explained, because state efforts to regulate in this area

16  "could pose an obstacle to or place an undue burden on the provision of broadband Internet

17  access service and conflict with the deregulatory approach" adopted in the 2018 Order.  *Id.*

18  **C.    SB-822 Adopts Rules That Conflict with the 2018 Order**

19  On September 30, 2018, California enacted SB-822.  The bill's sponsors made clear that

20  their goal was to undo the 2018 Order.  The author of SB-822 described it as "reflecting what

21  was repealed by the FCC last year."[4]  And he said further that SB-822 was designed to "step[ ]

22  in" and regulate BIAS after the FCC "abandoned net neutrality protections."[5]

23

24  [4] Press Release, *Senators Wiener and De Leon and Assemblymembers Santiago and Bonta Announce Agreement on California Bill with Strongest Net Neutrality Protections in the Country* (July 5, 2018), https://bit.ly/2QoftbL; *see also* Press Release, *Senator Wiener to Introduce Net Neutrality in California* (Dec. 14, 2017), https://bit.ly/2IwASwH (announcing "plans to introduce legislation to establish net neutrality protections in California after the Federal Communications Commission repealed national Net Neutrality regulations").

25

26

27

28  [5] Cal. Assembly Comm. on Communications & Conveyance, SB-822, at 6 (Aug. 22, 2018), https://bit.ly/2RfXJAw.

1    Reflecting those purposes, SB-822 resurrects 2015 Order rules the FCC had repealed,

2  including the no-blocking, no-throttling, and no-paid-prioritization rules, as well as the Internet

3  Conduct Standard.  *Compare* Cal. Civ. Code § 3101(a)(1), (2), (4), (7), *with* 2015 Order ¶¶ 15-

4  16, 18, 21; *see also id.* § 3101(b) (applying the rules in § 3101(a) to providers of mobile BIAS).

5  SB-822 also adopts a disclosure rule that restores the repealed disclosure regulation from the

6  2015 Order, rather than the regulation adopted in the 2018 Order.  *Compare* Cal. Civ. Code

7  § 3101(a)(8), *with* 47 C.F.R. § 8.3 (2016) *and* 47 C.F.R. § 8.1(a) (2018).

8    In addition, SB-822 goes beyond the 2015 Order.  First, SB-822 includes multiple

9  provisions that, while ambiguous, directly regulate BIAS providers' agreements for the

10  exchange of Internet traffic with edge providers and other Internet network operators.  SB-822

11  restricts BIAS providers from "entering into ISP traffic exchange agreements that . . . evade the

12  prohibitions contained" in §§ 3101 and 3102 and from "[r]equiring consideration, monetary or

13  otherwise, from an edge provider" in exchange for, among other things, "[d]elivering Internet

14  traffic to, and carrying Internet traffic from, the Internet service provider's end users."  Cal. Civ.

15  Code § 3101(a)(3), (9); *id.* § 3100(m) (defining ISP traffic exchange agreement).

16    Second, SB-822 adopts a bright-line rule that prohibits BIAS providers from "[e]ngaging

17  in zero-rating in exchange for consideration, monetary or otherwise, from a third party."  *Id.*

18  § 3101(a)(5).  And it also prohibits BIAS providers from "[z]ero-rating some Internet content,

19  applications, services, or devices in a category of Internet content, applications, services, or

20  devices, but not the entire category."  *Id.* § 3101(a)(6).

21    SB-822 is scheduled to take effect on January 1, 2019.  *See* Cal. Const. art. IV, § 8(c)(1).

22    **ARGUMENT**

23    SB-822 is unconstitutional in its entirety.  It is preempted under the Supremacy Clause

24  and violates the dormant Commerce Clause.  Plaintiffs' members will suffer irreparable harm

25  from being subjected to this unconstitutional state law during the pendency of this litigation.  In

26  addition, new Civil Code sections 3101(a)(3), (5), (6), and (9) threaten irreparable harm to

27  Plaintiffs' members if they take effect on January 1, 2019.  Preliminarily enjoining those

28  sections during the pendency of this litigation will preserve the status quo and will not harm the

State or California consumers; the 2018 Order's transparency regime and Plaintiffs' members' commitments, which are enforceable by the FTC and state attorneys general, will continue to ensure an open Internet.  A preliminary injunction will also respect Congress's allocation of judicial authority to review FCC decisions.  Plaintiffs therefore satisfy all of the requirements for a preliminary injunction:  they are likely to succeed on the merits, their members will suffer irreparable harm absent an injunction, the balance of the equities tips in Plaintiffs' favor, and the public interest favors an injunction.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Federal Law Preempts SB-822

#### 1.    *The 2018 Order Expressly Preempts SB-822*

**a.**    The FCC declared that federal law preempts state regulation "that would effectively impose rules or requirements that [the FCC] repealed or decided to refrain from imposing" or that would "impose more stringent requirements."  2018 Order ¶ 195.[6]  That is exactly what SB-822 does.  It imposes regulations that the FCC repealed in the 2018 Order and regulations that the FCC declined to impose in both the 2018 Order and the 2015 Order.

