# EXHIBIT A

Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD, FIGEL, & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless Association and USTelecom – The Broadband Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable Association*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
505 Montgomery Street, Suite 1300
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs American Cable Association, CTIA – The Wireless Association, NCTA – The Internet & Television Association, and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiff NCTA – The Internet & Television Association*

*Pro hac vice* motion to be filed

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. _____<br><br>**DECLARATION OF KEN KLAER OF COMCAST IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Courtroom:<br>Judge: |

I, Ken Klaer, declare as follows.

1. My name is Ken Klaer. I am Senior Vice President of Comcast Technology Solutions, a division of Comcast Cable Communications ("Comcast"). In this role, I am responsible for overseeing Comcast's commercial Internet traffic exchange arrangements with hundreds of networks, edge providers, and other third parties. I am also very familiar with Comcast's network infrastructure and practices. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

**Background on Interconnection and Comcast's Backbone Network**

2. Comcast is an Internet service provider ("ISP") that offers broadband Internet access service to mass-market customers in 39 states, including California, and the District of Columbia. Comcast currently has more than 24 million residential Internet customers and more than 2 million business Internet customers. In addition, Comcast has nearly 800,000 mobile Internet lines from its recently launched Xfinity Mobile service. Millions of these residential customers and nearly two hundred thousand business customers are located in California. Comcast is also a member of Plaintiff NCTA – The Internet & Television Association.

3. Internet traffic exchange involves the flow of data among the interconnected "network of networks" that comprises the "public Internet," including Comcast's advanced broadband network. The exchange of Internet traffic between networks is a fundamental and necessary function that makes the Internet work. It is also a core component of managing Comcast's network.

4. Comcast first began interconnecting with other networks over two decades ago, giving our Comcast customers access to all of the content, applications, and services offered over the Internet from "edge providers," which today include websites and online services such as Google, Netflix, Twitter, and countless others. Initially, Comcast did not have its own backbone network facilities. In order to send our customers' traffic out onto the global Internet, and to allow others on the Internet to reach our customers, Comcast relied on purchasing

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

"transit" services from providers with existing large network infrastructures, known as "backbone" providers, that serve as Internet network middlemen.

5. Fifteen years ago, Comcast decided to invest billions of dollars to build its own backbone infrastructure to offer a more robust network. Over this period, Comcast has invested in more than 145,000 miles of fiber, 18 backbone interconnection points (four of which are located in California), as well as 26 regional interconnect facilities across 22 regional markets (two of which are located in California). These interconnection points and facilities are now home to thousands of interconnection ports, supporting over 100 Tbps of capacity into Comcast's network. Comcast continues to add new ports as Internet use grows.

6. Our extensive investments have allowed Comcast to connect directly to major network providers on the Internet, creating a host of direct routes between Comcast's network and other providers' networks. Those routes allow providers to send their own end users' traffic directly to Comcast without using Internet middlemen, and also to send traffic from *other* providers through to Comcast's network (i.e., transit traffic). Likewise, Comcast uses those routes to deliver its own customers' traffic, and to send "transit traffic" from other entities through its network off to other networks across the Internet.

7. As Comcast built out its backbone capabilities, it also became possible to offer direct backbone connections to "one-way" networks, such as content delivery networks ("CDNs") and cloud services providers that are used to deliver online services to ISP networks, and eventually to very large edge providers that have their own facilities. These commercial arrangements allow for more efficient interconnection and exchange of Internet traffic with Comcast's expanding network. Today, these direct interconnection arrangements include other backbone providers (e.g., Level 3 and Zayo); CDNs (e.g., Akamai); major edge providers (e.g., Netflix, YouTube, and Yahoo); and other ISP networks (e.g., Charter, Cox, and AT&T). Some providers are hybrids of these categories (e.g., edge providers that also offer CDN or cloud services).

2

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

8. The various backbone connections that Comcast and all other major players on the Internet have established are typically documented in so-called "interconnection agreements" (and sometimes also rely on interconnection policies published on providers' network websites). Generally speaking, these interconnection agreements include specific terms for adding capacity to existing interconnection points (on Comcast's or the other provider's facilities) and/or require capacity reviews at pre-set intervals to discuss and evaluate the needs of each interconnecting party, consider traffic growth projections and geographic routing needs, and the like. Interconnection agreements enable both parties to plan for Internet traffic growth and to ensure that there is sufficient capacity at both parties' interconnection points to accommodate the traffic volumes of each interconnection partner. This helps to avoid system "congestion," which can delay and disrupt the delivery of traffic to both partners' customers and impair their Internet experience. Because Comcast and its interconnection partners also offer transit across their networks onto *other* providers' networks, the effects of such congestion can be far-reaching.

