# EXHIBIT B

Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD, FIGEL, & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless Association and USTelecom – The Broadband Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable Association*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
505 Montgomery Street, Suite 1300
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs American Cable Association, CTIA – The Wireless Association, NCTA – The Internet & Television Association, and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiff NCTA – The Internet & Television Association*

*Pro hac vice* motion to be filed

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. _____<br><br>**DECLARATION OF JOE RUSZKIEWICZ OF AT&T IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Joe Ruszkiewicz, declare as follows.

1.     I, Joe Ruszkiewicz, am Assistant Vice President–Product Marketing Management at AT&T, a member of plaintiffs USTelecom and CTIA. I have worked in this position since 2005 and for AT&T since 1986. I have been personally involved in the negotiation and administration of interconnection agreements. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2.     AT&T believes in and is committed to an open Internet. It has clearly and unequivocally stated, including in enforceable commitments, that it does not block consumers from accessing lawful content or engage in discriminatory throttling of content. Central to the proper functioning of an open Internet are efficient and commercially reasonable interconnection arrangements. As I explain below, the interconnection provisions of SB 822 will not further an open Internet. Instead, they will threaten the efficient and commercially reasonable interconnection arrangements on which the Internet depends.

## Summary

3.     AT&T provides broadband Internet access to mass-market customers nationwide, including in California. To bring those customers the content and connectivity they demand, AT&T has negotiated numerous commercial "interconnection" agreements for the exchange of Internet traffic with other networks on the Internet.

4.     AT&T and the entities with which it interconnects route traffic along many paths connecting millions of Internet users. The terms of AT&T's interconnection agreements are carefully negotiated to specify the types and locations of traffic-exchange facilities as well as the financial responsibilities undertaken by each network to augment capacity amid rapidly escalating Internet usage. These interconnection arrangements, along with those between third

Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

parties, support the modern Internet and enable it to function properly in this highly dynamic environment.

5. These private agreements have long been free of prescriptive regulation by any governmental authority. I understand, however, that SB 822 purports to regulate such agreements and may be construed to prohibit payment for direct interconnection in many circumstances. *See* § 3101(a)(9) (regulating "ISP traffic exchange" agreements deemed by California authorities to "evad[e]" state net neutrality requirements); *see also* § 3101(a)(3) (prohibiting a broadband Internet access provider from "[r]equiring consideration" from "edge provider[s]" in exchange for "[d]elivering Internet traffic" to its end users). Enforcement of this new legislation threatens to involve regulators in the minute details of carefully reticulated interconnection agreements—deciding, for example, when particular networks are entitled to "free interconnection," at what physical locations, and at what levels of capacity. Such unprecedented regulatory intervention would threaten the interconnection arrangements supporting the modern Internet and impair network performance to the detriment of network operators and their customers. That outcome would not only disserve the public interest, but cause AT&T substantial irreparable harm.

6. First, because the Internet is agnostic as to state political boundaries, the state-specific nature of SB 822 creates enormous uncertainty about its practical application and would create incentives to engage in highly inefficient forms of "geographic arbitrage." The statute seems to ignore the commercial realities that (1) interconnection agreements involve traffic-exchange points both inside and outside of California, and (2) any given interconnection point (wherever located) is used to route enormous volumes of Internet traffic to many different fixed and mobile customers, some of whom are likely in California and most of whom are likely in other states besides California. It would be impossible any time in the foreseeable future to

segregate the terabytes of Internet data exchanged at these interconnection facilities on the basis of the state jurisdictions where individual Internet packets originated or are headed.  Thus, if this statute applies to interconnection for any communication with an origination point or an endpoint located in California, no matter where the traffic is exchanged, it will effectively govern—and thus distort—all interconnection arrangements nationwide, even for Internet traffic that never touches California.  Meanwhile, other states are considering their own versions of net neutrality legislation, and to the extent another state adopts a different interconnection regime, it would conflict with California's, leaving AT&T no way to comply with both.

7.     Even if SB 822 applies to traffic exchange in California only, that will create incentives for major networks to drive more of their AT&T-bound traffic at California traffic-exchange locations not for any sound engineering reason, but simply to avail themselves of asserted state-law rights to "free interconnection."  That outcome could cause significant congestion at interconnection points throughout California, harming the Internet experience of AT&T's customers.  The networks that deliver this extra traffic into California traffic-exchange points could then blame AT&T for the congestion that they themselves have caused and the ensuing degradation of Internet performance.  And they could cite those consequences as a reason for compelling AT&T to incur the costs of augmenting the facilities needed to accommodate all of this excessive traffic.  This is precisely the strategy that certain companies undertook in 2014 in their unsuccessful effort to persuade the FCC to regulate their interconnection agreements with AT&T and others.

