1  Scott H. Angstreich*
   Leslie V. Pope*
2  Alex A. Parkinson*
   KELLOGG, HANSEN, TODD,
3     FIGEL & FREDERICK, P.L.L.C.
   1615 M Street, NW, Suite 400
4  Washington, DC 20036
   (202) 326-7900
5  sangstreich@kellogghansen.com
   lpope@kellogghansen.com
6  aparkinson@kellogghansen.com

7  *Attorneys for Plaintiffs*
   *CTIA – The Wireless Association and*
8  *USTelecom – The Broadband Association*

9  Jeffrey A. Lamken (CA SBN 154217)
   MOLOLAMKEN LLP
10 The Watergate, Suite 500
   600 New Hampshire Avenue, NW
11 Washington, DC 20037
   (202) 556-2000
12 jlamken@mololamken.com

13 *Attorney for Plaintiff*
   *American Cable Association*

14 * Admitted *pro hac vice*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

15

16

17            **IN THE UNITED STATES DISTRICT COURT**

             **FOR THE EASTERN DISTRICT OF CALIFORNIA**

18

19 AMERICAN CABLE ASSOCIATION, CTIA
   – THE WIRELESS ASSOCIATION, NCTA –
20 THE INTERNET & TELEVISION
   ASSOCIATION, and USTELECOM – THE
21 BROADBAND ASSOCIATION, on behalf of
   their members,
22
                                              Case No. 2:18-cv-02684
23            Plaintiffs,
                                              **FIRST AMENDED COMPLAINT**
24       v.

25 XAVIER BECERRA, in his official capacity   Judge: Hon. John A. Mendez
   as Attorney General of California,
26
27            Defendant.

28

**COMPLAINT**

Plaintiffs American Cable Association ("ACA"), CTIA – The Wireless Association ("CTIA"), NCTA – The Internet & Television Association ("NCTA"), and USTelecom – The Broadband Association ("USTelecom," and collectively with ACA, CTIA, and NCTA, the "Associations") bring this suit on behalf of their members for declaratory judgment and injunctive relief against Defendant Xavier Becerra, in his official capacity as Attorney General of California, stating as follows:

**NATURE OF THE CASE**

1. This case presents a classic example of unconstitutional state regulation. The State of California has enacted SB-822, entitled the "California Internet Consumer Protection and Net Neutrality Act of 2018,"[1] directly regulating the provision of broadband Internet access services ("broadband").[2] This statute was purposefully intended to countermand and undermine federal law by imposing on broadband—an interstate communications service—the very same regulations that the Federal Communications Commission ("FCC") expressly repealed in its 2018 *Restoring Internet Freedom* Order (and by adopting even more restrictive regulations). Because federal law, including the Communications Act of 1934, as amended ("Communications Act"), precludes States from taking such action, SB-822 is preempted under the Supremacy Clause of the United States Constitution. It also regulates far outside the borders of the State of California and unduly burdens interstate commerce in violation of the dormant Commerce Clause of the United States Constitution. Indeed, as the FCC has repeatedly recognized, it is impossible or impracticable for an Internet service provider ("ISP") offering broadband even to distinguish traffic that moves only within California from traffic that crosses state borders, and SB-822 does not even attempt to do so. Both the Supremacy Clause and the dormant Commerce Clause protect ISPs from such

[1] SB-822 is reproduced in Exhibit A.

[2] This complaint uses the term "broadband" to refer to the mass-market broadband Internet access services sold to consumers and small businesses that are included in SB-822's definition of broadband Internet access service. *See* Cal. Civ. Code § 3100(b).

FIRST AMENDED COMPLAINT

overreach and the resultant patchwork of inconsistent regulations that are unduly burdensome and impossible to comply with as a practical matter.  The Court should declare that SB-822 is preempted and unconstitutional, and should permanently enjoin Defendant from enforcing or giving effect to it.[3]

2.      In the Communications Act, Congress granted the FCC—and denied to the States—the authority "to regulate all aspects of interstate communication by wire or radio."  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984); *see* 47 U.S.C. § 151 (describing "the purpose" of the FCC as "regulating interstate and foreign commerce in communication by wire and radio").[4]  The Act created a clear division of regulatory authority between the FCC and the States, *see* 47 U.S.C. § 152(a)-(b), whereby the FCC is "totally entrusted" with the regulation of interstate communications while states may regulate only "[p]urely intrastate communications," *NARUC v. FCC*, 746 F.2d 1492, 1498 (D.C. Cir. 1984); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 86 (D.C. Cir. 2019) (per curiam) (recognizing "States' statutorily conferred authority to regulate *intrastate* communications" (emphasis added)).  Congress also expressly preempted state attempts to "regulate the entry of or the rates charged by . . . any private mobile service."  47 U.S.C. § 332(c)(3)(A).[5]

3.      Exercising its authority over interstate communications, after careful review and deliberation, the FCC adopted the 2018 *Restoring Internet Freedom* Order, which established "a calibrated federal regulatory regime" for mass-market broadband "based on the pro-competitive,

---

[3] The Associations also are filing a Renewed Motion for Preliminary Injunction concurrently with this Amended Complaint, based on the immediate irreparable harm SB-822 poses.

[4] Prior to the Communications Act, federal regulators at the Interstate Commerce Commission had sole authority to regulate interstate and international communications, "occup[ying] . . . the field . . . [and] exclud[ing] state action."  *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919); *accord Western Union Tel. Co. v. Boegli*, 251 U.S. 315, 316 (1920).  The Communications Act transferred that authority to the FCC. *See Scripps-Howard Radio v. FCC*, 316 U.S. 4, 6 (1942).

[5] Congress similarly preempted States from "regulat[ing] the entry of or the rates charged by any commercial mobile service," but preserved state authority over "the other terms and conditions of commercial mobile services."  47 U.S.C. § 332(c)(3)(A).  Congress did not similarly preserve any state authority with respect to private mobile services.

FIRST AMENDED COMPLAINT

1   deregulatory goals of the 1996 [Telecommunications] Act." Declaratory Ruling, Report and

2   Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd. 311, ¶ 194 (2018) ("2018 Order"),

3   *petitions for review granted in part and denied in part*, *Mozilla*, 940 F.3d 1 (D.C. Cir. 2019); *see*

4   *also* Notice of Final Rule and Announcement of Effective Date, 83 Fed. Reg. 21,927 (May 11,

5   2018) (announcing effective date of 2018 Order as June 11, 2018).  The 2018 Order protects

6   Internet openness with a regime of transparency and disclosure rather than heavy-handed

7   regulations.  Pursuant to that regime, the Associations' members, either on their own or through

8   their Associations, have made public commitments to preserve core principles of Internet

9   openness. *See, e.g.*, 2018 Order ¶ 142 (collecting examples of members' commitments).  Those

10  commitments, as the FCC explained, are fully enforceable by the Federal Trade Commission

11  ("FTC") and state attorneys general under federal and state unfair and deceptive trade practices

12  laws (provided they enforce such commitments in a manner consistent with federal law).  *See id.*

13  ¶¶ 142, 196, 244; *see also id.* ¶ 242.  "Transparency thus leads to openness," *id.* ¶ 245, and the

14  Internet has remained free and open since the adoption of the 2018 Order, just as it was under the

15  longstanding light-touch approach that applied for most of the Internet's history.

16          4.     The 2018 Order also determined that broadband is an inherently interstate

17  "information service," as defined by the Communications Act, restoring the longstanding position

18  that the FCC (on a bipartisan basis) and the courts had adhered to for decades.  *See id.* ¶¶ 20, 199.

19  The 2018 Order thereby reversed a 2015 FCC ruling, *see* Report and Order on Remand,

20  Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601,

21  ¶ 331 (2015) ("2015 Order"), that broadband should be regulated as a common carrier

22  "telecommunications service" under the Communications Act (though even the 2015 Order

23  expressly "reaffirm[ed] the Commission's longstanding conclusion that broadband Internet access

24  service is jurisdictionally interstate for regulatory purposes," *see id.* ¶ 431).  The 2018 Order

25  similarly restored the FCC's longstanding determination that wireless broadband is a private

26  mobile service, not a commercial mobile service, under the Communications Act and therefore is

27  statutorily immune from common carrier regulation.  2018 Order ¶ 74.  Here, too, the FCC

28

FIRST AMENDED COMPLAINT

1   reversed a 2015 ruling, *see* 2015 Order ¶ 388, that mass-market wireless broadband should be

2   regulated as a common carrier commercial mobile service.

3          5.     Based on its disclosure regime and these statutory classifications, the FCC repealed

4   certain "net neutrality" rules and regulations that were adopted in the 2015 Order and predicated

5   on the classification of broadband as a common carrier service.  The 2015 Order had imposed five

6   basic forms of conduct regulation on the provision of broadband: a no-blocking rule, a no-throttling

7   rule, a no-paid-prioritization rule, a general "Internet Conduct Standard," and a process for filing

8   complaints challenging the reasonableness of ISPs' Internet interconnection and traffic-exchange

9   practices.  The 2018 Order repealed each of these measures based on federal law and policy

10   mandating a light-touch regulatory approach to broadband.  *See* 2018 Order ¶¶ 1-5.  Relying on its

11   authority under Section 257 of the Communications Act, the FCC also revised its longstanding

12   "transparency rule" to specifically require ISPs to disclose blocking, throttling, and other practices

13   in the context of their broadband services, to protect Internet openness through a policy of

14   disclosure coupled with consumer protection and antitrust oversight and enforcement.  *Id.* ¶¶ 220-

15   223.

16          6.     In addition to reclassifying (and thereby reestablishing) fixed and mobile

17   broadband as services statutorily immune from common carrier regulation and repealing the

18   above-described rules and regulations, the 2018 Order recognized and reaffirmed the preemption

19   principles that follow from the federal statutory framework.  As noted, the primacy of federal law

20   in this "inherently" "jurisdictionally interstate" context is one of the few points on which the 2018

21   Order and the 2015 Order agree:  both decisions "preclude[d] states from imposing obligations on

22   broadband service[s] that are inconsistent with the carefully tailored [federal] regulatory scheme."

23   2015 Order ¶¶ 431, 433; *see* 2018 Order ¶¶ 194, 200; *see also* 47 U.S.C. § 152(a)-(b).

24          7.     In 2019, the D.C. Circuit largely rejected a petition for review that California—

25   among others—had brought to challenge the validity of the 2018 Order, holding that the FCC had

26   validly exercised its authority under the federal Communications Act.  *Mozilla*, 940 F.3d 1 (D.C.

27   Cir. 2019).  Although the D.C. Circuit vacated the FCC's decision in the 2018 Order to expressly

28   and prospectively preempt every state or local requirement inconsistent with that order, the court

                                                            FIRST AMENDED COMPLAINT

did so only because it found the FCC lacked authority to expressly preempt all state regulation of intrastate broadband, even in the absence of a conflict with federal law.  *See id.* at 74, 80-82, 86. The D.C. Circuit did not address whether the Communications Act itself preempted state regulation—under field, express, or conflict preemption.  The court likewise made clear it was not addressing the 2018 Order's "preemptive effect under principles of conflict preemption or any other implied-preemption doctrine."  *Id.* at 85.  In fact, the court recognized that some state laws could conflict with, and be preempted by, the 2018 Order.  *See id.* at 85-86.  This case presents those unresolved issues.

