Scott H. Angstreich*
Leslie V. Pope*
Alex A. Parkinson*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
lpope@kellogghansen.com
aparkinson@kellogghansen.com

*Attorneys for Plaintiffs*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*

Jeffrey A. Lamken (CA SBN 154217)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff*
*American Cable Association*

* Admitted *pro hac vice*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 2:18-cv-02684<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. John A. Mendez |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

I.     The Internet ............................................................................................................ 3

II.    Federal Regulation and Deregulation of Broadband Internet Access Service .................. 4

     A.    The FCC's 2010 and 2015 Orders ........................................................ 5

     B.    The FCC's 2018 Order ........................................................................ 6

III.   SB-822 Adopts Measures That Conflict with the 2018 Order ....................................... 7

IV.   Procedural History ................................................................................................. 9

V.    The D.C. Circuit's Decision in *Mozilla Corp. v. FCC* ....................................................... 9

STANDARD OF REVIEW ............................................................................................... 10

ARGUMENT ................................................................................................................ 10

I.     Plaintiffs Are Likely To Succeed on the Merits ......................................................... 10

     A.    SB-822 Regulates in a Preempted Field and Is Expressly Preempted ................. 10

          1.    SB-822 Is Preempted Because It Regulates Interstate Communications Services .................................................... 10

          2.    SB-822 Is Expressly Preempted Insofar as It Regulates Private Mobile Services ................................................................... 13

     B.    SB-822 Is Invalid Under the Conflict Preemption Doctrine ............................... 14

          1.    SB-822 Conflicts with Congress's Prohibition on Common Carrier Regulation of Information Services and Private Mobile Services ........................................................................ 14

              a.    Federal Law Prohibits Imposing Common Carrier Regulation on Information Services and Private Mobile Services ................. 15

              b.    SB-822 Imposes Common Carrier Regulation ........................... 16

          2.    SB-822 Conflicts with the Federal Policy of Light-Touch Regulation for Information Services ..................................................... 18

II.    SB-822 Will Subject Plaintiffs' Members to Immediate and Irreparable Harm .............. 23

III.   The Equities and the Public Interest Favor an Injunction .............................................. 29

CONCLUSION ............................................................................................................. 30

i

# TABLE OF AUTHORITIES

Page

CASES

*All. Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567 (9th Cir. 1988) ..................................... 15

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046
(9th Cir. 2009) .............................................................................23-24, 25, 27, 30

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ............................... 29

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983) ................................ 19

*AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366 (1999)................................................. 12

*Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983 (7th Cir. 2000) .......................... 14

*Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000)................................................. 4

*Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129 (E.D. Cal. 2011) .............................. 30

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847 (9th Cir. 2009), *vacated
and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr.
of S. Cal., Inc.*, 565 U.S. 606 (2012) ................................................................23, 29

*California v. FCC*, 39 F.3d 919 (9th Cir. 1994) ........................................................ 16

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) ............................... 11, 15, 18, 23

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012)........................................... 15, 17

*Chamber of Commerce of U.S. v. Becerra*, 438 F. Supp. 3d 1078 (E.D. Cal.
2020), *appeal pending*, No. 20-15291 (9th Cir.) ........................................24, 25, 27

*Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018),
*cert. denied*, 140 S. Ct. 6 (2019) ............................................................... 21

*Comput. & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982).......................... 16

*Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184 (N.D. Cal. June 2, 2016) .................. 25, 27

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) ........................................ 10

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ..................................... 19, 22

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ....................................................20-21, 23

*Hines v. Davidowitz*, 312 U.S. 52 (1941)................................................................... 15

*Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486 (2d Cir. 1968)...................................................... 11

*Johnson v. Am. Towers, LLC*, 781 F.3d 693 (4th Cir. 2015) ...................................... 14

*Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) .............................. 13

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) .................................... 23

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) ............................... 2, 9, 10, 11, 13, 14, 15, 18, 19, 22

*NARUC v. FCC*:

    525 F.2d 630 (D.C. Cir. 1976) ......................................................... 17

    746 F.2d 1492 (D.C. Cir. 1984) ....................................................... 11

*NASUCA v. FCC*, 457 F.3d 1238 (11th Cir.), *opinion modified on denial of reh'g*, 468 F.3d 1272 (2006) .......................................................................... 14

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) ......................... 13

*Nation v. City of Glendale*, 804 F.3d 1292 (9th Cir. 2015) .......................................... 15

*NCAA v. Christie*, 926 F. Supp. 2d 551 (D.N.J.), *aff'd sub nom.*
*NCAA v. Governor of N.J.*, 730 F.3d 208 (3d Cir. 2013) ................................... 23

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013) ................................................................... 30

*Pac. Bell v. Pac-W. Telecomm, Inc.*, 325 F.3d 1114 (9th Cir. 2003) .......................... 12

*Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868 (D. Ariz. 2012) ................ 30

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919) .................... 11

*Qwest Commc'ns Inc. v. City of Berkeley*, 433 F.3d 1253 (9th Cir. 2006) .................... 13

*Ray v. Atl. Richfield Co.*, 435 U.S. 151 (1978) ....................................................... 19

*Reno v. ACLU*, 521 U.S. 844 (1997) ...................................................................... 3

*Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4 (1942) ......................................... 11

*Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571 (9th Cir. 2008) ............ 13

*State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421 (10th Cir. 1986) ...................... 11

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) .......... 24, 25, 27

*Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781 (9th Cir. 2001) .................... 29

*Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773 (5th Cir. 1990) ...................... 23, 30

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409
(1986) ................................................................................................................16

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*,
139 S. Ct. 453, 454, 455, 474, 475 (2018) ............................................4, 12, 17

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ......................................30

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in part,
rev'd in part, and remanded*, 921 F.3d 865 (9th Cir. 2019), *cert. denied*,
No. 19-532 (U.S. June 15, 2020) ...................................................................30

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) .............................4, 15, 5, 16, 17

*W. Union Tel. Co. v. Boegli*, 251 U.S. 315 (1920) ....................................................11

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................10

*Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003) ................................11


ADMINISTRATIVE DECISIONS

2020 Broadband Deployment Report, *Inquiry Concerning Deployment of Advanced
Telecommunications Capability to All Americans in a Reasonable and
Timely Fashion*, GN Docket No. 19-285, FCC 20-50, 2020 WL 2013309
(rel. Apr. 24, 2020) ...........................................................................................29

Decision Issuing Revised General Order 168, Market Rules to Empower
Telecommunications Consumers and to Prevent Fraud, Decision
06-03-013 (Cal. Pub. Utils. Comm'n Mar. 2, 2006) ......................................16

Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018), *petitions for review granted in part and denied
in part, Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) .................1, 2, 4, 5, 6, 7, 8,
9, 10, 12, 14, 15, 18,
19, 20, 21, 22, 28, 29, 30

Memorandum Opinion and Order, *AT&T and the Associated Bell System Cos.
Interconnection with Specialized Carriers*, 56 F.C.C.2d 14 (1975),
*aff'd*, *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977) ................................11

Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory
Ruling Concerning an Order of the Minnesota Public Utilities Commission*,
19 FCC Rcd. 22404 (2004), *petitions for review denied*, *Minn. Pub. Utils.
Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) ............................................11

Memorandum Opinion and Order on Reconsideration, *Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 2 FCC Rcd. 3035 (1987) .................................................................. 16

Public Notice, *Wireline Competition Bureau Seeks To Refresh Record in Restoring Internet Freedom and Lifeline Proceedings in Light of the D.C. Circuit's Mozilla Decision*, 35 FCC Rcd. 1446 (2020) ...................................... 9

Report and Order, *Preserving the Open Internet*, 25 FCC Rcd. 17905 (2010), *vacated in part and remanded*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ........................................................................................................ 5, 12

Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015), *petitions for review denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S. Ct. 453, 454, 455, 474, 475 (2018) .................... 4, 5, 6, 8, 12, 17, 18, 21, 22, 28

CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. art. VI, cl. 2 (Supremacy Clause) .................................................... 1, 3, 16, 20, 23, 29

Communications Act of 1934, 47 U.S.C. § 151 *et seq.*  ........................................ 1, 2, 3, 4, 6, 9, 10, 11, 15, 18, 20

     47 U.S.C. § 151 ...................................................................................... 2, 11

     47 U.S.C. § 152 ...................................................................................... 2, 11

     47 U.S.C. § 152(a) ...................................................................................... 11

     47 U.S.C. § 153(51) ................................................................................... 15

     47 U.S.C. § 201(b) .................................................................................... 18

     47 U.S.C. § 202(A) .................................................................................... 18

     47 U.S.C. § 230(b)(2) ................................................................................... 4

     47 U.S.C. § 257 ............................................................................... 6, 7, 9, 20

     47 U.S.C. § 332(c)(2) .................................................................................. 15

     47 U.S.C. § 332(c)(3)(A) ..................................................................... 2, 13, 14

     47 U.S.C. § 1302(a) ..................................................................................... 4

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ................................ 12, 15

California Internet Consumer Protection and Net Neutrality Act of 2018,
Cal. Civ. Code § 3100 *et seq.* ................................................................. 1

§ 3100(b) .................................................................................. 4, 8, 12

§ 3100(e) .......................................................................................... 24

§ 3100(m) .......................................................................................... 8

§ 3101(a)(1) ............................................................................. 8, 17, 28

§ 3101(a)(2) ............................................................................. 8, 17, 28

§ 3101(a)(3) ............................................................................. 8, 17, 24

§ 3101(a)(4) ................................................................................. 8, 17

§ 3101(a)(5) ....................................................................... 8, 14, 17, 26

§ 3101(a)(6) ....................................................................... 8, 14, 17, 26

§ 3101(a)(7) ................................................................................. 8, 28

§ 3101(a)(7)(A) .................................................................................. 18

§ 3101(a)(8) ....................................................................................... 8

