Scott H. Angstreich*
Leslie V. Pope*
Alex A. Parkinson*
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
lpope@kellogghansen.com
aparkinson@kellogghansen.com

*Attorneys for Plaintiffs*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*

Jeffrey A. Lamken (CA SBN 154217)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff*
*American Cable Association*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

* Admitted *pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 2:18-cv-02684<br><br>**DECLARATION OF GUY MCCORMICK IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. John A. Mendez |

I, Guy McCormick, declare as follows:

1. I am the Senior Vice President of Technology Engineering for Cox Communications. In this role, I lead the operational transformation and technology strategy for the enterprise engineering organization. My duties include strategic oversight for infrastructure and enabling service platforms including those used to provide broadband Internet access service.

2. Cox is an Internet service provider ("ISP") that offers broadband Internet access service to mass-market customers in 18 states, including California. Cox serves approximately 6 million residential and commercial broadband customers nationally, and more than 930,000 customers in California. Cox is also a member of NCTA – The Internet & Television Association.

3. Cox does not shape, block, or throttle Internet traffic or engage in other network practices based on the particular online content, protocols, or applications a customer uses or by a customer's use of the network. It has committed publicly to these principles and is dedicated to providing a high-quality Internet access experience for all of its customers. *See* Cox Internet Service Disclosures (June 12, 2020), https://www.cox.com/aboutus/policies/internet-service-disclosures.html.

4. Notwithstanding Cox's public commitments, California's SB-822 will subject Cox to substantial and immediate harms if it is allowed to go into effect. Among other things, SB-822 revives the Federal Communications Commission's ("FCC") repealed Internet Conduct Standard, which prohibited ISPs from "unreasonably interfering with or unreasonably disadvantaging" end users' access to Internet content providers or Internet content providers' access to end users. *See* Cal. Civ. Code § 3101(a)(7)(A).

5. In public comments in the FCC rulemaking proceeding that ultimately led to the repeal of the federal Internet Conduct Standard, Cox strongly opposed the FCC's brief imposition of that standard and explained how it subjected Cox to significant harms. Specifically, Cox explained that "[i]n light of its unbounded nature—under which virtually any practice could be deemed unreasonable based on post-hoc judgments, and could subject the

provider to massive liability—the [Internet] Conduct Standard counterproductively deters [Basic Internet Access Service] providers from introducing consumer-friendly service offerings." Cox further noted that, while that standard was in place, Cox was "forced to undertake additional costly and open-ended regulatory reviews to consider whether new products and services could be alleged to run afoul of this extraordinarily vague standard, and has approached such decisions more cautiously." Comments of Cox Communications, WC Docket No. 17-708, at 31 (filed July 17, 2017). The FCC ultimately agreed with Cox's description of the harms of the Internet Conduct Standard, explaining that "under the Internet Conduct Standard ISPs have faced two options: either wait for a regulatory enforcement action that could arrive at some unspecified future point or stop providing consumers" with various services. Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd 311, ¶ 250 (2018).

6. If not enjoined, California's revival of the Internet Conduct Standard repealed by the FCC will result in the same harms, including a significant chilling effect on Cox's ability to manage its existing services efficiently and provide high-quality service without risking legal sanction.

7. Cox presents below two illustrative examples of consumer-friendly congestion management practices that today are clearly lawful but SB-822 places in immediate legal jeopardy: (1) Cox's practice designed to prevent network congestion from unusually high utilization in discrete portions of its network, and (2) Cox's policies to address harms from individual subscribers who use extraordinary and unreasonable amounts of network bandwidth. Although Cox is confident both practices are reasonable and should be considered legal under any appropriate standard, it likely will be forced to suspend the first practice because of the substantial legal risks that SB-822 and comparable state measures currently pose, or will likely pose in the near future if allowed to become effective. If Cox were to maintain that practice, it could face lengthy regulatory and/or legal proceedings with uncertain outcomes and potentially face significant liability. For the same reasons, Cox is reviewing its policy for individual subscribers who engage in abuse through the use of extraordinary and unreasonable amounts of network bandwidth and, pending future developments, may ultimately be forced to suspend that

policy as well or face substantially increased liability risks. In each case, if Cox is unable to use these congestion management practices when necessary it will likely result in substantial harm to Cox's subscribers experience, and corresponding irreparable harm to Cox's reputation and goodwill. In addition, SB-822 will impose further irreparable harm by forcing Cox to undertake costly legal reviews in connection with network management practices, which also diminishes the timeliness, efficiency, and effectiveness of Cox's responses to dynamic technological and marketplace developments.

