Scott H. Angstreich*
Leslie V. Pope*
Alex A. Parkinson*
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
lpope@kellogghansen.com
aparkinson@kellogghansen.com

*Attorneys for Plaintiffs*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*

Jeffrey A. Lamken (CA SBN 154217)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff*
*American Cable Association*

* Admitted *pro hac vice*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 2:18-cv-02684<br><br>**DECLARATION OF BARBARA RODEN OF AT&T IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

I, Barbara Roden, declare as follows.

1. I, Barbara Roden, am Vice President – Mobile Broadband Network Services of AT&T Mobility Services LLC, an indirect wholly-owned subsidiary of AT&T Inc. I am within the Consumer Marketing organization and directly oversee the group within AT&T Mobility that manages the Sponsored Data program.

2. I submit this declaration to address the irreparable harms that AT&T would incur by virtue of its Sponsored Data program in the event that SB-822 is enforced effective August 5, 2020. Sponsored Data is a service offered by AT&T Mobility that enables providers of content over the Internet to cover the data usage charges for those who access their content. Sponsored Data is closely analogous to toll-free telephone service, which enables businesses to cover the costs of incoming telephone calls. Sponsored Data is beneficial to businesses who use it to encourage online viewing of their content. And it is beneficial to consumers, particularly those on tiered data plans with data allowances, who effectively get "free data" under the program. Indeed, Sponsored Data even benefits content providers who do not subscribe to the service because it effectively enlarges consumers' data allowances, freeing up data that might not otherwise be available to view non-sponsored content. Sponsored Data also promotes competition, enabling AT&T to distinguish its over-the-top video and mobile wireless services from those of its competitors.

3. Notwithstanding these benefits, SB-822 renders AT&T's Sponsored Data program unlawful in California. As a result, when SB-822 takes effect, customers who today stream sponsored content for free will no longer be able to do so. Among those customers are the many thousands of AT&T Mobility customers who subscribe to one of AT&T's affiliated video services such as DIRECTV that participate in Sponsored Data. As a result of SB-822, AT&T will have to cancel a valuable feature of its wireless and video offerings. This will understandably upset customers, causing AT&T a significant loss of goodwill and harm AT&T in the competitive marketplace by invalidating an innovative feature of its services that customers value.

1

Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

**AT&T's Sponsored Data Program**

4.  As of the second quarter of 2020, AT&T provided AT&T-branded mobile services to over 90 million subscribers.[1] It offers such services in all 50 states and has deployed extensive network facilities in all 50 states.  AT&T has millions of mass-market customer accounts with California billing addresses.

5.  AT&T offers a variety of mobile service plans, some of which offer an unlimited data allowance and others that allow customers a fixed amount of data usage for a monthly fee (*i.e.*, "limited" or "tiered" data plans).[2]  Although the relative mix of "limited" and "unlimited" customers has changed as customers increasingly subscribe to unlimited plans, a very large number of AT&T's branded smartphone customers continue to subscribe to "limited" data plans.

6.  Like its rivals, AT&T competes not only on price and network quality, but also on the basis of product bundling and innovative service features, including features that use "zero rating."  Launched in January 2014, AT&T's Sponsored Data program enabled customers on limited plans to stream certain content on a "zero-rated" basis—*i.e.*, without having it count against their data allowances.  AT&T Sponsored Data closely resembles free shipping for online commerce or 800-number toll-free calling.  Just as Holiday Inn covers toll charges when customers dial 1-800-HOLIDAY, content providers who participate in the Sponsored Data program cover data charges for the customers who access their content over AT&T's mobile network.

---

[1] These "branded" mobile subscriptions include AT&T's Consumer Mobility post-paid and AT&T prepaid subscribers and connections and Business Solutions post-paid wireless subscribers and connections. *See* AT&T, *Second Quarter Financial and Operating Trends, Earnings* (2020), https://investors.att.com/~/media/Files/A/ATT-IR/financial-reports/quarterly-earnings/2020/q2-2020/2q20-trending-schedule.pdf.

[2] For purposes of this declaration, plans that provide a fixed amount of high-speed data during a bill period are referred to as "limited" plans, while plans that provide unlimited high-speed data during a bill period are referred to as "unlimited" plans (unlimited plans typically are subject to congestion-based data management, always applicable for some plans and after an allotment of data such as 50 GB or 22 GB per line in a bill period for other plans).