The FCC's express preemption of state laws like SB-822 is sufficient to satisfy Plaintiffs' burden of showing a likelihood of success on the merits, because California cannot collaterally attack that determination here.  In the Hobbs Act, Congress vested the federal courts of appeals with "exclusive jurisdiction . . . to determine the validity of all final orders of the Federal Communications Commission."  28 U.S.C. § 2342(1); *see* 47 U.S.C. § 402(a).  As the Ninth Circuit has repeatedly explained, because § 2342(1) "requires that all challenges to the validity of final orders of the FCC be brought by original petition in a court of appeals," *US West Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002), a court "must presume the validity of FCC regulations, rules, and orders that are currently in effect," *CallerID4u, Inc.*

---

[6] This express preemption also includes "any state laws that would require the disclosure of broadband Internet access service performance information, commercial terms, or network management practices in any way inconsistent with the transparency rule we adopt herein."  2018 Order ¶ 195 n.729.

1  *v. MCI Commc'ns Servs. Inc.*, 880 F.3d 1048, 1062 (9th Cir. 2018).  A district court, therefore,

2  "lack[s] jurisdiction to pass on the validity of the FCC regulations." *Jennings*, 304 F.3d at 958.

3  That is true even where a court "doubt[s] the soundness of the FCC's" decision; a court is "not

4  at liberty to review that interpretation" and, instead, is "required by the Hobbs Act to apply [the

5  FCC's decision] as it is written." *US West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055

6  (9th Cir. 2000), *as amended on reh'g* (Sept. 13, 2000).  California has filed a Hobbs Act petition

7  seeking direct review of the 2018 Order and has challenged the FCC's express preemption

8  ruling.[7]  That challenge is pending in the D.C. Circuit, which has exclusive jurisdiction to

9  review the 2018 Order; in the meantime, this Court and all others must presume its validity and

10  enforce it as written.

11        **b.**     In any event, that preemption ruling is lawful.  Agency regulations "have no less

12  pre-emptive effect" than federal statutes, even without "express congressional authorization to

13  displace state law." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982);

14  *see City of New York v. FCC*, 486 U.S. 57, 63-64 (1988); *see also National Fed'n of the Blind v.*

15  *United Airlines Inc.*, 813 F.3d 718, 738-40 (9th Cir. 2016) (affirming preemptive force of

16  Department of Transportation regulations).  In addition, a "decision to forgo regulation" carries

17  "as much pre-emptive force as a decision *to* regulate." *Arkansas Elec. Co-op. v. Arkansas Pub.*

18  *Serv. Comm'n*, 461 U.S. 375, 384 (1983); *see also United States v. Locke*, 529 U.S. 89, 109-10

19  (2000) (holding that federal regulations preempt where the agency "has promulgated its own

20  requirement on the subject or has decided that no such requirement should be imposed at all");

21  *New York State Comm'n on Cable Television v. FCC*, 669 F.2d 58, 66 (2d Cir. 1982) (rejecting

22  argument against preemption where FCC had not imposed regulation of its own).

23        The 2018 Order is a final agency order that has the "force and effect of federal law."

24  *Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015).  Congress granted the FCC —

25  and denied to states — the authority "to regulate all aspects of interstate communication by

26  wire." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984); *see* 47 U.S.C. § 152(a)-(b).

27  That authority includes determining whether a service is a telecommunications service or an

28             [7] *See Mozilla Corp. v. FCC*, No. 18-1051 *et al.* (D.C. Cir.).

1  information service, and whether a mobile service is a commercial or private mobile service.

2  *See*, *e.g.*, *National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980

3  (2005).  Services within the latter categories are immune from common carrier regulation.[8]  The

4  FCC has authority to preempt states from interfering with the FCC's classification decisions and

5  the substantive consequences that follow from them.  And courts have upheld the preemption of

6  state regulation of jurisdictionally interstate information services.  *See Charter Advanced Servs.*

7  *(MN), LLC v. Lange*, – F.3d –, 2018 WL 4260322, at *2, *4 (8th Cir. Sept. 7, 2018); *California*

8  *v. FCC*, 39 F.3d 919, 932-33 (9th Cir. 1994).