9. While Comcast's backbone investments allow it to offer direct interconnection arrangements to edge providers, these arrangements are entirely optional for edge providers. The majority of edge providers do not engage in direct arrangements with Comcast. Typically, only large edge providers that have their own network facilities opt for a direct connection arrangement with Comcast, because they have the capacity to reach various backbone (or regional) interconnection points. Other edge providers rely on the dozens of third-party transit providers, CDNs, and other intermediary networks that act as middlemen and offer alternative routes for the delivery of traffic to Comcast or other ISPs' networks.

10. That said, many edge providers and other interconnecting parties prefer – for economic, technical, and other reasons – to enter into interconnection agreements with Comcast so that they can route their traffic directly to Comcast's network (and on to its end user customers) and bypass intermediary, third-party networks. These direct interconnection arrangements can provide more reliable and consistent delivery of content (due in part to fewer

3

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

hops over which the traffic must travel), thereby improving the experiences of our customers. Providers can also work out customized arrangements that meet their geographic needs or address specific routing requirements they may have.

11. Comcast's interconnection agreements reflect the particular needs and attributes of each interconnecting partner. For example, consistent with well-established market practices, Comcast provides "settlement-free" interconnection, primarily to other large backbone and transit providers that offer a generally balanced exchange of traffic with Comcast. "Settlement-free" simply means that no monetary payment is made in either direction; the exchange of traffic is the sum total of the parties' mutual consideration.[1] Comcast has dozens of such agreements.

12. In other cases, where the exchange of traffic and value is significantly out of balance, it is common for the interconnection arrangement to involve payment (in one direction or the other), at least for the portion of traffic that is out of balance. As of the end of 2017, Comcast had approximately 100 commercial Internet interconnection contracts that involve payment in some form, including with many large edge providers and with CDNs such as Akamai, Limelight, and Cloudflare.

13. Moreover, interconnecting partners often agree to share the costs of upgrading capacity at interconnection points caused by shifts in traffic volumes or flows. Several of Comcast's more significant interconnection agreements also involve other terms – including payment terms for various additional or related services – that reflect the parties' broader commercial relationship.

14. Each of these different interconnection agreements reflects a mutually beneficial arrangement between Comcast and the interconnecting partner. Because the Internet is an inherently two-sided marketplace – where end-user customers and network and content

---

[1] Settlement-free arrangements may also be appropriate where the parties have other ways to provide each other with mutual value in connection with the interconnection investment, other than monetary payment, such as with providers of Root DNS services (e.g., Internet Systems Consortium), that are a critical part of the Internet infrastructure.

4

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

providers all use and benefit from the overall network – interconnection agreements provide a means to ensure that the costs are spread fairly and not borne solely by end-user customers through broadband Internet subscription rates.  Our paid interconnection agreements, in particular, help to ensure that no provider and its customers are saddled with funding the network costs imposed disproportionately by another, and provide market-driven incentives for interconnecting parties to exchange Internet traffic in an efficient and predictable manner that best serves the end-user customers.

15.    Further, as I noted above, Comcast exchanges Internet traffic at the dozens of network facilities it has built around the country, including the four backbone interconnection points and two regional interconnection points within California.  The geographic diversity of these facilities is another key feature of Comcast's network that enables Comcast to manage Internet traffic efficiently and effectively.  Under its interconnection agreements, Comcast and its interconnecting partners typically seek to ensure that these geographically diverse interconnection points are put to their most efficient use.  Comcast's settlement-free interconnection agreements, for example, require interconnection at a minimum of four such geographically diverse interconnection points to help maintain a balanced flow of traffic across interconnection points.  Commercial interconnection arrangements may cover a substantial number, if not all, of these interconnection points, or may provide for more selective interconnection deeper into the network at our regional hubs.

16.    There is no requirement for Internet traffic originating with or delivered to an end-user customer located in California to be exchanged at a traffic exchange point located within California. Depending on Internet traffic volumes at any particular moment, traffic from or to California may be routed over any part of Comcast's backbone infrastructure or the Internet more broadly to provide the most efficient delivery.  For similar reasons, is it not technically feasible for Comcast to treat Internet traffic both to and from California separately from all other Comcast Internet traffic.