8.     More broadly, even the threat of regulatory intervention in the highly interdependent terms of these agreements would destabilize commercial negotiations by undermining ordinary incentives to compromise on individual issues in order to reach a mutually agreeable solution.  For example, in contexts where payment mechanisms are

3
Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

necessary to ensure efficient interconnection arrangements, one party could hold out in hopes of persuading a state regulator to excuse it from paying anything, thereby increasing the risk that no agreement will be reached and that efficient interconnection arrangements will be abandoned. Regulatory gamesmanship would replace sound economic and engineering considerations as the principal driver in negotiations about how traffic is managed, when facilities are augmented, who pays for what, and all other issues that arise in this complex area.

9. In sum, these and the other practical consequences of SB 822, discussed below, would irreparably harm AT&T and its customers in California and across the nation if the legislation takes effect.

**Overview of Internet Interconnection Arrangements**

10. The Internet is a "network of networks" that uses a common addressing scheme to enable computers on one network to find computers on other networks and communicate with them. Before a user on one of the Internet's constituent networks can communicate with a user on another network, the two networks must connect with each other, either directly or indirectly. Networks have long achieved such interconnection through "peering" and "transit" agreements, which have been unregulated since the beginning of the commercial Internet in the mid-1990s.

11. Peering is a private commercial arrangement under which two "peer" Internet providers interconnect *directly* and exchange traffic. Each peer provides the other with access only to its own customers rather than to the entire Internet. For example, in the following diagram, Network C has a peering relationship with both Network A and Network B, but Network A does not have a peering relationship with Network B:



Because Networks A and B do not interconnect directly, they need to find an alternative, *indirect* means of connecting their respective customers.

12. Transit is a key means of achieving such indirect interconnection. When a network sells "transit," it ensures the delivery of its customers' traffic to virtually any Internet destination. For example, suppose that Network A serves a large content provider and Network B serves some of that content provider's customers. Network C can sell transit services to Network A (which becomes its transit customer) to enable the content provider's traffic to reach Network B's end users:



13. In this scenario, Network A pays Network C for the transit service that enables Network A's customers (including content providers) to reach the customers (including end users) of Network B and the other peers of Network C. Significantly, however, *many additional networks* besides Network C also peer with (or provide transport services to) Network B and thus stand ready to compete with Network C in selling transit services to Network A. As a

5

Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

result, the marketplace for transit services is highly competitive, and the per-unit price of those services has been declining for many years. As the Federal Communications Commission ("FCC") found in 2016, "transit prices have fallen by more than 90% in the last five years alone."[1]

14. Whereas transit arrangements involve monetary payments, peering (direct-interconnection) arrangements may or may not. "Settlement-free peering," in which no money changes hands, is likely to make economic sense when (among other circumstances) the traffic flows between networks is roughly balanced and the arrangement presents each network with similar costs and benefits. Under longstanding industry practice, however, one network has traditionally compensated another for direct interconnection if the traffic flows between them are highly "asymmetric"—*i.e.*, if the first network consistently delivers far more traffic onto the second party's network than vice versa and thus imposes disproportionate network costs on the second network.

15. One well-known illustration of this phenomenon involved a dispute in 2005 between two large network peers, Level 3 and Cogent. Cogent had begun delivering much more traffic onto Level 3's network than vice versa, and Level 3 demanded compensation for the imbalance (with apparent success). As Level 3 explained at the time, "Cogent was using far more of Level 3's network, far more of the time, than the reverse. Following our review, we decided that it was unfair for us to be subsidizing Cogent's business."[2]

---

[1] Mem. Op. and Order, *Applications of XO Holdings and Verizon Communications Inc. for Consent to Transfer Control of Licenses and Authorizations,* 31 FCC Rcd 12501, ¶ 44 n.156 (Nov. 16, 2016); *see also* William Norton, *What Are the Historical Transit Pricing Trends?*, DRPEERING, http://drpeering.net/FAQ/What-are-the-historical-transit-pricing-trends.php (last visited September 24, 2018).

[2] Level 3 Comm'ns, *Level 3 Issues Statement Concerning Internet Peering and Cogent Communications* (Oct. 7, 2005), http://news.centurylink.com/news?item=125153.