8.   The State of California's SB-822, by its own terms, is deliberately intended to regulate interstate communications and revive the rules the FCC repealed in the 2018 Order, and thereby effectively nullify federal law.  As explained above, the 2018 Order repealed the no-blocking rule, no-throttling rule, no-paid-prioritization rule, Internet Conduct Standard, and common carrier regulation of ISPs' Internet interconnection and traffic-exchange practices.  SB-822 now purports to re-impose every single one of those restrictions on any ISP providing broadband in the State of California.  Moreover, SB-822 establishes restrictions that go *further* than those repealed in the 2018 Order, including by banning the "zero-rating" of certain traffic delivered to users and by imposing ambiguous restrictions on agreements for the exchange of Internet traffic with edge providers and other Internet network operators.

9.   The FCC in the 2015 Order had declined to ban both zero-rating and paid interconnection, expressly finding that both services can provide significant benefits to consumers and edge providers.  *See* 2015 Order ¶¶ 152, 201.  While sometimes preemption issues are complex, inviting a difficult assessment of whether a state law actually conflicts with federal law, this case is unusually straightforward: SB-822 clearly attempts to regulate an interstate communications service that is subject to exclusive federal regulation and in a manner that conflicts with federal law.  Indeed, SB-822's animating purpose and clear effect is to enact rules that the FCC has expressly rejected and that conflict with the Communication Act itself, thereby countermanding federal law.  Plaintiffs challenge California's express regulation of interstate broadband in a way that intentionally and directly conflicts with federal law.

FIRST AMENDED COMPLAINT

10.    California's attempts to revive—and indeed expand—a repealed federal regulatory regime are preempted.  Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state measures that contravene validly adopted federal laws and policy determinations, including those contained in FCC orders, are preempted and have no force or effect.  Here, that preemption applies for at least three distinct reasons.

11.    First, the Communications Act itself preempts SB-822 because broadband Internet access is an interstate service, which is a field in which states are barred from regulating, and because Section 332(c)(3)(A) expressly preempts States from regulating private mobile services.  Contrary to this congressional allocation of regulatory authority, SB-822 regulates interstate communications services and private mobile services.   States can regulate only *intra*state communications services—"interstate communications service[s] are to be governed solely by federal law" because "Congress intended to occupy the field."  *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003); *see* 47 U.S.C. § 152(a)-(b).  The FCC and courts have long recognized that broadband is an interstate communications service, because, among other reasons, "'a substantial portion of Internet traffic involves accessing interstate or foreign websites.'"  2018 Order ¶ 199 (quoting *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000)); *see id.* ¶ 199 nn.739-742 (citing authority); *see also U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 730-31 (D.C. Cir. 2016) (affirming FCC's jurisdictional determination) ("*USTelecom*"), *cert. denied*, 139 S. Ct. 453, 454, 455, 474, 475 (2018).  Moreover, the inherent technical nature of the Internet makes it impossible to separate out and treat distinctly Internet traffic that is wholly intrastate, because Internet communications are broken up into packets of information that are routed across facilities located throughout the country (and beyond).  And SB-822 leaves no doubt as to California's attempt to regulate an interstate service, as it adopts the FCC's definition of broadband as a service that reaches "all or substantially all Internet endpoints," Cal. Civ. Code § 3100(b), the vast majority of which lie *outside* California.  SB-822 makes no effort to identify any segregable intrastate component of broadband for targeted state regulation; it seeks to regulate the entire service.

12.    The Communications Act also expressly preempts States from "regulat[ing] the entry of or the rates charged by . . . any private mobile service."  47 U.S.C. § 332(c)(3)(A).  Yet

FIRST AMENDED COMPLAINT

1    SB-822 engages in just such regulation.  It seeks to regulate the "entry of . . . [a] private mobile

2    service" by imposing conditions on the manner in which that service may be provided that

3    "obstruct or burden a wireless service provider's ability" to provide that service.  *Johnson v. Am.*

4    *Towers, LLC*, 781 F.3d 693, 705 (4th Cir. 2015) (citation omitted).  It also seeks to regulate the

5    "rates charged by . . . [a] private mobile service" by prohibiting certain forms of "zero-rating."

6    Cal. Civ. Code § 3101(a)(5)-(6), (b).  Congress expressly preempted state regulations that "affect

7    the amount that a user is charged for [private mobile] service."  *NASUCA v. FCC*, 457 F.3d 1238,

8    1254 (11th Cir.), *opinion modified on other grounds on denial of reh'g*, 468 F.3d 1272 (2006) (per

9    curiam).

10          13.     Second, the Communications Act also preempts SB-822 under the conflict

11   preemption doctrine because the state law imposes common carrier duties—that is, categorical

12   rules governing how providers offer service that leave "no room at all for 'individualized

13   bargaining,'" *Verizon v. FCC*, 740 F.3d 623, 658 (D.C. Cir. 2014) (quoting *Cellco P'ship v. FCC*,

14   700 F.3d 534, 548 (D.C. Cir. 2012))—on an "information service" that is statutorily exempt from

15   such regulation.  The Communications Act expressly prohibits the imposition of common carrier

16   obligations on providers of information services and on providers of private mobile services.  *See*

17   *id.* at 650 (citing 47 U.S.C. §§ 153(51), 332(c)(2)).[6]  That is why, prior to the 2015 Order, the D.C.

18   Circuit invalidated some of the same requirements that California seeks to impose here when the

19   FCC applied them to these same non-common-carrier services.  *See id.*  It is also why the FCC's

20   adoption of these and other requirements in its now-rescinded 2015 Order was predicated on

21   classifying broadband as a common carrier telecommunications service.  *See* 2015 Order ¶¶ 307-

22   308.   That predicate no longer applies because the 2018 Order restored the longstanding

23   classification of broadband as an information service, and of mobile broadband as a private mobile

24   service.

25

26

_____

27          [6] "Private mobile services" are those mobile services that are not "commercial mobile radio

28   service[s]" as defined by the Communications Act and the FCC.  47 U.S.C. § 332(d).

FIRST AMENDED COMPLAINT

14. Third, the 2018 Order preempts SB-822 under conflict preemption principles and precedent because SB-822 stands as an obstacle to binding federal policy choices adopted in that Order. In fact, SB-822's animating purpose and clear effect is to undo the changes made by the 2018 Order. SB-822 resurrects rules from the 2015 Order that the FCC repealed in the 2018 Order—including the no-blocking, no-throttling, and no-paid-prioritization rules, as well as the Internet Conduct Standard—based on judicially validated FCC findings that such rules were unnecessary and affirmatively harmful. *Compare* Cal. Civ. Code § 3101(a)(1), (2), (4), (7), *with* 2015 Order ¶¶ 15-16, 18, 21; *see also* Cal. Civ. Code § 3101(b) (applying the prescriptive rules to mobile broadband). SB-822 also adopts a disclosure rule that restores the repealed disclosure regulation from the 2015 Order, rather than the disclosure regulation adopted in the 2018 Order. *Compare* Cal. Civ. Code § 3101(a)(8), *with* 47 C.F.R. § 8.3 (2016) *and* 47 C.F.R. § 8.1(a) (2018). And SB-822 goes even further than the 2015 Order in several important ways, discussed below. It thus contravenes federal policy choices.

15. Finally, SB-822 violates the "dormant" or "negative" Commerce Clause of the United States Constitution by regulating conduct occurring wholly outside California's borders. Specifically, SB-822 regulates Internet services that involve overwhelmingly interstate communications, which the FCC has found cannot practically be separated from instances of purely intrastate electronic communications. Moreover, in regulating Internet interconnection, SB-822 is not limited to ISPs' dealings with California customers; it also effectively regulates ISPs' contracts with edge providers in all fifty States, and the exchange of traffic occurring wholly outside of California.

16. SB-822 also violates the "dormant" or "negative" Commerce Clause because it imposes undue burdens on interstate commerce that far outweigh any purported benefits to California by re-imposing rules that the FCC expressly found to harm interstate commerce and to offer no net benefits. *See* 2018 Order ¶¶ 246-266. In addition, in the 2018 Order, the FCC recognized that state and local efforts to regulate in this area "could pose an obstacle to or place an undue burden on the provision of broadband Internet access service and conflict with the deregulatory approach" adopted in the 2018 Order. *Id.* ¶ 195. Indeed, the FCC has consistently

FIRST AMENDED COMPLAINT

1   determined that broadband must be governed "by a uniform set of federal regulations, rather than

2   by a patchwork that includes separate state and local requirements."  2018 Order ¶ 194; *see also*

3   2015 Order ¶ 433 (ruling that broadband must remain subject to "a comprehensive regulatory

4   framework" at the national level that "preclude[s] states from imposing obligations on broadband

5   service that are inconsistent with the [FCC's] carefully tailored regulatory scheme").  Disparate

6   state and local requirements could introduce a patchwork of potentially conflicting broadband

7   regulations.  This is already happening; while California has been at the forefront of these efforts,

8   several other states have adopted or are considering different and incongruous broadband

9   regulations, which are consistent only in their disregard for the primacy of federal law.  And given

10  the high degree of ambiguity inherent in many of the requirements, state agencies and courts

11  inevitably will interpret these requirements differently and further perpetuate and compound their

12  incongruity.

13                    **JURISDICTION AND VENUE**

14           17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the

15  Associations' claims arise under the laws of the United States, including the Communications Act,

16  the 2018 Order, 42 U.S.C. § 1983, and the Supremacy and Commerce Clauses of the United States

17  Constitution.  This Court has equitable jurisdiction to enjoin unconstitutional action.  *Armstrong*

18  *v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

19           18.     Because an actual controversy within the Court's jurisdiction exists, this Court may

20  grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C.

21  §§ 2201-2202.

22           19.     Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b)(1)

23  and (b)(2), because Defendant is located within this district and a substantial part of the events

24  giving rise to the Associations' claims occurred in this district.

25                         **PARTIES**

26           20.     Plaintiff ACA is a trade association of small and medium-sized cable companies in

27  the United States.  Many of ACA's members are small, family-owned businesses that have served

28

10

FIRST AMENDED COMPLAINT

1    their communities for decades.  Multiple ACA members offer broadband services to households,

2    businesses, and governmental entities in California.

3          21.    Plaintiff CTIA is a non-profit association that represents the wireless

4    communications industry.  Members of CTIA include wireless broadband ISPs operating in the

5    State of California and throughout the country, as well as providers of other wireless services,

6    device manufacturers, and other wireless industry participants.

7          22.    Plaintiff NCTA is the principal national trade association of the cable industry in

8    the United States.  Its members include cable providers offering broadband services to households,

9    businesses, and governmental entities throughout the country, including in California.

10          23.    Plaintiff USTelecom is a non-profit association of service providers and suppliers

11    for the telecommunications industry.  Its members provide broadband services and new Internet

12    Protocol-based services over fiber-rich networks to millions of consumers and businesses across

13    the country, including in California.

14          24.    The Associations have standing to bring the claims asserted in this Complaint on

15    behalf of their members because (a) the subject matter of this suit is germane to the Associations'

16    purpose; (b) members of the Associations would have standing on their own to bring these claims,

17    given the substantial harms that members face if the invalid and unconstitutional state measures at

18    issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires

19    the participation of the Associations' individual members in this lawsuit.