§ 3101(a)(9) ......................................................................... 8, 18, 24

§ 3101(b) ..................................................................................... 8, 14

§ 3104 ......................................................................................... 25, 26

47 C.F.R.:

§ 8.1(a) (2018) .................................................................................. 8

§ 8.1(b) (2018) ................................................................................ 12

§ 8.1(b) ............................................................................................. 8

§ 8.3 (2016) ....................................................................................... 8


LEGISLATIVE MATERIALS

AB 51 (Cal. 2019) .............................................................................. 24

Hearing on SB-822, Cal. Assembly Comm. on Communications & Conveyance
(Aug. 22, 2018), https://bit.ly/2D2E4li .......................................... 8

Press Release, *Senators Wiener and De Leon and Assemblymembers Santiago and Bonta Announce Agreement on California Bill with Strongest Net Neutrality Protections in the Country* (July 5, 2018), https://bit.ly/2QoftbL ..................................................................................... 7

Press Release, *Senator Wiener to Introduce Net Neutrality Legislation in California* (Dec. 14, 2017), https://bit.ly/2IwASwH ..................................... 7-8

SB-822 (Cal. 2018) ...................................................................................*passim*

OTHER MATERIALS

Compl., *United States v. California*, No. 2:18-cv-02660-JAM-DB, ECF #1 (E.D. Cal. Sept. 30, 2018) .................................................................. 9

Stip. Regarding Temporary Stay of Litig. and Agreement Not To Enforce Senate Bill 822, *United States v. California*, No. 2:18-cv-02660-JAM-DB, ECF #15 (E.D. Cal. Oct. 26, 2018) ................................................... 9, 10, 29

**INTRODUCTION**

California's SB-822 — the "California Internet Consumer Protection and Net Neutrality Act of 2018" — seeks to regulate Plaintiffs' members' provision of broadband Internet access service, the interstate communications service that enables users to access and transmit data across the country and around the world.  In doing so, SB-822 advances its drafters' stated purpose to undermine and conflict with federal law, which has primacy in regulating interstate communications.  SB-822 reimposes regulations that the Federal Communications Commission ("FCC") had adopted in 2015 and then rescinded in 2018.  SB-822 also imposes rules that the FCC in 2015 considered and rejected.  SB-822 conflicts with both the federal Communications Act of 1934 and the FCC's 2018 Order,[1] and, consistent with well-established precedent, is preempted under the Supremacy Clause of the Constitution.

Plaintiffs are trade associations whose members provide broadband Internet access service to customers in California and across the country.  Plaintiffs and their members support an open Internet, which benefits their customers and, therefore, the broadband businesses in which they collectively have invested hundreds of billions of dollars.  Plaintiffs' members, either on their own or through the associations, have publicly committed to preserve core principles of Internet openness, and the FCC's 2018 Order ensures that those commitments are clear and enforceable.  This case, therefore, is not about whether the Internet will remain open.  Instead, this case is about California's effort to frustrate and undermine federal law by imposing state-specific rules on an interstate communications service that the FCC — under both Democratic and Republican administrations spanning more than 20 years — has held must be subject to a single, uniform set of federal rules, instead of a patchwork of state-by-state regulation.

SB-822 is preempted under principles of field, express, and conflict preemption.  First, SB-822 purports to regulate interstate communications services and private mobile services,

---

[1] Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) ("2018 Order"), *petitions for review granted in part and denied in part*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam).

including by imposing entry and rate regulation on private mobile services.  Yet Congress granted the FCC exclusive regulatory authority over the former services and, separately, expressly preempted States from exercising authority over the latter.  *See* 47 U.S.C. §§ 151, 152, 332(c)(3)(A).  Second, even if California could regulate interstate communications services and private mobile services, SB-822 is preempted because it conflicts with the Communications Act by imposing common carrier obligations on those services.  Third, SB-822 also is preempted because it conflicts with the 2018 Order.  SB-822 imposes the same obligations that the FCC rejected or repealed after finding that they are affirmatively harmful both to the continued development of broadband services and to consumers.

This case, filed in 2018, has been stayed while the D.C. Circuit considered challenges to the 2018 Order.  The D.C. Circuit largely upheld that order, but vacated the portion that attempted to expressly and prospectively preempt *all* state and local broadband laws and regulations.  The court found the FCC lacked authority to issue a "sweeping" decision "categorically" preempting all state and local regulation of "intrastate broadband" in the absence of any showing that all such regulation conflicted with or is otherwise preempted by federal law. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 74, 81-82, 86 (D.C. Cir. 2019) (per curiam).  The D.C. Circuit did not hold that States could regulate interstate broadband.  Nor did it address whether the Communications Act itself preempted state regulation — under field, express, or conflict preemption.  And the court likewise made clear it was not addressing the 2018 Order's "preemptive effect under principles of conflict preemption or any other implied-preemption doctrine."  *Id.* at 85.  In fact, the court recognized that some state laws could conflict with, and be preempted by, the 2018 Order.  *See id.* at 85-86.

The D.C. Circuit's rejection of the 2018 Order's express preemption decision therefore has no effect on this case, which presents issues *Mozilla* left open.  And, while sometimes preemption questions are complex, inviting a difficult assessment of whether a state law actually conflicts with federal law, here the issue is unusually straightforward: SB-822 attempts to regulate an interstate communications service that is subject to exclusive federal regulation and in a manner that conflicts with federal law.  Indeed, SB-822's animating purpose and clear

2

effect is to enact rules that the FCC has expressly rejected and that conflict with the Communications Act itself, thereby countermanding federal law.

Because SB-822 violates the Supremacy Clause and thus is unconstitutional, Plaintiffs' members would be irreparably harmed if subjected to that unconstitutional law during the pendency of this litigation.  In addition, although it is not clear how SB-822's vague restrictions on interconnection arrangements between all Plaintiffs' members and Internet content providers ("edge providers") or other Internet network operators will be interpreted and applied, those restrictions create substantial marketplace uncertainty and incentives for the inefficient routing of Internet traffic that will harm Plaintiffs' members.  SB-822 also would outlaw some of CTIA's and USTelecom's members' "zero rating" offerings, which benefit consumers by exempting certain Internet traffic from counting against their monthly data allowance.  And the chilling effects of SB-822's vague Internet Conduct Standard and the uncertain application of its other prohibitions would harm broadband providers by causing them to refrain from engaging in beneficial network-management practices that could be deemed unlawful after the fact.  SB-822 thus would irreparably harm Plaintiffs' members by costing them customers and goodwill, as well as revenues that cannot be recovered from the State.  Finally, the balance of equities and public interest favor injunctive relief.  A preliminary injunction would preserve the status quo, in which the Internet has remained open even as SB-822 has not taken effect pursuant to Defendant's voluntary agreement, and Plaintiffs' members remain subject to enforceable public commitments to preserve core principles of Internet openness.

## BACKGROUND

### I.     The Internet

The Internet is an interconnected web of computer networks that deliver traffic among servers and end users located around the world and provide a host of integrated information-processing capabilities.  *See Reno v. ACLU*, 521 U.S. 844, 849-50 (1997).  Among the companies that build and operate different parts of this network are Internet service providers ("ISPs"), including Plaintiffs' members.  ISPs have invested hundreds of billions of dollars to deploy the broadband infrastructure that gives consumers the capability of sending and

3

1  receiving information to and from other parts of the Internet and dynamically managing such

2  data flows.  *See Verizon v. FCC*, 740 F.3d 623, 628-29 (D.C. Cir. 2014).

3      The FCC and courts have long recognized that broadband[2] is an interstate

4  communications service, because, among other reasons, " 'a substantial portion of Internet traffic

5  involves accessing interstate or foreign websites.' "  2018 Order ¶ 199 (quoting *Bell Atl. Tel. Cos.*

6  *v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000)); *see id.* ¶ 199 nn.739-742 (citing authority); *see also*

7  *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 730-31 (D.C. Cir. 2016) (affirming FCC's

8  jurisdictional determination) ("*USTelecom*"), *cert. denied*, 139 S. Ct. 453, 454, 455, 474, 475

9  (2018).  Indeed, even when a person views a single web page or clicks a single hyperlink, her

10  browser will retrieve content from multiple servers located around the country or the world.  *See*

11  Paradise Decl. ¶ 5.

12  **II.    Federal Regulation and Deregulation of Broadband Internet Access Service**

13      In 1996, Congress made clear that it is "the policy of the United States" "to preserve the

14  vibrant and competitive free market that presently exists for the Internet and other interactive

15  computer services, unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), as well as

16  to encourage the deployment of broadband Internet access capabilities by "remov[ing] barriers

17  to infrastructure investment," *id.* § 1302(a).  For nearly two decades, the FCC consistently

18  implemented that federal policy through "a light-touch approach to the Internet" that rejected

19  "sweeping regulation of Internet service providers."  2018 Order ¶ 9; *see id.* ¶¶ 10-16.

20  Throughout this period — with the exception of a brief detour — the FCC classified broadband

21  as an "information service" and mobile broadband as a "private mobile service," not a

22  "telecommunications service" or a "commercial mobile service."  As such, these services were

23  exempt from common carrier regulation under Title II of the federal Communications Act.  *See*

24  *id.* ¶¶ 9-10, 17.  That "successful light-touch bipartisan framework . . . promoted a free and open

---

25  [2] This memorandum uses the term "broadband" to refer to the mass-market broadband

26  Internet access services sold to consumers and small businesses that were subject to Title II regulation under the FCC's 2015 Order and are included in the definition of broadband Internet

27  access in SB-822.  *See* Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ("2015 Order"); Cal. Civ. Code

28  § 3100(b) (defining broadband Internet access service).

Internet and, for almost twenty years, saw it flourish." *Id*. ¶ 18.