8. **Congestion Management**: As background, using the Data Over Cable Service Interface Specification ("DOCSIS"), Cox uses hybrid fiber-coaxial cable network to connect its subscribers to the Internet, with coaxial cable linking each individual subscriber's cable modem to a neighborhood node, and fiber optic cables connecting the node further upstream into Cox's network. The network has a finite capacity from the nodes to the subscriber, and each subscriber within a given neighborhood shares that capacity with his or her neighbors from the node.

9. Cox's network provisioning and engineering practices are designed to enable its customers to receive the maximum advertised (or greater) speeds associated with their chosen tier of service, regardless of how much bandwidth their neighbors are using. Cox plans for growth in utilization and regularly addresses it through construction and spectrum management to add node capacity. And Cox's network architecture and related engineering standards are constantly evolving through a long-term, multi-year network upgrade transformation to maintain top-quality service. As part of that transformation, Cox also is increasingly installing fiber optic and symmetrical services to new homes and businesses, which will relieve congestion over the longer term. There are presently approximately 29,900 nodes in Cox's network.

10. Occasionally, however, a node will experience unanticipated extraordinary and sustained utilization that negatively affects subscribers served by that node. The COVID-19 crisis in particular has caused such events. The crisis has resulted in a surge in residential Internet use across the country. Overall, Cox's network has performed extremely well throughout this crisis. But there have been some extraordinary usage patterns on a small number of nodes in Cox's network that exceeded planned construction schedules and prompted Cox to

3

apply targeted congestion management practices in a very small portion of its network to ensure that customers' experiences in those areas were not materially impaired, especially during this critical time (approximately 1.17 percent of nodes). Although congestion impacted a small portion of the network, Cox is keenly aware that high-quality Internet service is important for every household and family that relies on Internet service to learn, work and connect to the outside world, particularly during a time of pandemic.

11. Cox discloses to all subscribers that it may take appropriate measures when necessary in response to usage levels or other exigent circumstances that "have a significant effect on [its] customers' ability to use" its services.[1] Substantially increased and sustained usage due to COVID-19 is one such circumstance, as these utilization spikes could have a negative impact on subscriber experience across an entire node as congestion impedes network performance.

12. To address these isolated issues and ensure excellent service for all customers on these nodes (approximately 100,000 of approximately 6 million total broadband Internet access service customers), Cox notified customers on these nodes on its two highest service tiers ("Ultimate" and "Gigablast") that it would decrease one limited component of service, upstream speeds. Many Cox customers are not on these tiers, and those that are on them typically do not use Internet services in a manner that requires maximum upstream speeds. For those reasons, this interim measure to improve customer experience in the short term while Cox implements a longer term solution was anticipated to have only positive effects on network performance for the vast majority of customers. Nevertheless, Cox provided all Ultimate customers on these nodes a 60% increase in downstream speeds, which is the most important aspect of service for the majority of customers (from 300Mbps to 500Mbps), and a $20 credit to all Gigablast customers. These COVID-driven speed adjustments were extremely limited in scope and applied to approximately 17.4% of customers served on the impacted nodes.

13. These strategic adjustments in upstream speeds resulted in substantially improved performance across many metrics for subscribers throughout the affected nodes. Node

---

[1] *See* https://www.cox.com/aboutus/policies/internet-service-disclosures.html

congestion negatively affects network performance in multiple ways, and impairs the subscriber's Internet experience. On the small number of nodes that were experiencing congestion issues due to increased usage relating to COVID-19, Cox's congestion management produced a net experience improvement for every customer—and for approximately 100,000 customers in total.

14. **Acceptable Use Policy**: Separately, Cox maintains an "Acceptable Use Policy" to which all Internet customers must agree upon signing up for the service. *See* https://www.cox.com/aboutus/policies/acceptable-use-policy.html. Among other things, the Acceptable Use Policy forbids individual subscribers from "[r]estrict[ing], inhibit[ing], or otherwise interfer[ing] with the ability of any other person to use or enjoy their . . . Service," including by uploading or downloading "such large amounts of data, information, and/or other content beyond typical residential usage." If a subscriber within a node engages in such excessive use, for example, he or she risks adversely affecting service for other users in the neighborhood.