2
Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

1       7.      Any content provider, whether affiliated or unaffiliated with AT&T, may participate in AT&T Sponsored Data on the same terms as any other, regardless of its size, affiliation, or the amount of data that it chooses to sponsor.  The rate for participation is also extremely low:  it is well below the comparable per-unit rate that retail customers would otherwise pay for the same data usage on mobile plans with data allowances, and it reflects the lowest wholesale data rate that AT&T offers to major wireless resellers that commit to large purchase volumes in the competitive market for wholesale network capacity.

8.      AT&T's Sponsored Data program offers significant benefits to its customers and to content providers. It not only enables content providers to encourage viewing of their content, but also effectively enlarges the data allowance of every retail customer on a "limited" data plan who views sponsored content.  Specifically, because such content does not count against data allowances, the Sponsored Data program allows them to use more data for viewing *non-sponsored* content.

### AT&T Mobile Video Offerings

9.      Although a variety of affiliated and unaffiliated companies and nonprofit organizations have participated in AT&T Sponsored Data since the program was launched, the largest participant by data volume has been DIRECTV, which merged with AT&T in 2015 and joined the program in September 2016.

10.     DIRECTV is a subscription-TV provider that provides two types of relevant services.  First, it offers a satellite-based service that provides video programming to customers through roof-top antennas and set-top boxes.  For the convenience of those customers, DIRECTV enables them to view largely the same programming online under the brand names "DIRECTV Everywhere" and "NFL Sunday Ticket."  Those customers can stream that programming over the web and through mobile applications ("apps") on smartphones, subject to certain restrictions.  Second, in November 2016, DIRECTV launched a lower-priced streaming-only, multichannel video service (also known as an "over-the-top" or "OTT" service) that offers

3

Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

1  live TV called "DIRECTV NOW." DIRECTV NOW, which has been rebranded to AT&T TV

2  NOW, allows customers to view video content over the web or through the AT&T TV app.

3      11.    Through DIRECTV's participation in the AT&T Sponsored Data program,

4  consumers who subscribe to one of these DIRECTV services can stream DIRECTV content

5  over AT&T's mobile broadband network without having that content count against their data

6  allowances. This offering is known as "Data Free TV."

7      12.    Participation in Data Free TV is automatic for every customer who subscribes to

8  a DIRECTV service and downloads one of its apps. Each app is programmed to inform

9  customers who are also AT&T mobile subscribers that their mobile data will not count against

10 their usage allowances. The apps deliver that message both when users first download them and

11 then at regular intervals thereafter. See Exhs. 1 & 2.

12     13.    A smaller number of AT&T mobile data customers also receive the benefits of

13 Data Free TV through another app. In particular, customers who subscribe to AT&T's fixed-

14 line U-verse subscription-TV service are entitled to stream that service over AT&T's mobile

15 broadband network using the U-verse app without that usage counting against their data

16 allowances.

17     14.    In March 2020, AT&T launched AT&T TV, a multichannel streaming video

18 experience that offers live TV, sports, on-demand movies and shows, Cloud DVR, and other

19 functionality over a customer's broadband connection. AT&T TV also allows subscribers to

20 stream content wirelessly to their phones or tablets through the AT&T TV app. When they do

21 so over AT&T's mobile network, AT&T sponsors their data usage.

22     15.    AT&T also now offers the HBO Max over-the-top service, which launched on

23 May 26, 2020. HBO participates in AT&T's Sponsored Data program and sponsors the data for

24 AT&T wireless subscribers who access HBO Max content over AT&T's mobile network.

25     16.    When Data Free TV was launched in mid-2016, AT&T and DIRECTV

26 emphasized the consumer benefits of this program in their advertising. *See*, *e.g.*, Exh. 3 (ad in

27 *ESPN Magazine*). Although AT&T's marketing strategy has since changed to emphasize new

28

unlimited plans, a substantial number of AT&T's branded mobile subscribers base remain on limited data plans with finite data allowances (*e.g.*, 5 GB high-speed data per month). Many of these subscribers have downloaded and use one or more of AT&T's mobile video apps. Because those apps participate in Sponsored Data, AT&T's mobile subscribers use them to access video content without exceeding their data allowances (*i.e.*, overage charges or slower throughput, depending on the service plan).

17. If allowed to go into effect, SB-822 would impose multiple, significant harms on consumers. First, to the extent it forces AT&T to eliminate its Sponsored Data program in California (or, as discussed below, nationally), SB-822 would effectively reduce the data allowance for any customer on a limited data plan that uses one of AT&T's mobile video apps because such usage would now count against the applicable data allowance. Second, it would deprive customers of the benefits of more robust competition for wireless broadband internet access, video distribution, and bundled service offerings.