9       **c.**     Even apart from the 2018 Order's express preemption ruling, any state measure

10  that contravenes federal broadband policy is independently invalid under the doctrine of conflict

11  preemption.  *See*, *e.g.*, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 883-84 (2000)

12  (federal determination that statutory objectives, including promoting innovation, were best

13  achieved through less, rather than more, regulation had preemptive force under conflict

14  preemption principles).  SB-822 plainly "stand[s] as an 'obstacle' to the accomplishment" of the

15  federal policy of ensuring a uniform, light-touch regulatory framework for BIAS.  *Id.* at 885-86.

16  Therefore, conflict preemption would provide a sufficient basis for finding SB-822 preempted

17  even if the FCC had said *nothing at all* about preemption in the 2018 Order.  *See id.* at 884

18  (explaining that courts have "never . . . required a specific, formal agency statement identifying

19  conflict in order to conclude that such a conflict in fact exists"); *BellSouth Telecomms., LLC v.*

20  *Metropolitan Gov't of Nashville & Davidson Cty.*, 2017 WL 5641145, at *4-7 (M.D. Tenn. Nov.

21  21, 2017) (applying conflict preemption to find that FCC order preempted city ordinance that

22  stood as an obstacle to the FCC's chosen approach to regulating pole attachments, even though

23  FCC order did not include an express preemption ruling or otherwise address preemption).

24       2.     *SB-822 Conflicts with Congress's Prohibition on Common Carrier*
             *Regulation of Information Services and Private Mobile Services*

25       The Communications Act independently preempts SB-822.  Congress separated

26  interstate communications services into distinct categories, permitting common carrier

27

28       [8] *See* 47 U.S.C. §§ 153(51), 332(c)(1)(A), (c)(2); *Verizon*, 740 F.3d at 650.

regulation of some (telecommunications services and commercial mobile services) and prohibiting common carrier regulation of the others (information services and private mobile services).  In the 2018 Order, the FCC classified all BIAS as an information service and mobile BIAS as a private mobile service.  *See* 2018 Order ¶ 2.[9]  The FCC "would violate the Communications Act were it to regulate broadband providers as common carriers" while they are so classified.  *Verizon*, 740 F.3d at 650.

Those statutory provisions equally preclude *state* common carrier regulation, because regulating providers of information services and private mobile services as common carriers "stands as an obstacle" to Congress's decision to immunize them from such regulation.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Nation v. City of Glendale*, 804 F.3d 1292, 1299-300 (9th Cir. 2015) (holding Arizona statute preempted because it sought to frustrate a Secretary of Interior decision and stood as an obstacle to Congress's purposes as reflected in a federal statute).  SB-822 does just that:  it expressly seeks to regulate BIAS providers as common carriers when providing the same *interstate* service that the FCC has classified in a manner that makes them "statutorily immune . . . from treatment as common carriers."  *Cellco P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012); *compare* Cal. Civ. Code § 3100(b) (defining the BIAS service subject to regulation), *with* 47 C.F.R. § 8.1(b) (2018) (same).

Nor can there be any doubt that SB-822 imposes common carrier regulations.  When the FCC imposed the proscriptive rules and the Internet Conduct Standard that SB-822 replicates, the FCC acknowledged they were common carrier regulations.  *See* 2015 Order ¶¶ 288-296; *see also Verizon*, 740 F.3d at 650, 657-58 (striking down an earlier FCC attempt to impose such rules as common carrier obligations).  And when the FCC in 2015 subjected BIAS providers' Internet traffic exchange arrangements to case-by-case scrutiny for reasonableness, the agency likewise recognized that it was imposing common carrier obligations.  *See* 2015 Order ¶ 204.

Therefore, SB-822 is independently preempted because it imposes common carrier regulation on BIAS providers that are statutorily immune from such regulation by virtue of the

---

[9] The Hobbs Act immunizes the FCC's classification decisions from collateral attack in this proceeding.  *See*, *e.g.*, *CallerID4u*, 880 F.3d at 1062; *Hamilton*, 224 F.3d at 1055.

FCC's classification decisions.  That is true not only of the portions of SB-822 that replicate the common carrier regulations the FCC adopted in the 2015 Order, but also the portions of SB-822 that adopt common carrier rules the FCC considered and rejected in that order.  *See Verizon*, 740 F.3d at 657-58 (finding invalid provisions that leave "no room at all for 'individualized bargaining' ").

### B.    SB-822 Violates the Dormant Commerce Clause

#### 1.    SB-822 Regulates Extraterritorially

The dormant Commerce Clause preempts state laws that regulate outside the state's borders.  *See National Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993) (affirming invalidation of statute that would "force the [defendant]" to "regulate the integrity of its product in every state according to Nevada's . . . rules"); *Estate of Graham v. Sotheby's Inc.*, 860 F. Supp. 2d 1117, 1124 (C.D. Cal. 2012) (invalidating law regulating out-of-state transactions involving a California resident).  A law is extraterritorial where "the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Miller*, 10 F.3d at 639.  Such extraterritorial legislation is "*per se* invalid under the Commerce Clause."  *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986).