**Harms Caused by SB 822's Prohibition on Consideration from Edge Providers**

17. I understand that SB 822 prohibits ISPs like Comcast from "requiring consideration, monetary or otherwise, from an edge provider" for "delivering Internet traffic to, and carrying Internet traffic from, the Internet service provider's end users" and for "avoiding having the edge provider's content . . . impaired or degraded." The legislation also prohibits ISPs from "engaging in practices that have the purpose or effect of evading" various net neutrality prohibitions through "ISP traffic exchange" arrangements made with, among others, "an edge provider, content delivery network, or other network operator." And it decrees that "any waiver of [these] provisions is contrary to public policy and shall be unenforceable and void." Due to the broad and ambiguous wording of these paid interconnection provisions in SB 822, Comcast fully expects that some edge providers and even intermediary networks, such as CDNs and transit providers, will assert that the law prohibits Comcast from receiving consideration for interconnecting and exchanging Internet traffic.

18. Although Comcast believes that the paid interconnection provisions in SB 822 can and should be read more narrowly, these provisions will nonetheless impose irreparable harms to Comcast if allowed to take effect. These harms will occur immediately, as different parties assert divergent and conflicting commercial expectations for Internet traffic exchange and seek to take advantage of the law to avoid sharing the costs of interconnection that they traditionally have paid. And these harms will also be long-term if the broad restrictive view of the paid interconnection provisions advocated by some entities are adopted by the California Attorney General or a California state court.

*Loss of Interconnection Partners, Revenues, and Goodwill*

19. The paid interconnection provisions will harm Comcast's ability to enter into new, mutually beneficial interconnection agreements with edge providers that involve consideration, leading to a loss of existing and prospective interconnection partners and significant lost revenues. In fact, Comcast has been engaged in discussions with at least two large edge providers about entering into new interconnection agreements that would involve

6

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

monetary consideration.  The prospect of SB 822's enactment and its ambiguous "prohibition" on paid interconnection have already delayed these commercial negotiations.  If the law becomes effective, it will likely be the death-knell of these commercial discussions, as it would put Comcast in the untenable position of risking an enforcement action or litigation by entering into interconnection agreements that could be claimed – and ultimately deemed by the California Attorney General or a California state court – to violate SB 822's paid interconnection provisions.  Our ability to negotiate new paid interconnection agreements with other edge providers will likewise be harmed.

20. Notably, reading SB 822 to ban paid interconnection, as some entities will no doubt do, is unlikely to save most edge providers any money.  Rather than connecting directly to Comcast, they will now likely pay a third-party transit provider, such as Cogent, to reach Comcast's network.  So while middlemen such as Cogent will make money by routing additional traffic onto Comcast's network, Comcast and other ISPs will not be able to offer these edge providers competing paid interconnection services, which could be more efficiently and economically desirable for both parties.  At the same time, Comcast's costs of supporting the network will also rise since we will be deprived of a source of contribution to our Internet network costs.  In other words, one portion of the two-sided Internet marketplace will be significantly interrupted, which will shift the costs onto Comcast's end users.  In addition, larger edge providers will not be able to enjoy the benefits of direct interconnection with Comcast on mutually beneficial terms, which include joint capacity planning to handle growth, service level agreements, outage escalations, and so on.

21. Together, these effects of SB 822 will harm our customers, resulting in a loss of good will and damage to our reputation as an ISP.  The loss in revenues and other monetary damages that the law will cause to Comcast will also be significant and are difficult to calculate.  In any event, I understand that money damages would not be recoverable from California due to sovereign immunity principles.

***Harms Under Existing Commercial Interconnection Agreements***

22. Comcast's existing paid interconnection agreements with edge providers and others will be under a similar legal cloud, leaving Comcast vulnerable to the risk of immediate enforcement action or other litigation, disruption to its business operations, and further loss of customers, revenues, and good will.  For example, the California Attorney General, or one (or more) of our direct-interconnection edge provider partners, could contend that the compensation provisions in our existing interconnection agreements are void or unenforceable under SB 822.  Edge providers could seek to legally compel us to provision additional network capacity without any reciprocal consideration, or refuse to pay invoices for interconnection and force us to sue for non-payment.  Similarly, as existing interconnection agreements come up for renewal, or require additional network capacity, edge providers may expect Comcast to continue these arrangements but now without cost to them (i.e., for free) and at Comcast's sole expense.