**Interconnection Between Content Providers and ISPs**

16. In the earliest years of the commercial Internet, most content providers did not operate Internet networks of their own. Instead, they relied solely on network providers such as AT&T, Level 3, Tata, Sprint, Cogent, and Verizon/MCI to convey their traffic across the Internet by means of transit agreements. These providers are known as "backbone" providers or (particularly if they also serve many end-user customers) "Internet service providers" ("ISPs"). Over the past two decades, interconnection arrangements between content providers and ISPs have grown both more complex and more efficient.

17. *Third-party CDNs.*  Many content providers purchase specialized "content delivery network" ("CDN") services from third parties such as Akamai, Limelight, or Level 3. Either over its own network facilities or those of third-party contractors, a CDN arranges for (1) the transmission of a given content provider's content to many different "cache servers" across the Internet and (2) interconnection of those servers with ISP networks serving customers in particular geographic regions. That arrangement reduces the number of "hops" the content must take from its source (a server) to its destination (individual end users) and is typically more efficient than routing all of the same content from servers in a single geographical location to distant points throughout the Internet.

18. A CDN may interconnect with a given ISP's network either indirectly, by hiring a transit provider to intermediate between it and the ISP, or directly, by negotiating an arrangement with the ISP itself. When a CDN interconnects directly with an ISP, the traffic flows between the two networks are almost entirely unidirectional. For example, when a streaming-video provider hires Akamai to deliver its traffic to an ISP, Akamai delivers enormous quantities of data from its cache servers to the ISP at various points of interconnection, which the ISP must then transmit to its end users; those end users, in contrast,

7

typically transmit very little data back to the content providers or their CDNs. As in other contexts where traffic flows between two networks are highly asymmetric, a CDN typically compensates an ISP for the substantial costs of accommodating this extra traffic on the ISP's network.

19. ***CDN-equipped content providers.*** Although Akamai and other third-party CDNs are traditional providers of CDN functionality, some of the largest content providers—such as Netflix, Google, and Amazon—have now deployed global CDNs of their own. Through their proprietary CDNs, these content providers have entered into direct interconnection agreements with ISPs serving end-user customers. For example, through a direct-interconnection service known as "AT&T Dedicated Internet," AT&T enables content providers (as well as third-party CDNs) to choose the capacity of their connections and to deliver as much traffic to AT&T's network as those connections will permit. Such agreements benefit any CDN-equipped content provider because they reduce the costs of relying on third-party middlemen (third-party CDNs and transit providers) and ensure efficient delivery of their content to an ISP's customers with a minimum of network hops.

20. Of course, whether a content provider operates its own CDN or contracts CDN functionality out to a third party such as Akamai, the relevant traffic flows are all nearly one-directional and impose the same disproportionate costs on the ISP's network. As a result, just as third-party CDNs have long compensated ISPs for direct interconnection, compensation typically flows from a CDN-equipped content provider to any ISP that it directly interconnects with. But such direct interconnection does not impose new costs on the content provider that it otherwise would not bear. In the absence of direct interconnection with the ISP, the content provider would still pay a third party (either a third-party CDN or a transit provider) for the function of indirectly interconnecting with the ISP's network.

8
Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

21. Compensation for direct-interconnection arrangements between ISPs and content providers (or their CDNs) serves critical efficiency objectives. Because the compensation owed depends in part on the volume of data traffic delivered onto the ISP's network, each content provider has appropriate incentives to keep that traffic volume efficient—for example, by using various forms of "digital compression" to convey essentially the same information with less data traffic. Requiring content providers to cover the costs their traffic imposes on the ISP's network also gives them appropriate incentives to agree to efficient points of interconnection so that the ISP does not incur the costs of transporting high-volume data traffic over unnecessary distances.

22. Finally, because ISPs must recover their network costs from one source or another, these paid-interconnection arrangements impose downward pressure on the retail prices that ISPs charge all other customers for broadband Internet access service. Thus, all else held equal, banning payment for direct interconnection services offered by AT&T in California would cause customers to pay higher retail rates than they otherwise would.

### The Many Alternatives to Direct Interconnection

23. In AT&T's experience, content providers rarely rely *exclusively* on direct interconnection arrangements to reach any given ISP's customers. Instead, they typically supplement such arrangements by negotiating agreements with third-party CDNs and/or with one or more transit providers (*e.g.*, the ISP's peers). Those third-party arrangements provide multiple alternative paths into any ISP's network and enable each content provider to adjust its routing decisions among those providers on a moment-by-moment basis, depending on cost, measured performance, congestion, network outages, and other considerations. These third-party alternatives also constrain the price that any ISP can charge for direct interconnection.