20          25.    Defendant Xavier Becerra is the Attorney General of California.  Pursuant to

21    Article V, Section 13 of the California Constitution, as well as his common law *parens patriae*

22    power, he is the "chief law officer of the State" with the "duty" "to see that the laws of the State

23    are uniformly and adequately enforced," and to "prosecute any violations of law" whenever "in

24    the opinion of the Attorney General any law of the State is not being adequately enforced."  Cal.

25    Const. art. V, § 13.  Additionally, under California's Unfair Competition Law, the Attorney

26    General has the power to bring an action against businesses for violations of SB-822's

27    requirements.  *See* Cal. Bus. & Prof. Code § 17200 (prohibiting "any unlawful, unfair or fraudulent

28    business act"); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539-40 (Cal.

FIRST AMENDED COMPLAINT

1999) ("By proscribing 'any unlawful' business practice, 'section 17200 borrows violations of other laws and treats them as unlawful practices' . . . ." (quoting *State Farm Fire & Cas. Co. v. Super. Ct.*, 53 Cal. Rptr. 2d 229, 234 (Ct. App. 1996))); Cal. Bus. & Prof. Code § 17204 (providing enforcement authority to the Attorney General for violations of § 17200).  The Attorney General thus has both "direct authority and practical ability to enforce the challenged statute."  *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846 (9th Cir. 2002).  The Attorney General has pledged that it will be "a priority for his office" to "preserv[e] net neutrality protections for California's consumers."  Cal. S. Judiciary Comm., SB-822, 2017-2018 Sess. at 22 (Apr. 23, 2018), https://bit.ly/2DGvGry.  He is sued in his official capacity only.

**STATEMENT OF FACTS**

***The Associations' Members***

26.     The Associations' members provide broadband to customers throughout California. These members provide broadband in California (and throughout the country) using extensive wired and wireless networks that enable the routing of data packets along dynamic paths without regard for state or even national boundaries.  It is "well-settled" that the Associations' members' broadband offerings are "jurisdictionally interstate service[s] because 'a substantial portion of Internet traffic involves accessing interstate or foreign websites.'" 2018 Order ¶ 199 (quoting *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000)); *see also id.* ¶¶ 199-200 (collecting cites to extensive prior FCC and judicial precedent in support).  "Because both interstate and intrastate communications can travel over the same Internet connection (and indeed may do so in response to a single query from a consumer), it is impossible or impracticable for ISPs to distinguish between intrastate and interstate communications over the Internet or to apply different rules in each circumstance." *Id.* ¶ 200.

27.     Moreover, as the Internet is a "network of networks," ISPs must interconnect with numerous other network operators to exchange Internet traffic—including large "backbone" providers, which carry high volumes of Internet traffic, content delivery networks ("CDNs"), which store content in geographically distributed locations for more efficient delivery, and other intermediate network providers.  The highly interconnected nature of the Internet ensures that there

FIRST AMENDED COMPLAINT

are many paths to an ISP's network for any particular Internet content provider (also known as an "edge provider").  Although many edge providers pay intermediate network providers to reach ISPs and their customers, some edge providers have found it more efficient to invest in their own content distribution networks, which they then seek to interconnect directly with ISPs.  Those edge providers often pay ISPs for that direct interconnection, sharing the costs associated with delivery of that traffic consistent with longstanding and well-established market practices.  ISPs typically offer "settlement-free" interconnection (that is, interconnection without monetary payment by either party) to network operators that offer a generally balanced exchange of traffic and mutual value to the providers (and their customers) on both sides.  Where the exchange of traffic or value instead is significantly out of balance, or substantially unidirectional, it is common for the interconnection arrangement to involve payment in one direction or the other.  Moreover, interconnecting providers often agree to share the costs of upgrading capacity at interconnection points caused by shifts in traffic volumes or flows.  These payments help ensure that no provider is saddled with funding network costs imposed disproportionately by another, and provide market-driven incentives for interconnecting parties to exchange Internet traffic in an efficient and predictable manner.  This is how the Internet has operated for decades.  Absent such paid interconnection arrangements, all network costs would be shifted to ISPs' customers.  In addition, the potential for traffic congestion that degrades end users' online experiences would increase significantly.

### *Federal Law Governing Broadband Internet Access Service*

28.    In 1996, Congress made clear that it is "the policy of the United States" "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), as well as to encourage the deployment of broadband Internet access capabilities by "remov[ing] barriers to infrastructure investment," *id*. § 1302(a).  The provision of broadband in general—and the issue of net neutrality in particular—have long been the focus of substantial regulatory interest and activity at the federal level.  That is as it should be, given the inherently interstate nature of Internet service.  For many years before 2015, the FCC repeatedly made clear that broadband is properly

FIRST AMENDED COMPLAINT

1    classified as an interstate information service and, therefore, free from common-carrier-style

2    regulation.  *See, e.g.*, Memorandum Opinion and Order, *In re GTE Telephone Operating Cos.*, 13

3    FCC Rcd. 22466, ¶¶ 16-19 (1998); Declaratory Ruling and Notice of Proposed Rulemaking,

4    *Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC

5    Rcd. 4798, ¶¶ 38-39 (2002); Report and Order and Notice of Proposed Rulemaking, *Appropriate*

6    *Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 FCC Rcd. 14853,

7    ¶ 12 (2005); Memorandum Opinion and Order, *United Power Line Council's Petition for*

8    *Declaratory Ruling Regarding the Classification of Broadband Over Power Line Internet Access*

9    *Service as an Information Service*, 21 FCC Rcd. 13281 (2006); Declaratory Ruling, *Appropriate*

10   *Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 FCC Rcd.

11   5901 (2007); *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

12   1003 (2005) (upholding the FCC's 2002 determination that broadband is an information service).

13        29.    In 2010, the FCC confirmed its classification of broadband as an interstate

14   information service but sought to impose prohibitions against blocking and unreasonable

15   discrimination under various statutory provisions.  The D.C. Circuit vacated those requirements,

16   however, finding that they imposed common carrier obligations on entities that were statutorily

17   exempt from such regulation in light of their status as information service providers.  *See Verizon*,

18   740 F.3d at 659 (vacating in part Report and Order, *Preserving the Open Internet*, 25 FCC Rcd.

19   17905 (2010) ("2010 Order").

20        30.    **The 2015 Order.**  On remand from *Verizon*, in 2015, the FCC temporarily deviated

21   from its longstanding classification of broadband as an information service when it adopted the

22   2015 Order, which reclassified "mass-market retail" broadband as an interstate

23   "telecommunications service."  *See* 2015 Order ¶¶ 25, 189, 308.  The FCC simultaneously

24   abandoned the longstanding classification of mobile broadband as a "private mobile service" and

25   reclassified "mass-market retail" mobile broadband as a "commercial mobile service."  *Id.* ¶ 388.

26   With these changes to then-existing law, the FCC was able to subject mass-market fixed and

27   mobile broadband to common carrier regulation.  Exercising that newly created authority, it did

28

FIRST AMENDED COMPLAINT

just that, adopting a set of net neutrality regulations governing broadband providers. The regulations included the following three so-called "bright-line" rules:

- No blocking: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or non-harmful devices, subject to reasonable network management." 2015 Order ¶ 15.

- No throttling: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management." *Id.* ¶ 16.

- No paid prioritization: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not engage in paid prioritization. 'Paid prioritization' refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶ 18.

31.    The FCC also adopted a general "Internet Conduct Standard," which stated: "Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be considered a violation of this rule." *Id.* ¶ 21. Notably, in the context of adopting the Internet Conduct Standard, the FCC considered a ban on "zero-rating." *Id.* ¶ 151. Zero-rating describes a service where a broadband provider does not charge its customers for using data in connection with particular applications or services (such as video streaming), including where the

FIRST AMENDED COMPLAINT

1   provider of those applications or services pays for the data usage on behalf of the customer,

2   analogous to toll-free telephone service.  But, even in an otherwise far-reaching order, the FCC

3   declined to impose a presumptive ban on zero-rating, observing that "new [zero-rated] service

4   offerings, depending on how they are structured, could benefit consumers and competition," and

5   thus opting instead for case-by-case review of specific zero-rating plans under the Internet Conduct

6   Standard.  *Id.* ¶ 152.  The 2015 Order expressly acknowledged that the Internet Conduct Standard,

7   together with the bright-line rules it adopted, constituted common carrier regulation.  *See id.*

8   ¶¶ 288-296.

9        32.   Additionally, the 2015 Order provided for "case-by-case" review of the

10  "reasonable[ness]" of ISPs' practices when interconnecting with other network operators and

11  exchanging Internet traffic through those connections.  *See id.* ¶¶ 202-206.  This, too, was framed

12  as an application of common carrier obligations to broadband.  *See id.* ¶ 204.  In establishing this

13  case-by-case review of ISPs' interconnection and traffic-exchange practices, the FCC expressly

14  declined to "apply the open Internet rules to interconnection."  *Id.* ¶ 30; *see also id.* ¶ 202 ("We do

15  not believe that it is appropriate or necessary to subject arrangements for Internet traffic exchange

16  . . . to the rules we adopt today.").  The FCC also rejected proposals to ban payments in the context

17  of Internet interconnection and traffic exchange—which, as noted above, have long been

18  commonplace in the marketplace and help promote efficiency and predictability.  *See id.* ¶ 202

19  (declining "to draw policy conclusions concerning new paid Internet traffic exchange

20  arrangements between broadband Internet access service providers and edge providers, CDNs, or

21  backbone services").

22       33.   The FCC supplemented these common carrier regulations with rules intended to

23  ensure that Internet access service providers are transparent about their network-management

24  practices and terms of service.  To that end, the 2015 Order left in place transparency requirements

25  first adopted in 2010, though the FCC added certain non-codified "enhancements" to the

26  requirements.  *See id.* ¶ 23 ("A person engaged in the provision of broadband Internet access

27  service shall publicly disclose accurate information regarding the network management practices,

28  performance, and commercial terms of its broadband Internet access services sufficient for

FIRST AMENDED COMPLAINT

consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings."); *id.* ¶ 24 (describing the enhancements).

34.    Finally, the 2015 Order "reaffirm[ed] the Commission's longstanding conclusion that broadband Internet access service is jurisdictionally interstate for regulatory purposes." *Id.* ¶ 431.  The FCC's conclusion turned on the "Internet's inherently global and open architecture," which makes "end-to-end jurisdictional analysis"—of the sort that would enable the identification of a purely intrastate component—"extremely difficult[,] if not impossible." *Id.*

35.    **The 2018 Order.**  In 2017, the FCC reexamined this departure from its historical approach to broadband regulation and adopted the 2018 Order, which restored the pre-2015 classification of broadband as an interstate "information service," as well as the pre-2015 classification of mobile broadband as a "private mobile service."   Recognizing that the Communications Act precludes subjecting these services to common carrier regulation, and relying on an in-depth analysis of the public interest, the FCC accordingly repealed the so-called bright-line rules in the 2015 Order on blocking, throttling, and paid prioritization, as well as the Internet Conduct Standard.  *See* 2018 Order ¶¶ 239, 246-267.  The 2018 Order also eliminated the 2015 Order's case-by-case oversight of ISPs' interconnection practices, based on extensive record evidence showing that "present competitive pressures in the market for Internet traffic exchange . . . undermine the need for regulatory oversight." *Id.* ¶ 170.  In lieu of these requirements, relying on its authority under Section 257 of the Communications Act, the 2018 Order revised the transparency rule to expressly require that broadband providers publicly and clearly disclose any blocking, throttling, paid prioritization, or affiliated prioritization.  *See id.* ¶ 220.  The FCC preserved the core requirement that ISPs disclose key terms relating to broadband performance, commercial terms, and network management, *see id.* ¶ 215, while rescinding certain "enhancements" that the 2015 Order had imposed, such as requirements concerning the disclosure of highly technical performance characteristics, which the FCC determined would not be useful to consumers, *see id.* ¶¶ 214-215, 221-222.