### A.    The FCC's 2010 and 2015 Orders

In 2010, the FCC confirmed its classification of broadband as an interstate information service but sought to impose prohibitions against blocking and unreasonable discrimination under various statutory provisions.  The D.C. Circuit vacated those requirements, finding that they imposed common carrier obligations on entities that were statutorily exempt from such regulation in light of their status as information service providers.  *See Verizon*, 740 F.3d at 659 (vacating in part Report and Order, *Preserving the Open Internet*, 25 FCC Rcd. 17905 (2010) ("2010 Order")).

On remand from *Verizon*, the FCC in 2015 temporarily deviated from its longstanding classifications when it reclassified broadband as a "telecommunications service" and mobile broadband as a "commercial mobile service," so that it could subject them to common carrier regulation under federal law.  *See* 2015 Order ¶¶ 25, 189, 388.  Using that newly asserted authority, the FCC adopted a series of prescriptive rules banning blocking, throttling, and paid prioritization of Internet traffic.  *See id.* ¶¶ 15-16, 18.  The FCC also adopted a broad "Internet Conduct Standard," prohibiting broadband providers from "unreasonably disadvantag[ing]" or "unreasonably interfer[ing]" with end users' access to Internet content and content providers' access to end users.  *Id*. ¶ 21.  The FCC acknowledged that these rules constituted common carrier regulation.  *See id.* ¶¶ 288-296.

The FCC considered a separate ban on "zero rating" — a service where a broadband provider does not charge its customers for using data in connection with particular applications or services (such as video streaming), including where the provider of those applications or services pays for the data usage on behalf of the customer, analogous to toll-free telephone service.  *See id.* ¶ 151.  The FCC rejected claims that it should ban zero rating generally or any particular zero-rating offering, observing that these offerings "could benefit consumers and competition."  *Id*. ¶ 152.  The FCC instead held that it would assess such offerings on a case-by-case basis.  *See id.*

The FCC also rejected claims that it should adopt blanket regulations governing the

terms and conditions on which broadband providers interconnect their networks and exchange

Internet traffic with other network operators and edge providers, including by adopting specific

rules governing interconnection or banning the sharing of interconnection costs between edge

providers or other third parties and broadband providers.  In lieu of prescribing rates or

mandating other terms and conditions, the FCC opted for "case-by-case" review of such

agreements for "reasonable[ness]."  *Id.* ¶¶ 202-206.  The FCC expressly recognized that, in

asserting authority to regulate these interconnection arrangements, it was imposing common

carrier obligations on broadband providers.  *See id.* ¶ 204.

In imposing these measures, the FCC "reaffirm[ed] [its] longstanding conclusion that

broadband Internet access service is jurisdictionally interstate for regulatory purposes" and that

it intended "to preclude states from imposing obligations on broadband service that are

inconsistent with [its] carefully tailored regulatory scheme."  *Id.* ¶¶ 431, 433.

### B.    The FCC's 2018 Order

In the 2018 Order, the FCC "reinstate[d]" the "light-touch information service

framework" that had governed before the 2015 Order.  2018 Order ¶ 2.  The FCC again

classified broadband as an interstate "information service" and mobile broadband as a "private

mobile service," both statutorily immune from common carriage regulation.  *See id.* ¶¶ 2, 18,

65.  In concluding that it should restore the classifications that had applied before 2015, the FCC

weighed the costs and benefits of the 2015 Order's rules and found that "the costs of these rules

to innovation and investment outweigh any benefits they may have."  *Id.* ¶ 4; *see also id.* ¶¶ 86-

154, 239, 246-266 (noting that innovative offerings like mobile zero-rating plans were subject to

prolonged uncertainty under the Internet Conduct Standard).  And the FCC rescinded the 2015

Order's case-by-case oversight of broadband providers' interconnection arrangements, finding

that "competitive pressures in the market for Internet traffic exchange . . . undermine the need

for regulatory oversight."  *Id.* ¶ 170.

In place of the 2015 Order's "utility-style regulation of the Internet," *id.* ¶ 2, the FCC

exercised its authority under Section 257 of the Communications Act to retain "transparency"

requirements that "protect Internet freedom . . . more effectively and at lower social cost," *id.*

¶ 208.  In addition to mandated disclosures relating to performance, pricing, and network-management practices generally, the FCC required broadband providers to disclose — publicly and clearly — any practices that block, throttle, or prioritize traffic for payment or to benefit an affiliate, among other things.  *See id.* ¶¶ 218-223; 47 U.S.C. § 257.  These disclosures, the FCC found, would enable the Federal Trade Commission ("FTC") and States "to enforce any commitments made by ISPs," including the commitments that ISPs have made to manage their networks in line with open Internet principles.  2018 Order ¶¶ 141-142.

The 2018 Order reaffirmed the FCC's longstanding (and bipartisan) determination that broadband is a "predominantly interstate" communications service that must be governed by "a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements."  *Id.* ¶¶ 194, 199.  Finally, the FCC announced that the 2018 Order "preempt[ed] any state or local measures that would effectively impose rules or requirements that [the FCC] ha[s] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that [it] address[ed] in th[e] order."  *Id.* ¶ 195.

California — as well as the California Public Utilities Commission ("CPUC"), the County of Santa Clara, and numerous others — petitioned for review of the 2018 Order.  These petitioners challenged the FCC's reclassification of broadband as an information service and private mobile service; the elimination of the prescriptive rules and Internet Conduct Standard; and the preemption of all state and local broadband regulation.

## III.  SB-822 Adopts Measures That Conflict with the 2018 Order

On September 30, 2018, while the appeal of the 2018 Order remained pending, California enacted SB-822.  The bill's sponsors made clear that their goal was to undo the changes made by the 2018 Order.  The author of SB-822 described it as reinstating "what was repealed by the FCC" in the 2018 Order.[3]  And he said further that SB-822 was designed to

---

[3] Press Release, *Senators Wiener and De Leon and Assemblymembers Santiago and Bonta Announce Agreement on California Bill with Strongest Net Neutrality Protections in the Country* (July 5, 2018), https://bit.ly/2QoftbL; *see also* Press Release, *Senator Wiener to*

1    "step[ ] in" and regulate broadband Internet access service after the FCC "abandoned net

2    neutrality protections."[4]

3            Reflecting its sponsors' intent, SB-822 defines the broadband services subject to its

4    requirements using a definition virtually identical to the FCC's, which reaches high-speed,

5    mass-market Internet access services that "provide[ ] the capability to transmit data to, and

6    receive data from, all or substantially all Internet endpoints." *Compare* Cal. Civ. Code

7    § 3100(b) *with* 47 C.F.R. § 8.1(b).  SB-822 then resurrects rules from the 2015 Order that the

8    FCC repealed in the 2018 Order, including the no-blocking, no-throttling, and no-paid-

9    prioritization rules, as well as the Internet Conduct Standard.  *Compare* Cal. Civ. Code

10   § 3101(a)(1), (2), (4), (7), *with* 2015 Order ¶¶ 15-16, 18, 21; *see also* Cal. Civ. Code § 3101(b)

11   (applying the prescriptive rules to mobile broadband).  SB-822 also adopts a disclosure rule that

12   restores the repealed disclosure regulation from the 2015 Order, rather than the disclosure

13   regulation adopted in the 2018 Order.  *Compare* Cal. Civ. Code § 3101(a)(8) *with* 47 C.F.R.

14   § 8.3 (2016) *and* 47 C.F.R. § 8.1(a) (2018).

15           But SB-822 also goes beyond the 2015 Order.  First, SB-822 includes multiple

16   provisions that, while ambiguous, directly regulate broadband providers' agreements for the

17   exchange of Internet traffic with edge providers and other Internet network operators.  *See* Cal.

18   Civ. Code § 3101(a)(3), (9); *id.* § 3100(m) (defining ISP traffic-exchange agreement).  Second,

19   SB-822 adopts a bright-line rule that prohibits broadband providers — including mobile

20   broadband providers — from "[e]ngaging in zero-rating" in either of two contexts:  when it is

21   "in exchange for consideration, monetary or otherwise, from a third party," *id.* § 3101(a)(5), (b),

22   or when the provider "[z]ero-rat[es] some Internet content, applications, services, or devices in a

23   category of Internet content, applications, services, or devices, but not the entire category," *id.*

24   § 3101(a)(6).

25   _____

26   *Introduce Net Neutrality Legislation in California* (Dec. 14, 2017) (announcing "plans to
     introduce legislation to establish net neutrality protections in California after the [FCC] repealed

27   national Net Neutrality regulations"), https://bit.ly/2IwASwH.

28        [4] Hearing on SB-822, at 6, Cal. Assembly Comm. on Communications & Conveyance
     (Aug. 22, 2018), https://bit.ly/2D2E4li.

1    **IV.    Procedural History**

2         On September 30, 2018, the United States filed a complaint and motion for a preliminary

3    injunction seeking to enjoin enforcement of SB-822.  *See United States v. California*, No. 2:18-

4    cv-02660-JAM-DB, ECF #1 (E.D. Cal. Sept. 30, 2018).  Plaintiffs did the same soon after.  In

5    light of California's then-ongoing challenge to the 2018 Order, both the United States and

6    Plaintiffs agreed to stay this litigation in exchange for the State's agreement that it would "not

7    take any action to enforce, or direct the enforcement of, Senate Bill 822 in any respect" during

8    the pendency of the State's petition for review of the 2018 Order, through this Court's

9    resolution of any renewed motions for a preliminary injunction halting SB-822.  *See id.*, ECF

10   #15, at 6 (Oct. 26, 2018) ("Parties' Stip.").