15. Violations of this term of the Acceptable Use Policy are rare. But sometimes there are small numbers of subscribers who do so, including approximately 0.002 percent who have utilized upstream bandwidth recently at grossly disproportionate rates, such as over 100 times the rate of average households. In response to such violations of Cox's Acceptable Use Policy, and to ensure that Cox may take action so these subscribers' usage patterns do not adversely impact other users in their neighborhood, the policy allows Cox to notify the individual subscriber that his or her service speeds may be reduced to allow Cox to communicate with the customer regarding the abuse and attempt to resolve the issue. Cox only invokes the policy when absolutely necessary and has not done so until recently during the COVID-19 crisis, but it is an important tool for such emergency situations.

16. The purpose of reducing speeds for a user who violates the Acceptable Use Policy is to prevent the extraordinary usage patterns that, as with the upload abuse described above, can have adverse effects for potentially hundreds of subscribers across an entire node. In other words, Cox enforces its Acceptable Use Policy in this way only to preserve Internet performance

for every other member of the node that is being shared with the individual user who is violating the Acceptable Use Policy.

17.     **Irreparable Harm to Cox from SB-822**: SB-822's imposition of an Internet Conduct Standard—which effectively revives the same standard the FCC repealed based on its findings that the standard harmed broadband providers and their customers—will threaten Cox with imminent irreparable harm because there is a significant risk that SB-822's broadly worded prohibitions against "blocking" and "throttling" will be construed to apply to modifying the characteristics of service tiers or congestion management practices Cox believes to constitute "reasonable network management" (and thus exempt from such bans). And Cox will be forced to devote increased resources to evaluating compliance issues and enforcement risks associated with network management practices, while suffering from delays and inefficiency as a result and potentially loss of customers and revenue.

18.     *First*, the substantial legal risks associated with SB-822 and other similar state measures likely will prompt Cox to suspend (in whole or in part) its congestion management practice described above for preventing congestion at nodes with extraordinary utilization. Although Cox believes that modifying service tier upstream speeds while increasing downstream speeds or alternatively offering customer credits is a reasonable means of optimizing broadband customer experience, there is a significant risk that this practice would be deemed inconsistent with SB-822's Internet Conduct Standard and similar state mandates. In particular, notwithstanding the benefits to broadband subscribers' Internet experience, SB-822's vague and open-ended Internet conduct standard could result in allegations by state officials and/or a finding by a court that Cox had "unreasonably interfered" with its customers' access to Internet content.

19.     By the same token, Cox will be harmed by any application of California's prohibitions on blocking and throttling in a manner inconsistent with Cox's stated commitments. Although Cox has no intention of engaging in "blocking" or "throttling" as it understands those terms, various advocates, stakeholders, and enforcement officials use those terms in different ways, such that a practice Cox regards as reasonable network management—including

6

modifying service tier speeds to prevent congestion at heavily utilized nodes—could be found to constitute unlawful blocking or throttling within the meaning of SB-822. Notably, SB-822's throttling ban also prohibits "without limitation, differentiating, positively or negatively," among Internet content or traffic. Cal. Civ. Code §§ 3101(a)(2), 3100(j). It is unclear what conduct this definition will actually cover, but its text sweeps more broadly than the FCC's former prohibition or any commonly used descriptions of what constitutes "throttling," compounding the risk that Cox's congestion management practices could be found in violation.

20. Accordingly, notwithstanding Cox's belief that its congestion management practice of modifying service tier speeds at a small number of nodes with extraordinary utilization constitutes "reasonable network management," and thus falls outside California's prohibitions against "blocking" and "throttling," Cox has no way to know how California officials or a court will construe those terms. That uncertainty, together with the uncertain application of SB-822's Internet Conduct Standard, is likely to lead Cox to conclude that the substantial liability risks associated with such expansive and vague prohibitions warrant suspension of its congestion management practice to address additional node congestion. To the extent that Cox must suspend or limit that practice, affected subscribers will be deprived of the associated benefits, and some subscribers will experience diminished network performance when node utilization spikes. In turn, to the extent that Cox's subscribers experience degraded Internet service, that will likely result in reputational harm to Cox and lost business.