**Compliance Costs and Difficulties Relating to the Ambiguous Geographic Scope of SB-822**

18. SB-822 applies only "insofar as [a] provider is engaged in providing … broadband Internet access service," § 3101(a), (b), defined as a service "provided to customers in California," § 3100(b). It is unclear whether this language applies to (1) customers with billing addresses in California, but only when they are physically in California; (2) customers who are physically in California no matter where their billing address is; or (3) customers with billing addresses in California no matter where they are physically.[3]

19. Implementing Options (1) and (2) would require AT&T to build systems to "geofence" California, such that AT&T customers are denied the benefits of Data Free TV only when they are streaming video while physically within the state's borders. These systems do

---

[3] It would be completely infeasible to base compliance on area codes. In today's telecommunications environment, area codes—particularly for mobile numbers—no longer correspond with any degree of fidelity to physical locations. For example, someone who obtained a cell phone as a teenager in Los Angeles may well retain her original (213) cell phone number long after moving out of state.

not exist today and would require the expenditure of substantial time and resources to construct, and there would be no way to recover those costs from the State in the event that this statute is later invalidated. To avoid geo-fencing, AT&T would have to ignore the location of the customer when implementing SB-822 and cease zero rating of content streamed from inside or outside of California.

20. Option (3) would present difficult and costly challenges of its own. First, it would greatly extend the reach of SB-822 to persons and activities far beyond the state's boundaries, as subscribers with billing addresses in California may well spend large amounts of time outside California. Similarly, an account holder may have a billing address in California but pay for the lines used by family members located in other states. Under Option (3), all of those family members would be subject to the extraterritorial reach of SB-822 even during extended periods when they neither reside in nor travel to California. Moreover, Option (3) would require AT&T to notify all affected subscribers of the consequences of moving their billing addresses into or out of California. Doing so would add more compliance costs to the process and, in the case of customers moving into California, present the serious risk of losing those customers altogether.

## **The Irreparable Harm AT&T Will Suffer From Canceling Data Free TV**

21. As discussed, it is unclear what SB-822 means when it prohibits zero-rating in connection with mobile services "provided to customers in California," § 3100(b), and that ambiguity will compound the difficulty and costs of compliance measures discussed below. But quite apart from that concern, the statute's flat ban on sponsored-data arrangements such as Data Free TV for any significant class of customers will impose major costs on AT&T it could not hope to recover in the event the statute is later invalidated.

   **a.   AT&T Would Suffer Reputational Damage and Loss of Customers if Forced to Eliminate Sponsored Data.**

22. By compelling AT&T to discontinue Data Free TV for a large subset of its mobile customers, SB-822 will subject AT&T to an immediate and substantial loss of customer goodwill. As noted, a substantial number of AT&T's customers on branded wireless plans

6
Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

remain on limited data plans with defined data allowances. AT&T believes that many of these customers relied on AT&T's promise of zero-rated content as a reason for signing up (or staying) with AT&T mobile services. Also, even as to customers that did not originally choose AT&T because of zero-rated content, millions of subscribers are actively taking advantage of that feature. AT&T DIRECTV customers have had the benefits of Data Free TV for four years. Many customers have undoubtedly adjusted their viewing habits to take advantage of this effective increase in their data allowance.

23. Customers who relied on AT&T's Data Free TV feature for years, as well as those who only recently started enjoying the benefit of sponsored data when using the HBO Max service that launched in May of this year, will be upset that AT&T is no longer offering a service and may blame AT&T for their frustrated expectations. This is particularly true for those customers that will start bumping up against applicable data allowances without zero-rating. Some may abandon AT&T's mobile service, the relevant AT&T video service, or both, in favor of competitive alternatives. Because it may be difficult or impossible to win many of these consumers back within the foreseeable future, SB-822 would likely cost AT&T substantial revenues. In addition, aggrieved customers will express their dissatisfaction to their friends and acquaintances. Their dissatisfaction will likely also attract widespread, negative media attention. This reputational damage could reduce the ability of AT&T to attract and retain wireless or video (or both) customers for many years.

24. AT&T could only partially mitigate this reputational damage by promptly informing customers that it is discontinuing sponsored data and by explaining that it is doing so in response to new state legislation that the federal government and others have challenged as preempted. First, some consumers may miss the communication about the change in service and instead learn about the cancelation of sponsored data only after they exceed their data allowances and call AT&T to complain about the consequences (either overage fees or slowed throughput, depending on the service plan). Second, even those customers who immediately read AT&T's cancelation message may be skeptical of AT&T's claim that it is only temporarily

suspending sponsored data in response to an unlawful state law that it hopes will soon be invalidated. Most of AT&T's customers are unfamiliar with the litigation process and will focus mainly on the fact that AT&T promised a feature that it is no longer delivering.