SB-822 is invalid because it both directly regulates and has the practical effect of regulating commerce outside of California.  As shown above, SB-822 regulates the transmission of data to and the receipt of data from "all or substantially all Internet endpoints" across the county and around the world.  Cal. Civ. Code § 3100(b).  The proscriptive rules and the Internet Conduct Standard apply with respect to Internet traffic sent to or originated by California customers, regardless of whether activities that allegedly violate those rules occur at BIAS provider equipment located inside or outside California.  In addition, other prohibitions and obligations in SB-822 appear not to stop at the California border but to extend to a BIAS provider's operations nationwide.  For example, SB-822's ambiguous restrictions on BIAS providers' agreements for Internet traffic exchange either reach the exchange of Internet traffic *outside* of California, since some of that traffic is delivered to or from California consumers, or

affect non-California consumers insofar as their Internet traffic is exchanged in California.[10]
Likewise, SB-822's prohibitions on zero rating encompass Internet traffic delivered to
customers in California from servers located outside of California.  Those prohibitions may also
prohibit BIAS providers from zero rating traffic either for their non-California customers while
they vacation in California or for their California customers while they travel outside the state.

In addition, "it is impossible or impracticable for ISPs to distinguish between intrastate
and interstate communications over the Internet or to apply different rules in each
circumstance."  2018 Order ¶ 200.  Therefore, a BIAS provider "could not comply with state . . .
rules for intrastate communications without applying the same rules to interstate
communications."  *Id.*  Indeed, the FCC expressly "reject[ed] the view" that "some aspects of
broadband Internet access service could theoretically be regulated differently in different
states."  *Id.* ¶ 200 n.744.  The FCC found instead that "it would not be possible for [California]
to regulate the use of a broadband Internet connection for *intrastate communications* without
also affecting the use of that same connection for *interstate communications*."  *Id.*  Courts have
likewise recognized that the "internet's geographic reach . . . makes state regulation
impracticable."  *American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003).
Therefore, it is " 'difficult, if not impossible, for a state to regulate internet activities without
projecting its legislation into other States.' "  *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1024
(E.D. Cal. 2017) (quoting *Dean*, 342 F.3d at 103) (alteration omitted).

Courts have repeatedly invalidated state Internet regulations due to their extraterritorial
reach.  *See id.* at 1025 (granting preliminary injunction of statute with practical effect of
governing out-of-state web content); *see also*, *e.g.*, *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239
(4th Cir. 2004) (invalidating a Virginia law that criminalized the dissemination of material over
the Internet because it necessarily regulates conduct occurring entirely out-of-state); *ACLU v.
Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (similar); *cf. North Dakota v. Heydinger*, 825
F.3d 912, 921 (8th Cir. 2016) (statute regulating electricity imported to Minnesota regulates

---

[10] *See* Declaration of Ken Klaer ¶¶ 5, 15-16 ("Klaer Decl.") (Ex. A); Declaration of Joe
Ruszkiewicz ¶¶ 5, 30-31 ("Ruszkiewicz Decl.") (Ex. B).

conduct "wholly outside" Minnesota because out-of-state power generators cannot identify and segregate Minnesota-bound electrons, and analogizing to the Internet).

One reason the dormant Commerce Clause forbids extraterritorial state regulation is that it creates an "impermissible risk of inconsistent regulation by different States." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987); *see Brown-Forman*, 476 U.S. at 583 (invalidating law where "proliferation" of similar state laws "greatly multiplied the likelihood that a seller will be subjected to inconsistent obligations in different States"); *Miller*, 10 F.3d 639-40 (affirming injunction of state statute inconsistent with similar state statutes). For example, in contrast to SB-822, which reinstates the FCC's repealed Internet Conduct Standard, New York's governor has issued an executive order that imposes an entirely different catch-all provision prohibiting ISPs from "requir[ing] that end users pay different or higher rates to access specific types of content or applications." N.Y. Exec. Order 175 (signed Jan. 24, 2018), https://on.ny.gov/2LBkRGY. Additional inconsistent state laws and executive orders also exist.[11] These inconsistent laws and the risk of additional ones further underscore that SB-822 violates the dormant Commerce Clause.

### 2.    *SB-822 Unduly Burdens Interstate Commerce*

SB-822 independently violates the dormant Commerce Clause because it imposes burdens that are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). A regulation burdens commerce if it "regulate[s] activities that inherently require a uniform system of regulation" or "impairs the free flow of materials and products across state borders." *National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1154-55 (9th Cir. 2012).