23. This will put Comcast to an untenable "Hobson's Choice":  either (a) forgo the revenues that it would otherwise be entitled to, and absorb all of the costs for direct interconnection, to avoid harmful disruption of our Internet service and potential enforcement actions by the State for noncompliance with SB 822, (b) terminate its direct interconnection arrangements with these edge provider partners, resulting in lost revenues and likely causing increased traffic and congestion on third-party routes, which would degrade the customer experience and harm Comcast's good will and reputation (among other things, our customers may wrongly conclude that Comcast is "throttling" content along these routes), or (c) engage in protracted and disruptive litigation with its interconnection partners to have each agreement declared lawful.  Under any of these options, monetary damages would not adequately compensate Comcast for these harms, even if we could somehow recover them from the State.

***Harms to Comcast from a Broader Disruption of the Network Ecosystem***

24. In addition, some entities are likely to read the paid interconnection provisions in SB 822 to include intermediary networks, like CDNs and transit providers, rather than applying

8

only to edge providers. This potential application of the law would upend the backbone ecosystem.

25. For example, I understand that Cogent, a transit provider, was among the interested stakeholders that actively lobbied for the paid interconnection provisions. The broad and ambiguous prohibition on paid interconnection, coupled with the non-"evasion" and non-waiver provisions of SB 822, provide ample fodder for Cogent (and possibly even the California Attorney General) to claim that the ban on paid interconnection extends to transit providers like Cogent directly or as potential agents of or "proxies" for edge providers. As a consequence, the third-party routes onto which edge provider Internet traffic is re-directed will themselves be in turmoil under SB 822.

26. As background, both edge providers and the intermediary networks that carry edge providers' traffic for a fee (e.g., CDNs and transit providers like Cogent) dictate the path that their traffic will travel to reach Comcast's network. Based on incidents of Internet congestion that occurred in 2013-2014, an authoritative independent study confirmed that most of these congestion incidents were attributed to "decisions by content providers as to how to route content" as part of "recognized business issues" (i.e., commercial disputes or arbitrage).[2] As a later version of the study concluded, Internet "congestion can more or less instantly shift (in a day or so) from one path to another . . . . [A] content provider can shift a huge fraction of traffic from that [one] link to another link overnight."[3] Direct interconnection agreements alleviate these tactics by removing intermediary networks as middlemen. As these same researchers recently concluded, the incidence of "persistently congested transit links . . . –

---

[2] MIT Information Policy Project, *Measuring Internet Congestion: A Preliminary Report* 2 (2014), http://laweconcenter.org/images/articles/appa_clark-measuring_internet_congestion.pdf.pdf.

[3] David Clark et al., *Measurement and Analysis of Internet Interconnection and Congestion* 9-10 (2014), https://groups.csail.mit.edu/ana/Measurement-and-Analysis-of-Internet-Interconnection-and-Congestion-September2014.pdf.

9

Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

regardless of cause – implies clear motivation for large players to engage in direct peering negotiations" (i.e., direct interconnection agreements).[4]

27.     To be sure, Comcast has experienced incidents where both settlement-free peers and CDNs have manipulated their traffic to congest certain Comcast interconnection points, thereby degrading Internet service for our customers, in an attempt to extract perceived benefits from us.  For example, in 2013-2014, Cogent sold transit service to Netflix and other content providers at a significant discount, who then began rerouting large amounts of traffic over Cogent's interconnection ports with Comcast.  Cogent's traffic into Comcast's network grew by nearly *500 percent* over a very short time period, overwhelming Cogent's existing spare capacity and additional capacity that Comcast supplied on a complimentary basis in the hopes of encouraging a commercial solution with Cogent.  This congestion not only affected popular content, but also disrupted traffic from other business customers of Comcast and Cogent.  Cogent later admitted that it had created "at least two priority levels (a 'fast lane' and 'slow lane')" in 2014 that resulted in the de-prioritization of Netflix traffic.[5]

28.     Throughout this period, Cogent refused to discuss any kind of commercial arrangement with Comcast.[6]  The congestion at the Cogent links only disappeared after Netflix

---

[4] Amogh Dhamdhere et al., *Inferring Persistent Domain Congestion* 13 (2018), http://www.caida.org/publications/papers/2018/inferring_persistent_interdomain_congestion/inferring_persistent_interdomain_congestion.pdf.

[5] Dan Rayburn, *Cogent Now Admits They Slowed Down Netflix's Traffic, Creating a Fast Lane & Slow Lane*, STREAMINGMEDIABLOG.COM (Nov. 5, 2014), https://www.streamingmediablog.com/2014/11/cogent-now-admits-slowed-netflixs-traffic-creating-fastlane-slow-lane.html.