24. As these alternatives reveal, no content provider *needs* to interconnect directly with any ISP—or deal directly with the ISP in any other respect—in order to ensure that its

9

content reaches the ISP's customers. Although some content providers have chosen to interconnect *directly* with ISPs, they typically do so to supplement third-party CDN services and/or transit services offered by one or more of the ISP's peers (and, for many ISPs, the ISP's own transit providers). Those more traditional forms of *indirect* interconnection will also enable the content providers' traffic to reach any ISP's end users.

25. Given this multiplicity of paths into an ISP network, no ISP can selectively degrade particular peering arrangements to harm particular content providers—especially because those content providers and their transit intermediaries, not the ISP, choose the interconnection path they will use for sending content to the ISP's customers.[3] As a result, AT&T could not subject a content provider to a "degradation by congestion" strategy without, among other things, limiting capacity across *all of its interconnection points* for extended periods. That strategy would be commercially self-destructive because it would degrade the ISP's entire service—not just the performance of any given content provider—and would thus threaten the ISP's status as a broadband provider to both consumers and businesses.

**Efforts to Manipulate the Regulatory System**

26. Interconnection among IP networks has functioned efficiently for more than two decades without prescriptive regulation by the FCC or other regulatory authorities.[4] That was

---

[3] Although I can make these observations only in connection with my experience at AT&T, they appear to apply broadly to all ISPs. *See Applications of Global Crossing Limited and Level 3 Communications, Inc. for Consent to Transfer Control*, Mem. Opinion and Order and Declaratory Ruling, 26 FCC Rcd 14,068, ¶ 27 (2011) (finding foreclosure concerns unfounded because "if the combined entity were to engage in connection degradation or price increases," its interconnection customers "would be able to transition easily to another provider").

[4] *See generally* Stanley M. Besen & Mark A. Israel, *The Evolution of Internet Interconnection from Hierarchy to "Mesh": Implications for Government Regulation*, 25 Info. Econ. & Pol'y 235 (2013).

10
Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

true even during the brief period (2015-16) in which the FCC imposed common carrier regulation on broadband ISPs to enforce "net neutrality" rules, which are fundamentally distinct from interconnection arrangements.[5]

27. In the months leading up to that decision, however, Netflix and certain network providers, including Cogent, tried to persuade the FCC to issue rules forbidding or restricting compensation for direct-interconnection arrangements. In arguing that such rules were necessary, these companies cited a series of interconnection disputes in 2014 in which they erroneously blamed AT&T and other ISPs for the poor performance of Netflix traffic on certain networks. As it turned out, however, the complaining companies themselves had allowed congestion to occur by driving their traffic to certain locations on ISP networks and then refusing to pay for the upgrades needed to accommodate the greater traffic load.[6]

28. After this was explained, the FCC rejected requests by Cogent and others to intervene by prohibiting paid-interconnection arrangements. It concluded that "prescriptive rules" governing interconnection arrangements were particularly unwarranted and opted instead

---

[5] Report and Order on Remand, *Protecting and Promoting the Open Internet,* 30 FCC Rcd 5601 ¶ 31 (2015) (*"2015 Order"*).

[6] *See*, *e.g.*, Dan Rayburn, *Cogent Now Admits They Slowed Down Netflix's Traffic, Creating A Fast Lane & Slow Lane*, StreamingMediaBlog (Nov. 5, 2014) (*"Cogent Now Admits"*), https://www.streamingmediablog.com/2014/11/cogent-now-admits-slowed-netflixs-traffic-creating-fast-lane-slow-lane.html; Nick Feamster, *Why Your Netflix Traffic is Slow, and Why the Open Internet Order Won't (Necessarily) Make It Faster*, Freedom to Tinker (Mar. 25, 2015), https://freedom-to-tinker.com/2015/03/25/why-your-netflix-traffic-is-slow-and-why-the-open-internet-order-wont-necessarily-make-it-faster/ ("Much of the popular media has led consumers to believe that the reason that certain Internet traffic—specifically, Netflix video streams—were experiencing poor performance because Internet service providers are explicitly slowing down Internet traffic. … These caricatures are false, and they demonstrate a fundamental misunderstanding of how Internet connectivity works, what led to the congestion in the first place, and the economics of how the problems were ultimately resolved."); *see also* David Clark *et al.*, *Measurement and Analysis of Internet Interconnection and Congestion,* at 9-10 (Sept. 10, 2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2417573.

to continue "watch[ing]" and "learn[ing]" about the evolution of Internet interconnection.[7] Denied a ban on paid-interconnection arrangements, these network operators quickly entered into efficient, mutually agreeable agreements that resolved their congestion.