FIRST AMENDED COMPLAINT

36.     The FCC further determined that the FTC has both the authority and capability to "enforce any commitments made by ISPs regarding their network management practices," including the net neutrality commitments the Associations and their members had made publicly. *Id.* ¶ 141 (citing 15 U.S.C. § 45(a)).  It further noted that federal antitrust laws, enforceable by both the FTC and Department of Justice, provide additional protections.  *See id.* ¶ 143.  Thus, the FCC concluded that "the [revised] transparency rule," "in combination with the state of broadband Internet access service competition and the antitrust and consumer protection laws, obviates the need for conduct rules by achieving comparable benefits at lower cost."  *Id.* ¶ 239.

37.     The 2018 Order further reaffirmed the FCC's longstanding (and bipartisan) determination that broadband is inherently interstate and must be governed by "a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements." 2018 Order ¶ 194.  Indeed, the FCC has long confirmed its "preemption authority to preclude states from imposing obligations on broadband service that are inconsistent with the [FCC's] carefully tailored regulatory scheme."  2015 Order ¶ 433.  Federal courts have likewise affirmed that broadband is an "'interstate and foreign communication by wire' within the meaning of Title I of the Communications Act," *Comcast Corp. v. FCC*, 600 F.3d 642, 646-47 (D.C. Cir. 2010) (quoting 47 U.S.C. § 152(a)), and thereby subject to the "centraliz[ed] authority" of the FCC, 47 U.S.C. § 151.

38.     Building on its long-held position, the FCC explained in the 2018 Order that it was establishing "a calibrated federal regulatory regime [for broadband] based on the pro-competitive, deregulatory goals of the 1996 Act."  2018 Order ¶ 194.  Allowing state and local governments to adopt their own separate, and more burdensome, requirements for broadband service, the FCC explained, could "significantly disrupt the balance" struck by federal law and "could impair the provision of such service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates."  *Id.*

39.     The FCC also included a broadly worded, express preemption provision in the 2018 Order.  That provision states that the 2018 Order "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain

FIRST AMENDED COMPLAINT

1  from imposing in this order or that would impose more stringent requirements for *any aspect* of

2  broadband service" addressed in that order, 2018 Order ¶ 195 (emphases added), "includ[ing] any

3  state laws that would require the disclosure of broadband Internet access service performance

4  information, commercial terms, or network management practices in any way inconsistent with

5  the transparency rule adopted" by the 2018 Order, *id.* ¶ 195 n.729.  The FCC explained that state

6  efforts to regulate in this area "could pose an obstacle to or place an undue burden on the provision

7  of broadband Internet access service and conflict with the deregulatory approach" adopted in the

8  2018 Order.  *Id.* ¶ 195.  Indeed, even the 2015 Order determined "that broadband Internet access

9  service is jurisdictionally interstate for regulatory purposes," 2015 Order ¶ 431—as the 2018 Order

10  reaffirmed, *see* 2018 Order ¶ 199—and admonished states not to "frustrate federal broadband

11  policies," 2015 Order ¶ 433.

12       40.     On October 1, 2019, the D.C. Circuit largely upheld the 2018 Order.  *See Mozilla*

13  *Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).  The D.C. Circuit concluded that the FCC had

14  reasonably classified broadband Internet access service as an information service, *see id.* at 18-35,

15  and wireless broadband as a private mobile service, *see id.* at 35-45.  The D.C. Circuit also

16  determined—following a review of the record—that the FCC had authority under Section 257 of

17  the Communications Act to impose "transparency" requirements, and had reasonably determined

18  that a combination of "transparency" and "existing antitrust and consumer protection laws can

19  adequately protect Internet openness."  *Id.* at 47-49, 56.[7]

20       41.     The D.C. Circuit vacated the 2018 Order's express preemption of all state and local

21  broadband regulation, because it found that the FCC lacked explicit statutory authority to preempt

22  "*any and all* forms of state regulation of *intra*state broadband" through a "Preemption Directive"

23  that "sweeps broader than ordinary conflict preemption."  *Id.* at 81-82 (emphasis added).  The D.C.

24

25      [7] The D.C. Circuit remanded "three discrete issues" to the FCC for further explanation—

26  involving public safety, pole attachments, and the federal Lifeline program—but did not vacate
   the 2018 Order.  *Mozilla*, 940 F.3d at 18.  The FCC is conducting a proceeding on these discrete

27  issues.  *See* Public Notice, *Wireline Competition Bureau Seeks To Refresh Record in Restoring*
   *Internet Freedom and Lifeline Proceedings in Light of the D.C. Circuit's Mozilla Decision*, 35

28  FCC Rcd. 1446 (2020).

FIRST AMENDED COMPLAINT

1   Circuit repeatedly emphasized that the flaw in the FCC's "sweeping Preemption Directive" was

2   its "categorical[] aboli[tion of] all fifty States' statutorily conferred authority to regulate *intra*state

3   communications." *Id.* at 74, 86 (emphasis added); *see id.* at 80-81 (finding the FCC lacked

4   "authority . . . to kick the States out of *intra*state broadband regulation") (emphasis added).  The

5   court did not hold that states could regulate *inter*state broadband or address whether the federal

6   Communications Act preempts any state efforts to do so.  The D.C. Circuit also did not identify

7   any distinct "intrastate broadband" service that the states were authorized to regulate or decide

8   whether the 2018 Order preempted any particular state law, "because no particular state law [wa]s

9   at issue in [that] case" and so "it would be wholly premature to pass on the preemptive effect,

10  under conflict or other recognized preemption principles, of the remaining portions of the 2018

11  Order" that the court did not vacate.  *Id.* at 85-86.

12      42.     On February 6, 2020, the D.C. Circuit denied the petitioners' motion for rehearing

13  en banc.  No party timely petitioned for a writ of certiorari.

14      43.     The 2018 Order enjoys the full protection of the Supremacy Clause.  The Supreme

15  Court has long recognized that "[f]ederal regulations have no less pre-emptive effect than federal

16  statutes," *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982), and that "a

17  federal agency acting within the scope of its congressionally delegated authority may pre-empt

18  state regulation and hence render unenforceable state or local laws that are otherwise not

19  inconsistent with federal law," *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988) (internal

20  quotation marks omitted).  In holding that the FCC acted within its authority in (i) classifying

21  broadband as an interstate information service, (ii) repealing the prohibitions against blocking,

22  throttling, and paid prioritization and the imposition of the "Internet Conduct Standard" on the

23  ground that such measures are unnecessary and counterproductive, and (iii) imposing

24  "transparency" requirements under Section 257 as a more reasonable basis, when combined with

25  existing antitrust and consumer protection laws, for adequately protecting Internet openness, the

26  *Mozilla* court established that those federal determinations preempt conflicting state laws.  *See*

27  *Mozilla*, 940 F.3d at 85 (noting that the conflict preemption doctrine will invalidate a state law if

28  a "state practice actually undermines the 2018 Order"); *see also id.* (explaining that any suggestion

FIRST AMENDED COMPLAINT

1   that conflict preemption will be unavailable because the FCC lacked authority to categorically

2   preempt all state laws misapprehends the conflict preemption doctrine).

3          44.    Moreover, a federal determination that an area is best left "*un*regulated" carries "as

4   much pre-emptive force as a decision *to* regulate."  *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv.*

5   *Comm'n*, 461 U.S. 375, 384 (1983) (emphasis in original); *see also Geier v. Am. Honda Motor*

6   *Co.*, 529 U.S. 861, 883-84 (2000) (federal determination that statutory objectives, including

7   promoting innovation, were best achieved through less rather than more regulation constituted a

8   substantive determination with preemptive force); *Minn. Pub. Utils. Comm'n. v. FCC*, 483 F.3d

9   570, 580 (8th Cir. 2007) (recognizing that "deregulation" is a "valid federal interest[] the FCC may

10  protect through preemption of state regulation").  States thus must respect, and not flout, the 2018

11  Order's determinations regarding the proper regulatory status of broadband, and its repeal of the

12  blocking and other common carrier rules from the 2015 Order (in favor of a transparency-based

13  enforcement regime), just like any other federal law.

14                              *California's SB-822*

15         45.    On August 31, 2018, the California Legislature passed SB-822.  From inception

16  through enactment, the sponsors of SB-822 have made crystal clear that the purpose of this statute

17  is to nullify the FCC's decision to restore the longstanding, light-touch regulatory approach, and

18  re-impose the rejected federal regime.  *E.g.*, Hearing on SB-822, at 6, Cal. Assembly Comm. on

19  Commc'ns & Conveyance (Aug. 22, 2018), https://bit.ly/2D2E4li (quoting bill authors' statement

20  that "[w]hen the federal government decides to walk away from this duty [to regulate broadband]

21  and its authority to regulate this industry, it is up to the states to protect their residents," and that

22  "Senate Bill 822 steps in and puts California at the national forefront of ensuring an open

23  internet"); *id.* at 9 ("This bill seeks to codify the prescribed [2015 Order rules that were repealed

24  by the 2018 Order] . . . ."); Press Release, *Senators Wiener and De Leon and Assemblymembers*

25  *Santiago and Bonta Announce Agreement on California Bill with Strongest Net Neutrality*

26  *Protections in the Country* (July 5, 2018), https://bit.ly/2QoftbL ("[T]he legislators announced an

27  agreement on bill language that will ensure California enacts strong, comprehensive, and

28  enforceable net neutrality reflecting what was repealed by the FCC last year."); Press Release,

21

FIRST AMENDED COMPLAINT

*Senator Wiener to Introduce Net Neutrality Legislation in California* (Dec. 14, 2017), https://bit.ly/2IwASwH (announcing "plans to introduce legislation to establish net neutrality protections in California after the Federal Communications Commission repealed national Net Neutrality regulations").

46.   SB-822 directly re-imposes the very same regulatory restrictions that the FCC considered and repealed in the 2018 Order.   SB-822 prohibits ISPs offering broadband to customers in California from, among other things, "[b]locking lawful content, applications, services, or nonharmful devices"; "[i]mpairing or degrading lawful Internet traffic on the basis of Internet content, application, or service"; and "[e]ngaging in paid prioritization."  Cal. Civ. Code § 3101(a)(1), (2), (4).[8]  These provisions are largely identical to the three bright-line rules adopted in the 2015 Order and later rescinded in the 2018 Order.  *Compare* Cal. Civ. Code § 3101(a)(1), *with* 2015 Order ¶ 15; *compare* Cal. Civ. Code § 3101(a)(2), *with* 2015 Order ¶ 16; *compare* Cal. Civ. Code § 3101(a)(4), *with* 2015 Order ¶ 18.  SB-822 also incorporates the Internet Conduct Standard adopted in the 2015 Order, and rescinded in the 2018 Order, nearly verbatim.  *Compare* Cal. Civ. Code § 3101(a)(7)(A), *with* 2015 Order ¶ 21.