11   **V.    The D.C. Circuit's Decision in *Mozilla Corp. v. FCC***

12        On October 1, 2019, the D.C. Circuit largely upheld the 2018 Order.  The D.C. Circuit

13   concluded that the FCC had reasonably classified broadband Internet access service as an

14   information service, *see Mozilla*, 940 F.3d at 18-35, and wireless broadband as a private mobile

15   service, *see id.* at 35-45.  The D.C. Circuit also determined — following a review of the record

16   — that the FCC had authority under Section 257 of the Communications Act to impose

17   "transparency" requirements and had reasonably determined that a combination of

18   "transparency" and "existing antitrust and consumer protection laws can adequately protect

19   Internet openness."  *Id.* at 47-49, 56.[5]

20        The D.C. Circuit vacated the 2018 Order's categorical preemption of all state and local

21   broadband regulation, because it found that the FCC lacked express statutory authority to

22   preempt "any and all forms of state regulation of *intra*state broadband" through a "Preemption

23   Directive" that "sweeps broader than ordinary conflict preemption."  *Id.* at 81-82 (emphasis

24   added).  The D.C. Circuit repeatedly emphasized that the flaw in the FCC's "sweeping

25   _____

26        [5] The D.C. Circuit remanded "three discrete issues" to the FCC for further explanation
     — involving public safety, pole attachments, and the federal Lifeline program — but did not
27   vacate the 2018 Order.  *Mozilla*, 940 F.3d at 18.  The FCC is conducting a proceeding on these
     discrete issues.  *See* Public Notice, *Wireline Competition Bureau Seeks To Refresh Record in*
28   *Restoring Internet Freedom and Lifeline Proceedings in Light of the D.C. Circuit's Mozilla*
     *Decision*, 35 FCC Rcd. 1446 (2020).

Preemption Directive" was its "*categorical*[ ] aboli[tion of] all fifty States' statutorily conferred authority to regulate *intra*state communications." *Id.* at 74, 86 (emphases added); *see id.* at 80-81 (finding the FCC lacked "authority . . . to kick the States out of *intra*state broadband regulation") (emphasis added).  The court did not suggest that there *was* a class of intrastate broadband service that the States could regulate, but simply required that the preemption question be decided on the basis of a particular state or local law.  Notably, the court did not hold that States could regulate *inter*state broadband or address the Communications Act's preemption of any state efforts to do so.  The D.C. Circuit also did not decide whether the 2018 Order preempted any particular state law, "because no particular state law [wa]s at issue in th[at] case" and so "it would be wholly premature to pass on the preemptive effect, under conflict or other recognized preemption principles, of the remaining portions of the 2018 Order" that the court upheld.  *Id.* at 85-86.

On February 6, 2020, the D.C. Circuit denied the petitioners' motions for rehearing en banc.  No party timely petitioned for a writ of certiorari.  Pursuant to the State's agreement (*see* Parties' Stip. at 6), the filing of this renewed motion for a preliminary injunction extends California's promise not to enforce SB-822 until the Court reaches a decision on this (and the federal government's similar) motion.

## STANDARD OF REVIEW

This Court should issue a preliminary injunction upon a showing that Plaintiffs are likely to succeed on the merits, their members will suffer irreparable harm absent an injunction, the balance of the equities tips in Plaintiffs' favor, and the public interest favors an injunction.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

**I.      Plaintiffs Are Likely To Succeed on the Merits**

**A.      SB-822 Regulates in a Preempted Field and Is Expressly Preempted**

*1.      SB-822 Is Field Preempted Because It Regulates Interstate Communications Services*

In the Communications Act, Congress granted the FCC — *and denied to the States* —

the authority "to regulate all aspects of interstate communication by wire or radio." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700 (1984); *see* 47 U.S.C. § 151 (describing "the purpose" of the FCC as "regulating interstate and foreign commerce in communication by wire and radio").[6]  Congress "totally entrusted" the FCC with the exclusive authority to regulate interstate communications, while States may regulate only "[p]urely intrastate communications." *NARUC v. FCC*, 746 F.2d 1492, 1498 (D.C. Cir. 1984); 47 U.S.C. § 152; *see also Mozilla*, 940 F.3d at 86 (recognizing "States' statutorily conferred authority to regulate intrastate communications").[7]  "The Supreme Court has held that the establishment [in the Act] of this broad scheme for the regulation of interstate service by communications carriers indicates an intent on the part of Congress to occupy the field to the exclusion of state law." *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968) (collecting cases).  Accordingly, "interstate communications services are to be governed solely by federal law" because "Congress intended to occupy the field." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003).  So, for example, under this jurisdictional division, for decades the interstate aspects of voice telecommunications services (*e.g.*, long distance calls) have been regulated by the FCC, whereas the intrastate aspects of such services (*e.g.*, local telephone calls) have been regulated by the

---

[6] Prior to the Communications Act, the Interstate Commerce Commission ("ICC") had sole authority to regulate interstate and international communications, "occup[ying] . . . the field . . . [and] exclud[ing] state action." *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919); *accord W. Union Tel. Co. v. Boegli*, 251 U.S. 315, 316 (1920).  The Communications Act transferred that authority to the FCC.  *See Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 6 (1942).

[7] *See also State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421, 1427 (10th Cir. 1986) (finding that Section 152 "has been uniformly interpreted" as giving FCC jurisdiction over all communications except "local matters" that by "their nature and effect are separable from and do not substantially affect the regulation of interstate communications"); Memorandum Opinion and Order, *Vonage Holdings Corp. Petition for Declaratory Ruling Concerning an Order of the Minnesota Public Utilities Commission*, 19 FCC Rcd. 22404, ¶ 16 (2004) (finding that FCC has "exclusive jurisdiction over 'all interstate and foreign communication'") (quoting 47 U.S.C. § 152(a)), *petitions for review denied*, *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007); Memorandum Opinion and Order, *AT&T and the Associated Bell System Cos. Interconnection with Specialized Carriers*, 56 F.C.C.2d 14, ¶ 21 (1975) ("the States do not have jurisdiction over interstate communications"), *aff'd*, *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977) (per curiam).

1    States, where the two are severable.[8]

2         Broadband undisputedly involves communications among points across the United

3    States, as the servers containing content and enabling services customers use via the Internet are

4    geographically dispersed.  And both the FCC and federal courts have repeatedly held that this

5    service is an interstate communications service.  *See*, *e.g.*, 2015 Order ¶ 431 ("broadband

6    Internet access service is jurisdictionally interstate for regulatory purposes"); *USTelecom*, 825

7    F.3d at 730-31 (same).[9]  SB-822 does not attempt to define any intrastate broadband service

8    over which California could claim regulatory authority.  Instead, SB-822 defines the service it

9    seeks to regulate as an interstate service:  "a mass-market retail service by wire or radio

10   provided to customers in California that provides the capability to transmit data to, and receive

11   data from, *all or substantially all Internet endpoints*."  Cal. Civ. Code § 3100(b) (emphasis

12   added).  This definition of broadband is virtually identical to the definition the FCC used in the

13   2018 Order, the 2015 Order, and prior orders.  *See*, *e.g.*, 2018 Order ¶¶ 24, 176; 2015 Order ¶ 25

14   (noting that this definition is "[c]onsistent" with the definition in the FCC's 2010 Order); *see*

15   *also* 47 C.F.R. § 8.1(b) (2018).[10]  In addition, there is no "intrastate broadband" service for

16   SB-822 to regulate.  Not only is broadband an interstate service as a legal matter, but, unlike

17

18        [8] The Telecommunications Act of 1996 ("1996 Act") expanded the FCC's authority by
     "broadly extend[ing] [federal] law into the field of intrastate telecommunications."  *AT&T Corp.*
19   *v. Iowa Utils. Bd.*, 525 U.S. 366, 385 n.10 (1999).  To the extent Congress authorized "state
     commissions[ ] [to] participat[e] in the administration of the new *federal* regime," those
20   expressly authorized actions are "to be guided by federal-agency regulations."  *Id.* at 378 n.6.

21        [9] As the Ninth Circuit recognized, the FCC and courts had reached the same conclusion
     as to "dial up" Internet access service.  *See Pac. Bell v. Pac-W. Telecomm, Inc.*, 325 F.3d 1114,
22   1126 (9th Cir. 2003) ("[T]he FCC and the D.C. Circuit have made it clear that ISP traffic is
23   'interstate' for jurisdictional purposes.").

24        [10] Nor does the reference in SB-822's definition of broadband to customers "in
     California," Cal. Civ. Code § 3100(b), change the analysis.  As the FCC has consistently held,
25   an "end-to-end jurisdictional analysis," which considers the location of the end points of a
     communication rather than where the customer receiving the service is located, is used to
26   determine whether a service is interstate or intrastate.  *See* 2015 Order ¶ 431; *USTelecom*, 825
     F.3d at 730.  The fact that *one* end point is located in California does not entitle the State to
27   regulate an interstate service.  And, even where both end points may be located in California,
     SB-822 makes no attempt to limit its reach to such transmissions; instead, by definition, it
28   regulates Internet traffic reaching "all Internet endpoints," Cal. Civ. Code § 3100(b).

providers of voice telecommunications services, ISPs do not sell distinct "local" and "long distance" broadband services.  Nor are ISPs "required to develop a mechanism for distinguishing between interstate and intrastate [broadband] communications merely to provide [States] with an intrastate communication they can then regulate."  *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007).

Because SB-822 expressly seeks to regulate an interstate communications service, it intrudes into the field that Congress intended the FCC to occupy and is therefore preempted.  *See, e.g.*, *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733-34 (9th Cir. 2016).  *Mozilla* nowhere holds, or even suggests, that States have authority to regulate interstate broadband.

Moreover, there is no way to sever the component of SB-822 that applies to interstate broadband and preserve the rest.  There is no language in the definition of broadband in SB-822 that could be excised to limit its reach to intrastate broadband.  Even if there were, given the centrality of SB-822's broad definition of broadband to the function and purpose of the law, there is "no evidence" that the law "would have been adopted without the invalid" definition.  *Qwest Commc'ns Inc. v. City of Berkeley*, 433 F.3d 1253, 1259-60 (9th Cir. 2006) (declining to sever), *overruled on other grounds by Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc).  The definition also cannot be severed from the statute without improperly "affecting [its] general functionality," *id.* at 1259, as the defined term is used throughout SB-822.