21. *Second*, although Cox thus far has maintained its approach to responding to Acceptable Use Policy violations in spite of the impending effectiveness of SB-822, that statute and similar state measures will create substantial liability risks if Cox continues to rely on these practices. To be sure, Cox strongly believes that its responses to violations of its Acceptable Use Policy are fully consistent with net neutrality principles, and they are demonstrably effective, as they have resulted in significant improvements; roughly half of abusers contacted reform their usage. But some critics have asserted otherwise, and Cox has no way to assure that its position will be accepted by California enforcement officials and courts.

22. During the COVID-19 crisis, for example, Cox enforced its Acceptable Use

Policy independent of—but sometimes in conjunction with—the congestion management practice at nodes with extraordinary utilization.  A reporter conflated these two distinct practices (even after Cox explained the distinction) and alleged that Cox inappropriately "punishe[d]" all members of a specific node for the usage rate of one specific customer who was violating the Acceptable Use Policy.[2]  This claim was false:  Cox does not "punish" other users within a node because one customer within that group violated the Acceptable Use Policy—rather, its enforcement of the Acceptable Use Policy is limited to the subscriber who violated it.  Cox is also transparent about when it will use this and other network management practices and believes they are reasonable means of addressing extraordinary and abnormal usage on its network and the resultant potential diminution of service quality.

23. This misunderstanding and mischaracterization of the company's congestion management practices illustrates the legal and business risks for Cox if SB-822 takes effect. Network management is complex, and even practices that are designed to minimize the effect of unforeseen circumstances and ensure optimal user experience across the entire network might be characterized (or mischaracterized) by critics as "unreasonable."

24. As with the congestion management practice, if California's Internet Conduct Standard becomes effective, it would put Cox to an inevitable Hobson's Choice with respect to its enforcement of the company's Acceptable Use Policy.  On the one hand, Cox could continue to respond to Acceptable Use Policy violations as it is currently doing, but that would expose Cox to a significant risk of legal sanction and a loss of goodwill based on regulators' after-the-fact assessment of the lawfulness of Cox's congestion management practices.  On the other hand, Cox could stop employing this congestion management practice, as with the broader modification of tier speeds on overutilized nodes, but ensuring stable and reliable Internet connectivity is more critical than ever—especially during the COVID-19 crisis.  Forgoing enforcement of Cox's Acceptable Use Policy could compromise Cox's ability to manage its network.  If excessive utilization is not addressed, it can diminish the quality of other customers'

---

[2] *See* Jon Brodkin, *Cox Slows Internet Speeds In Entire Neighborhoods to Punish Any Heavy Users*, ARS TECHNICA (June 8, 2020), https://arstechnica.com/tech-policy/2020/06/cox-slows-internet-speeds-in-entire-neighborhoods-to-punish-any-heavy-users/.

service, and inevitably result in reduced goodwill and the prospect of losing customers.

25. In addition to the risks posed by the Internet Conduct Standard, Cox's modifying service tier speeds in response to violations of its Acceptable Use Policy could be deemed a prohibited form of "blocking" or "throttling," notwithstanding Cox's position that this is a reasonable network management practice. That risk again forces an untenable choice between suspending a practice that benefits customers overall and maintaining that practice subject to a substantially heightened risk of adverse enforcement action.

26. *Third*, even apart from being forced to suspend the congestion management practice and the additional practice relating to Acceptable Use Policy violations or to face increased liability risks, the impending effectiveness of SB-822 will require Cox to undertake costly legal reviews to assess the risk of engaging in these and additional practices under the Internet Conduct Standard, prohibitions against "blocking," "throttling," and "paid prioritization," and the new oversight of traffic-exchange agreements. The need to undertake such legal risk assessments imposes increased operating costs, chills or at minimum delays the introduction of new practices and service features that are intended to benefit consumers, and reduces Cox's competitiveness by impeding its ability to respond to technological and marketplace developments.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of August 2020 in Atlanta, Georgia.

/s/ Guy McCormick
Guy McCormick
Senior Vice President of Technology Engineering
Cox Communications