### b. SB-822 Will Force AT&T to Incur Substantial Costs to Notify Customers That AT&T Can No Longer Offer Sponsored Data.

25. Even apart from these reputational harms, notifying millions of customers of this change in their terms of service would by itself impose substantial costs and is logistically burdensome. At a minimum, AT&T would need to prepare and send a bill insert to customers with California billing addresses. As described further below, the necessary work to do so is a costly undertaking. But it is logistically problematic as well, as bill inserts for affected customers must be planned well in advance of the relevant billing cycles, which are staggered.

26. The difficulties and costs would only multiply if AT&T is required to cease zero-rating not just for customers that have established billing addresses in California, but for any customer that might travel to California. In that circumstance, AT&T would need to provide notifications to *all* of its subscribers. That would not only significantly increase the cost of notification, but, as noted above, expose AT&T to a nationwide loss of customer goodwill because it would deny all subscribers who might travel to California the full benefits of Data Free TV. Of course, if SB-822 is invalidated, AT&T would then need to notify all subscribers that it is once again able to provide sponsored data in California.

27. AT&T would face separate constraints if it sought to deliver the cancelation notice through email or SMS text messages. AT&T lacks email addresses for a large percentage of its wireless customer base—for example, it typically lacks such addresses for (1) pre-paid customers and (2) all users in a group or family plan other than the account-holder. And SMS text messages are inherently constrained by screen size and other limits in the amount of information that can be delivered. AT&T could not provide its customers with appropriate and sufficient detail about SB-822, the prospects for its invalidation, the complexities of its geographic application, and AT&T's remediation efforts. Although the text message could include a link to a webpage, the message itself would still need to provide an appropriate level

8
Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction

of detail to provide sufficient notice of the change and to ensure that customers make the decision to click through to that webpage.  Of course, these problems relate only to AT&T's *technical ability* to reach its customer base promptly.  Again, once AT&T does reach its customers, it will inevitably suffer major losses of goodwill and subscription revenues.

28. AT&T would not be able to recover the costs associated with these customer notifications, which are significant.  Such costs would include, for example, the costs of reconfiguring systems to accommodate this one-time mass-notification effort and staffing up additional call centers to handle the expected influx of calls from angry customers.  Then, if and when SB-822 is reversed, AT&T would incur substantial additional expense simply to *correct* its prior notifications.  First, AT&T would have to notify its existing customers that, contrary to those prior notifications, it was restoring sponsored data.  AT&T might also need to run advertisements for consumers in general to inform them that sponsored data is suddenly available after all, contrary to what they learned from all of the negative publicity about the cancelation of that program.

   **c.**   **AT&T Would Need to Incur Substantial, Unrecoverable Costs to Make the Operational Changes Necessary to Achieve Compliance with SB-822.**

29. In addition to these notification and advertising costs, SB-822 would require AT&T to undertake the costly software development, systems updates, and other technological work needed to shut down Data Free TV for all DIRECTV and AT&T video services in California.  For example, because the apps for all of these services repeatedly assure customers that their data is zero-rated, AT&T would have to redesign all of these apps to inform customers that sponsored data is no longer available in California, a task that would require substantial resources.  AT&T would then have to take steps to persuade customers to delete their existing apps and download the new ones.  That is not a straightforward task.  Many customers may postpone or ignore application-update notifications, and many disable automatic update features on their devices.

30. AT&T would also have to make a variety of time-consuming and costly changes to its back-office systems to ensure that customers who currently enjoy the benefits of

sponsored data become subject instead to usage assessments when they stream video over AT&T's mobile broadband network.  Although these system changes would be most obviously required for customers on limited data plans, they would also be required for customers on AT&T's unlimited plans, who are subject to occasional reduced speeds during periods of network congestion (at varying points, depending on their unlimited plan).

31.     Finally, because SB-822 requires AT&T to eliminate sponsored data for unaffiliated participants in the program, AT&T would need to expend resources working with those participants to ensure that (1) there is no zero-rating of those third-party apps "in California" and (2) customers understand that their use of third-party apps on AT&T's mobile broadband network is no longer zero-rated in California. These customers include Veterans subscribing to AT&T wireless services whose usage of the Veterans' Administration's Telehealth app is sponsored by AT&T.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of August 2020 in Atlanta, Georgia.

_____
Barbara Roden

Declaration of Barbara Roden in Support of Plaintiffs' Motion for Preliminary Injunction