SB-822 significantly burdens interstate commerce. First, SB-822 regulates BIAS, which is a nationwide, interstate service that requires "a uniform set of federal regulations, rather than . . . a patchwork that includes separate state and local requirements." 2018 Order ¶ 194; *see also*

---

[11] As of today, eight other states — Hawaii, Montana, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington — have enacted laws or promulgated executive orders that seek to regulate BIAS providers. *See* National Conference of State Legislatures, Net Neutrality Legislation in States (Oct. 1, 2018), https://bit.ly/2y58AVb.

2015 Order ¶ 433 (adopting a "comprehensive regulatory framework governing [BIAS] nationwide" and stating its "firm intention" to preempt "inconsistent" state obligations).  Courts striking down state efforts to regulate the Internet have recognized that "the structure of the Internet bears a striking resemblance to a railroad, highway, or other means of interstate transportation," which likewise must be subject to uniform regulations. *Johnson*, 194 F.3d at 1162; *see also Southern Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 771 (1945) (invalidating state law governing train length because "national uniformity" in railroad regulations is "practically indispensable"); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527 (1959) (invalidating state regulation of mudguards on semi-trailers).  Like operators of interstate trains and commercial semi-trailers, "it is impossible or impracticable for ISPs to distinguish between intrastate and interstate" activities "or to apply different rules in each circumstance."  2018 Order ¶ 200.

Second, in the 2018 Order, the FCC found that common carrier regulation of BIAS providers "ha[d] resulted, and [would] result, in considerable social cost, in terms of foregone investment and innovation," with "no discernable incremental benefit relative to" the "pre-existing legal remedies, particularly antitrust and consumer protection laws."  *Id.* ¶ 87; *see id.* ¶¶ 88-154 (canvassing the record evidence).  The FCC reached the same conclusion with respect to the extension of common carrier obligations to Internet traffic exchange arrangements.  *See id.* ¶¶ 167-173.  In sum, the FCC found the "benefits of maintaining" common carrier regulation of BIAS "are approximately zero" and that doing so "would have net negative benefits" and "would decrease overall economic welfare."  *Id.* ¶ 312.

The FCC also reviewed the Internet Conduct Standard and the proscriptive rules that the 2015 Order adopted, and which SB-822 revives, and found that the "costs of each rule outweigh its benefits."  2018 Order ¶ 239; *see also id.* ¶¶ 246-266 (canvassing record evidence).  The FCC specifically found "little incremental benefit and significant cost to retaining the Internet Conduct Standard," which "created uncertainty and likely denied or delayed consumer access to innovative new services" and "different pricing plans that benefit consumers."  *Id.* ¶¶ 246, 249.  The FCC concluded that the "benefits of the Internet conduct standard are limited if not

approximately zero," while the "costs of the rule are considerable." *Id.* ¶¶ 317-318; *see id.*

¶¶ 319-323 (making similar findings regarding the proscriptive rules).

The FCC's findings on the costs and benefits of these rules, which are immune from

collateral attack here,[12] demonstrate that SB-822's burdens on interstate commerce are "clearly

excessive." *Pike*, 397 U.S. at 142; *Union Pac. R.R. Co. v. California Pub. Utils. Comm'n*, 346

F.3d 851, 871-72 (9th Cir. 2003) (invalidating state statute imposing performance-based

requirements on railroads because burden on commerce outweighs benefits to state); *Pioneer*

*Military Lending, Inc. v. Dufauchard*, 2006 WL 2053486, at *14 (E.D. Cal. July 21, 2006)

(enjoining, under *Pike*, California law requiring non-California lenders to get a California

business license because law imposed significant costs and benefits were insignificant).

## II.    SB-822 WILL SUBJECT PLAINTIFFS' MEMBERS TO IMMEDIATE AND IRREPARABLE HARM

Plaintiffs' members will suffer immediate and irreparable harm if SB-822 takes effect on

January 1, 2019, before this litigation is complete.  "[A]n alleged constitutional infringement

will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715

(9th Cir. 1997).  That is because "the interest of preserving the Supremacy Clause is

paramount." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 853 (9th Cir.