[6] Since 2002, Cogent has been involved in at least 10 similar peering disputes with AOL, Verizon, Level 3, Sprint, France Telecom, ESNet, Telia, China Telecom, and others. *See* Cybertelecom, *Industry:  Cogent*, http://www.cybertelecom.org/industry/cogent.htm (detailing Cogent's peering disputes) (last visited Sept. 20, 2018); *see also* Press Release, CenturyLink-Level 3, *Level 3 Issues Statement Concerning Internet Peering and Cogent Communications* (2005), http://news.centurylink.com/news?item=125153 ("Cogent was sending far more traffic to the Level 3 network than Level 3 was sending to Cogent's network.  It is important to keep in mind that traffic received by Level 3 in a peering relationship must be moved across Level 3's network at considerable expense.  Simply put, this means that, without paying, Cogent was using far more of Level 3's network, far more of the time, than the reverse.  Following our

and Comcast entered into a contract addressing multiple aspects of their business relationship, including all interconnection needs and direct connections into Comcast's network.  This commercial arrangement effectively removed Cogent as an intermediary for Netflix, eliminating Cogent's ability to engage in such traffic exchange arbitrage (at least with respect to Netflix's substantial traffic).[7]

29.     In similar incidents, other intermediary networks, in addition to Cogent, have intentionally routed traffic over certain interconnection links that were already congested, despite the availability of other non-congested links into Comcast's network, in further attempts to subsidize their operations by shifting unfair costs onto Comcast and its customers.

30.     In each incident, and regardless of the actual underlying facts, Comcast has borne the brunt of criticism from affected customers for any degraded experience due to traffic congestion caused by the transit provider or CDN.  Because Comcast has the direct relationship with the end-user customer, its customer service call centers were flooded with complaints, requiring additional staffing and related costs.  We suffered a loss of good will, harm to our reputation as an ISP, and even loss of Internet customers to other broadband providers.

31.     The same harms will occur if the paid interconnection provisions in SB 822 are read to extend to intermediary networks, *and, in fact, will be even worse* because SB 822 would restrict the option Comcast and other ISPs currently have to alleviate these harms through direct commercial interconnection agreements with edge providers, which some intermediary networks will claim are now prohibited.  For example, intermediary networks will contend that Comcast and other ISPs must provide unlimited free capacity to them for their delivery of *other* parties' (i.e., edge providers') traffic onto Comcast's networks.  Conceding to these demands and providing this interconnection capacity for free to intermediary networks will again increase our network support costs, and give intermediary networks an unfair market advantage to

---

review, we decided that it was *unfair for us to be subsidizing Cogent's business*.") (emphasis added).

[7] David Clark et al., *Measurement and Analysis of Internet Interconnection and Congestion* at 9-10.

1  generate revenues by selling delivery to Comcast's network to edge providers at high margins.
2  It will also significantly disrupt and harm our Internet services.
3      32.     And even if Comcast rejects such demands by intermediary networks, the legal
4  uncertainties created by SB 822 will likely result in a commercial stalemate and have to be
5  resolved through protracted litigation.  All the while, it will cause significant disruption to
6  Internet traffic exchange and impose substantial interconnection costs on Comcast and its
7  customers.  These harms will only worsen during the impasse, since these intermediary
8  networks will be operating a highly profitable, essentially cost-free "highway" into the Comcast
9  network and thus be incentivized to constantly increase the amount of transit they sell to our
10 network and attempt to force Comcast to increase capacity for free to avert having our
11 customers' experience degraded.

***Additional Risks of Harm to Comcast From the Paid Interconnection Provisions***

13      33.     As noted above, this problem would not be unique to California because traffic is
14 routed to California from throughout the country and vice versa.  But even if the State disavows
15 any intention for the paid interconnection provisions to apply outside of California, and instead
16 claims that the law only regulates the exchange of Internet traffic in the State, SB 822 will still
17 harm Comcast and its broadband Internet customers in numerous ways.
18      34.     Under this view of the law, the ambiguous prohibition on paid interconnection
19 and non-"evasion" and non-waiver provisions in SB 822 will still be seen by intermediary
20 networks as an invitation to the same kind of interconnection arbitrage described above.  Only
21 this time, intermediary networks will be incentivized to route substantial amounts of their
22 Internet traffic, destined both for California and non-California end users, to Comcast's
23 interconnection points in the State.  Such artificial re-routing of traffic will cause significant
24 congestion and disruption at our California facilities, degrading and slowing Comcast's ability
25 to deliver Internet content to its customers in the State.  And even though this network
26 congestion will be caused solely by edge providers and/or intermediary networks rerouting
27 Internet traffic to flood our interconnection links in California, a large percentage of our
28

1  customers (and many in the media) will again blame Comcast for such service disruptions.
2  Meanwhile, intermediary networks will contend that they are entitled to obtain increased
3  interconnection capacity on Comcast's network for free to relieve this congestion, which they
4  will then resell at high margins to their edge provider customers.