29. I believe that Cogent and others repeated their claims about the same 2014 interconnection disputes to induce the California legislature to enact SB 822's restrictions on paid-interconnection agreements. In my experience, however, efficient interconnection agreements can be more easily reached only if one side *cannot* credibly threaten to invoke regulatory intervention as a fallback in case it does not win all of the terms it seeks in negotiations. So long as a credible threat of regulatory intervention persists, it will chill commercial negotiations because one side will have incentives to hold out in hopes of a more favorable regulatory outcome. Similarly, that regulatory overhang will give networks that wish to interconnect directly with ISPs artificial incentives to route their traffic to ISPs in ways that *generate congestion*, at the expense of end users, in order to gain the attention of regulators and make their intervention more likely. As discussed below, that is one of the central threats posed by SB 822.

### The Irreparable Harms Imposed By SB 822

30. If allowed to take effect on January 1, 2019, the interconnection provisions of SB 822 would irreparably harm AT&T and its customers in two broad types of ways. First, because the Internet is oblivious to state political boundaries, state-by-state regulation of Internet interconnection would create arbitrage incentives, impose unnecessary costs on ISPs, and ultimately impair Internet performance. Second, regulatory intervention in historically unregulated traffic-exchange arrangements would distort interconnection arrangements and

---

[7] *2015 Order* ¶ 31.

impose unprecedented and costly uncertainty on the entire Internet ecosystem.  AT&T is particularly concerned that the prospect of regulatory intervention under SB 822 will disrupt ongoing and future negotiations and produce inefficient, regulation-driven interconnection arrangements that harm AT&T and its customers.

31.  ***Costs of state-by-state regulation.***  AT&T and its direct-interconnection counterparties typically exchange Internet traffic at multiple designated points across the country.  Some of these points are located in California, but most are not.  Because state boundaries are irrelevant to efficient Internet traffic routing, traffic exchanged *outside* of California under these contracts may well be destined for AT&T's fixed and mobile broadband Internet access customers *within* California (as well as many customers outside of California).  Likewise, traffic exchanged at points *within* California may well be destined for AT&T's fixed and mobile broadband Internet access customers *outside* of California.[8]  These direct-interconnection agreements enable AT&T and its counterparties to route traffic in the manner that is most efficient at any particular time.  The efficiencies of these agreements would be lost if individual states could impose substantively different rules on interconnection arrangements depending on the states in which interconnection points or end users are located.

32.  That is what SB 822 purports to do, although the scope of its application is highly ambiguous.  The law's regulation of traffic-exchange arrangements applies only "insofar as [a] provider is engaged in providing … broadband Internet access service," § 3101(a), (b),

---

[8] As a general rule, traffic is exchanged between Internet peers utilizing a "hot potato" routing model.  The traffic is handed off by one peer to the other at the interconnection point closest to the origin of the traffic, regardless of where the traffic is ultimately destined, and the other peer is then obligated to carry that traffic on its own network to its destination.  If there is return traffic, the other peer hands it off to the first peer at the nearest interconnection point and the first peer is then obligated to carry that traffic on its own network to its destination.

13

Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

defined as a service "provided to customers in California," § 3100(b).  It is unclear how this language will apply to real-world interconnection agreements:  again, such agreements typically involve interconnection points both inside and outside of California, and any given interconnection point is used to route Internet traffic to many different fixed and mobile customers, some of whom are likely in California and many of whom are likely not.

33.     Under one conceivable interpretation, SB 822 purports to regulate all interconnection arrangements anywhere in the country if *some* of the traffic exchanged under those arrangements is destined for customers physically located in California.  Under that interpretation, SB 822 would have essentially *nationwide application* because some percentage of the traffic exchanged at any given interconnection point is likely to end up on computers or mobile devices of customers physically in California.  AT&T lacks the ability today to "geofence" California to ensure that traffic subject to SB 822 is treated in a manner consistent with that statute's requirements, while keeping all other traffic from reaching customers in California.  Moreover, if one state could adopt interconnection requirements with such *de facto* nationwide application, other states could do the same, threatening the industry with conflicting obligations imposed by disparate state-imposed interconnection rules with nationwide effect.