47.   Indeed, SB-822 actually goes *further* than the 2015 Order.  First, while the 2015 Order declined to prohibit zero-rating and instead subjected the practice to case-by-case review under the Internet Conduct Standard, *see supra* ¶ 31, SB-822 imposes outright bans on "[e]ngaging in zero-rating in exchange for consideration, monetary or otherwise, by third parties" and on "[z]ero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category."  Cal. Civ. Code § 3101(a)(5)-(6).  These prohibitions effectively outlaw zero-rated offerings that have been available in the marketplace since before the 2015 Order and remain available today, including in California, thereby depriving consumers of the ability to use data for free.

---

[8] Citations to the California Civil Code refer to the Code sections that will be amended by SB-822.

FIRST AMENDED COMPLAINT

48.     Second, while the 2015 Order opted for case-by-case review of ISPs' interconnection and traffic-exchange practices, and expressly declined to prohibit paid interconnection and traffic-exchange arrangements or to apply other bright-line prohibitions to those arrangements, *see supra* ¶ 32, SB-822 imposes restrictions on direct interconnection arrangements between ISPs and edge providers.  In particular, SB-822 restricts ISPs offering broadband from "entering into ISP traffic exchange agreements that . . . evade the prohibitions contained" in Sections 3101 and 3102.  Cal. Civ. Code § 3101(a)(9); *see id.* § 3100(m) (defining ISP traffic-exchange agreements).     SB-822 also restricts those ISPs from "[r]equiring consideration, monetary or otherwise, from an edge provider, including, but not limited to, in exchange for any of the following: (A) [d]elivering Internet traffic to, and carrying Internet traffic from, the Internet service provider's end users[;] (B) [a]voiding having the edge providers' content, application, service, or nonharmful device blocked from reaching the Internet service provider's end users[;] [and] (C) [a]voiding having the edge providers' content, application, service, or nonharmful device impaired or degraded."  *Id.* § 3101(a)(3).  And Section 3104 provides that "any waiver of the provisions of this title is contrary to public policy and shall be unenforceable and void."  *Id.* § 3104.  It is not clear how these vague provisions will be interpreted and applied, but they create substantial marketplace uncertainty with regard to existing and future arrangements between ISPs and edge providers.[9]

49.     Then-Governor Brown signed SB-822 into law on September 30, 2018.

50.     SB-822 was scheduled to take effect on January 1, 2019.  *See* Cal. Const. art. IV, § 8(c)(1).  On September 30, 2018, the United States Department of Justice filed a complaint and motion for a preliminary injunction seeking to enjoin enforcement of SB-822.  *See United States*

---

[9] SB-822 also includes its own disclosure requirement for ISPs—one that differs from the revised transparency rule adopted in the 2018 Order.  *Compare* 2018 Order ¶ 215 (requiring disclosure of "accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and other small businesses to develop, market, and maintain Internet offerings"), *with* Cal. Civ. Code § 3101(a)(8) (requiring that disclosures also be sufficient "for content, application, service, and device providers to develop, market, and maintain Internet offerings").

FIRST AMENDED COMPLAINT

1    *v. California*, No. 2:18-cv-02660-JAM-DB (E.D. Cal. Sept. 30, 2018).  Plaintiffs did the same

2    shortly thereafter.  (ECF # 1, 3).  In light of California's then-ongoing challenge to the 2018 Order,

3    the parties agreed to stay this litigation, subject to the State's agreement that it would "not take

4    any action to enforce, or direct the enforcement of, Senate Bill 822 in any respect" during the

5    pendency of the State's petition for review of the 2018 Order, through this Court's resolution of

6    any renewed motions for a preliminary injunction halting SB-822.  (*See id.*, ECF # 15, at 6 (Oct.

7    26. 2018) ("Parties' Stip.").  Pursuant to the State's agreement, *see id.*, the filing of a renewed

8    motion for a preliminary injunction extends California's promise to not enforce SB-822 until the

9    Court reaches a decision on that motion.

10                                   ***SB-822 Is Preempted***

11           51.    Federal law preempts SB-822 in multiple respects, under field preemption, express

12   preemption, and conflict preemption.  SB-822 impermissibly regulates in a field preempted by the

13   Communications Act; it regulates private mobile services in a manner Congress expressly

14   preempted; it is flatly inconsistent with, and stands as an obstacle to, the Communications Act's

15   prohibitions against subjecting information services and private mobile services to common carrier

16   regulation; and it deliberately flouts the FCC's binding determinations in the 2018 Order.

17           52.    **Field Preemption.**  SB-822 regulates interstate communications in violation of the

18   Communication Act's assignment of exclusive jurisdiction over such services to the FCC.  *See* 47

19   U.S.C. § 152.  The FCC is "totally entrusted" with the regulation of interstate communications,

20   while states may regulate only "[p]urely intrastate communications," *NARUC*, 746 F.2d at 1498;

21   *see also Mozilla*, 940 F.3d at 86 (recognizing "States' statutorily conferred authority to regulate

22   intrastate communications").[10]  "The Supreme Court has held that the establishment [in the Act]

23   _____

24           [10] *See also State Corp. Comm'n of State of Kan. v. FCC*, 787 F.2d 1421, 1427 (10th Cir.

25   1986) (Section 152 "has been uniformly interpreted" as giving the FCC jurisdiction over all
     communications except "local matters" that by "their nature and effect are separable from and do

26   not substantially affect the regulation of interstate communications"); Memorandum Opinion and
     Order, *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the*

27   *Minnesota Public Utilities Commission*, 19 FCC Rcd. 22404, ¶ 16 (2004) (FCC has "exclusive

28

                                                                  FIRST AMENDED COMPLAINT

of this broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968) (collecting cases); *see, e.g.*, *Postal Tel.-Cable Co..*, 251 U.S. at 30-31 (federal act designed "to bring under federal control the interstate business of telegraph companies . . . was an occupation of the field by Congress which excluded state action"). Accordingly, "interstate communications service[s] are to be governed solely by federal law" because "Congress intended to occupy the field." *Worldcom, Inc.*, 343 F.3d at 654 (citation omitted).

53.     Broadband undisputedly involves communications among points across the United States and around the globe, as the servers that contain the content customers access and enable the services customers use via the Internet are geographically dispersed across all states.  If there were such a thing as an intrastate broadband service, SB-822 makes no attempt to identify it or regulate only that intrastate service.  And both the FCC and federal courts have repeatedly held that this service, so defined, is an interstate communications service.  *See, e.g.*, 2015 Order ¶ 431 ("broadband Internet access service is jurisdictionally interstate for regulatory purposes"); *USTelecom*, 825 F.3d at 730-31 (same).[11]  In fact, SB-822 defines the service it seeks to regulate as an interstate service:  a "mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data from, *all or substantially all Internet endpoints*."  Cal. Civ. Code § 3100(b) (emphasis added).  SB-822's definition of broadband is virtually identical to the definition the FCC used in the 2018 Order, the 2015 Order,

jurisdiction over 'all interstate and foreign communication'") (quoting 47 U.S.C. § 152(a)), *petitions for review denied, Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007); Memorandum Opinion and Order, *AT&T and the Associated Bell System Cos. Interconnection with Specialized Carriers*, 56 F.C.C.2d 14, ¶ 21 (1975) ("[T]he States do not have jurisdiction over interstate communications . . . ."), *aff'd, California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977) (per curiam).

[11] As the Ninth Circuit recognized, the FCC and courts had reached the same conclusion as to "dial up" Internet access service.  *See Pac. Bell v. Pac-W. Telecomm, Inc.*, 325 F.3d 1114, 1126 (9th Cir. 2003) ("[T]he FCC and the D.C. Circuit have made it clear that ISP traffic is 'interstate' for jurisdictional purposes.").

FIRST AMENDED COMPLAINT

and prior orders.  *See, e.g.*, 2018 Order ¶¶ 24, 176; 2015 Order ¶ 25 (noting that this definition is "[c]onsistent" with the definition in the FCC's 2010 Order); *see also* 47 C.F.R. § 8.1(b) (2018).[12]

54.      Because SB-822 expressly seeks to regulate an interstate communications service, it intrudes into the field that Congress intended the FCC to occupy and is therefore preempted. *See*, *e.g.*, *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733-34 (9th Cir. 2016).[13] And notwithstanding the law's severability provision, *see* SB-822 § 3, SB-822's definition of broadband Internet access service is not severable under California law.

55.      **Express Preemption.**  SB-822 also is expressly preempted as it applies to mobile broadband services.  Congress in 1993 expressly preempted state attempts to "regulate the entry of or the rates charged by . . . any private mobile service."  47 U.S.C. § 332(c)(3)(A).  SB-822 seeks to regulate the "modes and conditions under which" wireless providers may offer a private mobile service, which are among "the very areas reserved to the FCC" under § 332(c)(3)(A). *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000); *see Johnson*, 781 F.3d at 705.  SB-822 also regulates the rates charged for private mobile service by prohibiting certain forms of zero-rating, and making it unlawful for mobile broadband providers to apply a consumer-friendly rate of $0 to a portion of their customers' private mobile services.  *See NASUCA*, 457 F.3d at 1254.

---

[12] The reference in SB-822's definition of broadband to customers "in California" does not change the analysis.  *See* Cal. Civ. Code § 3100(b).  As the FCC has consistently held, an "end-to-end jurisdictional analysis," which considers the location of the end points of a communication rather than where the customer receiving the service is located, is used to determine whether a service is interstate or intrastate.  *See* 2015 Order ¶ 431; *USTelecom*, 825 F.3d at 730.  The fact that *one* end point is located in California does not entitle the State to regulate an interstate service. And, even where both end points may be located in California, SB-822 makes no attempt to limit its reach to such incidental transmissions; instead, by definition, it regulates Internet traffic reaching "all Internet endpoints," Cal. Civ. Code § 3100(b).

[13] Nothing in *Mozilla* suggests that states have authority to regulate interstate broadband. On the contrary, the D.C. Circuit repeatedly identified as the problem with the FCC's express preemption decision that it made "a categorical determination that any and all forms of state regulation of *intrastate* broadband would inevitably conflict with the 2018 Order."  *Mozilla*, 940 F.3d at 82 (emphasis added); *see id.* at 80-81, 86.

FIRST AMENDED COMPLAINT

56.     **Conflict Preemption.**  SB-822 impermissibly imposes common carrier regulation on broadband providers in conflict with federal law.  The Communications Act prohibits the imposition of common carrier regulation on broadband providers except "to the extent" that they provide a "telecommunications service" or, in the case of wireless providers, a "commercial mobile service."  47 U.S.C. §§ 153(51), 332(c)(1)(A).  The FCC determined in the 2018 Order that broadband is an information service, not a telecommunications service.  2018 Order ¶¶ 86-87.  The FCC also determined that wireless broadband is a private mobile service, not a commercial mobile service.  *Id.* ¶ 74.  In so doing, the FCC further held that these classifications best achieve federal policies of "encourag[ing] broadband investment and innovation, [and] making broadband available to all Americans and benefitting the entire Internet ecosystem."  *Id.* ¶¶ 74, 86.  The D.C. Circuit affirmed these aspects of the 2018 Order.  *Mozilla*, 940 F.3d at 18-35.