   2.   *SB-822 Is Expressly Preempted Insofar as It Regulates Private Mobile Services*

In addition to giving the FCC exclusive jurisdiction over the field of interstate communications services, Congress in 1993 expressly preempted state attempts "to regulate the entry of or the rates charged by . . . any private mobile service."  47 U.S.C. § 332(c)(3)(A).[11]

---

[11] Congress similarly preempted States from "regulat[ing] the entry of or the rates charged by any commercial mobile service," but preserved state authority over "the other terms and conditions of commercial mobile services."  47 U.S.C. § 332(c)(3)(A).  Congress did not similarly preserve any state authority with respect to private mobile services.

The FCC held in the 2018 Order that mobile broadband is not only an interstate information service, but also that it is a private mobile service. *See* 2018 Order ¶ 65. The D.C. Circuit upheld that classification. *See Mozilla*, 940 F.3d at 43.

SB-822 violates both portions of the express preemption provision in § 332(c)(3)(A). First, it seeks to regulate "the entry of . . . [a] private mobile service." The "modes and conditions under which" wireless providers may offer services in a given market are among "the very areas reserved to the FCC" under § 332(c)(3)(A). *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000). State laws that, like SB-822, "obstruct or burden a wireless service provider's ability" to provide a private mobile service by imposing conditions on the manner in which that service is provided are therefore expressly preempted. *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 705 (4th Cir. 2015).

Second, SB-822 regulates "the rates charged by . . . [a] private mobile service" by prohibiting some "zero-rating." Cal. Civ. Code § 3101(a)(5), (6), (b). SB-822 thus directly regulates the rates — by prohibiting a clearly consumer-friendly rate of $0 — for a portion of a customer's private mobile service. In § 332(c)(3)(A), Congress expressly preempted state regulations that "affect the amount that a user is charged for [private mobile] service." *NASUCA v. FCC*, 457 F.3d 1238, 1254 (11th Cir.), *opinion modified on other grounds on denial of reh'g*, 468 F.3d 1272 (2006) (per curiam).

**B.    SB-822 Is Invalid Under the Conflict Preemption Doctrine**

*1.    SB-822 Conflicts with Congress's Prohibition on Common Carrier Regulation of Information Services and Private Mobile Services*

In addition to impermissibly regulating inherently interstate communications services and private mobile service, SB-822's specific means of doing so also directly conflict with federal law. By imposing regulations that have been held to be common carriage on services that are statutorily immune from such regulation, SB-822 stands as an obstacle to accomplishing federal objectives and is therefore preempted.

14

1

     *a.*     *Federal Law Prohibits Imposing Common Carrier Regulation on Information Services and Private Mobile Services*

2          The federal Communications Act separates interstate communications services into

3  distinct categories, authorizing common carrier regulation of some ("telecommunications

4  services" and "commercial mobile services"), while prohibiting the imposition of common

5  carrier requirements on any others (including "information services" and "private mobile

6  services").[12]  These are "mutually exclusive" categories, subject to mutually exclusive

7  regulatory regimes.  *See* 2018 Order ¶¶ 53, 62 & n.239; *Mozilla*, 940 F.3d at 18-19.  The FCC's

8  determination that broadband is an information service — *not* a common carrier

9  "telecommunications service" (or a common carrier "commercial mobile service," in the case of

10  mobile broadband) — unequivocally bars the FCC from imposing common carrier obligations

11  on broadband.  *See*, *e.g.*, *Verizon*, 740 F.3d at 650 (holding that, because broadband is an

12  information service, it is "obvious that the Commission would violate the Communications Act

13  were it to regulate broadband providers as common carriers"); *Cellco P'ship v. FCC*, 700 F.3d

14  534, 538 (D.C. Cir. 2012) ("[M]obile-data providers are statutorily immune, perhaps twice over,

15  from treatment as common carriers.").

16          That bar also precludes state common carrier regulation of interstate information

17  services and private mobile services, which would "stand[ ] as an obstacle" to Congress's

18  decision to immunize these services from such regulation.  *Hines v. Davidowitz*, 312 U.S. 52, 67

19  (1941).[13]  Indeed, for decades, the FCC and the courts — applying both the 1996 Act (which

---

[12] *See* 47 U.S.C. § 153(51) ("A telecommunications carrier shall be treated as a common carrier under this chapter *only* to the extent that it is engaged in providing telecommunications services . . . .") (emphasis added); *id.* § 332(c)(2) ("A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter."); *see also All. Shippers, Inc. v. S. Pac. Transp. Co.*, 858 F.2d 567, 568-69 (9th Cir. 1988) (per curiam) (rejecting argument that, "when service is exempted from regulation by the [ICC] . . . , Congress intended to revive as to the exempted service a [state] law remedy for violation of an obligation imposed on common carriers").

[13] *See also Capital Cities Cable*, 467 U.S. at 699 (explaining that conflict preemption applies where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Nation v. City of Glendale*, 804 F.3d 1292, 1299-300 (9th Cir. 2015) (holding Arizona statute to be preempted because it sought to frustrate a

enacted definitions of "information service" and "telecommunications service") and predecessor regimes — have recognized that subjecting information service providers to common carrier regulation would contravene federal law.[14]  And the Supreme Court has long held in analogous contexts that, where Congress has prohibited federal regulators from imposing specific obligations, States may not impose such regulation without running afoul of the Supremacy Clause.  *See*, *e.g.*, *Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409, 422-23 (1986) (holding that Congress's decision to prevent the Federal Energy Regulatory Commission from regulating certain gas prices preempted States from reintroducing such regulation).  The conflict preemption doctrine therefore prevents California from imposing common carrier regulation on broadband providers, as the CPUC has repeatedly acknowledged. *See*, *e.g.*, Decision Issuing Revised General Order 168, Market Rules to Empower Telecommunications Consumers and to Prevent Fraud at 38, Decision 06-03-013 (CPUC Mar. 2, 2006) ("[T]he federal government has found that all enhanced or information services (in layman's terms, services relating to the Internet) are not subject to Title II common carrier regulations and, as a result, are broadly exempt from state communications regulations.").

### b.   SB-822 Imposes Common Carrier Regulation

Notwithstanding the prohibition on subjecting interstate information services and private mobile services to common carrier regulation, SB-822 imposes common carrier regulation on broadband.  "[T]he basic characteristic" of common carriage is the "requirement of holding oneself out to serve the public indiscriminately."  *Verizon*, 740 F.3d at 651.  Thus, if a service provider "is forced to offer service indiscriminately and on general terms, then [it] is being

---

Secretary of Interior decision and stood as an obstacle to Congress's purposes as reflected in a federal statute).

[14] *See*, *e.g.*, Memorandum Opinion and Order on Reconsideration, *Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry)*, 2 FCC Rcd. 3035, ¶ 181 n.374 (1987) (holding that "[s]tate public utility regulation" (*i.e.*, common carrier regulation) "of entry and service terms and conditions" of "enhanced" services (*i.e.*, the predecessor to information services) would hamper federal attempts to "promot[e] competition and open entry"); *see also Comput. & Commc'ns Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) (rejecting challenge to FCC preemption of state imposition of common carrier regulation on providers of enhanced services); *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) (same).

relegated to common carrier status." *Cellco*, 700 F.3d at 547.  That is exactly what SB-822 does.

Both the D.C. Circuit and the FCC have held that categorical prohibitions on blocking and throttling — like those in SB-822, *see* Cal. Civ. Code § 3101(a)(1), (2) — are common carrier regulations.  *See Verizon*, 740 F.3d at 655-56 (stating the court had "little hesitation" that a throttling ban was common carriage because it compels broadband providers to "hold themselves out" to edge providers "indiscriminately"); *USTelecom*, 825 F.3d at 695 (stating that "anti-blocking" rule "required broadband providers to offer service indiscriminately — the common law test for a per se common carrier obligation").  And, under these holdings, SB-822's related prohibition on "[r]equiring consideration" from an edge provider to avoid blocking or throttling, or in exchange for delivering Internet traffic, reinforces California's intent to require broadband providers to hold themselves out indiscriminately as common carriers under the statute.  *See* Cal. Civ. Code § 3101(a)(3).

The same is true for SB-822's prohibitions on paid prioritization and zero-rating.  *See id.* § 3101(a)(4), (5), (6).  The FCC's prior ban on "unreasonable discrimination" included a prohibition on "pay for priority" arrangements, and the D.C. Circuit found that such a prohibition leaves "no room at all for 'individualized bargaining,' " leading the court to hold that it constitutes common carrier regulation.  *Verizon*, 740 F.3d at 657 (quoting *Cellco*, 700 F.3d at 548).  In fact, SB-822's ban on paid prioritization is even *more* obviously common carrier regulation under that court's reasoning than the prohibition the FCC repealed, which at least (unlike SB-822) enabled providers to seek a waiver.  *See* 2015 Order ¶ 110.  SB-822's bans on certain zero-rating offerings likewise leave "no room" for "individualized bargaining" and thus constitute common carrier regulation, as well as prohibited rate regulation.  *Verizon*, 740 F.3d at 657; *see also NARUC v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) ("[A] carrier will not be a common carrier where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal.").

SB-822 also imposes common carrier regulation on broadband providers by establishing a sweeping duty not to "[u]nreasonably interfer[e] with, or unreasonably disadvantag[e],"

Internet traffic.  Cal. Civ. Code § 3101(a)(7)(A).  When the FCC similarly imposed such a rule in the 2015 Order, it acknowledged that this rule "represents [its] interpretation of sections 201 and 202 [of Title II of the federal Communications Act, designated as 'Common Carrier Regulation'] in the broadband Internet access context" and thus constitutes common carrier regulation.  2015 Order ¶ 137; *see also* 47 U.S.C. § 201(b) (requiring that common carriers' practices be "just and reasonable"); *id.* § 202(a) (similarly prohibiting common carriers from engaging in "unjust or unreasonable discrimination").