2009), *vacated and remanded on other grounds sub nom. Douglas v. Independent Living Ctr. of*

*S. Cal., Inc.*, 565 U.S. 606 (2012).  Thus, this Court recently "presume[d] that Plaintiff will

suffer irreparable harm based on [a] constitutional violation[ ]," namely the likelihood of success

"on [a] Supremacy Clause claim." *United States v. California*, 314 F. Supp. 3d 1077, 1096,

1098, 1112 (E.D. Cal. 2018); *see also Citicorp Servs. Inc. v. Gillespie*, 712 F. Supp. 749, 753-54

(N.D. Cal. 1989) (finding irreparable harm where plaintiff showed likelihood of success on its

Commerce Clause claim because Ninth Circuit "cases suggest that the alleged constitutional

violation alone should give rise to a presumption of irreparable harm"); *National Collegiate*

*Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J.) (holding that enactment of a law

---

[12] *See*, *e.g.*, *CallerID4u*, 880 F.3d at 1062; *Hamilton*, 224 F.3d at 1055.  California and other petitioners are challenging these findings before the D.C. Circuit.

"in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring the issuance of a permanent injunction"), *aff'd sub nom. National Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013).  Plaintiffs' showing that they are likely to succeed on their Supremacy Clause and dormant Commerce Clause challenges to SB-822 in its entirety satisfies the irreparable harm prong of the test for preliminary injunctive relief.

In addition, specific provisions of SB-822 will independently cause irreparable harm to Plaintiffs' members if permitted to take effect during the pendency of this litigation.  "[A] very real penalty [would] attach[ ] to [Plaintiffs' members] regardless of how they proceed" if these provisions took effect:  either monetary losses, forgone business opportunities and investments, and loss of substantial customer goodwill if members discontinue these practices, or the possibility of enforcement actions and interference in ongoing commercial agreements and negotiations if the practices continue.  *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill" can constitute irreparable harm); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (enforcement of state laws regulating airlines "would violate the Supremacy Clause, causing irreparable injury to the airlines" by "depriving [them] of a federally created right to have only one regulator").  The fact that Plaintiffs cannot recover those losses from the State, which enjoys sovereign immunity from damages actions, underscores the irreparable nature of the harm.  *See Pioneer Military*, 2006 WL 2053486, at \*18; *see also Odebrecht Constr., Inc. v. Secretary, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (collecting cases).

***California Civil Code § 3101(a)(3) and (9).***  Plaintiffs' members have entered into agreements with edge providers — companies such as Netflix, Google, and Apple that "provide[ ] . . . content, application[s], or service[s] over the Internet," Cal. Civ. Code § 3100(e) — that allow those edge providers to connect directly with the BIAS providers' network, in exchange for compensation, and are in the midst of negotiating additional such agreements.  *See* Klaer Decl. ¶ 7; Ruszkiewicz Decl. ¶ 37.  These agreements benefit the edge providers, Internet users, and BIAS providers.  An edge provider benefits because it can bypass the middlemen —

content distribution networks ("CDNs"), transit providers, and other Internet network operators — that it would otherwise pay to carry its content.  That benefits both the edge provider and the users, as the content can be routed more quickly and efficiently than when traffic is routed through middlemen.  The BIAS provider benefits because it can more effectively manage the often extremely large volumes of traffic that these edge providers route into its network.  That traffic would otherwise be delivered over one or more of the many different available routes into the BIAS provider's network, all of which it must independently manage to avoid congestion or other disruptions to its customers' Internet experiences.  *See* Klaer Decl. ¶¶ 14, 20, 25; Ruszkiewicz Decl. ¶¶ 19-22, 38.

SB-822 imposes ambiguous restrictions on BIAS providers' existing contracts for the exchange of Internet traffic with edge providers and others and exposes BIAS providers to the potential of immediate enforcement actions.  *See* Klaer Decl. ¶¶ 22-23; Ruszkiewicz Decl. ¶ 37. Although it is unclear what existing or new agreements will be claimed to constitute evasions of the prohibitions in SB-822, *see* Cal. Civ. Code § 3101(a)(9), the potential for such litigation threatens Plaintiffs' members with irreparable harm.  Such actions will impose significant financial costs on Plaintiffs' members and harm their reputations in the competitive marketplace for BIAS.  *See American Trucking*, 559 F.3d at 1057-58 (reversing denial of preliminary injunction and finding threat of enforcement proceedings constituted irreparable harm).  To the extent that Plaintiffs' members are forced to break off negotiations for new contracts, the result would be lost, unrecoverable business and revenue, harm to reputation and goodwill, and exposure to private suits for breach of contract.  *See* Klaer Decl. ¶ 21; Ruszkiewicz Decl. ¶ 39. The loss of "goodwill and revenue" also constitutes irreparable harm.  *Stuhlbarg*, 240 F.3d at 841; *see Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *6 (N.D. Cal. June 2, 2016).

The prospect that these provisions would become law has already delayed commercial negotiations over new direct interconnection agreements between a BIAS provider and at least two large edge providers.  *See* Klaer Decl. ¶ 19.  Those provisions will distort the outcomes of ongoing commercial negotiations with other edge providers and Internet network operators, some of which undoubtedly will claim that SB-822 entitles them to free interconnection with

ISPs.  *See id.*; Ruszkiewicz Decl. ¶ 39.  Making matters worse, SB-822 includes an ambiguous restriction on contractual waivers of these provisions.  *See* Cal. Civ. Code § 3104.