5       35.     The vast amount of data and the variability in the timing of traffic flows across
6  the Internet will also make it infeasible for Comcast or other ISPs to effectively plan for or
7  manage such abuses of its California facilities.  For starters, Comcast would need to install new
8  network infrastructure or, in some cases, even arrange for more space and power to
9  accommodate new interconnection demands from intermediary networks, all while leaving
10 significant existing interconnection capacity with edge providers and other networks lying
11 fallow and stranded.  Depending on how much work is required, this process can take six to
12 eight weeks, on average, for each upgrade, during which time Comcast end user customers and
13 commercial partners, as well as other networks interconnected with Comcast's networks – both
14 within and outside of California – would continue to experience congestion and degraded
15 service.

16      36.     Nor would it be feasible for Comcast to avoid these harms by relocating its
17 interconnection exchange points outside of California.  These facilities are located to help
18 optimize our network infrastructure for the exchange of Internet traffic in California, where
19 some of the heaviest usage of our network occurs, as well as in surrounding states.  Moving
20 these facilities out of the State would increase the latency (i.e., delays in content delivery) that
21 our customers in California experience, degrading their broadband Internet service.  It would
22 also cost millions of dollars in unrecoverable expense and be highly disruptive to our business
23 operations.

24      ***Harms Caused by Conflicting State Net Neutrality Laws***

25      37.     Although California has been at the forefront of enacting legislation to reinstate
26 the net neutrality rules rescinded by the Federal Communications Commission ("FCC"), to date
27 at least three other states (Washington, Oregon, and Vermont) have enacted state-specific net
28

13
Declaration of Ken Klaer of Comcast in Support of Plaintiffs' Motion for Preliminary Injunction

1  neutrality legislation.  And six states (Hawaii, Montana, New Jersey, New York, Rhode Island,
2  and Vermont) have issued executive orders establishing state-specific net neutrality obligations.
3  There is significant variation among these state measures.  For example, while SB 822 reinstates
4  the FCC's repealed Internet Conduct Standard, the New York executive order imposes an
5  entirely different catch-all provision prohibiting ISPs from "requir[ing] that end users pay
6  different or higher rates to access specific types of content or applications."  *See* New York EO-
7  175 (signed Jan. 24, 2018), *available at* https://on.ny.gov/2LBkRGY.  Because Comcast's
8  Internet services are inherently interstate, it will be impossible or impracticable for Comcast to
9  apply California's requirements to Internet packets as they move through California, and then to
10 apply New York's requirements when those packets travel through New York.

11     38.   Allowing SB 822 to take effect will expose Comcast to a patchwork of
12 inconsistent and burdensome regulation and immediately impair our ability to provide Internet
13 services in California and other parts of the country.  These harms will only multiply as other
14 states enact net neutrality legislation, and different agencies and courts in different states
15 interpret and enforce each state's requirements differently as applied to Comcast's Internet
16 services.

17                     **The Requested Injunction Will Not Harm Others**

18     39.   In contrast to the irreparable and imminent harms that SB 822 will cause to
19 Comcast, its broadband Internet customers, and numerous commercial interconnection partners,
20 the requested injunction will not harm edge providers.  Comcast has no incentive or ability to
21 block or degrade content from edge providers under its existing interconnection agreements.
22 Such tactics would not only cause significant disruption of our customers' enjoyment of their
23 broadband service (and result in some of them switching Internet providers), but would also
24 violate our contractual obligations to our interconnection partners.  The requested injunction
25 would not harm transit providers, CDNs, or other intermediary networks that interconnect with
26 Comcast, either, because it would simply maintain the status quo.  Based on my industry
27 experience, and as the FCC has noted repeatedly, the interconnection marketplace has been
28

1  functioning effectively for many years *without* SB 822, and will continue to do so if the
2  requested injunction is granted.[8]

---

[8] *See, e.g., Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 ¶ 18 (2018) (observing that the Internet has flourished "for almost twenty years" under a "light-touch bipartisan framework").

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 27th day of September 2018 in Denver, Colorado.

Ken Klaer
SVP, Comcast Technology Solutions
Comcast Cable Communications