34.     At a minimum, SB 822 could be read to apply only to interconnection arrangements physically located in California.  That interpretation, however, would create incentives to engage in "geographic arbitrage":  a strategy by content-sending networks to deliver more of their AT&T-bound traffic to California locations to avail themselves of asserted rights to "free interconnection" under state law, even if most of the traffic is destined for AT&T customers far away from California.  In the short term, that arbitrage strategy would potentially expose AT&T's network to massive congestion both (1) at the interconnection points in California that become overloaded and (2) on AT&T's backbone network, as AT&T is forced to

14

Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

deliver this extra traffic to its ultimate destination throughout the rest of the country.  I expect that the content-sending networks causing that congestion would blame AT&T for the corresponding decline in the quality of end user experiences, just as Cogent and others did in the 2014 Netflix-related disputes discussed above.  Because end users have no ready basis for validating such misinformation, many would in fact attribute their poor service to AT&T, causing lasting harm to AT&T's reputation.

35. Over the ensuing months, AT&T would then incur additional costs if it had to adapt to these geographic arbitrage schemes by increasing its interconnection capacity in California and transport capacity across the rest of the country so that it could then backhaul traffic from that State to the distant geographic points where the traffic would have been more efficiently handed off in the absence of SB 822.  Those costs would then be magnified if, as is likely, other States in turn adopted state-specific rules governing interconnection arrangements within their borders, requiring AT&T to incur the additional costs of continuously adapting its network to an ever-changing patchwork quilt of state-by-state regulation.

36. ***Inherent costs of interconnection regulation.***  Even apart from these costs of complying with disparate state-by-state regulation, SB 822's restrictions on direct-interconnection arrangements would impose unrecoverable costs on AT&T, its customers, and the Internet ecosystem as a whole.

37. First, I understand that continued performance by AT&T under its existing Internet traffic exchange agreements with providers such as Facebook, Netflix, Google, Amazon, and Apple would likely expose AT&T to immediate claims by public and private entities that the compensation terms of those agreements violate SB 822.  Such claims would cast doubt on whether AT&T should continue providing interconnection services under these contracts, which presuppose that AT&T will be compensated for the costs it incurs.

15
Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction

38. Moreover, insofar as SB 822 shields interconnecting networks from covering the costs their traffic imposes on AT&T's network, they would lose the financial incentives discussed above to manage their exchange of traffic with AT&T efficiently and predictably. For example, if freed from any obligation to cover those costs, content-sending networks would lack the incentives they have today to engage in efficient digital compression. As a result, they could deliver greater volumes of traffic onto AT&T's network and do so at inefficient points and in unpredictable ways. That outcome would impose additional costs on AT&T as it tries to keep up with these new network demands, and it could also impair network performance to the detriment of AT&T's end user customers, again harming AT&T's reputation in the competitive marketplace for broadband Internet access services. Similarly, as discussed above, shielding content-sending networks from covering their share of ISP network costs would not only increase those costs in an absolute sense (by removing the interconnecting networks' incentives to minimize them), but would shift the entire burden of recovering those costs to all other customers, including retail consumers.

39. SB 822 would also harmfully distort the outcomes of commercial negotiations regarding interconnection arrangements. AT&T is currently negotiating with content providers regarding direct interconnection. As discussed, content providers and their network agents have long (and unsuccessfully) urged federal regulators to conclude (1) that they are entitled to free interconnection and traffic-delivery at points of their choosing on an ISP's network and (2) that each ISP must build sufficient capacity at no cost to the content provider (but at substantial cost to itself) to avoid congestion at these interconnection points and backhaul its traffic to end users across the country. AT&T had to bargain against the shadow of that regulatory threat several years ago, when the FCC was actively considering (even though it ultimately rejected) proposals to ban interconnection compensation altogether. It appears inevitable that content providers will

16

similarly rely on SB 822 to demand free, dedicated interconnection capacity at locations of their choice—not only within California, but nationwide, on the ground that some traffic exchanged outside of California may be destined for some customers in California.  As the FCC experience demonstrates, the threat of that outcome would distort the course of bargaining and result in substantial and irreparable harm to AT&T if SB 822 is allowed to take effect pending challenges to its validity.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of October 2018 in Dallas, Texas.

_____
Joe Ruszkiewicz

18
Declaration of Joe Ruszkiewicz of AT&T in Support of Plaintiffs' Motion for Preliminary Injunction