57.     Because broadband is an information service rather than a telecommunications service, broadband providers are exempt from common carrier regulation under federal law.  *See Verizon*, 740 F.3d at 650 (finding it "obvious that the Commission would violate the Communications Act were it to regulate broadband providers as common carriers," given the Commission's decision to "classify broadband providers . . . as providers of 'information services'").  And, because wireless broadband is a private mobile service, rather than a commercial mobile service, wireless broadband providers are doubly exempt from common carrier regulation.  *See id.* (finding that, "because the Commission has classified mobile broadband service as a 'private' mobile service . . . , treatment of mobile broadband providers as common carriers would violate section 332"); *Cellco P'ship*, 700 F.3d at 538.

58.     As explained above, the D.C. Circuit previously struck down the FCC's nearly identical, pre-2015 broadband rules precisely because it found that they imposed common carrier requirements on providers that are exempt from such regulation.  *See Verizon*, 740 F.3d at 657-68 (holding that a net neutrality regime that includes flat bans on blocking and paid prioritization and thus leaves "no room at all for individualized bargaining" constitutes impermissible common carrier regulation of information service providers (internal quotations marks and citations omitted)).  Indeed, when the FCC imposed the Internet Conduct Standard's prohibition on

FIRST AMENDED COMPLAINT

unreasonable interference, it acknowledged that this rule "represents [its] interpretation of sections 201 and 202 [of Title II of the Communications Act, designated as "Common Carrier Regulation"] in the broadband Internet access context" and thus constitutes common carrier regulation.  *See* 2015 Order ¶ 137; *see also* 47 U.S.C. § 201(b) (requiring that common carriers' practices be "just and reasonable"); *id.* § 202(a) (similarly prohibiting common carriers from engaging in "unjust or unreasonable discrimination").  By imposing common carrier regulation on both information services and private mobile services, SB-822 squarely conflicts with the federal prohibition on such regulation embodied in the Communications Act (as well as in the 2018 Order, as discussed further below), and is therefore preempted.  *See Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715, 718 (8th Cir. 2018) ("[A]ny state regulation of an information service conflicts with the federal policy of nonregulation, so that such regulation is preempted by federal law." (internal quotation marks and citation omitted)).

59.   Relatedly, SB-822's ban on certain zero-rating offerings also conflicts with Congress's express rejection of state authority to regulate the rates that private mobile service providers charge their customers.  *See* 47 U.S.C. § 332(c)(3)(A) ("[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service.").  By banning mobile broadband providers from setting the price for certain data their customers send and receive at zero, SB-822 plainly regulates the "rates charged by . . . a[] private mobile service" in violation of federal law.  SB-822 is preempted in part for this reason as well.

60.   SB-822 also conflicts with the entirety of the FCC's 2018 Order, undermining the binding legal and policy determinations upheld in *Mozilla*, thus giving rise to conflict preemption. Indeed, the admitted purpose and unmistakable effect of SB-822 is to reinstate rules the FCC had adopted in the 2015 Order but later repealed in the 2018 Order.  The final Senate floor analysis of the bill noted that its purpose is to effect a "continuation of net neutrality requirements" established by the 2015 Order but repealed by the 2018 Order.  Senate Floor Analysis: SB-822, Cal. S. Rules Comm., at 4 (Aug. 30, 2018), https://bit.ly/2DGvGry.  The rules or requirements that the FCC repealed in the 2018 Order include the prior no-blocking rule, no-throttling rule, no-paid-

FIRST AMENDED COMPLAINT

1   prioritization rule, Internet Conduct Standard, and oversight of ISPs' interconnection and traffic-

2   exchange practices.  SB-822 reinstates all of these repealed rules.[14]

3       61.     In fact, SB-822 goes even further than the repealed federal rules.  As set forth above,

4   SB-822 includes a ban on certain zero-rating practices, which the 2015 Order never did.  *See* 2015

5   Order ¶ 153 (declining to ban zero-rating and subjecting the practice to case-by-case review under

6   the Internet Conduct Standard).   SB-822 also imposes ambiguous restrictions that create

7   substantial uncertainty regarding paid interconnection agreements between ISPs and edge

8   providers, which the 2015 Order sought to protect from heavy-handed regulation.  *See, e.g.*, *id.*

9   ¶ 202 (declining to outlaw paid interconnection or to apply net neutrality rules to the

10  interconnection marketplace).  These aspects of SB-822 plainly conflict with the 2018 Order, but

11  notably they would even have been preempted by the 2015 Order.  *See* 2015 Order ¶ 433.

12      62.     Therefore, SB-822 unquestionably stands as an obstacle to the federal policy of

13  reducing regulation of broadband by re-imposing the same regulations the FCC repealed, and by

14  enacting more intrusive restrictions in other areas.  *See, e.g.*, *City of New York*, 486 U.S. at 64

15  ("The statutorily authorized regulations of an agency will pre-empt any state or local law that

16  conflicts with such regulations or frustrates the purposes thereof."); *Ark. Elec. Co-op. Corp.*, 461

17  U.S. at 384 (a "federal determination that the area is best left *un*regulated" carries "as much pre-

18  emptive force as a decision *to* regulate") (emphasis in original).  These measures blatantly flout

19  the FCC's statutorily authorized, federal policy determinations and harm ISPs and consumers both

20  by constraining the development of innovative new services at lower prices and by subjecting ISPs

21  to a patchwork of complex, burdensome, and inconsistent regulation.

22                      ***SB-822 Violates the Dormant Commerce Clause***

23      63.     SB-822 independently violates the Commerce Clause of the United States

24  Constitution, Art. I, § 8, cl. 3, both because it regulates "commerce occurring wholly outside the

25

26  _____

27          [14] As noted above, SB-822 also includes a disclosure requirement that differs from the 2018 Order's revised transparency rule.  *See supra* note 9.  This requirement is preempted as well under conflict preemption principles.  Indeed, California would have had no reason to enact SB-822's

28  disclosure requirement if the intent were merely to replicate the FCC's existing transparency rule.

1   boundaries of [California]," *Healy v. Beer Inst..*, 491 U.S. 324, 336 (1989), and because it imposes

2   excessive burdens on interstate commerce that outweigh any purported local benefit, *Pike v. Bruce*

3   *Church, Inc.*, 397 U.S. 137, 146 (1970).  Under the "dormant" or "negative" Commerce Clause, a

4   state may not "discriminate against or burden the interstate flow of articles of commerce," *Or.*

5   *Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994), or "erect barriers against

6   interstate trade," *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980).  SB-822 plainly violates

7   these core constitutional principles.

8       64.    SB-822 is *per se* unconstitutional because it "has the 'practical effect' of regulating

9   commerce occurring wholly outside [California's] borders."  *Healy*, 491 U.S. at 332.  As the FCC

10   has long recognized, and as courts have confirmed, Internet access service is inherently interstate,

11   and it is impossible or impracticable to separate Internet service into intrastate and interstate

12   activities.  *See, e.g.*, 2018 Order ¶¶ 199-200 (citing prior FCC orders).  Under the "packet

13   switching" approach that undergirds all Internet transmissions, content is divided up into data

14   packets that ISPs deliver by routing them over a variety of interconnected networks along dynamic

15   paths without regard for state boundaries, which practically forecloses any effort to segregate

16   intrastate from interstate Internet communications.  Moreover, Internet websites draw content and

17   may contain hyperlinks to other servers that can be located anywhere across the globe, making it

18   all the more impracticable to identify any purely intrastate Internet communication.  As this Court

19   has recognized, "'it is difficult, if not impossible, for a state to regulate internet activities without

20   projecting its legislation into other States.'"  *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1024

21   (E.D. Cal. 2017) (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003), which

22   invalidated a state statute regulating certain Internet activities because the "[I]nternet's geographic

23   reach . . . makes state regulation impracticable").

24       65.    Additionally, while some of the Internet's major regional interconnection points are

25   located in California, an even larger number of those interconnection points are located *outside* of

26   California.  It is not clear what the provisions of SB-822 quoted above in the interconnection

27   context mean, but because SB-822 appears to regulate Internet traffic-exchange agreements

28   without regard to where the interconnection points are located, it also regulates extraterritorially

                                    FIRST AMENDED COMPLAINT

in at least two ways.  First, interconnection points in California also handle traffic destined for customers in other states, so SB-822 necessarily regulates Internet traffic that crosses California's borders on the way to or from out-of-state customers.  Second, because interconnection points located outside of California handle traffic destined for customers in California, SB-822 necessarily regulates traffic exchange occurring wholly outside California.  While a number of other states have enacted their own broadband regulations or promulgated executive orders on the topic—and an even larger number of states have not done so—none besides California has undertaken to regulate Internet interconnection and traffic exchange.  By contrast, SB-822 uniquely regulates such inherently interstate activities through ambiguous provisions regulating the exchange of Internet traffic, including outside of California.  It is not clear how these provisions will be interpreted or applied, but it seems inevitable that these California regulations will conflict with other states' decisions to leave such arrangements to the marketplace, without regulation. Just as the preemption doctrines discussed above enforce the primacy of federal law with respect to interstate services like broadband, so too does the dormant Commerce Clause protect against the encroachment of burdensome, inconsistent, and potentially contradictory state-level regimes for such services.

66.  SB-822 independently violates the dormant Commerce Clause because it imposes burdens on interstate commerce that are "excessive in relation to the putative local benefits" to California.  *Pike*, 397 U.S. at 142.  As the FCC has found, the requirements that the State of California seeks to re-impose place significant burdens on interstate commerce that outweigh any benefits those rules provide.  *See* 2018 Order ¶¶ 239-266.  For example, SB-822 revives the FCC's Internet Conduct Standard, which the FCC repealed because it "subjects providers to substantial regulatory uncertainty" and in turn led them to "forgo or delay innovative service offerings . . . that benefit consumers," and because the "net benefit of the Internet Conduct Standard is *negative*." 2018 Order ¶¶ 246-249 (emphasis added).  In eliminating that rule, the FCC found that such action likely would "benefit consumers, increase competition, and eliminate regulatory uncertainty that has a corresponding chilling effect on broadband investment and innovation."  *Id.* ¶ 249 (internal quotation marks and citations omitted).  Further, SB-822's restrictions on paid interconnection

FIRST AMENDED COMPLAINT

1   arrangements with edge providers expose to potential liability existing business practices that

2   provide benefits to consumers, edge providers, and broadband providers alike.  The same is true

3   insofar as SB-822 prohibits zero-rating.  No less importantly, the Supreme Court has warned

4   against the burden imposed on interstate commerce caused "by subjecting activities to inconsistent

5   regulations."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *see also Nat'l Ass'n*

6   *of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (recognizing that

7   "significant burdens on interstate commerce generally result from inconsistent regulation of

8   activities that are inherently national or require a uniform system of regulation").  In the context

9   of the Internet in particular, compliance with a patchwork of inconsistent state laws is inherently

10  burdensome and likely impossible.

11         67.    Against these burdens, the State did not, and indeed cannot, identify any local

12  benefits SB-822 will provide, much less benefits that outweigh the heavy burdens imposed on

13  interstate commerce—particularly in light of the 2018 Order's investment-friendly approach to

14  open Internet principles.  As described above, the 2018 Order implements detailed transparency

15  requirements under which ISPs must clearly disclose their network practices and terms of service.