Finally, SB-822 extends these common carrier requirements to agreements for "ISP traffic exchange" that would "evade" those requirements.  Cal. Civ. Code § 3101(a)(9).  SB-822's language creates significant uncertainty and arguably could be interpreted to prohibit broadband providers from entering into traffic-exchange arrangements that require both connecting parties to share the costs of interconnection and delivery of traffic — *i.e.*, requiring them to interconnect at a fixed rate of $0 — an especially draconian form of common carrier regulation.  *Cf.* 47 U.S.C. § 201(b) (requiring common carriers to charge "just and reasonable" rates).

In short, SB-822 imposes common carrier requirements on an information service — broadband — that the Communications Act protects from such requirements.  Indeed, the California Legislature's rationale for enacting SB-822 was to restore the "telecommunications service" classification from the FCC's 2015 Order — thus undoing the "information service" classification adopted in the 2018 Order and upheld by the *Mozilla* court — so that broadband providers would be subject to common carrier regulation.  *See supra* notes 3-4.  But a State cannot undo or override federal law because it would prefer a different policy framework.  *See Capital Cities Cable*, 467 U.S. at 708 ("[W]hen federal officials determine, as the FCC has here, that restrictive regulation of a particular area is not in the public interest, States are not permitted to use their police power to enact such a regulation.").

2.    *SB-822 Conflicts with the Federal Policy of Light-Touch Regulation for Information Services*

SB-822 also is preempted because it directly conflicts with the methods the FCC has

adopted to pursue a federal deregulatory policy for broadband Internet access services.  It is well-established that, under ordinary conflict preemption principles, a "state law [that] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" a federal regulation is preempted.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  And a federal decision to *de*regulate, particularly in an industry with extensive federal oversight, preempts contrary state regulatory efforts the same as a federal decision *to* regulate. *See*, *e.g.*, *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978) ("[W]here failure of federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, States are not permitted to use their police power to enact such a regulation.") (alteration omitted); *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983) ("[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.").

    The D.C. Circuit's vacatur of the FCC's categorical *express preemption* ruling in the 2018 Order does not prevent application of ordinary *conflict preemption* principles in this setting.  The *Mozilla* court held that the FCC lacked authority to expressly and prophylactically preempt all state regulation of intrastate broadband.  *See* 940 F.3d at 81-86.  But "because no particular state law" was at issue in that case, the court found it "wholly premature to pass on the preemptive effect . . . of the remaining portions of the 2018 Order," which the D.C. Circuit upheld.  *Id.* at 86; *see also id.* at 81-82 ("[b]ecause a conflict-preemption analysis involves fact-intensive inquiries, it mandates deferral of review until an actual" conflict between a particular state law and federal law arises); *see also id.* at 85 (deeming it premature to "consider whether the remaining portions of the 2018 Order [that the court upheld] have preemptive effect under principles of conflict preemption").  The court did not suggest that state regulation (much less of *inter*state broadband) was *protected*, but simply that the FCC's categorical determination was not the proper way to preempt as-of-then unidentified state regulations.  It left no doubt that a

state law that actually conflicted with the 2018 Order (or the Communications Act) would be subject to invalidation under the conflict preemption doctrine.  *See id.*

Unlike what the D.C. Circuit viewed as the 2018 Order's categorical express preemption of all state and local regulation of intrastate broadband, conflict preemption (here with respect to state regulation of *interstate* broadband) is grounded in the Supremacy Clause and arises whenever a state law conflicts with any lawfully promulgated FCC order.  *See id.* (explaining that any argument that the 2018 Order lacks preemptive effect under the conflict preemption doctrine "confuses (i) the scope of the Commission's authority to expressly preempt, with (ii) the (potential) implied preemptive effect of the regulatory choices the Commission makes that are within its authority").  Here, the FCC exercised its lawful and well-established authority to classify broadband as an information service (and mobile broadband as a private mobile service) in part because it found that the Title II common carrier regime was an inappropriate and harmful regulatory framework for the Internet.  The D.C. Circuit upheld that exercise of authority, as well as the FCC's decision to eliminate prohibitions against blocking, throttling, and paid prioritization and the "Internet Conduct Standard," on the ground that such requirements are unnecessary and counterproductive.  The D.C. Circuit likewise upheld the FCC's determination that transparency requirements lawfully promulgated under Section 257 of the Communications Act, coupled with consumer protection and antitrust oversight, are the most appropriate regulatory mechanisms for this marketplace.  Those lawful exercises of federal authority necessarily preempt any state laws that actually conflict with them — as SB-822 does.

In the 2018 Order, the FCC explained that broadband should be regulated as an information service because, among other things, that classification "is more likely to encourage broadband investment and innovation, furthering [the agency's] goal of making broadband available to all Americans and benefitting the entire Internet ecosystem."  2018 Order ¶ 86.  By contrast, the FCC concluded that the common carrier regime imposed in 2015 "ha[d] resulted . . . in considerable social cost, in terms of foregone investment and innovation," while having "no discernable incremental benefit."  *Id.* ¶ 87.  These cost-benefit assessments form a valid predicate for conflict preemption.  *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874-75,

878 (2000) (state law preempted for raising obstacle to achievement of agency's judgment on the best cost-benefit regulatory mix); *Charter Advanced Servs. (MN), LLC v. Lange*, 903 F.3d 715, 719 (8th Cir. 2018) ("[A]ny state regulation of an information service conflicts with the federal policy of nonregulation."), *cert. denied*, 140 S. Ct. 6 (2019).

In addition to conflicting with the policies underlying the FCC's information service classification, SB-822 conflicts with the 2018 Order by imposing on broadband services a series of specific mandates that the FCC deliberately eliminated for those same services. Indeed, the conflict could hardly be more stark, as SB-822 purports to reimpose each mandate from the FCC's 2015 Order that the 2018 Order rejected as contrary to the public interest:

- The FCC concluded that its "Internet Conduct Standard" had "created uncertainty and likely denied or delayed consumer access to innovative new services" and that its "net benefit" was "negative." 2018 Order ¶ 246. It therefore eliminated that rule, finding that such action likely would "benefit consumers, increase competition, and eliminate regulatory uncertainty that has a corresponding chilling effect on broadband investment and innovation." *Id.* ¶ 249. Yet SB-822 purports to reinstate the very same mandate that the FCC found harmful to consumers and competition.

- The FCC concluded that lifting its previous categorical ban on paid prioritization would "increase network innovation," encourage entry of new edge providers, reduce economic inefficiency, and "lead to lower prices for consumers." *Id.* ¶¶ 254-256, 259. And "to the extent" paid prioritization could lead to any harms, the FCC believed they were "outweighed by the distortions that banning [the practice] would impose." *Id.* ¶ 261. Again, SB-822 purports to impose the same blanket ban that the FCC rejected as harmful.

- The FCC concluded that the 2015 no-blocking and no-throttling rules were not necessary "to prevent the harms that they were intended to thwart." *Id.* ¶ 263. There had been "scant evidence that end users, under different legal frameworks, have been prevented by blocking or throttling from accessing the content of their choosing." *Id.* ¶ 265. And there are other ways to ensure that blocking and throttling do not occur and are detected

1 and remedied in the unlikely event they do.  *See id.* ¶¶ 263-265.  Nevertheless,

2 California sought to override these federal rulings by reinstating those bans.

3 • The FCC concluded that "a thirteen-month investigation" into "zero-rating" uncovered

4 *no* "specific evidence of harm" from the practice and that broadband providers were

5 needlessly prevented under the FCC's Title II common carrier regime from providing

6 this "innovative offering[ ]" to consumers.  *Id.* ¶ 250.  The FCC accordingly made clear,

7 even under the 2015 Order, that zero-rating was permissible.  Remarkably, even though

8 the 2015 Order had rejected an outright ban on zero-rating — subjecting such

9 arrangements only to possible scrutiny under the Internet Conduct Standard — SB-822

10 imposes a flat ban on many such arrangements, conflicting not only with the 2018 Order

11 but also with the earlier (superseded) order on which it was supposedly modeled, in

12 which the FCC recognized the consumer benefits from such arrangements.

13 • The FCC concluded that imposing common carrier regulation on Internet

14 interconnection and traffic-exchange arrangements "was unnecessary and is likely to

15 unduly inhibit competition and innovation."  *Id.* ¶ 167.  It further determined that

16 "freeing Internet traffic exchange arrangements from burdensome government

17 regulation, and allowing market forces to discipline this emerging and competitive

18 market[,] is the better course."  *Id.* ¶ 168.  Yet, again, SB-822 purports to countermand

19 that federal determination; and the State not only subjects traffic-exchange arrangements

20 to a complaint process, as the FCC did in its 2015 Order, but goes much further and

21 arguably bans paid traffic-exchange arrangements outright.

22 Each requirement that California seeks to impose conflicts with the FCC's

23 determinations in the 2018 Order that these mandates are unnecessary and on net harmful —

24 determinations that *Mozilla* upheld as reasonable.  SB-822 thus poses an "obstacle to the

25 accomplishment and execution of the full purposes and objectives of" federal law.  *Fid. Fed.*

26 *Sav. & Loan*, 458 U.S. at 153.  Indeed, it is difficult to imagine a clearer "obstacle" to federal

27 policy than a state law whose express purpose and unmistakable effect is to reimpose mandates

28 nearly *identical* to those that the FCC revoked.  A State cannot overturn federal rulings based on

a preference for conflicting policies, as SB-822 purports to do.  *See Geier*, 529 U.S. at 881 (state law preempted where it "would have presented an obstacle to the variety and mix of [options for industry] that the federal regulation sought"); *Capital Cities Cable*, 467 U.S. at 708 (state law preempted where it created "a result [that] is wholly at odds with the regulatory goals contemplated by the FCC").