If the State or other entities claim that SB-822 regulates the nationwide exchange of Internet traffic, so long as that traffic is sent to or from California users of BIAS services, ISPs face the risk of having to alter their traffic exchange agreements and potentially to reconfigure their physical networks nationwide.  It is commercially impracticable to treat California Internet traffic differently from other Internet traffic.  *See* Ruszkiewicz Decl. ¶ 33; Klaer Decl. ¶ 16.  If the State or other entities instead claim that SB-822 regulates the exchange of all Internet traffic at points within California, some content-sending networks likely will seek to engage in arbitrage by routing traffic to interconnection points in California in an attempt to obtain increased interconnection capacity on ISPs' networks for free, thus causing significant additional congestion and disruption at ISPs' California facilities.  This could lead to congestion at the California interconnection points and under-utilization of interconnection points outside California, stranding investment.  *See* Klaer Decl. ¶¶ 24, 31-32, 34-35; Ruszkiewicz Decl. ¶¶ 34-35.  All of these harms will result in financial losses that ISPs can never recoup from the State.  *See*, *e.g.*, Klaer Decl. ¶¶ 23, 31, 36; Ruszkiewicz Decl. ¶¶ 34-35, 37-38.

***California Civil Code § 3101(a)(5) and (6).***  Plaintiff CTIA's members have developed offerings that "zero rate" certain content by excluding that content when calculating whether a customer has exceeded her monthly data allowance for mobile BIAS service.[13]  These offerings especially benefit consumers who purchase mobile BIAS plans that charge them a flat, monthly rate for a certain quantity of data, as those customers incur additional charges if they exceed that monthly data allowance.  Zero rating thus provides customers more data for the same money, while also benefiting the edge providers who encourage the use of their content by bearing the costs of the associated data usage on behalf of their customers.  Mobile BIAS providers also

---

[13] *See*, *e.g.*, AT&T, About Data Free TV, https://www.att.com/esupport/article.html#!/u-verse-tv/KM1131836; Sponsored Data from AT&T, https://www.att.com/att/sponsoreddata/en/index.html.

1  benefit, as the ability of customers to get more data for the same money makes their service

2  more attractive in the highly competitive marketplace for mobile BIAS.

3       SB-822 expressly prohibits these zero rating offerings.  *See* Cal. Civ. Code § 3101(a)(5),

4  (6).  A BIAS provider's continued compliance with its existing contracts with its customers —

5  which enable those customers to receive zero-rated content — is thus made an unlawful act.

6  Again, willing consumers, BIAS providers, and content providers could not all agree to continue

7  those zero rating offerings, or enter into new contracts for them, because SB-822 makes "any

8  waiver of the provisions of this title . . . unenforceable and void."  Cal. Civ. Code § 3104.

9       Sections 3101(a)(5) and (6) thus threaten to cause irreparable harm to CTIA's members

10  and to any other BIAS providers that introduce zero-rated offerings.  If CTIA's members

11  continue to perform under their existing contracts with their customers and providers of zero-

12  rated content, they will face the risk of enforcement actions under SB-822.  Such actions will

13  impose significant financial costs on CTIA's members, including potential civil penalties, and

14  harm their reputations in the competitive marketplace for mobile BIAS.  *See American*

15  *Trucking*, 559 F.3d at 1057-58.  If CTIA's members instead terminate their zero rating offerings

16  due to fear of imminent enforcement, the result would be lost, unrecoverable business and

17  revenue, harm to reputation and goodwill, and exposure to private suits for breach of contract,

18  all of which constitutes irreparable harm.  *Stuhlbarg*, 240 F.3d at 841; *Dish Network*, 2016 WL

19  3092184, at *6.

20  **III.  THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION**

21       The remaining factors also support entry of a preliminary injunction because "it would

22  not be equitable or in the public's interest to allow the state to continue to violate the

23  requirements of federal law."  *California Pharmacists*, 563 F.3d at 852-53.  The interest in

24  enforcing the Supremacy Clause is so strong that establishing a likelihood of success "also

25  establishe[s] that both the public interest and the balance of the equities favor a preliminary

26  injunction."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

27       In addition, the balance of equities tips sharply in Plaintiffs' favor because SB-822 has

28  not yet taken effect, and enjoining the law will simply "preserv[e] the status quo and prevent[]

the irreparable loss of rights before judgment." *Textile Unlimited*, 240 F.3d at 786.  That status

quo is a well-functioning interstate marketplace for BIAS in which the 2018 Order, which

protects Internet openness through a transparency regime, remains in effect.  That "transparency

promotes openness and empowers consumers."  2018 Order ¶ 244.  Plaintiffs' members, either

on their own or through their trade associations, have also made public commitments to preserve

core principles of Internet openness.  *See*, *e.g.*, *id.* ¶ 142 n.511.  The FTC can enforce these

commitments "if ISPs fail to live up to their word," as can state attorneys general under state

and federal unfair and deceptive trade practices laws (provided they enforce such commitments

in a manner consistent with federal law).  *See id.* ¶¶ 142, 196, 244.