16  ISPs must disclose blocking, throttling, paid prioritization, congestion management, and other

17  network-management practices and performance characteristics.  2018 Order ¶¶ 219-222.  These

18  disclosures enable consumers to choose between ISPs; moreover, ISP commitments and

19  disclosures are fully enforceable by the FTC,[15] as well as by state attorneys general, under federal

20  and state unfair and deceptive trade practices laws (provided they enforce such commitments in a

21  manner consistent with federal law).  *See* 2018 Order ¶¶ 196, 244; *see also id.* ¶ 242.  Beyond

22  those transparency requirements, consumer protection and antitrust laws provide a backstop

23  against any anti-competitive behavior.  The FCC found that these constraints "will significantly

24  reduce the likelihood that ISPs will engage in actions that would harm consumers or competition."

25  *Id.* ¶ 116.  And in the *Mozilla* decision, the court upheld that conclusion.  940 F.3d at 55-59.

26

27  _____

28  [15] The FTC has authority under Section 5 of the FTC Act to take enforcement action
    challenging any "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(1).

FIRST AMENDED COMPLAINT

68.     In concluding that this "lighter touch" approach would protect consumers, while better promoting innovation and investment, the FCC found, based on its evaluation of the record evidence, that "ISPs have strong incentives to preserve Internet openness," 2018 Order ¶ 117, and that "there has been a shift toward ISPs resolving openness issues themselves with less and less need for Commission intervention," *id.* ¶ 242.  In that vein, all of the Associations' members, either on their own or through their Associations, have made public commitments to preserve Internet openness, which, as described above, are fully enforceable.

69.     The Supreme Court has held that state regulations fail the dormant Commerce Clause's balancing test where, as here, the purported benefit "could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.  SB-822 fails even to offer a factual basis for the claims that its provisions will benefit the State, and that is plainly insufficient to overcome the excessive burdens these provisions impose on interstate commerce.  *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 530 (1959) (when "balanced against the clear burden on commerce," a state's "inconclusive" showing of benefit is insufficient to defeat a dormant Commerce Clause challenge).

70.     Furthermore, courts have long recognized that the dormant Commerce Clause prevents states from "imped[ing] . . . the free flow of commerce" where there exists a "need of national uniformity." *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 767 (1945); *Morgan v. Virginia*, 328 U.S. 373, 386 (1946).  Indeed, courts foresaw the very dilemma SB-822 poses, with one Court of Appeals observing "that the internet will soon be seen as falling within the class of subjects that are protected from state regulation because they 'imperatively demand[] a single uniform rule.'" *Am. Booksellers Found.*, 342 F.3d at 104 (quoting *Cooley v. Bd. of Wardens*, 53 U.S. 299, 319 (1851)).  As predicted, SB-822 is at the vanguard of inconsistent, incongruous, and incompatible Internet access service regulations being adopted by numerous states in disregard of the need for federal primacy and uniformity.  The dormant Commerce Clause is a bulwark "against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337.  SB-822 demands application of this constitutional bulwark here.

                    FIRST AMENDED COMPLAINT

1

*Injury to the Associations' Members*

2    71.    SB-822 poses substantial harms to the Associations' members.  It subjects the

3 Associations' members to unconstitutional legal requirements—a significant injury in and of itself,

4 and one that courts have found to be irreparable for purposes of issuing a permanent injunction.

5 *See, e.g.*, *NCAA v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (holding that enactment of a

6 law "in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring

7 the issuance of a permanent injunction"), *aff'd sub nom. NCAA v. Governor of N.J.*, 730 F.3d 208

8 (3d Cir. 2013).

9    72.    As set forth in more detail in the accompanying Motion for Preliminary Injunction

10 and supporting declarations, SB-822's ambiguous restrictions on paid interconnection agreements

11 between ISPs and edge providers create uncertainty that will harm ISPs' businesses.  Those

12 provisions will influence ongoing commercial negotiations with edge providers, and even transit

13 providers, CDNs, and other Internet network operators, some of which undoubtedly will claim that

14 SB-822 entitles them to free interconnection with ISPs despite the costs to the ISPs and their

15 customers.  And SB-822 subjects ISPs' existing agreements with these entities to the threat of legal

16 challenges under the vague "eva[sion]" standard in § 3101(a)(9).  Furthermore, if the State or these

17 other providers claim that SB-822 regulates the nationwide exchange of Internet traffic so long as

18 that traffic is sent to or from California users of broadband, ISPs face the risk of having to alter

19 their traffic exchange agreements and potentially to reconfigure their physical networks

20 nationwide.  If the State or these other providers instead claim that SB-822 regulates the exchange

21 of all Internet traffic at points *within* California, some providers likely will engage in arbitrage by

22 routing substantial amounts of their Internet traffic to interconnection points in California in an

23 attempt to obtain increased interconnection capacity on ISPs' networks for free, thus causing

24 significant additional congestion and disruption at ISPs' California facilities.  This could lead to

25 congestion at the California interconnection points, affecting the quality of services sent over

26 broadband networks and causing customer dissatisfaction.  That in turn could lead to a spike in

27 customer service inquiries, which impose increased costs for broadband providers, as well as

28 irretrievable loss of customers and goodwill.  It could also lead to under-utilization of

1    interconnection points outside California, stranding significant investment.    All of these harms

2    will result in financial losses and other injuries that members can never recoup from the State.

3          73.    SB-822's ban on certain zero-rating practices similarly outlaws existing business

4    practices and imposes substantial harms.  Zero-rating offerings benefit consumers who purchase

5    mobile broadband plans that charge them a flat, monthly rate for a certain quantity of data, as those

6    customers incur additional charges if they exceed that monthly data allowance. Zero-rating thus

7    enables consumers to use services, such as video streaming services, without incurring substantial

8    data overages.  Zero rating provides customers more data for the same money, while also

9    benefiting the edge providers who encourage the use of their content by bearing the costs of the

10   associated data usage on behalf of their customers.  It can also benefit edge providers that do not

11   participate in the program by effectively increasing the amount of data customers can use with

12   their offerings.  Mobile broadband providers also benefit, as the ability of customers to get more

13   data for the same money makes their service more attractive in the highly competitive marketplace

14   for mobile broadband.  Members' continued offering of zero-rated services will likely expose

15   members to enforcement action and harm their reputation, whereas discontinuing these services

16   will lead to lost business and profits and will harm customers that currently benefit from those

17   services including through lower prices, causing harm to members' reputation and customer

18   goodwill.  Notifying millions of customers about the change in service and investing substantial

19   resources to ensure ongoing compliance with SB-822 would entail further costs.  The resulting

20   financial losses and other harms likewise will not be recoverable from the State.

21          74.    Other requirements imposed by SB-822 will also cause irreparable injury to the

22   businesses of the Associations' members.  For instance, the 2018 Order makes clear that the

23   Internet Conduct Standard, which the FCC specifically repealed but which SB-822 reinstates for

24   California ISPs, subjects ISPs (and their customers) to significant harm.  *See* 2018 Order ¶¶ 246-

25   252.  This "vague Internet Conduct Standard subjects providers to substantial regulatory

26   uncertainty," *id.* ¶ 247, as a result of which "ISPs and edge providers of all sizes have foregone

27   and are likely to forgo or delay innovative service offerings or different pricing plans that benefit

28   consumers, citing regulatory uncertainty under the Internet Conduct Standard in particular," *id.*

FIRST AMENDED COMPLAINT

¶ 249.   At least one broadband provider already suspended certain of its beneficial network-management practices, in part because of the threat of liability that SB-822 and potential other copycat state measures would impose, thereby depriving its customers of the benefits of such practices.  The loss of business opportunities caused by the application of and compliance with SB-822 will therefore result in irreparable harm to the Associations' members.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that the district court did not abuse its discretion in finding a permanent injunction necessary to prevent loss of business opportunities).

75.     More broadly, state measures such as these that impose burdensome requirements on ISPs "impair the provision of [broadband Internet access] service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates."  2018 Order ¶ 194.  As noted above, this harmful "patchwork" of state regulation has already become a reality.  In addition to California, three other states (Washington, Oregon, and Vermont) have enacted state-specific net neutrality legislation.  Additionally, six states (Hawaii, Montana, New Jersey, New York, Rhode Island, and Vermont) have issued executive orders establishing state-specific net neutrality obligations.  There is significant variation among these state measures.  For example, in contrast to SB-822, which reinstates the FCC's repealed Internet Conduct Standard, the New York executive order imposes an entirely different catch-all provision prohibiting ISPs from "requir[ing] that end users pay different or higher rates to access specific types of content or applications."  *See* New York EO-175 (signed Jan. 24, 2018), *available at* https://on.ny.gov/2LBkRGY.  Because of the inherently interstate nature of the Internet, providers cannot apply California's requirements to Internet packets as they move through California, and then apply New York's requirements when those packets travel through New York.  The provision of broadband is already being "impair[ed]" by the imposition of these separate and inconsistent state regulatory regimes.  2018 Order ¶ 194.  And these sorts of variations will only multiply as other states enact net neutrality legislation, and different agencies and courts in different states interpret and enforce each state's requirements differently.

FIRST AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CLAIM FOR RELIEF**

*SB-822 Is Preempted by Federal Law*

76.     The allegations of paragraphs 1 through 75 above are incorporated as though fully set forth herein.

77.     SB-822 is preempted by the Communications Act and the 2018 Order.  Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that contravene validly enacted federal law are preempted and have no force or effect.  SB-822 contravenes binding federal law as set forth in the Communications Act and the 2018 Order, and is therefore preempted.

78.     SB-822 regulates in a field preempted by federal law under the Communications Act, which precludes states from regulating interstate communications services.  Congress granted the FCC exclusive regulatory authority over those services, and expressly denied such authority to the states.  *See* 47 U.S.C. §§ 151, 152.  Because SB-822 expressly seeks to regulate an undisputedly interstate service, SB-822 is preempted.

79.     SB-822 is also expressly preempted as applied to mobile broadband providers, because it regulates both the entry and the rates of mobile broadband, which is a private mobile service.  *See id.* § 332(c)(3)(A).

80.     SB-822 further runs afoul of the Communications Act by subjecting providers of an information service (and, in the case of wireless providers, a private mobile service) to common carrier regulation.  The 2018 Order reclassifies broadband as an information service and mobile broadband as a private mobile service, both of which are exempt from common carrier regulation under the Communications Act.  By basing its requirements on standards formerly predicated on classifying broadband as a common carrier telecommunications service, SB-822 imposes common carrier regulation on ISPs in violation of the express terms of the Communications Act and federal policy and is therefore preempted for that reason as well.

81.     SB-822 is further subject to conflict preemption because it stands as an obstacle to and frustrates the federal policy of reducing regulation of broadband as set forth in the 2018 Order.  SB-822 seeks to reinstate the very requirements that the 2018 Order repealed.  And SB-822

FIRST AMENDED COMPLAINT

expands those obligations to a larger set of practices and services than the repealed federal regulations covered, by imposing even more stringent prohibitions.   Accordingly, SB-822 is preempted by the 2018 Order.

82.     SB-822 subjects the Associations' members to significant and irreparable harm by imposing unconstitutional requirements on members, outlawing existing business practices, causing members to lose business opportunities, and impairing members' services by exposing them to a patchwork of inconsistent regulation.

83.     California's enforcement of SB-822 will deprive the Associations' members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

### *SB-822 Violates the Dormant Commerce Clause*

84.     The allegations of paragraphs 1 through 83 above are incorporated as though fully set forth herein.

85.     SB-822 violates the Commerce Clause of the United States Constitution.   U.S. Const. art. I, § 8, cl. 3.

86.     SB-822 is a state measure that regulates conduct occurring outside the borders of the State.  It also imposes burdens on interstate commerce that are not justified by putative in-state benefits.  Binding precedent holds that such state regulations are invalid under the Commerce Clause.