**II.     SB-822 Will Subject Plaintiffs' Members to Immediate and Irreparable Harm**

Plaintiffs' members will suffer immediate and irreparable harm if SB-822 takes effect before this litigation is complete.  "[A]n alleged constitutional infringement will often alone constitute irreparable harm."  *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997).  That is particularly true where preemption is at stake, because "the interest of preserving the Supremacy Clause is paramount."  *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 853 (9th Cir. 2009), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *see also NCAA v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J.) (holding that enactment of a law "in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm requiring the issuance of a permanent injunction"), *aff'd sub nom. NCAA v. Governor of N.J.*, 730 F.3d 208 (3d Cir. 2013); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (enforcement of state laws regulating airlines "would violate the Supremacy Clause, causing irreparable injury to the airlines" by "depriving [them] of a federally created right to have only one regulator").  Plaintiffs' showing that they are likely to succeed on their Supremacy Clause challenges to SB-822 therefore satisfies the irreparable harm requirement.

In addition, specific provisions of SB-822 will independently cause irreparable harm to Plaintiffs' members if permitted to take effect during the pendency of this litigation.  "[A] very real penalty [would] attach[] to [Plaintiffs' members] regardless of how they proceed":  either monetary losses, forgone business opportunities and investments, and loss of substantial customer goodwill if members discontinue these practices; or the possibility of enforcement actions and interference in ongoing commercial agreements and negotiations if the practices continue.  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir.

1   2009); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

2   2001) ("threatened loss of prospective customers or goodwill" can constitute irreparable harm).

3   The fact that Plaintiffs cannot recover those losses from the State, which enjoys sovereign

4   immunity from damages actions, underscores the irreparable nature of the harm.  *See Chamber*

5   *of Commerce of U.S. v. Becerra*, 438 F. Supp. 3d 1078, 1103-05 (E.D. Cal. 2020) (finding

6   irreparable harm and preliminarily enjoining California's AB 51 (2019)), *appeal pending*,

7   No. 20-15291 (9th Cir.).

8        *California Civil Code § 3101(a)(3), (9).*  Plaintiffs' members have entered into

9   agreements with edge providers — companies that "provide[] . . . content, application[s], or

10  service[s] over the Internet," Cal. Civ. Code § 3100(e) — that allow those edge providers to

11  connect directly with the broadband providers' networks, in exchange for compensation, and are

12  in the midst of negotiating additional such agreements.  *See* Klaer Decl. ¶¶ 12-13, 19; Paradise

13  Decl. ¶¶ 18, 38.  These agreements benefit the edge providers, Internet users, and broadband

14  providers.  An edge provider benefits because it can bypass the middlemen — content

15  distribution networks, transit providers, and other Internet network operators — that it would

16  otherwise pay to carry its content.  *See* Paradise Decl. ¶ 18.  That benefits both the edge provider

17  and its users, as content can be routed more quickly and efficiently than when traffic is routed

18  through middlemen.  *See id.* ¶ 16.  The broadband provider benefits because it can more

19  effectively manage the often extremely large volumes of traffic that these edge providers route

20  into its network.  That traffic would otherwise be delivered over one or more of the many

21  different available routes into the broadband provider's network, all of which it must

22  independently manage to avoid congestion or other disruptions to its customers' Internet

23  experiences.  *See* Klaer Decl. ¶¶ 10, 16; Paradise Decl. ¶ 20.

24       SB-822 imposes ambiguous restrictions on broadband providers' existing contracts for

25  the exchange of Internet traffic with edge providers and others and exposes broadband providers

26  to the potential of immediate enforcement actions.  *See* Klaer Decl. ¶¶ 19-21; Paradise Decl.

27  ¶¶ 31-32.  Although it is unclear what existing or new agreements will be claimed to constitute

28  evasions of the prohibitions in SB-822, *see* Cal. Civ. Code § 3101(a)(9), the potential for such

1    litigation threatens Plaintiffs' members with irreparable harm.  *See Am. Trucking*, 559 F.3d at

2    1057-58 (reversing denial of preliminary injunction and finding threat of enforcement

3    proceedings constituted irreparable harm); *Chamber of Commerce*, 438 F. Supp. 3d at 1103-04

4    (finding irreparable harm in light of "the uncertainties surrounding [a California statute's]

5    implementation").  If Plaintiffs' members are forced to cease negotiations for new contracts, the

6    result would be lost (and unrecoverable) business and revenue, harm to reputation and goodwill,

7    and exposure to private suits for breach of contract.  *See* Klaer Decl. ¶¶ 21-23, 39; Paradise

8    Decl. ¶¶ 33, 38.  The loss of "goodwill and revenue" also constitutes irreparable harm.

9    *Stuhlbarg*, 240 F.3d at 841; *see Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *6 (N.D.

10   Cal. June 2, 2016).

11        The prospect that these provisions would become law will distort the outcomes of

12   ongoing commercial negotiations with other edge providers and Internet network operators,

13   some of which undoubtedly will claim that SB-822 entitles them to free interconnection with

14   ISPs.  *See* Klaer Decl. ¶¶ 19-20, 23; Paradise Decl. ¶ 38.  This will place ISPs in the untenable

15   position of forgoing revenue, terminating interconnection arrangements, or engaging in

16   protracted litigation.  *See* Klaer Decl. ¶ 23.  Making matters worse, SB-822 includes an

17   ambiguous restriction on contractual waivers of these provisions.  *See* Cal. Civ. Code § 3104.

18        If the State or other entities claim that SB-822 regulates the nationwide exchange of

19   Internet traffic, so long as that traffic is sent to or from California users of broadband services,

20   ISPs face the risk of having to alter their traffic-exchange agreements and to reconfigure their

21   physical networks nationwide.  It is commercially and technologically impracticable to treat

22   California-bound and California-originated interstate Internet traffic differently from other

23   interstate Internet traffic without at a minimum significant and costly changes to ISPs'

24   networks.  *See* Paradise Decl. ¶¶ 30-32; Klaer Decl. ¶¶ 16, 33.  If the State or other entities

25   instead claim that SB-822 regulates the exchange of all Internet traffic at points within

26   California, some content-sending networks likely will seek to engage in arbitrage by routing

27   traffic to interconnection points in California in an attempt to obtain increased interconnection

28   capacity on ISPs' networks for free, thus causing significant additional congestion and

1    disruption at ISPs' California facilities.  *See* Paradise Decl. ¶ 33.  This could lead to congestion

2    at the California interconnection points, affecting the quality of services sent over broadband

3    networks and causing customer dissatisfaction.  That in turn could lead to a spike in customer

4    service inquiries, which impose increased costs for broadband providers, as well as irretrievable

5    loss of customers and goodwill.  It could also lead to under-utilization of interconnection points

6    outside California, stranding significant investment.  *See* Klaer Decl. ¶¶ 24-31; Paradise Decl.

7    ¶ 34.  All of these harms will result in financial losses that ISPs can never recoup from the State.

8    *See* Klaer Decl. ¶¶ 22-23; Paradise Decl. ¶¶ 34-35, 37.

9       ***California Civil Code § 3101(a)(5), (6).***  Plaintiffs' members have developed offerings

10   that "zero rate" certain content by excluding that content when calculating whether a customer

11   has exceeded her monthly data allowance for mobile broadband service.  *See* Roden Decl. ¶¶ 4-8,

12   11-14.  These offerings benefit consumers who purchase mobile broadband plans that charge

13   them a flat, monthly rate for a certain quantity of data, as those customers incur additional

14   charges if they exceed that monthly data allowance.  *See id.* ¶¶ 6, 16.  Zero rating thus enables

15   consumers to use services, such as video streaming services, without incurring substantial data

16   overages.  *See id.* ¶¶ 10-11.  Zero rating provides customers more data for the same money,

17   while also benefiting the edge providers that encourage the use of their content by bearing the

18   costs of the associated data usage on behalf of their customers.  *See id.* ¶¶ 8, 14.  It can also

19   benefit edge providers that do not participate in the program by effectively increasing the amount

20   of data customers can use with their offerings.  *See id.* ¶ 2.  Mobile broadband providers also

21   benefit, as the ability of customers to get more data for the same money makes their service more

22   attractive in the highly competitive marketplace for mobile broadband.  *See id.* ¶¶ 6-7, 22-23.

23      SB-822 expressly prohibits certain zero-rating arrangements.  *See* Cal. Civ. Code

24   § 3101(a)(5), (6).  Willing consumers, broadband providers, and content providers could not all

25   agree to continue those zero-rating offerings, or enter into new contracts for them, because

26   SB-822 makes "any waiver of the provisions of this title . . . unenforceable and void."  *Id.*

27   § 3104.

28      SB-822 therefore threatens to cause irreparable harm to Plaintiffs' members with certain

26

1    zero-rated offerings.  *See* Roden Decl. ¶¶ 21-30.  If those members continue to perform under

2    their existing contracts with their customers and providers of zero-rated content, they will face

3    the risk of enforcement actions under SB-822.  Such actions will impose significant financial

4    costs on Plaintiffs' members — including potential civil penalties — and harm their reputations

5    in the competitive marketplace for mobile broadband.  *See Am. Trucking*, 559 F.3d at 1057-58;

6    *Chamber of Commerce*, 438 F. Supp. 3d at 1103-04.  If those members instead terminate their

7    zero-rating offerings due to fear of imminent enforcement, the result would be lost,

8    unrecoverable business and revenue, and harm to reputation and goodwill, *see* Roden Decl.