On the other hand, the State will suffer no harm because the inability to enforce a statute

that is likely unconstitutional is not harmful.  *See Planned Parenthood Ariz., Inc. v. Betlach*, 899

F. Supp. 2d 868, 887 (D. Ariz. 2012); *Odebrecht Constr.*, 715 F.3d at 1289 (reasoning that the

"nebulous, not easily quantified harm of being prevented from enforcing one of its laws" is

insubstantial); *Trans World Airlines*, 897 F.2d at 784.  Likewise, a preliminary injunction serves

the public interest, which is reflected in the FCC's "decision[s] to deregulate," as well as in "the

Constitution's declaration that federal law is to be supreme."  *American Trucking*, 559 F.3d at

1059-60.  "Frustration of federal statutes and prerogatives are not in the public interest."

*California*, 314 F. Supp. 3d at 1112 (quoting *United States v. Alabama*, 691 F.3d 1269, 1301

(11th Cir. 2012)).  A preliminary injunction also serves the public interest in enforcing

Congress's allocation to the courts of appeals of exclusive jurisdiction to review FCC orders.

Just as this Court must presume the validity of the 2018 Order and apply it as written, the State

also has no authority to enact statutes that presume that the FCC's action is invalid.

## CONCLUSION

The Court should grant Plaintiffs' motion and preliminarily enjoin SB-822 in its entirety

or, at a minimum, California Civil Code § 3101(a)(3), (5), (6), and (9).[14]

---

[14] The Court should not require Plaintiffs to post a bond.  *See California Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E.D. Cal. 2011).  If the Court concludes that a bond is appropriate, the amount should be nominal because the State will suffer no damages from a preliminary injunction.  *See Planned Parenthood*, 899 F. Supp. 2d at 887-88.

1   Dated: October 3, 2018                    *Respectfully submitted,*

2                                             /s/  Marc R. Lewis

3   Scott H. Angstreich*                      Marc R. Lewis (CA SBN 233306)
    Brendan J. Crimmins*                      LEWIS & LLEWELLYN LLP
    Rachel Proctor May*                       505 Montgomery Street, Suite 1300
4   KELLOGG, HANSEN, TODD,                    San Francisco, CA 94111
      FIGEL & FREDERICK, P.L.L.C.             (415) 800-0591
5   1615 M Street NW, Suite 400               mlewis@lewisllewellyn.com
    Washington, DC 20036
6     (202) 326-7900                          *Attorney for Plaintiffs American Cable*
      sangstreich@kellogghansen.com           *Association, CTIA – The Wireless*
7     bcrimmins@kellogghansen.com             *Association, NCTA – The Internet &*
      rmay@kellogghansen.com                  *Television Association, and USTelecom –*
8                                             *The Broadband Association*

    *Attorneys for Plaintiffs CTIA – The Wireless*
9   *Association and USTelecom – The*
    *Broadband Association*                   Matthew A. Brill*
10                                            Matthew T. Murchison*
                                              Adam J. Tuetken*
11  Jeffrey A. Lamken*                        LATHAM & WATKINS LLP
    MOLOLAMKEN LLP                            555 Eleventh Street NW, Suite 1000
12  The Watergate, Suite 600                  Washington, DC 20004
    600 New Hampshire Ave., NW                (202) 637-2200
13  Washington, DC 20037                      matthew.brill@lw.com
    (202) 556-2000                            matthew.murchison@lw.com
14  jlamken@mololamken.com                    adam.tuetken@lw.com

15  *Attorney for Plaintiff American Cable*   *Attorneys for Plaintiff NCTA – The Internet*
    *Association*                             *& Television Association*
16

17

18  *Pro hac vice* motion to be filed

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that, on October 3, 2018, I electronically submitted the attached

3    document to the Clerk's Office using the U.S. District Court for the Eastern District of

4    California's Electronic Document Filing System (ECF) and will include this memorandum with

5    the Summons and Complaint to be served on Defendant in this case.

6

7

8                                                   /s/  Marc R. Lewis
                                                    Marc R. Lewis (CA SBN 233306)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28