87.     SB-822 subjects the Associations' members to significant and irreparable harm by imposing unconstitutional requirements on members, outlawing existing business practices, causing members to lose business opportunities, and impairing members' services by exposing them to a patchwork of inconsistent and burdensome regulation.

88.     California's enforcement of SB-822 will deprive the Associations' members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

FIRST AMENDED COMPLAINT

1

2

**PRAYER FOR RELIEF**

3

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

4

    1.  A declaration and judgment pursuant to 28 U.S.C. § 2201 that SB-822 is preempted

5

        by federal law.

6

    2.  A declaration and judgment pursuant to 28 U.S.C. § 2201 that SB-822 violates the

7

        Commerce Clause.

8

    3.  Preliminary and permanent injunctive relief preventing Defendant from enforcing

9

        or giving effect to SB-822.

10

    4.  An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

11

    5.  Such further relief as the Court deems just and equitable.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

Dated: August 5, 2020

Respectfully submitted,

/s/   *Marc R. Lewis*

Scott H. Angstreich*                          Marc R. Lewis (CA SBN 233306)
Leslie V. Pope*                               LEWIS & LLEWELLYN LLP
Alex A. Parkinson*                            601 Montgomery Street, Suite 2000
KELLOGG, HANSEN, TODD,                        San Francisco, CA 94111
    FIGEL & FREDERICK, P.L.L.C.               (415) 800-0591
1615 M Street, NW, Suite 400                  mlewis@lewisllewellyn.com
Washington, DC 20036
(202) 326-7900                                *Attorney for Plaintiffs*
sangstreich@kellogghansen.com                 *American Cable Association,*
lpope@kellogghansen.com                       *CTIA – The Wireless Association,*
aparkinson@kellogghansen.com                  *NCTA – The Internet & Television*
                                              *Association, and USTelecom –*
*Attorneys for Plaintiffs*                    *The Broadband Association*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*       Matthew A. Brill*
                                              Matthew T. Murchison*
Jeffrey A. Lamken (CA SBN 154217)             Ryan S. Baasch*
MOLOLAMKEN LLP                                James A. Tomberlin*
The Watergate, Suite 500                      LATHAM & WATKINS LLP
600 New Hampshire Avenue, NW                  555 Eleventh Street NW, Suite 1000
Washington, DC 20037                          Washington, DC 20004
(202) 556-2000                                (202) 637-2200
jlamken@mololamken.com                        matthew.brill@lw.com
                                              matthew.murchison@lw.com
*Attorney for Plaintiff*                      ryan.baasch@lw.com
*American Cable Association*                  james.tomberlin@lw.com

* Admitted *pro hac vice*                     *Attorneys for Plaintiff*
                                              *NCTA – The Internet & Television*
                                              *Association*

FIRST AMENDED COMPLAINT

**EXHIBIT A**



### Senate Bill No. 822

### CHAPTER 976

An act to add Title 15 (commencing with Section 3100) to Part 4 of Division 3 of the Civil Code, relating to communications.

[Approved by Governor September 30, 2018. Filed with Secretary of State September 30, 2018.]

LEGISLATIVE COUNSEL'S DIGEST

SB 822, Wiener. Communications: broadband Internet access service.

Existing law imposes certain obligations in the context of particular transactions, and provides mechanisms to enforce those obligations.

This bill would enact the California Internet Consumer Protection and Net Neutrality Act of 2018. This act would prohibit fixed and mobile Internet service providers, as defined, that provide broadband Internet access service, as defined, from engaging in specified actions concerning the treatment of Internet traffic. The act would prohibit, among other things, blocking lawful content, applications, services, or nonharmful devices, impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, and specified practices relating to zero-rating, as defined. It would also prohibit fixed and mobile Internet service providers from offering or providing services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services have the purpose or effect of evading the above-described prohibitions or negatively affect the performance of broadband Internet access service.

*The people of the State of California do enact as follows:*

SECTION 1.   (a)  The Legislature finds and declares all of the following:

(1)  This act is adopted pursuant to the police power inherent in the State of California to protect and promote the safety, life, public health, public convenience, general prosperity, and well-being of society, and the welfare of the state's population and economy, that are increasingly dependent on an open and neutral Internet.

(2)  Almost every sector of California's economy, democracy, and society is dependent on the open and neutral Internet that supports vital functions regulated under the police power of the state, including, but not limited to, each of the following:

(A)  Police and emergency services.

(B)  Health and safety services and infrastructure.

(C)  Utility services and infrastructure.

89

(D)  Transportation infrastructure and services, and the expansion of zero- and low-emission transportation options.

(E)  Government services, voting, and democratic decisionmaking processes.

(F)  Education.

(G)  Business and economic activity.

(H)  Environmental monitoring and protection, and achievement of state environmental goals.

(I)  Land use regulation.

(b)  This act shall be known, and may be cited, as the California Internet Consumer Protection and Net Neutrality Act of 2018.

SEC. 2.  Title 15 (commencing with Section 3100) is added to Part 4 of Division 3 of the Civil Code, to read:

TITLE 15.  INTERNET NEUTRALITY

3100.  For purposes of this title, the following definitions apply:

(a)  "Application-agnostic" means not differentiating on the basis of source, destination, Internet content, application, service, or device, or class of Internet content, application, service, or device.

(b)  "Broadband Internet access service" means a mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data from, all or substantially all Internet endpoints, including, but not limited to, any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. "Broadband Internet access service" also encompasses any service provided to customers in California that provides a functional equivalent of that service or that is used to evade the protections set forth in this title.

(c)  "Class of Internet content, application, service, or device" means Internet content, or a group of Internet applications, services, or devices, sharing a common characteristic, including, but not limited to, sharing the same source or destination, belonging to the same type of content, application, service, or device, using the same application- or transport-layer protocol, or having similar technical characteristics, including, but not limited to, the size, sequencing, or timing of packets, or sensitivity to delay.

(d)  "Content, applications, or services" means all Internet traffic transmitted to or from end users of a broadband Internet access service, including, but not limited to, traffic that may not fit clearly into any of these categories.

(e)  "Edge provider" means any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

(f)  "End user" means any individual or entity that uses a broadband Internet access service.

89

(g)  "Enterprise service offering" means an offering to larger organizations through customized or individually negotiated arrangements or special access services.

(h)  "Fixed broadband Internet access service" means a broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes, but is not limited to, fixed wireless services including, but not limited to, fixed unlicensed wireless services, and fixed satellite services.

(i)  "Fixed Internet service provider" means a business that provides fixed broadband Internet access service to an individual, corporation, government, or other customer in California.

(j)  "Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device" means impairing or degrading any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices. The term includes, without limitation, differentiating, positively or negatively, among any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices.

(k)  "Internet service provider" means a business that provides broadband Internet access service to an individual, corporation, government, or other customer in California.

(*l*)  "ISP traffic exchange" means the exchange of Internet traffic destined for, or originating from, an Internet service provider's end users between the Internet service provider's network and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator.

(m)  "ISP traffic exchange agreement" means an agreement between an Internet service provider and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator, to exchange Internet traffic destined for, or originating from, an Internet service provider's end users between the Internet service provider's network and the other individual or entity.

(n)  "Mass market" service means a service marketed and sold on a standardized basis to residential customers, small businesses, and other customers, including, but not limited to, schools, institutions of higher learning, and libraries. "Mass market" services also include broadband Internet access services purchased with support of the E-rate and Rural Health Care programs and similar programs at the federal and state level, regardless of whether they are customized or individually negotiated, as well as any broadband Internet access service offered using networks supported by the Connect America Fund or similar programs at the federal and state level. "Mass market" service does not include enterprise service offerings.

(o) "Mobile broadband Internet access service" means a broadband Internet access service that serves end users primarily using mobile stations. Mobile broadband Internet access service includes, but is not limited to, broadband Internet access services that use smartphones or mobile-network-enabled tablets as the primary endpoints for connection to the Internet, as well as mobile satellite broadband services.

(p) "Mobile Internet service provider" means a business that provides mobile broadband Internet access service to an individual, corporation, government, or other customer in California.

(q) "Mobile station" means a radio communication station capable of being moved and which ordinarily does move.

(r) "Paid prioritization" means the management of an Internet service provider's network to directly or indirectly favor some traffic over other traffic, including, but not limited to, through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity.

(s) "Reasonable network management" means a network management practice that is reasonable. A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for, and tailored to, achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service, and is as application-agnostic as possible.

(t) "Zero-rating" means exempting some Internet traffic from a customer's data usage allowance.

3101.   (a)  It shall be unlawful for a fixed Internet service provider, insofar as the provider is engaged in providing fixed broadband Internet access service, to engage in any of the following activities:

(1)  Blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management.

(2)  Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, subject to reasonable network management.

(3)  Requiring consideration, monetary or otherwise, from an edge provider, including, but not limited to, in exchange for any of the following:

(A)  Delivering Internet traffic to, and carrying Internet traffic from, the Internet service provider's end users.

(B)  Avoiding having the edge provider's content, application, service, or nonharmful device blocked from reaching the Internet service provider's end users.

(C)  Avoiding having the edge provider's content, application, service, or nonharmful device impaired or degraded.

(4)  Engaging in paid prioritization.

89

(5)  Engaging in zero-rating in exchange for consideration, monetary or otherwise, from a third party.

(6)  Zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category.

(7)  (A)  Unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be a violation of this paragraph.

(B)  Zero-rating Internet traffic in application-agnostic ways shall not be a violation of subparagraph (A) provided that no consideration, monetary or otherwise, is provided by any third party in exchange for the Internet service provider's decision whether to zero-rate traffic.

(8)  Failing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.

(9)  Engaging in practices, including, but not limited to, agreements, with respect to, related to, or in connection with, ISP traffic exchange that have the purpose or effect of evading the prohibitions contained in this section and Section 3102. Nothing in this paragraph shall be construed to prohibit Internet service providers from entering into ISP traffic exchange agreements that do not evade the prohibitions contained in this section and Section 3102.

(b)  It shall be unlawful for a mobile Internet service provider, insofar as the provider is engaged in providing mobile broadband Internet access service, to engage in any of the activities described in paragraphs (1), (2), (3), (4), (5), (6), (7), (8), and (9) of subdivision (a).

3102.  (a)  It shall be unlawful for a fixed Internet service provider to offer or provide services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services satisfy either of the following conditions:

(1)  They have the purpose or effect of evading the prohibitions in Section 3101.

(2)  They negatively affect the performance of broadband Internet access service.

(b)  It shall be unlawful for a mobile Internet service provider to offer or provide services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services satisfy either of the conditions specified in paragraphs (1) and (2) of subdivision (a).

(c)  Nothing in this section shall be construed to prohibit a fixed or mobile Internet service provider from offering or providing services other than broadband Internet access service that are delivered over the same last-mile

89

connection as the broadband Internet access service and do not violate this section.

3103.   (a)  Nothing in this title supersedes any obligation or authorization a fixed or mobile Internet service provider may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.

(b)  Nothing in this title prohibits reasonable efforts by a fixed or mobile Internet service provider to address copyright infringement or other unlawful activity.

3104.   Notwithstanding Section 3268 or any other law, any waiver of the provisions of this title is contrary to public policy and shall be unenforceable and void.

SEC. 3.   The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

O