9    ¶¶ 21-23 — all of which constitutes irreparable harm, *see Stuhlbarg*, 240 F.3d at 841; *Dish

10   Network*, 2016 WL 3092184, at *6.  Moreover, cancelling a zero-rating service entails

11   significant implementation costs.  Notifying millions of customers about the change in service

12   — bringing about the foregoing loss in reputation and goodwill — would itself carry significant,

13   unrecoverable expenses, including the cost of actually issuing notice to millions of consumers.

14   *See* Roden Decl. ¶¶ 24-27.  And reconfiguring services that currently provide customers with

15   zero-rated data requires significant investment both within the user-facing service and on

16   members' backend data infrastructure.  *See id.* ¶¶ 28-29.  These costs would not be recoverable

17   were the Court to subsequently determine SB-822 is unlawful.

18          Even after incurring these termination costs, Plaintiffs' members will suffer significant

19   additional harm if they want to continue offering zero-rated content to customers not covered by

20   SB-822 —to both honor existing contracts with and compete for those customers' business —

21   rather than ceasing that service nationwide.  *See id.* ¶¶ 18-20.  For example, if SB-822 applies

22   only to data used while a customer is "in California," Plaintiffs' members will likely have to

23   invest substantial resources to construct a (currently non-existent) system that identifies when

24   customers are using data while physically within the State's borders and notifies the provider's

25   billing systems on a real-time basis not to zero-rate that data.  *See id.* ¶ 19.  On the other hand, if

26   SB-822 is read to apply when a customer with a California billing address uses a mobile device,

27   whether inside or outside the State, providers will be required to invest in systems that can

28   identify all devices associated with a California billing address and ensure that those devices are

1   properly and timely identified as billing addresses change. *See id.* ¶ 20.  All of these costs also

2   would not be recoverable if Plaintiffs ultimately prevail on the merits.

3   ***California Civil Code § 3101(a)(1), (2), (7).***  Some of Plaintiffs' members utilize

4   network-management practices to address extraordinary usage and potential congestion on their

5   networks — including during the COVID-19 crisis — in the interest of ensuring that all

6   customers on the network enjoy an optimal Internet experience. *See* McCormick Decl. ¶¶ 8-16.

7   For example, sometimes usage spikes in specific parts of Plaintiffs' members' networks threaten

8   to degrade the performance for groups of customers in that part of that network. *See id.* ¶ 10.  In

9   addition, a small number of individual customers upload extraordinary amounts of content (*i.e.*,

10   100 times or more than the average user on the network), which likewise can burden the

11   network and degrade other customers' experience. *See id.* ¶¶ 14-15.  In these instances,

12   Plaintiffs' members may implement consumption limits or other temporary limitations to ensure

13   that customers continue to enjoy an optimal Internet experience. *See id.* ¶¶ 11-12, 15-16; *see also*

14   *id.* ¶ 13 (describing substantial performance improvement for subscribers after limits imposed).

15   But SB-822's Internet Conduct Standard, no different from the 2015 Order's identical

16   rule, creates substantial legal uncertainty for these and other network-management practices,

17   and creates a chilling effect that deters Plaintiffs' members from taking active steps to manage

18   network congestion for the benefit of their entire customer base. *See* 2018 Order ¶ 251 ("[t]he

19   uncertainty surrounding the [Internet Conduct Standard] establishes a standard for behavior that

20   virtually requires advice of counsel before a single decision is made and raises costs [especially

21   for smaller ISPs that] struggle to understand its application") (last alteration in original);

22   McCormick Decl. ¶¶ 5-7, 17, 26.  At least one broadband provider is likely to suspend certain of

23   its beneficial network-management practices, in part because of the threat of liability that SB-

24   822 and potential other copycat state measures would impose, thereby depriving its customers

25   of the benefits of such practices. *See id.* ¶¶ 18-20.  And the prospect that California may

26   interpret other provisions of SB-822 (*e.g.*, the prohibitions against blocking and throttling) to

27   deem these practices unlawful likewise causes irreparable harm to Plaintiffs' members. *See id.*

28   ¶ 21.

### III.   The Equities and the Public Interest Favor an Injunction

The remaining factors also support entry of a preliminary injunction because "it would not be equitable or in the public's interest to allow the state to continue to violate the requirements of federal law." *Cal. Pharmacists*, 563 F.3d at 852-53.  The interest in enforcing the Supremacy Clause is so strong that establishing a likelihood of success "also establishe[s] that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

In addition, the balance of equities tips sharply in Plaintiffs' favor because SB-822 has not yet taken effect,[15] and enjoining the law will simply "preserv[e] the status quo and prevent[ ] the irreparable loss of rights before judgment."  *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001).  That status quo is a well-functioning interstate marketplace for broadband in which the 2018 Order, which protects Internet openness through an enforceable transparency regime, has been in effect for more than two years.  During that time, the nation's broadband networks have remained resilient and ISPs have expanded capacity to address the unprecedented traffic increases during the ongoing COVID-19 pandemic.  Moreover, since the 2018 Order, "the digital divide [has] continue[d] to narrow as more Americans than ever before have access to high-speed broadband."  2020 Broadband Deployment Report, *Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, GN Docket No. 19-285, FCC 20-50, 2020 WL 2013309, ¶ 2 (rel. Apr. 24, 2020).  In addition, Plaintiffs' members, either on their own or through their trade associations, have made public commitments to preserve core principles of Internet openness.  *See, e.g.*, 2018 Order ¶ 142 n.511.  The FTC can enforce these commitments "if ISPs fail to live up to their word," as can state attorneys general under state and federal unfair and deceptive trade practices laws (provided they enforce such commitments in a manner consistent with federal law).  *See id.* ¶¶ 142, 196, 244.

---

[15] Although SB-822 took effect on January 1, 2019, the State stipulated that it would "not take any action to enforce, or direct the enforcement of, Senate Bill 822 in any respect" until this Court rules on this motion.  *See* Parties' Stip. at 6.

On the other hand, the State will suffer no harm if SB-822 is preliminarily enjoined.  The State agreed not to enforce SB-822 for more than 19 months, undermining any claim that immediate enforcement is necessary to prevent harms to the State or its residents.  In addition, the inability to enforce a statute that is likely unconstitutional is not harmful.  *See Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 887 (D. Ariz. 2012); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (reasoning that the "nebulous, not easily quantified harm of being prevented from enforcing one of its laws" is insubstantial); *Trans World Airlines*, 897 F.2d at 784.  Likewise, a preliminary injunction serves the public interest, which is reflected in the FCC's "decision to deregulate," as well as in "the Constitution's declaration that federal law is to be supreme."  *Am. Trucking*, 559 F.3d at 1059-60.  The FCC concluded that the same rules SB-822 seeks to impose here "resulted . . . in considerable social cost, in terms of foregone investment and innovation," with no meaningful countervailing benefit for consumers.  2018 Order ¶ 87.  And " '[f]rustration of federal statutes and prerogatives are not in the public interest.' "  *United States v. California*, 314 F. Supp. 3d 1077, 1112 (E.D. Cal. 2018) (quoting *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012)), *aff'd in part, rev'd in part on other grounds, and remanded*, 921 F.3d 865 (9th Cir. 2019), *cert. denied*, No. 19-532 (U.S. June 15, 2020).

## CONCLUSION

The Court should grant Plaintiffs' motion and preliminarily enjoin SB-822 in its entirety.[16]

---

[16] The Court should not require Plaintiffs to post a bond.  *See Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E.D. Cal. 2011).  If the Court concludes that a bond is appropriate, the amount should be nominal because the State will suffer no damages from a preliminary injunction.  *See Planned Parenthood*, 899 F. Supp. 2d at 887-88.

1   Dated: August 5, 2020

2

3   Scott H. Angstreich*                         /s/      Marc R. Lewis
    Leslie V. Pope*                              Marc R. Lewis (CA SBN 233306)
4   Alex A. Parkinson*                           LEWIS & LLEWELLYN LLP
    KELLOGG, HANSEN, TODD,                       601 Montgomery Street, Suite 2000
5     FIGEL & FREDERICK, P.L.L.C.                San Francisco, CA 94111
    1615 M Street, NW, Suite 400                 (415) 800-0591
6   Washington, DC 20036                         mlewis@lewisllewellyn.com
    (202) 326-7900
7   sangstreich@kellogghansen.com                *Attorney for Plaintiffs*
    lpope@kellogghansen.com                      *American Cable Association,*
8   aparkinson@kellogghansen.com                 *CTIA – The Wireless Association,*
                                                 *NCTA – The Internet & Television Association,*
9   *Attorneys for Plaintiffs*                   *and USTelecom – The Broadband Association*
    *CTIA – The Wireless Association and*
10  *USTelecom – The Broadband Association*      Matthew A. Brill*
                                                 Matthew T. Murchison*
11                                               Ryan S. Baasch*
    Jeffrey A. Lamken (CA SBN 154217)            James A. Tomberlin*
12  MOLOLAMKEN LLP                               LATHAM & WATKINS LLP
    The Watergate, Suite 500                     555 Eleventh Street NW, Suite 1000
13  600 New Hampshire Avenue, NW                 Washington, DC 20004
    Washington, DC 20037                         (202) 637-2200
14  (202) 556-2000                               matthew.brill@lw.com
    jlamken@mololamken.com                       matthew.murchison@lw.com
15                                               ryan.baasch@lw.com
    *Attorney for Plaintiff*                     james.tomberlin@lw.com
16  *American Cable Association*
                                                 *Attorneys for Plaintiff*
17  * Admitted *pro hac vice*                    *NCTA – The Internet & Television Association*

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that, on August 5, 2020, I electronically submitted the attached

3  document to the Clerk's Office using the U.S. District Court for the Eastern District of

4  California's Electronic Document Filing System (ECF).

5

6

7                                        /s/      *Marc R. Lewis*_____
                                         Marc R. Lewis (CA SBN 233306)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28