XAVIER BECERRA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SARAH E. KURTZ
Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
P. PATTY LI, State Bar No. 266937
Deputy Attorney General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 510-3817
  Fax: (415) 703-1234
  E-mail:  Patty.Li@doj.ca.gov
*Attorneys for Defendants the State of California,
Governor Gavin C. Newsom, and Attorney General
Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**THE STATE OF CALIFORNIA, et al.,**<br><br>Defendants. | 2:18-cv-02660-JAM-DB<br>2:18-cv-02684-JAM-DB<br><br>**DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION MOTIONS**<br><br>Judge:       The Hon. John A. Mendez<br>Actions Filed: Oct. 1, 2018; Oct. 3, 2018 |
| **AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Factual and Legal Background ........................................................................................ 2

    I.     The Architecture of the Internet and the Major Players ................................. 2

    II.    The Crucial Importance of, and the Threat to, Net Neutrality ...................... 3

         A.    BIAS Providers Have Engaged in Unequal Treatment of Internet
              Traffic ........................................................................................................ 3

         B.    Open Access to the Internet is Essential ..................................... 5

    III.   The Development—and Abrupt Termination—of Federal Net Neutrality
        Protections ............................................................................................................ 6

         A.    The FCC Moves to Regulate Broadband After Finding Numerous
              Abuses ....................................................................................................... 6

         B.    The FCC Reclassifies BIAS as an "Information Service," Repeals
              Its Net Neutrality Rules, and Tries—But Fails—to Preempt the
              States From Adopting Their Own Rules .............................................. 8

    IV.   California Protections for Its Internet Users ................................................... 9

         A.    California Protects Its Internet Users Through Numerous Laws ............... 9

         B.    California's Net Neutrality Law ............................................................. 10

    V.    Proceedings to Date .......................................................................................... 11

Legal Standard ............................................................................................................... 11

Argument ....................................................................................................................... 12

    I.     Plaintiffs Are Not Likely to Succeed on the Merits of Their Preemption
        Claims ................................................................................................................... 12

         A.    Because SB 822 Is an Exercise of California's Historic Police
              Powers, the Presumption Against Preemption Applies Here ................... 13

         B.    No Conflict Preemption Results from the 2018 Order .......................... 14

             1.    Conflict Preemption Can Only Result from Agency Action
                 Authorized by Statute .................................................................... 15

             2.    No Conflict Preemption Results from the 2018 Order,
                 Which Is Based on the FCC's Lack of Authority to Impose
                 Net Neutrality Rules ...................................................................... 16

                 a.    Reclassification Left the FCC with Only Ancillary
                       Authority Over BIAS, Which Cannot Support
                       Preemption ......................................................................... 16

                 b.    The Repeal of Federal Net Neutrality Protections
                       Results from a Lack of Authority, Which Cannot
                       Constitute a Federal Deregulatory Policy With
                       Preemptive Effect ............................................................... 21

                 c.    No Conflict Preemption Results from the
                       Transparency Rule .............................................................. 24

**TABLE OF CONTENTS**
(continued)

|  |  |  |  | Page |
|---|---|---|---|---|
|  |  | d. | No Conflict Preemption Results from Purported "Factual Findings" in the 2018 Order | 26 |
|  | C. | No Conflict Preemption Results from the Communications Act | | 28 |
|  | D. | No Field Preemption Results from the Act's General References to FCC Regulation of "Interstate Communications" | | 31 |
|  |  | 1. | General References to FCC Regulation of "Interstate" Communications Do Not Result in Field Preemption | 32 |
|  |  | 2. | Numerous Provisions of the Act Assume or Recognize State Regulation | 34 |
|  |  | 3. | The Field Preemption Claim Is Incompatible with the Case Law | 35 |
|  |  | 4. | Under Plaintiffs' Sweeping Theory of Field Preemption, All State Regulation of Information Services Would Be Preempted, but That Is Not the Law | 36 |
|  | E. | The Communications Act Does Not Expressly Preempt SB 822's Regulation of Mobile BIAS | | 37 |
|  |  | 1. | SB 822's Mobile Broadband Provisions Do Not Regulate the Entry of Any Mobile Service | 38 |
|  |  | 2. | SB 822's Zero-Rating Provisions Do Not Regulate the Rates Charged by Any Mobile Service | 39 |
| II. | Plaintiffs Have Failed to Demonstrate Irreparable Harm | | | 40 |
|  | A. | A Presumption of Irreparable Harm Is Not Appropriate | | 40 |
|  | B. | ISP Plaintiffs Have Failed to Establish Irreparable Harm | | 41 |
|  |  | 1. | The Alleged Harms Relating to Interconnection, the General Conduct Rule, and the Prohibitions on Blocking and Throttling Are Entirely Speculative | 41 |
|  |  | 2. | The Harms Alleged from the Zero-Rating Provisions Are Also Entirely Speculative | 45 |
|  | C. | The Irreparable Harm Alleged by the United States Is Legally Irrelevant and Has Not Been Established | | 46 |
| III. | The Balance of Equities Weighs Strongly Against an Injunction | | | 47 |
| Conclusion | | | | 50 |

# TABLE OF AUTHORITIES

**Page**

**CASES**

*ACA Connects – Am. Comm'cns Ass'n v. Frey*
2020 WL 3799767 (D. Me. July 7, 2020) ........................................................................13, 18

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev Comm'n*
410 F.3d 492 (9th Cir. 2005)........................................................................37

*Alliance Shippers v. Southern Pacific Transport Company*
858 F.2d 567 (9th Cir. 1988)........................................................................30

*American Library Ass'n v. FCC*
406 F.3d 689 (D.C. Cir. 2005) ........................................................................17, 23

*American Trucking Ass'n, Inc. v. City of Los Angeles*
559 F.3d 1046 (9th Cir. 2009)........................................................................40

*Arizona v. United States*
567 U.S. 387 (2012) ........................................................................25, 32, 33

*Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*
461 U.S. 375 (1983) ........................................................................22

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015) ........................................................................40

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*
950 F.2d 1401 (9th Cir. 1991) ........................................................................40

*AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*
349 F.3d 402 (7th Cir. 2003)........................................................................28

*Atherton v. FDIC*
519 U.S. 213 (1997) ........................................................................21

*Bastien v. AT&T Wireless Servs., Inc.*
205 F.3d 983 (7th Cir. 2000)........................................................................38

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*
330 U.S. 767 (1947) ........................................................................23

*Bofi Fed. Bank v. Erhart*
2016 WL 4680291 (S.D. Cal. Sept. 7, 2016) ........................................................................45

iii

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*California v. ARC Am. Corp.*
    490 U.S. 93 (1989)............................................................................................13

4

*California v. FCC*
    39 F.3d 919 (9th Cir. 1994)............................................................................30

5

6

*California v. FCC*
    567 F.2d 84 (D.C. Cir. 1977).........................................................................36

7

*Capital Cities Cable, Inc. v. Crisp*
    467 U.S. 691 (1984)..........................................................................22, 23, 36

8

9

*Caribbean Marine Servs. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988).................................................................41, 44, 46

10

*Chamber of Commerce of U.S. v. Whiting*
    563 U.S. 582 (2011)...................................................................................22, 30

11

12

*Charter Advanced Servs. LLC v. Lange*
    903 F.3d 715 (8th Cir. 2018).......................................................................24, 27

13

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*
    467 U.S. 837 (1984)......................................................................................9, 19

14

15

*Cipollone v. Liggett Group, Inc.*
    505 U.S. 504 (1992).........................................................................................34

16

*City of Dallas v. FCC*
    165 F.3d 341 (5th Cir. 1999)......................................................................28, 30

17

18

*Coal. for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997)..........................................................................12

19

*Comcast v. FCC*
    600 F.3d 642 (D.C. Cir. 2010) ................................................................. *passim*

20

21

*Computer and Communications Industry Ass'n v. FCC*
    693 F.2d 198 (D.C. Cir. 1982).....................................................................29, 35

22

*Durnford v. MusclePharm Corp.*
    907 F.3d 595 (9th Cir. 2018)..........................................................................13

23

24

*eBay Inc. v. MercExchange, L.L.C.*
    547 U.S. 388 (2006)........................................................................................40

25

26

27

28

iv

**TABLE OF AUTHORITIES**
(continued)

Page

*Elrod v. Burns*
    427 U.S. 347 (1976) ...................................................................................40

*Farina v. Nokia Inc.*
    625 F.3d 97 (3d Cir. 2010) .........................................................................29

*FCC v. Midwest Video Corp.*
    440 U.S. 689 (1979) ...................................................................................33

*Fedor v. Cingular Wireless Corp.*
    355 F.3d 1069 (7th Cir. 2004) .............................................................38, 39

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*
    458 U.S. 141 (1982) .............................................................................15, 32

*Geier v. Am. Honda Motor Co., Inc.,*
    529 U.S. 861 (2000) .................................................................21, 22, 27, 29

*Gibbons v. Ogden*
    22 U.S. 1 (1824) ........................................................................................40

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*
    742 F.3d 414 (9th Cir. 2014) ...............................................................35, 37

*Head v. New Mexico Bd. of Exam'rs in Optometry*
    374 U.S. 424 (1963) ...................................................................................35

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*
    736 F.3d 1239 (9th Cir. 2013) ...................................................................43

*Hovila v. Tween Brands, Inc.*
    2010 WL 1433417 (W.D. Wash. Apr. 7, 2010) ........................................14

*In re Excel Innovations, Inc.*
    502 F.3d 1086 (9th Cir. 2007) ...................................................................43

*In re Verizon New England, Inc.*
    173 Vt. 327 (Vt. 2002) ...............................................................................36

*Ivy v. Broadcasting Co. v. American Tel. & Tel. Co*
    391 F.2d 486 (2d Cir. 1968) ......................................................................36

*Johnson v. American Towers, LLC*
    781 F.3d 693 (4th Cir. 2015) .....................................................................38

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Kansas v. Garcia*
    140 S. Ct. 791 (2020) ...........................................................................................15, 18

4

*La. Pub. Serv. Comm'n v. FCC*
    476 U.S. 355 (1986) .......................................................................................15, 16, 21

5

6

*Lipschultz v. Charter Advanced Servs. (MN), LLC*
    140 S. Ct. 6 (2019) .........................................................................................18, 24, 27

7

*Maryland v. King*
    133 S. Ct. 1 (2012) ...............................................................................................47

8

9

*Mason v. Granholm*
    2007 WL 734990 (E.D. Mich. Mar 7, 2007) ...............................................................44

10

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996) ...............................................................................................13

11

12

*Melendres v. Arpaio*
    695 F.3d 990 (9th Cir. 2012) ...................................................................................40

13

14

*Merck Sharp & Dohme Corp. v. Albrecht*
    139 S. Ct. 1668 (2019) ...........................................................................................12

15

16

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*
    423 F.3d 1056 (9th Cir. 2005) .............................................................................34, 35

17

*Minn. Pub. Utils. Comm'n v. FCC*
    483 F.3d 570 (8th Cir. 2007) ...................................................................................23

18

19

*Mozilla Corp. v. FCC*
    940 F.3d 1 (D.C. Cir. 2019) ................................................................................ *passim*

20

21

*Multicultural Media, Telecom & Internet Council v. FCC*
    873 F.3d 932 (D.C. Cir. 2017) ...................................................................................33

22

23

*Murphy v. NCAA*
    138 S. Ct. 1461 (2018) ...........................................................................................12

24

*NASUCA v FCC*
    457 F.3d 1238 (11th Cir. 2006) ...................................................................................39

25

26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*
    545 U.S. 967 (2005) .......................................................................................2, 18, 19, 37

27

28

vi

**TABLE OF AUTHORITIES**
(continued)

Page

*Nat'l Fed'n of the Blind v. Target*
452 F. Supp. 2d 946 (N.D. Cal. 2006) ....................................................37

*Nat'l Fed'n of the Blind v. United Airlines Inc.*
813 F.3d 718 (9th Cir. 2016)...........................................................32, 35

*Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC*
746 F.2d 1492 (D.C. Cir. 1984) ............................................................36

*Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC*
533 F.2d 601 (D.C. Cir. 1976) ........................................................33, 35

*New Cingular Wireless PCS LLC v. Picker*
216 F. Supp. 3d 1060 (N.D. Cal. 2016) ................................................14

*New York State Comm'n on Cable Television v. FCC*
749 F.2d 804 (D.C. Cir. 1984) ..............................................................35

*New York v. FERC*
535 U.S. 1 (2002)...................................................................................15

*Nken v. Holder*
556 U.S. 418 (2009)...............................................................................47

*Oneok, Inc. v. Learjet, Inc.*
575 U.S. 373 (2015)...............................................................................15

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*
461 U.S. 190 (1983)...............................................................................33

*Peck v. Cingular Wireless, LLC*
535 F.3d 1053 (9th Cir. 2008)...............................................................39

*Perfect 10, Inc. v. Google, Inc.*
653 F.3d 976 (9th Cir. 2011)..........................................................40, 44

*Pinney v. Nokia, Inc.*
402 F.3d 430 (4th Cir. 2005).................................................................13

*Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.*
251 U.S. 27 (1919).................................................................................36

*Qwest Corp. v. Minn. Pub. Util. Comm'n*
684 F.3d 721 (8th Cir. 2012).................................................................29

**TABLE OF AUTHORITIES**
(continued)

Page

*Ray v. Atl. Richfield Co.*
    435 U.S. 151 (1978)...................................................................................23

*Rinky Dink Inc. v. Elec. Merchant Sys. Inc.*
    2013 WL 12074984 (W.D. Wash. Dec. 17, 2013)...................................14

*Rodriguez v. Robbins*
    715 F.3d 1127 (9th Cir. 2013)..................................................................40

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*
    105 F. Supp. 3d 108 (D.D.C. 2015) .........................................................44

*Sprietsma v. Mercury Marine*
    537 U.S. 51 (2002)..............................................................................21, 23

*Standard Havens Prods, Inc. v. Gencor Indus., Inc.*
    897 F.2d 511 (Fed. Cir. 1990)..................................................................46

*Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC*
    762 F. Supp. 2d 8 (D.D.C. 2011) .............................................................45

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
    240 F.3d 832 (9th Cir. 2001)....................................................................43

*Telesaurus VPC LLC v. Power*
    623 F.3d 998 (9th Cir. 2010)..............................................................38, 39

*Teltech Sys., Inc. v. Bryant*
    702 F.3d 232 (5th Cir. 2012)....................................................................13

*Thomas v. Cty. of Los Angeles*
    978 F.2d 504 (9th Cir. 1992)....................................................................12

*Ting v. AT&T*
    319 F.3d 1126 (9th Cir. 2003)......................................................13, 14, 36

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*
    585 F. App'x 390 (9th Cir. 2014) .............................................................43

*Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*
    474 U.S. 409 (1986)..................................................................................30

*United States Telecom Ass'n v. FCC*
    825 F.3d 674 (D.C. Cir. 2016) ....................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. California*
   314 F. Supp. 3d 1077 (E.D. Cal. 2018)......................................................................40

*United States v. California*
   921 F.3d 865 (9th Cir. 2019)...............................................................................13, 41

*United States v. Midwest Video Corp.*
   406 U.S. 649 (1972)...............................................................................................33

*United States v. Sw. Cable Co.*
   392 U.S. 157 (1968)...............................................................................................23

*Ventress v. Japan Airlines*
   747 F.3d 716 (9th Cir. 2014)..................................................................................28

*Verizon New England, Inc. v. R.I. Pub. Util. Comm'n*
   822 A.2d 187 (R.I. 2003).......................................................................................36

*Verizon v. FCC*
   740 F.3d 623 (D.C. Cir. 2014) ....................................................................... *passim*

*Virginia Uranium, Inc. v. Warren*
   139 S. Ct. 1894 (2019)......................................................................................12, 33

*Western Union Tel. Co. v Boegli*
   251 U.S. 315 (1920)...............................................................................................36

*Williamson v. Mazda Motor of Am., Inc.*
   562 U.S. 323 (2011).......................................................................................15, 27, 29

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)...................................................................................11, 12, 41, 43

*Wisconsin Pub. Intervenor v. Mortier*
   501 U.S. 597 (1991)...............................................................................................34

*Worldcom, Inc. v. Graphnet, Inc.*
   343 F.3d 651 (3d Cir. 2003)...................................................................................36

*Wyeth v. Levine*
   555 U.S. 555 (2009).......................................................................................13, 14, 21, 22

ix

**TABLE OF AUTHORITIES**
(continued)

Page

STATUTES

47 U.S.C.
§ 151.................................................................................................7, 31, 32, 33
§ 152...................................................................................................28, 31, 32, 33
§ 152(a)..............................................................................................................31, 33
§ 152(b)..............................................................................................................21, 31
§ 153(24)............................................................................................................29, 35
§ 153(51)................................................................................................................ *passim*
§ 154(i)......................................................................................................................17
§ 223(f)(2).................................................................................................................34
§ 230(b).....................................................................................................................20
§ 230(b)(2)................................................................................................................20
§ 230(e)(3)................................................................................................................34
§ 253(a).....................................................................................................................34
§ 253(d).....................................................................................................................34
§ 254(i)......................................................................................................................34
§ 257.........................................................................................................................26
§ 276.........................................................................................................................34
§ 332.........................................................................................................................39
§ 332(c)(1)..................................................................................................................7
§ 332(c)(2)..............................................................................................................7, 28
§ 332(c)(3)..........................................................................................34, 37, 38, 39
§ 332(c)(7)................................................................................................................34
§ 502(f)(2)................................................................................................................30
§ 543(a)(1)................................................................................................................34
§ 544(e).....................................................................................................................34
§ 556(c).....................................................................................................................34
§ 1302(a)...................................................................................................................34
§ 1304..................................................................................................................26, 34

47 C.F.R. § 8.1(a)............................................................................................24, 25

47 C.F.R. § 8.2(f) (2016) ....................................................................................11

American Recovery and Reinvestment Act of 2009,
Pub. L. No. 111-5 (2009) ................................................................................5

California Business and Professions Code
§ 17200....................................................................................................................10
§ 17529.5.................................................................................................................10
§§ 22575-22578......................................................................................................9
§§ 22580-22582......................................................................................................9

**TABLE OF AUTHORITIES**
(continued)

Page

California Civil Code
    § 51 ..........................................................................................................9
    § 1798.100 ...............................................................................................9
    § 3100 ...............................................................................................10, 11
    § 3101(a) ..........................................................10, 11, 25, 41, 42, 45, 46

California Penal Code
    § 288.2(a)(1) ...........................................................................................10

California Internet Consumer Protection and Net Neutrality Act of 2018, Senate
    Bill 822, Cal. Stats. 2018, Chapter 976 ............................................ *passim*

OTHER AUTHORITIES

Federal Communications Commission, Policy Review of Mobile Broadband
    Operators' Sponsored Data Offerings for Zero-Rated Content and Services. ......................4, 5

H.R. Rep. No. 104-458 (1996) ...............................................................29, 30

*In the Matter of Preserving the Open Internet*
    25 FCC Rcd. 17905 (2010) .......................................................... *passim*

*In the Matter of Protecting and Promoting the Open Internet*
    30 FCC Rcd. 560 (2015) ...............................................................................4

*In the Matter of Restoring Internet Freedom*
    32 FCC Rcd. 4434 (2017) ...........................................................................8

*In the Matter of Restoring Internet Freedom*
    33 FCC Rcd. 311 (2018) ............................................................... *passim*

*In the Matter of Wireless Telecommunications Bureau Report*
    32 FCC Rcd 1093 (2017) ...........................................................................8

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) ................................15

Shalini Ramachandran & Michael Calia, *Cablevision CEO Plays Down Business
    Effect of FCC Proposal* ...........................................................................42

Thomson Reuters Streetevents, Edited Transcript CMCSA – Q1 2015 Comcast
    Corp. Earnings Call, ...............................................................................42

**INTRODUCTION**

In response to the repeal of federal regulations ensuring open, non-discriminatory access to the Internet, California enacted its own net neutrality law.  Plaintiffs now seek to enjoin this exercise of California's traditional police powers, arguing that access to the Internet cannot be regulated by the states, and that the decision by the Federal Communications Commission ("FCC") to repeal its own net neutrality rules impliedly preempts the states from adopting such protections.  These are variations on the same arguments that the D.C. Circuit rejected when it vacated the FCC's so-called "Preemption Directive."  Plaintiffs' arguments here share the same fundamental flaws.  Just as the FCC had no statutory authority to issue its Preemption Directive, it could not have adopted a "federal deregulatory policy" that is binding on the states.  Plaintiffs' other attempts to manufacture preemption also fail.  Their sweeping theory that federal law preempts the entire field of "interstate communication" is remarkable on many levels, starting with the fact that the FCC itself did not see fit to mention field preemption when it issued its failed Preemption Directive.  Nothing in the Communications Act, the Telecommunications Act, or any federal case supports this sweeping theory.

Plaintiffs have also failed to demonstrate any irreparable harm, instead offering only speculation about the possible effects of having to comply with California's law, which they concede has yet to be enforced or authoritatively construed by any court.  Indeed, net neutrality conduct rules very similar to California's were in effect nationwide from 2015-2018, and the major broadband providers suffered no discernible harm, let alone significant, irreparable harm.  Weighed against Plaintiffs' complaint that they cannot precisely predict how California's law will be interpreted and enforced is the very real harm to the public that would result from the issuance of an injunction.  Nearly every facet of modern life depends on open access to the Internet; yet, it is well established that, absent net neutrality conduct rules, major broadband providers have the incentive and ability to abuse their control of the network to economically benefit themselves and their business partners, and that they have done so in the past.  Here, in order to protect public health, safety, and welfare, the public interest demands that Plaintiffs' preliminary injunction motions be denied.

1

1                                   **FACTUAL AND LEGAL BACKGROUND**

2 **I.    THE ARCHITECTURE OF THE INTERNET AND THE MAJOR PLAYERS**

3       In order to properly understand the issues in this case, a brief overview of the Internet and

4 its vulnerability to abuse by broadband providers is required.  The Internet is a vast "network of

5 interconnected computers."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

6 U.S. 967, 974 (2005) ("*Brand X*").  The basic unit of Internet communication is the "data packet."

7 Declaration of Scott Jordan ¶ 4.  Information sent over the Internet is broken down into multiple

8 packets to be transmitted to the receiver, at which point the packets are reassembled without

9 change in the underlying information's form or content.  *United States Telecom Ass'n v. FCC*,

10 825 F.3d 674, 690 (D.C. Cir. 2016) ("*U.S. Telecom Ass'n*").

11       The "major participants in the Internet marketplace" consist of "backbone networks,

12 broadband providers, edge providers, and end users."  *Verizon v. FCC*, 740 F.3d 623, 628 (D.C.

13 Cir. 2014) (citations omitted).  "Backbone networks are interconnected, long-haul fiber-optic

14 links and high-speed routers capable of transmitting vast amounts of data."  *Id.* at 629.

15 Broadband providers, also known as broadband Internet access service ("BIAS") providers,

16 "operate the 'last-mile' transmission lines" connecting end users to these backbone networks,

17 through "high-speed communications technologies, such as cable modem service."  *Id.*  "Edge

18 providers are those who, like Amazon or Google, provide content, services, and applications over

19 the Internet, while end users are those who consume edge providers' content, services, and

20 applications."  *Id.*  "These categories of entities are not necessarily mutually exclusive," as

21 "broadband providers may offer content, applications, and services that compete with those

22 furnished by edge providers."  *Id.*  "In recent years, some edge providers, such as Netflix and

23 Google, have begun connecting directly to broadband providers' networks, thus avoiding the need

24 to interconnect with the backbone, and some broadband providers, such as Comcast and AT&T,

25 have begun developing their own backbone networks."  *U.S. Telecom Ass'n*, 825 F.3d at 690

26 (citations omitted).

27

28

## II.    THE CRUCIAL IMPORTANCE OF, AND THE THREAT TO, NET NEUTRALITY

### A.    BIAS Providers Have Engaged in Unequal Treatment of Internet Traffic

"[I]nternet openness—commonly known as net neutrality—[is] the principle that broadband providers must treat all internet traffic the same regardless of source." *U.S. Telecom Ass'n*, 825 F.3d at 689.  Net neutrality was built into the original architecture of the Internet, which was designed to be application- and content-blind, such that the companies that connect people to the Internet ("internet service providers" or "ISPs") could not interfere with what people do online. Declaration of Margaret Dolgenos, ¶ 9; *In the Matter of Preserving the Open Internet*, 25 FCC Rcd. 17905, ¶ 13 & n.13 (2010), *vacated in part sub nom. Verizon v. FCC*, 740 F.3d 623 ("2010 Order").

Until the mid-1990s, ISPs did not have the technology to determine the content of the data packets they were delivering to and from their subscribers.  Declaration of Alexis Ohanian, ¶ 8; Jordan Decl. ¶ 13.  This technology is now in widespread use, enabling ISPs to block, slow down, or speed up specific content, applications, or services, or to put particular websites in a "fast lane" to an ISP's subscribers if those websites have paid the ISP a fee.  Ohanian Decl. ¶¶ 5-6, 9, 14-15; Jordan Decl. ¶¶ 13-37; Dolgenos Decl. ¶¶ 4-8.  Thus, ISPs, whose affiliates and business partners compete directly with edge providers, have the means and incentive to use their control of the network for anti-competitive purposes.  The danger, as described by the DC Circuit, is that ISPs can "prevent their end-user subscribers from accessing certain edge providers altogether, or might degrade the quality of their end-user subscribers' access to certain edge providers, either as a means of favoring their own competing content or services or to enable them to collect fees from certain edge providers." *Verizon*, 740 F.3d at 629.

Concerns that ISPs could use their network control for anti-competitive purposes are based, in part, on specific findings by the FCC that ISPs have engaged in such conduct.  For example, in 2010, the FCC found that "broadband providers endanger the Internet's openness by blocking or degrading content and applications without disclosing their practices to end users and edge providers, notwithstanding the Commission's adoption of open Internet principles in 2005."  2010 Order ¶ 4.  As explained by the D.C. Circuit:

3

> The Commission . . . convincingly detailed how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers.  Because all end users generally access the Internet through a single broadband provider, that provider functions as a "'terminating monopolist,'" with power to act as a "gatekeeper" with respect to edge providers that might seek to reach its end-user subscribers. . . . [T]his ability to act as a "gatekeeper" distinguishes broadband providers from other participants in the Internet marketplace—including prominent and potentially powerful edge providers such as Google and Apple—who have no similar "control [over] access to the Internet for their subscribers and for anyone wishing to reach those subscribers."

*Verizon*, 740 F.3d at 646 (citations omitted).  In 2015, the FCC also found:

> (1) "broadband providers hold all the tools necessary to deceive consumers, degrade content, or disfavor the content that they don't like,"; (2) "broadband providers have both the incentive and the ability to act as gatekeepers standing between edge providers and consumers"; (3) "[a]s gatekeepers, they can block access altogether; they can target competitors, including competitors to their own video services; and they can extract unfair tolls," and "[s]uch conduct would, as the Commission concluded in 2010, 'reduce the rate of innovation at the edge and, in turn, the likely rate of improvements to network infrastructure'"; and (4) "broadband providers (including mobile broadband providers) have the economic incentives and technical ability to engage in practices that pose a threat to Internet openness by harming other network providers, edge providers, and end users."

*In the Matter of Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 ¶¶ 8, 85, 20, 78 (2015) ("2015 Order"), *aff'd sub nom. U.S. Telecom Ass'n*, 825 F.3d 674.  And, in 2017, the FCC determined that certain zero-rating practices by AT&T "inflict significant unreasonable disadvantages on edge providers and unreasonably interfere with their ability to compete against AT&T's affiliate[.]"  FCC, Policy Review of Mobile Broadband Operators' Sponsored Data Offerings for Zero-Rated Content and Services, at 16-17 (Jan. 11, 2017) ("2017 Zero-Rating Report").[1]  It also concluded that "sponsored data offerings [where an edge provider pays to be zero-rated] by vertically integrated mobile broadband providers may harm consumers and competition in downstream industry sectors by unreasonably discriminating in favor of select downstream providers, especially their own affiliates."  *Id.*

These FCC findings are not exhaustive.  There are numerous other examples of ISPs using their terminating access monopoly to undermine open Internet principles, suppress competition,

---

[1] Zero-rating is the practice of exempting data from customers' data caps.  The report is available at https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0111/DOC-342982A1.pdf.

1   and limit user choice.  *See*, *e.g.*, Declaration of Angie Kronenberg, ¶¶ 12-21; Declaration of

2   Steven Renderos, ¶¶23-24; Declaration of Dave Schaeffer, ¶¶ 10-41.[2]

3       **B.    Open Access to the Internet is Essential**

4       Left unchecked, anti-competitive behavior by ISPs threatens the very foundation of the 21st

5   century economy:  a free and open Internet.  As Congress has recognized, Internet access is

6   fundamental to "consumer welfare, civic participation, public safety and homeland security,

7   community development, health care delivery, energy independence and efficiency, education,

8   worker training, private sector investment, entrepreneurial activit[ies], job creation and economic

9   growth."  American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5,

10  § 6001(k)(2)(D), 123 Stat. 115, 516 (2009).  The California Legislature has similarly declared

11  that "[a]lmost every sector of [the] economy, democracy, and society is dependent on the open

12  and neutral Internet . . . ."  Senate Bill 822, the California Internet Consumer Protection and Net

13  Neutrality Act of 2018, Cal. Stats. 2018, ch. 976 ("SB 822"), Sec. 1(a)(2).[3]

14      Indeed, fair access to all types of content and applications is critically important to nearly

15  all economic activity that involves the transmission of information.  Businesses that depend on

16  non-discriminatory treatment of Internet traffic range from long-established entities providing

17  home security services, such as ADT (*see* Declaration of Thomas S. Nakatani, ¶¶ 8-11); to newer

18  businesses streaming content or delivering services over the Internet, such as Philo (Declaration

19  of Andrew McCollum, ¶¶ 4-7, 17-18); and include nearly every start-up in recent times (*see*

20  Ohanian Decl. ¶¶ 4-6, 8).  Creative industries (including film, television, and digital media),

21

22      [2] *See also* Declaration of P. Patty Li, Ex. A, People of the State of New York, Comments
    on the May 23, 2017 Notice of Proposed Rulemaking, at 1 (New York Attorney General's Office
23  investigations "have uncovered circumstantial evidence revealing – for the first time – that from at
    least 2013 to 2015, major BIAS providers made the deliberate business decision to let their
24  networks' interconnection points become congested with Internet traffic and used that congestion
    as leverage to extract payments from backbone providers and edge providers, despite knowing
25  that this practice lowered the quality of their customers' Internet service.").

        [3] These sectors include: "(A) Police and emergency services. (B) Health and safety
26  services and infrastructure. (C) Utility services and infrastructure. (D) Transportation
    infrastructure and services, and the expansion of zero- and low-emission transportation options.
27  (E) Government services, voting, and democratic decisionmaking processes. (F) Education. (G)
    Business and economic activity. (H) Environmental monitoring and protection, and achievement
28  of state environmental goals. (I) Land use regulation."  *Id.*

5

social justice organizations (such as MediaJustice), and a myriad of others also depend on their ability to reach end-users without being impeded by blocking, throttling, paid prioritization, zero-rating, and other anti-competitive practices by BIAS providers.  *See* Declaration of Laura Blum-Smith, ¶¶ 5-8; Renderos Decl., ¶¶ 7-12.

The central importance of free and open Internet access to modern life has never been more apparent than during the current COVID-19 public health crisis.  Almost any form of human interaction that cannot take place safely in-person is taking place online, including but not limited to religious worship, schooling, office work, political organizing (such as, in this election year, voter registration and turnout efforts), and healthcare.  *See* Declaration of London M. Breed, ¶¶ 2-8, 11-12; Declaration of Miguel Márquez, ¶¶ 20, 24, 30-31, 33; Renderos Decl. ¶¶ 9-10, 13-14, 19-20, 30, 42.  The wildfires currently raging throughout the western United States further demonstrate the urgency of protecting net neutrality: basic public safety functions, including but not limited to disseminating alerts to the public and organizing evacuations, now depend on the Internet more than ever.  *See* Declaration of Fire Chief Anthony Bowden, ¶¶ 5, 9; Márquez Decl. ¶¶ 13, 18, 20, 25.

For all these reasons, an order barring the enforcement of net neutrality protections would be particularly harmful at this time.  As shown above, ISPs have already demonstrated that, absent net neutrality protections, they can and will use their control of the network in ways that harm the public interest.

## III. THE DEVELOPMENT—AND ABRUPT TERMINATION—OF FEDERAL NET NEUTRALITY PROTECTIONS

### A. The FCC Moves to Regulate Broadband After Finding Numerous Abuses

Until recently, the FCC firmly supported net neutrality.  In a 2008 order, the FCC attempted to regulate a BIAS provider's network management practices that interfered with certain peer-to-peer file-sharing applications, but that effort was rejected by the D.C. Circuit for lack of statutory authority.  *See Comcast v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).  In 2010, the FCC issued an order adopting for the first time formal transparency, anti-blocking, and anti-discrimination rules for fixed BIAS providers, and more limited rules for mobile providers, based on section 706 of the

Telecommunications Act (47 U.S.C. § 1302).  2010 Order ¶ 1 & App. A (rules); *id*. ¶¶ 117-123. However, on review of the 2010 Order, the D.C. Circuit struck down portions of the FCC's rules, holding that because BIAS was not classified as a telecommunications service (under Title II of the Communications Act), the FCC lacked authority to promulgate the net neutrality conduct rules.  *See Verizon*, 740 F.3d 623.[4]

In response to the *Verizon* decision, the FCC adopted its 2015 Order, which classified fixed and mobile BIAS as a "telecommunications service" and mobile BIAS as a "commercial mobile service," thereby subjecting them to common carrier regulation, and adopted more detailed net neutrality conduct rules and protections, using its authority under Title II and section 706 of the Telecommunications Act.  2015 Order ¶¶ 331, 383.  The D.C. Circuit upheld the 2015 Order in *U.S. Telecom Ass'n*, 825 F.3d 674.

The net neutrality rules adopted in the 2015 Order included prohibitions on blocking, *id*. App. A § 8.5; throttling, *id*. § 8.7; and paid prioritization, *id*. § 8.9; as well as a general conduct rule requiring BIAS providers to "not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users," [5] *id*. § 8.11.  The 2015 Order also kept the transparency rule adopted in the 2010 Order.  *See* 2010 Order App. A § 8.3.

---

[4] Congress passed the Communications Act (the "Act") and created the FCC in 1934.  47 U.S.C. § 151 *et seq*.  The Telecommunications Act of 1996 added to and modified various provisions of the Communications Act.  *See* P.L. 104-104 (1996), 110 Stat. 56.  "The Commission's authority under the Act includes classifying various services into the appropriate statutory categories."  *Mozilla v. FCC*, 940 F.3d 1, 17 (D.C. Cir. 2019) (citing *Brand X*, 545 U.S. at 980-981).  "[T]he 1996 Telecommunications Act creates two potential classifications for broadband Internet: 'telecommunications services' under Title II of the Act and 'information services' under Title I."  *Id*.  "These similar-sounding terms carry considerable significance: Title II entails common carrier status, *see* 47 U.S.C. § 153(51) (defining 'telecommunications carrier'), and triggers an array of statutory restrictions and requirements (subject to forbearance at the Commission's election)."  However, "'information services' are exempted from common carriage status and, hence, Title II regulation."  *Id*.  "An analogous set of classifications applies to mobile broadband: A 'commercial mobile service' is subject to common carrier status, *see* 47 U.S.C. § 332(c)(1), whereas a 'private mobile service' is not, *see id*. § 332(c)(2)."  *Id*.

[5] The general conduct rule is also called the "no unreasonable interference/disadvantage" standard or the "Internet conduct standard."

7

1    Additional protections were included in the text of the 2015 Order itself.  For example,

2  BIAS providers were prohibited from charging edge providers for access to end-user Internet

3  customers.  2015 Order ¶¶ 113, 120.  ISPs were also prohibited from engaging in practices or

4  entering into agreements at the point of interconnection (i.e., where the data enters the ISP's

5  network) that have the purpose or effect of evading net neutrality protections.  *Id.* ¶¶ 195, 206.

6    The 2015 Order further prohibited BIAS providers from offering other services over the

7  same last-mile connection as regular Internet access service, if such offerings were designed to

8  evade the Order's net neutrality protections.  2015 Order ¶¶ 112, 207, 210, 212.  With respect to

9  zero-rating (i.e., exempting certain applications from consumers' data plan allowances), the FCC

10  would "look at and assess such practices under the no-unreasonable interference/disadvantage

11  standard, based on the facts of each individual case, and take action as necessary."  *Id.* ¶¶ 151-

12  152.[6]

13    **B.    The FCC Reclassifies BIAS as an "Information Service," Repeals Its Net
       Neutrality Rules, and Tries—But Fails—to Preempt the States From
14       Adopting Their Own Rules**

15    In 2017, the FCC abruptly reversed course on federal net neutrality protections, dropping

16  ongoing investigations into zero-rating practices and issuing a notice of proposed rulemaking to

17  repeal its net neutrality conduct rules.[7]  In January 2018, the FCC issued an order reclassifying

18  fixed and mobile BIAS as a Title I "information service," reclassifying mobile broadband as a

19  "private mobile service," and interpreting section 706 of the 1996 Act as "hortatory" and not an

20  independent grant of regulatory authority.  *In the Matter of Restoring Internet Freedom*, 33 FCC

21  Rcd. 311, ¶¶ 26-64, 65-85, 263-283 (2018) ("2018 Order"), *aff'd in part and vacated in part sub*

22  *nom. Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).  In the 2018 Order, which took effect on

23

24    [6] Following up on the concerns it expressed in the 2015 Order about zero-rating, the FCC
    later conducted an extensive investigation of these practices, and concluded there were at least
25  two kinds of zero-rating by BIAS providers that were harmful and likely to violate the general
    conduct rule: (1) using zero-rating as a means of granting preferential treatment to content from
26  affiliated edge providers or themselves, or (2) favoring companies and speakers with deep
    pockets.  *See* 2017 Zero-Rating Report at 1.

27    [7] *In the Matter of Wireless Telecommunications Bureau Report,* 32 FCC Rcd 1093, ¶¶ 1-2
    (2017); *In the Matter of Restoring Internet Freedom*, Notice of Proposed Rulemaking, 32 FCC
28  Rcd. 4434 (2017).

8

June 11, 2018, the FCC disclaimed *any* authority to impose generally applicable net neutrality rules on BIAS providers. *Id.* ¶ 267 ("The record in this proceeding does not persuade us that there are any sources of statutory authority that individually, or in the aggregate, could support conduct rules uniformly encompassing all ISPs."); *see also id.* ¶¶ 268-294. The FCC therefore repealed the net neutrality conduct rules and protections that had been promulgated in the 2015 Order, save for a less restrictive version of the transparency rule. *Id.* ¶¶ 239-67, 209-38. At the same time, the FCC adopted a Preemption Directive which purported to broadly preempt state and local jurisdictions from enacting "any measures that would effectively impose rules or requirements that we have repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for any aspect of broadband service that we adopt in this order." *Id.* ¶ 195.

Numerous private and governmental petitioners, including the State of California, sought review of the 2018 Order in the D.C. Circuit, which ultimately upheld the FCC's reclassification and repeal decisions, but vacated the Preemption Directive. *Mozilla*, 940 F.3d 1. The *Mozilla* court held that the decisions to reclassify and repeal were reasonable under the *Chevron* framework for evaluating an agency's interpretation of a statute. *Id.* at 20, 35 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984)). However, the court determined that the FCC lacked statutory authority for the Preemption Directive. *Id.* at 74.

## IV.   CALIFORNIA PROTECTIONS FOR ITS INTERNET USERS

### A.   California Protects Its Internet Users Through Numerous Laws

To protect the health, safety, and welfare of its residents, California has enacted a number of statutes governing activity on the Internet. These include laws regarding the privacy and security of information sent, collected, or exchanged over the Internet, such as the California Consumer Privacy Act (Cal. Civ. Code §§ 1798.100 *et seq.*); the California Online Privacy Protection Act (Cal. Bus. & Prof. Code §§ 22575-22578); and the Privacy Rights for California Minors in the Digital World Act (Cal. Bus. & Prof. Code §§ 22580-22582). Various California civil rights laws establish accessibility and non-discrimination requirements with respect to Internet websites or activity conducted over the Internet, including the Unruh Civil Rights Act

9

1   (Cal. Civ. Code §§ 51 *et seq*.).  California law also prohibits fraudulent or deceptive

2   advertisements or marketing practices over Internet websites or through email.  *See*, *e.g.*,

3   California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.); Cal. Bus. & Prof.

4   Code § 17529.5 (unlawful activities relating to commercial e-mail advertisements).  And, basic

5   public safety safeguards and prohibitions on criminal activity apply to conduct over the Internet.

6   *See*, *e.g.*, Cal. Pen. Code § 288.2(a)(1) (prohibiting distribution or exhibition of lewd matter to a

7   minor, including by "electronic communication").

8       **B.**    **California's Net Neutrality Law**

9       In keeping with this long history of protecting its residents from unfair and harmful

10   practices on the Internet, the California Legislature responded to the 2018 repeal of federal net

11   neutrality protections by passing its own protections for California.  On September 30, 2018, SB

12   822 was signed into law.  SB 822 applies to BIAS "provided to customers in California."  Cal.

13   Civ. Code § 3100(b); *see also id.* § 3100(i), (k), & (p).  SB 822 adopts many of the same net

14   neutrality protections as the FCC's 2015 Order.  Specifically, with respect to BIAS provided to

15   customers in California, SB 822 prohibits:

16   - Blocking or throttling[8] lawful content, applications, services, or nonharmful devices, Cal
17     Civ. Code §§ 3101(a)(1), (2), (b);

18   - Charging edge providers (i.e., content providers and websites) for delivering Internet traffic
       to and from BIAS providers' Internet customers, *id*. §§3101(a)(3), (b);

19   - Charging edge providers for technical preferential treatment, such as establishing pay-to-
20     play "slow" or "fast" lanes, also known as paid prioritization, *id*. §§ 3101(a)(4), (b);

21   - Engaging in zero-rating (exempting some Internet traffic from a customer's data usage
       allowance) in exchange for consideration, or with respect to a subset of Internet content,
22     applications, services, or devices, *id*. §§ 3101(a)(5) & (6), (a)(7)(B), (b).

23   - Unreasonably interfering with or disadvantaging an end-user's ability to select and access
       BIAS or the lawful content, applications, services, or devices of the end-user's choice, or an
24     edge provider's ability to make these same things available to end-users, *id*.
       §§ 3101(a)(7)(A), (b);

25   - Failing to publicly disclose accurate information about network management practices, *id*.
       §§ 3101(a)(8), (b);

26

27   _____

28       [8] "Throttling" refers to "[i]mpairing or degrading" certain Internet traffic.  Cal. Civ. Code
     §§ 3101(a)(2), 3100(j).

10

- Engaging in practices that have the purpose or effect of evading SB 822's net neutrality protections at the point of interconnection, where a BIAS provider exchanges Internet traffic to and from its BIAS customers with another entity (such as backbone providers), *id.* §§ 3101(a)(9), (b); and

- Offering other services over the same last-mile connection as regular Internet, if those services would evade SB 822's net neutrality protections, *id.* §§ 3102(a)(1), (b).

Some of SB 822's prohibitions are subject to an exception for "reasonable network management," *id.* §§ 3101(a)(1) (blocking), (a)(2) (throttling), and (a)(7)(a) (interference with end-user access to content, applications, or devices).  The definition of "reasonable network management," *id.* § 3100 (s), is taken from the FCC's 2015 and 2010 Orders.  *See* 2015 Order ¶¶ 220-221; 47 C.F.R. § 8.2(f) (2016); 2010 Order ¶ 87.

## V.   PROCEEDINGS TO DATE

When SB 822 was enacted in 2018, the United States and a group of industry trade associations for major ISPs ("ISP Plaintiffs") filed separate challenges to the law, including preliminary injunction motions.  *United States v. California*, No. 2:18-cv-02660; *American Cable Association v. Becerra*, No. 2:18-cv-02684.  The cases were ordered related, and the parties subsequently agreed to stay the litigation pending resolution of the *Mozilla* litigation, in particular California's challenge to the validity of the FCC's Preemption Directive.  As part of that stipulation, Defendants agreed to refrain from enforcing SB 822 until 30 days after resolution of any renewed preliminary injunction motions filed after the resumption of litigation.  The D.C. Circuit issued its opinion in *Mozilla* on October 1, 2019.  *Mozilla*, 940 F.3d 1.  After the time to seek review of the *Mozilla* decision expired, the United States and ISP Plaintiffs filed amended complaints and the instant preliminary injunction motions, which are being briefed and heard on the same schedule.  *See United States v. California*, ECF Nos. 7, 11, 17, 19, 20, 21; *American Cable Association*, ECF Nos. 12, 24, 36, 51, 52, 53.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff must establish (a) "that he is likely to succeed on the merits"; (b) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (c)

1  "that the balance of equities tips in his favor"; and (d) "that an injunction is in the public interest."

2  *Id.* at 20.  This burden is particularly heavy in cases seeking to enjoin state statutes, because "a

3  state suffers irreparable injury whenever an enactment of its people or their representatives is

4  enjoined."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *Thomas v. Cty. of*

5  *Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992) ("[A] strong factual record is necessary.").

6  **ARGUMENT**

7  **I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR PREEMPTION**

8  **CLAIMS**

9  The Supremacy Clause "specifies that federal law is supreme in case of a conflict with state

10  law."  *Murphy v. NCAA*, 138 S. Ct. 1461, 1479 (2018).  There are "three different types of

11  preemption—'conflict,' 'express,' and 'field'—but all of them work in the same way: Congress

12  enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights

13  or imposes restrictions that conflict with the federal law; and therefore the federal law takes

14  precedence and the state law is preempted."  *Id.* at 1479.

15  Regardless of the type of preemption, "[i]nvoking some brooding federal interest or

16  appealing to a judicial policy preference should never be enough to win preemption of a state law;

17  a litigant must point specifically to 'a constitutional text or a federal statute' that does the

18  displacing or conflicts with state law."  *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901

19  (2019) (plurality) (internal quotation marks and citation omitted).  Thus, a purported federal

20  policy, by itself, cannot preempt. "The Supremacy Clause grants 'supreme' status only to the 'the

21  *Laws* of the United States.'" *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679

22  (2019) (citing U. S. Const., Art. VI, cl. 2., emphasis in opinion).

23  As set forth below, Plaintiffs fail to identify any source of statutory or regulatory authority

24  that could preempt SB 822.  Instead, they argue that the FCC's decisions to reclassify BIAS as an

25  information service, and to repeal the FCC's prior rules, were motivated by a desire to impose a

26  "deregulatory policy" or a "light-touch" regulatory framework, on BIAS nationwide.  That may

27  be so, but the FCC's policy preferences, without more, are insufficient to preempt state law.  The

28  

12

1  presumption against preemption applies here, and nothing in the 2018 Order or the

2  Communications Act overcomes that presumption.

3  **A.   Because SB 822 Is an Exercise of California's Historic Police Powers, the
       Presumption Against Preemption Applies Here**

4

5      Any preemption analysis must "start with the assumption that the historic police powers of

6  the States were not to be superseded by the Federal Act unless that was the clear and manifest

7  purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also, e.g.*, *Medtronic, Inc.

8  v. Lohr*, 518 U.S. 470, 485 (1996) (describing the "presumption against the pre-emption of state

9  police power regulations" (internal quotation marks and citation omitted)). "[I]t is a state's

10 historic police power—not preemption—that [courts] must assume, unless clearly superseded by

11 federal statute." *United States v. California*, 921 F.3d 865, 887 (9th Cir. 2019) (citation omitted).

12     This presumption applies here.  SB 822 is a classic exercise of state police power to protect

13 consumers, public health, and public safety.  In enacting SB 822, the Legislature determined that

14 "[a]lmost every sector of California's economy, democracy, and society is dependent on the open

15 and neutral Internet that supports vital functions regulated under the police power of the state."

16 *Id.*, Sec. 1(a)(2).

17     Further, the fact that both state and federal governments regulate in this area does not defeat

18 the presumption.  Many federal courts have applied a presumption against preemption to state

19 health, safety, and consumer protection laws,[9] notwithstanding the presence of federal regulatory

20 authority.  *See, e.g.*, *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012) ("interstate

21 telecommunications"); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 453-54 & n.4 (4th Cir. 2005)

22 ("wireless telecommunications"); *ACA Connects – Am. Comm'cns Ass'n v. Frey*, 2020 WL

23 3799767, at *4 (D. Me. July 7, 2020) ("providers of broadband Internet access service").[10]

24 _____

25         [9] "Consumer protection falls well within [the] category" of "traditional state police
   power."  *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 601 (9th Cir. 2018); *see also, e.g.*,
   *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (noting the long history of state common-
26 law and statutory remedies against unfair business practices).

27         [10] In *Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003), the Ninth Circuit declined to
   "apply the presumption against preemption … because of the long history of federal presence in
   regulating long-distance telecommunications."  In *Wyeth*, however, the Supreme Court clarified
28

1

**B.**     **No Conflict Preemption Results from the 2018 Order**

2      SB 822 does not prevent BIAS providers from complying with the 2018 Order.  Instead,

3   Plaintiffs argue that the 2018 Order embodies a "federal deregulatory policy" with respect to

4   BIAS, and that SB 822 conflicts with this supposed federal "objective."  U.S. Br. at 16-18; ISP

5   Br. at 18-19.  This is simply another attempt at a strategy that failed in *Mozilla*, which rejected the

6   FCC's reliance on a purported "federal policy of nonregulation" as a basis for the Preemption

7   Directive.  940 F.3d at 78 ("What the Commission calls the 'federal policy of nonregulation for

8   information services' . . . cannot sustain the Preemption Directive either.").

9      The *Mozilla* court found that this asserted policy of nonregulation is untethered to the

10   FCC's congressionally delegated statutory authority; it is, at most, an agency policy preference,

11   and a shifting one at that.  This is fatal to the preemption theory at issue here.  *See Mozilla*, 940

12   F.3d at 75 (noting "in any area where the Commission lacks the authority to regulate, it equally

13   lacks the power to preempt state law").  Because the FCC had no statutory authority to expressly

14   preempt state net neutrality regulations, it also lacks statutory authority to do so impliedly,

15   through a purported "federal deregulatory policy."

16      The theory of conflict preemption pursued here takes the same policy preferences that

17   failed to sustain the Preemption Directive in *Mozilla*; restyles them as "purposes and objectives"

18   of the portions of the 2018 Order that were not vacated; and presents these policy preferences as

19   validly promulgated agency actions that conflict with SB 822, simply because the 2018 Order

20   went through notice-and-comment rulemaking.  *See* U.S. Br. at 15-16; ISP Br. at 20-23.  But

21   tying these policy preferences to the reclassification of BIAS as an information service, or the

22   repeal of the FCC's prior rules, does not change what they are—mere policy preferences divorced

23   that the application of the presumption turns on "the historic presence of state law" rather than the
historic "absence of federal regulation."  555 U.S. at 565 n.3.  Since then, district courts in the

24   Ninth Circuit have applied a presumption against preemption to state consumer protection
regulations in the telecommunications area.  *See Rinky Dink Inc. v. Elec. Merchant Sys. Inc.*, 2013

25   WL 12074984, at *2 (W.D. Wash. Dec. 17, 2013); *Hovila v. Tween Brands, Inc.*, 2010 WL
1433417, at *6-7 (W.D. Wash. Apr. 7, 2010) (citing and discussing *Wyeth* in applying

26   presumption against preemption); *see also New Cingular Wireless PCS LLC v. Picker*, 216 F.
Supp. 3d 1060, 1070 n.7 (N.D. Cal. 2016) (reasoning that "there is at least a fair argument that the

27   presumption applies, which further militates against the companies' expansive preemption
position").  And the Ninth Circuit's conclusion in *Ting* would not apply here in any event, given

28   the absence of significant federal regulation of information services.

14

1   from statutory authority to preempt.  The result is therefore the same as in *Mozilla*—without

2   statutory authority, these agency policy preferences cannot preempt.

3       **1.    Conflict Preemption Can Only Result from Agency Action
                Authorized by Statute**

4

5       Conflict preemption may occur when (1) "compliance with both state and federal law is

6   impossible," or (2) "state law 'stands as an obstacle to the accomplishment and execution of the

7   full purposes and objectives of Congress.'"  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015)

8   (citation omitted).  Plaintiffs here invoke "obstacle" conflict preemption.  As the Supreme Court

9   has recently cautioned, however, preemption of state law under that rubric "cannot be based on a

10  'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'"

11  *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (citation omitted).  "In all cases, the federal

12  restrictions or rights that are said to conflict with state law must stem from either the Constitution

13  itself or a valid statute enacted by Congress."  *Id.*[11]

14      That principle also applies when a party contends that a federal agency has displaced state

15  law by regulation.  When considering conflict preemption through agency action, courts must

16  consider "whether that action is within the scope of the [agency's] delegated authority."  *Fid.*

17  *Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982).  Even if it is clear that an

18  agency intended to preempt, "[t]he question remains whether the [agency] acted within its

19  statutory authority in issuing the pre-emptive . . . regulation."  *Id.* at 159.  *See also La. Pub. Serv.*

20  *Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("a federal agency may pre-empt state law only when

21  and if it is acting within the scope of its congressionally delegated authority"); *accord New York*

22  *v. FERC*, 535 U.S. 1, 18 (2002).  "[T]he best way of determining whether Congress intended the

23

24      [11] Indeed, a number of jurists and scholars have "rejected purposes-and-objectives pre-
        emption as inconsistent with the Constitution because it turns entirely on extratextual 'judicial

25      suppositions.'"  *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 341 (2011) (Thomas, J.,
        concurring in the judgment); *see also, e.g.*, Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 231-

26      232, 277-290 (2000) ("constitutional law has no place" for "a general doctrine of obstacle
        preemption," because "the mere fact that federal law serves certain purposes does not

27      automatically mean that it contradicts everything that might get in the way of those purposes").
        These insights underscore the need for any theory of obstacle preemption to be firmly rooted in

28      the text of specific statutory or regulatory enactments.

1   regulations of an administrative agency to displace state law is to examine the nature and scope of

2   the authority granted by Congress to the agency." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

3   Courts "simply cannot accept an argument that the FCC may" preempt state law merely because

4   "it thinks [preemption] will best effectuate a federal policy.  An agency may not confer power

5   upon itself." *Id.*  That basic principle defeats Plaintiffs' preemption claims here, because the FCC

6   lacks the authority to impose net neutrality protections of the sort California has enacted.

7             **2.      No Conflict Preemption Results from the 2018 Order, Which Is
                         Based on the FCC's Lack of Authority to Impose Net Neutrality
8                        Rules**

9           The FCC reclassified BIAS as an information service, and further determined that—

10  precisely because BIAS is an information service—it had no statutory authority to promulgate net

11  neutrality rules.  That lack of statutory authority is not the same thing as a congressionally

12  authorized decision to refrain from regulating BIAS, let alone to prevent the states from

13  regulating it.  Rather, it is simply a lack of authority.  Put another way, neither the reclassification

14  nor the resulting repeal of federal net neutrality protections can be taken as decisions to *refrain*

15  from exercising regulatory authority that would have preemptive effect.  Nor does SB 822

16  conflict with any other terms of the 2018 Order.

17                  **a.      Reclassification Left the FCC with Only Ancillary
                              Authority Over BIAS, Which Cannot Support
18                            Preemption**

19          Plaintiffs contend that the reclassification decision represents the FCC's attempt to "pursue

20  a federal deregulatory policy for [BIAS]," ISP Br. at 19; that "reducing the regulatory burden on

21  [BIAS] was the FCC's overarching objective" in issuing the 2018 Order, U.S. Br. at 16; and that

22  "the objective of the 2018 Order is to restore a light-touch federal approach to regulating

23  [BIAS]," *id.* at 17; *see also* ISP Br. at 20.  This distorts the decision that the FCC actually made,

24  which was simply to "restore broadband Internet access service to its Title I information service

25  classification." 2018 Order ¶ 2.  As stated in the 2018 Order, the FCC determined that "the best

26  reading of the relevant definitional provisions of the Act supports classifying broadband Internet

27  access service as an information service," and that this classification applies "regardless of

28  whether [BIAS is] offered using fixed or mobile technologies." *Id.* ¶¶ 26, 20.  As a result of the

                                                        16

1   reclassification decision, the FCC lost any statutory authority it otherwise might have had to

2   preempt the states; reclassification resulted in a *lack* of authority to regulate, not the setting of a

3   deregulatory agenda that could be imposed on the states.  While deregulation at both the federal

4   and state levels may indeed be the FCC's "objective," it is not an objective that Congress has

5   authorized the FCC to pursue with respect to information services.

6      As the D.C. Circuit correctly recognized, the reclassification decision sharply limited the

7   FCC's statutory authority over BIAS.  By classifying BIAS as a Title I information service, the

8   FCC lost any express or direct statutory authority to regulate BIAS.[12]  Whereas the FCC has

9   "express and expansive" authority to regulate telecommunications services under Title II,

10  *Comcast*, 600 F.3d at 645, any regulatory action by the FCC with respect to BIAS, as a Title I

11  information service, must now be "reasonably ancillary to the . . . effective performance of . . .

12  statutorily mandated responsibilities."  *American Library*, 406 F.3d at 692.  The D.C. Circuit held

13  that the Preemption Directive, which is conceptually indistinguishable from the "federal

14  deregulatory policy" at issue here, was not a valid exercise of the FCC's ancillary authority;

15  indeed, "nowhere in the 2018 Order . . . does [the FCC] claim ancillary authority for the

16  Preemption Directive."  *Mozilla*, 940 F.3d at 76 (citing 2018 Order ¶¶ 194–204).  Nor has the

17  United States claimed in this case that the FCC has ancillary authority to preempt the states.

18

19      [12] "The Commission's regulatory jurisdiction falls into two categories.  The first is the
20  'express and expansive authority' Congress delegated in the Act to regulate certain technologies."
    *Mozilla*, 940 F.3d at 75 (quoting *Comcast*, 600 F.3d at 645).  This authority extends to "common
21  carrier services, including landline telephony (Title II of the Act); radio transmissions, including
    broadcast television, radio, and cellular telephony (Title III); and 'cable services,' including cable
22  television (Title VI)."  *Comcast*, 600 F.3d at 645 (internal citations omitted).  The second
    category of regulatory jurisdiction is "ancillary authority," which "derives from a provision
23  within Title I of the Act that empowers the Commission to 'perform any and all acts, make such
    rules and regulations, and issue such orders, not inconsistent with this chapter, as may be
24  necessary in the execution of its functions,'" *Mozilla*, 940 F.3d at 75 (quoting 47 U.S.C. § 154(i)),
    and enables the FCC to regulate on matters "reasonably ancillary to the . . . effective performance
25  of its statutorily mandated responsibilities," *American Library Ass'n v. FCC*, 406 F.3d 689, 692
    (D.C. Cir. 2005).
26      In light of its reclassification of BIAS as a Title I information service, the FCC possesses
    only ancillary authority to regulate BIAS.  Through reclassification, the FCC "placed
27  broadband *outside* of its Title II jurisdiction.  And broadband is not a 'radio transmission' under
    Title III or a 'cable service' under Title VI.  So the Commission's express authority under Titles
28  III or VI does not come into play either."  *Mozilla*, 940 F.3d at 76.

17

1    Because the FCC lacks either direct or ancillary authority to preempt, Plaintiffs cannot

2  prevail simply by describing the reclassification decision as reflecting a policy preference for

3  light-handed regulation.  In rejecting similar arguments about the alleged preemptive effect of the

4  2018 Order, another district court recently held that the 2018 Order "is not an instance of

5  affirmative deregulation, but rather a decision by the FCC that it lacked authority to regulate in

6  the first place[.]"  *ACA Connects*, 2020 WL 3799767, at *4 (citing *Mozilla*, 940 F.3d at 78,

7  internal citation omitted).  Such an "abdication of authority" is of "dubious preemptive effect."

8  *Id*. at *5.  "The idea that the FCC's relinquishment of authority over ISPs creates a federal

9  scheme prohibiting state . . . regulation of ISPs blinks reality."  *Id*.

10    It is true that in explaining its decision to reclassify BIAS, the FCC referenced its policy

11  preference for a "light-touch regulatory framework."  2018 Order ¶ 2; *see also id.* ¶ 20.  But that

12  is not a basis for conflict preemption.  Only the substance of statutory and regulatory enactments,

13  not the policy preferences that may have motivated those enactments, can have preemptive effect.

14  "In all cases, the federal restrictions or rights that are said to conflict with state law must stem

15  from either the Constitution itself or a valid statute enacted by Congress" or the substance of an

16  agency regulation.  *Garcia*, 140 S. Ct. at 801.  Preemption "cannot be a mere byproduct of self-

17  made agency policy."  *Mozilla*, 940 F.3d at 78; *see also Lipschultz v. Charter Advanced Servs.*

18  *(MN), LLC*, 140 S. Ct. 6, 7 (2019) (Thomas, J., joined by Gorsuch, J., concurring in denial of

19  certiorari) ("It is doubtful whether a federal policy—let alone a policy of nonregulation—is 'Law'

20  for purposes of the Supremacy Clause.").

21    Nor can the FCC locate authority to establish a nationwide policy of deregulation in the

22  Act's statutory ambiguity regarding whether fixed and mobile BIAS are properly classified as an

23  information service or a telecommunications service, or whether mobile BIAS should be

24  classified as a commercial mobile service or a private mobile service.  *See* U.S. Br. 16; ISP Br.

25  20.  "The Commission's authority under the Act includes classifying various services into the

26  appropriate statutory categories."  *Mozilla*, 940 F.3d at 17 (citing *Brand X*, 545 U.S. at 980-81).

27  In exercising this authority, the FCC needs only to determine whether a service meets a particular

28  statutory definition.  *See Brand X*, 545 U.S. at 986.  Specifically, the classification "question in

18

1  the context of broadband service require[s] the Commission to determine whether broadband's

2  dataprocessing and telecommunications components 'are functionally integrated . . . or

3  functionally separate," and, relatedly, 'what the consumer perceives to be the integrated finished

4  product." *Mozilla*, 9400 F.3d at 4 (quoting *Brand X*, 545 U.S. at 990-91).  In determining

5  whether prior classification decisions were within the scope of the FCC's statutory authority,

6  courts have examined the FCC's reasons for deciding that a particular service satisfied the

7  statutory definition at issue.  *See Brand X*, 545 U.S. at 986-1000 (upholding classification of

8  "broadband cable Internet service" as a Title I information service); *U.S. Telecom Ass'n*, 825 F.3d

9  at 701-06, 713-24 (upholding classification of BIAS as a Title II telecommunications service).

10       But the power to determine whether BIAS satisfies a particular statutory definition must

11  not be conflated with the power to enact a policy preference about the appropriate level of

12  regulation for BIAS nationwide.  As the *Mozilla* court observed, it is not appropriate to

13  "collaps[e] the distinction between (i) the Commission's authority to make a threshold

14  classification decision, and (ii) the authority to issue affirmative and State-displacing legal

15  commands within the bounds of the classification scheme the Commission has selected (here,

16  Title I).  The agency's power to do the former says nothing about its authority to do the latter."

17  940 F.3d at 84.  To find otherwise would be to "take[] the discretion to decide which definition

18  best fits a real-world communications service and . . . turn that subsidiary judgment into a license

19  to reorder the entire statutory scheme to enforce an overarching 'nationwide regime' that enforces

20  the policy preference underlying the definitional choice."  *Id*. at 84.  "[T]he Commission's

21  interpretive authority under *Chevron* to classify broadband as a Title I information service"

22  cannot "do away with the *sine qua non* for agency preemption: a congressional delegation of

23  authority either to preempt or to *regulate*."  *Id*. at 82.  These observations apply with the same

24  force here.  Just as reclassification, by itself, was insufficient to support the FCC's Preemption

25  Directive, it cannot support a "federal deregulatory policy" that could preempt California from

26  enacting net neutrality protections.  In both cases, the required statutory authority to undertake the

27  regulatory action in question is utterly lacking.

28

1      Indeed, a conclusion that the statutory ambiguity regarding the proper classification of

2  BIAS can serve as a basis for conflict preemption would produce anomalous, if not absurd,

3  results.  For example, if the FCC could rely on such ambiguity to claim far-reaching power to

4  preempt state regulation of BIAS, it would then have virtually no authority to preempt state

5  regulation of services that are *unambiguously* classified under Title I.  There is no indication

6  Congress sought to create a regime of that kind.  Nor is there any overarching grant of statutory

7  authority to insulate *all* information services or private mobile services from the exercise of

8  traditional state police powers.[13]

9      Finally, the FCC's lack of authority to impose net neutrality regulations for BIAS does not

10  prevent the states from doing so.  "If Congress wanted Title I to vest the Commission with some

11  form of Dormant-Commerce-Clause-like power to negate States' statutory (and sovereign)

12  authority just by washing its hands of its own regulatory authority, Congress could have said so."

13  *Mozilla*, 940 F.3d at 83.  Nothing in the Act indicates that the FCC's lack of authority reflects a

14  congressional determination that the states' traditional police powers should be subject to the

15  same limitations as the FCC's powers.  *See id*. at 79 (finding definition of "telecommunications

16  carrier" in 47 U.S.C. § 153(51) to be "a definitional provision" constituting "a *limitation* on the

17  Commission's authority" and "not an independent source of regulatory authority" (emphasis in

18  original, internal quotation marks and citation omitted)).  As the Supreme Court has observed in

19

20        [13] As explained in *Comcast* and *Mozilla*—and as the FCC and Comcast Corporation have
previously acknowledged—the Act's reference in section 230(b)(2) to preserving a "vibrant and

21  competitive free market" for information services that is "unfettered by Federal or State
regulation" is a "statement of policy, not a delegation of regulatory authority."  *Mozilla*, 940 F.3d

22  at 78; *Comcast*, 600 F.3d at 652 ("Comcast argues that neither section 230(b) nor section 1 [of the
Act] can support the Commission's exercise of ancillary authority because the two provisions

23  amount to nothing more than congressional 'statements of policy,' which "are not an operative
part of the statute, and do not enlarge or confer powers on administrative agencies."); *id*. ("The

24  Commission acknowledges that section 230(b) [contains] statements of policy that themselves
delegate no regulatory authority."); 2018 Order ¶ 284 (characterizing section 230(b) as merely

25  "hortatory, directing the Commission to adhere to the policies specified in that provision
when *otherwise* exercising our authority") (emphasis added); *id*. ¶ 267 ("We also are not

26  persuaded that section 230 of the Communications Act is a grant of regulatory authority.").
Moreover, as the D.C. Circuit held, section 230(b)(2) is entirely consistent with net neutrality

27  rules that protect consumers' free and open access to the competitive Internet marketplace.  *See
U.S. Telecom Ass'n*, 825 F.3d at 693-95, 707-08.

28

1   the closely related context of section 152(b) of the Act, when faced with "a congressional denial

2   of power to the FCC," "we simply cannot accept an argument that the FCC may nevertheless take

3   action which it thinks will best effectuate a federal policy." *La. Pub. Serv. Comm'n*, 476 U.S. at

4   374.[14]

**b.     The Repeal of Federal Net Neutrality Protections Results from a Lack of Authority, Which Cannot Constitute a Federal Deregulatory Policy With Preemptive Effect**

8       In addition to reclassification, Plaintiffs assert conflict preemption based on the 2018

9   Order's repeal of the 2015 Order's net neutrality protections.  2018 Order ¶ 17.  Under this

10  closely related theory, the FCC's objective in repealing these protections was to implement a

11  "federal deregulatory policy" for BIAS, and SB 822 directly undermines that objective.  But,

12  again, this distorts the decision that the FCC actually made.  The FCC repealed the bulk of the

13  2015 Order because it determined it had no statutory authority to impose net neutrality conduct

14  rules on BIAS providers.  That is different from a congressionally-authorized decision to *refrain*

15  from regulating BIAS providers; therefore, the repeal does not have preemptive force.

16      That SB 822 enacts many of the same net neutrality protections repealed by the 2018 Order

17  does not, in and of itself, result in conflict preemption.  It is "quite wrong" to view the absence of

18  federal regulation, on its own, "as the functional equivalent of a regulation prohibiting all States

19  and their political subdivisions from adopting such a regulation."  *Sprietsma v. Mercury Marine*,

20  537 U.S. 51, 65 (2002); *see also, e.g.*, *Atherton v. FDIC*, 519 U.S. 213, 227 (1997) (where federal

---

22      [14] The United States does not claim an entitlement to deference for its assertion that the 2018 Order preempts SB 822, nor should it receive any.  As the Supreme Court has stated, even

23  when "the subject matter is technica[l] and the relevant history and background are complex and extensive," *Geier,* 529 U.S. at 883, "we have not deferred to an agency's *conclusion* that state law

24  is pre-empted.  Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme."  *Wyeth*, 555 U.S. at 576 (internal quotation marks and citation omitted).

25  "The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness."  *Id.* at 577 (citations omitted).

26  Here, the United States' preemption argument conflicts with the text and structure of the Act, and with the FCC's recognition in the 2018 Order that reclassification leaves the FCC with no

27  authority to issue net neutrality regulations.  The United States' explanation thus lacks consistency and persuasiveness, and should be accorded no weight.  *See id.* (giving no deference

28  when agency's explanation was "at odds with what evidence we have of Congress' purposes").

21

1    regulation sets a "floor," it "does not stand in the way of a stricter standard that the laws of some

2    States provide"); *Wyeth*, 555 U.S. at 577-78 (same).  Nor does preemption result simply because a

3    state imposes a requirement that a federal agency lacks statutory authority to adopt.  *See Chamber*

4    *of Commerce of U.S. v. Whiting*, 563 U.S. 582, 608 (2011) ("*Whiting*") (state requirement to use

5    federal employment authorization program did not conflict with federal law prohibiting federal

6    agency from requiring participation in program).

7         Plaintiffs nevertheless argue that the repeal has preemptive effect because it constitutes an

8    affirmative determination to leave BIAS mostly unregulated, at both the federal and state levels.

9    *See* U.S. Br. at 15-16; ISP Br. at 19.  But, as recognized in the cases cited by Plaintiffs, an

10   agency's decision not to regulate may have preemptive effect *only if the agency possesses*

11   *statutory authority to regulate in the first place*.  Of critical importance, an agency must have the

12   power to issue "an authoritative federal determination" as to the appropriate regulatory approach

13   for any given subject area.  *Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*, 461

14   U.S. 375, 384 (1983).  And, in that case, the Supreme Court found no such statutory

15   authorization, because "nothing in the language, history, or policy of the Federal Power Act

16   suggests such a conclusion.  Congress's purpose in 1935 was to fill a regulatory gap, not to

17   perpetuate one."  461 U.S. at 384.  Accordingly, *Arkansas Electric* does not help Plaintiffs; just

18   the opposite, it confirms that, because the FCC lacks statutory authority to impose net neutrality

19   conduct rules on BIAS providers, it also lacks authority to bar the states from imposing their own

20   rules on BIAS providers.

21        The other cases Plaintiffs rely on all involve statutory authority to affirmatively regulate the

22   underlying activity, such that the decision *not* to regulate constituted a valid exercise of statutory

23   power delegated to the agency.  *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 874-76

24   (2000) (federal agency's decision not to require airbags in all cars impliedly preempted state tort

25   suit premised on absence of airbags, where agency could have "require[d] the use of airbags" in

26   all cars but chose not to do so); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 700, 704 (1984)

27   (FCC regulations requiring cable operators to carry broadcast signals without exception for

28   certain types of advertising preempted state advertising prohibition, when FCC "has by no means

22

1  forsaken its regulatory power" over carriage of broadcast signals);[15] *Ray v. Atl. Richfield Co.*, 435

2  U.S. 151, 174, 178 (1978) (federal agency's decision not to ban oil tankers of a certain size

3  preempted state regulation seeking to do so, where "[w]e begin with the premise that the

4  Secretary has the authority to establish 'vessel size and speed limitations[.]'");[16] *Bethlehem Steel*

5  *Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 775 (1947) (federal agency's "refusal to

6  designate [certain] bargaining units was a determination and an exercise of its discretion to

7  determine that such units were not appropriate for bargaining purposes").  In each of these cases,

8  unlike here, the agency unquestionably had the power to impose the regulation at issue, and

9  exercised that authority to decide that such regulation should not be imposed.[17]

10  Plaintiffs' attempt to characterize the repeal as a decision to impose a nationwide "light-

11  touch" regulatory regime that preempts the states thus fails for lack of statutory authority.  As

12  explained above, with respect to BIAS the FCC only has authority that is "reasonably ancillary to

13  the . . . effective performance of its statutorily mandated responsibilities."  *American Library*, 406

14  F.3d at 692; *supra* at 17.  Simply asserting that a "federal deregulatory policy" exists is not

15  enough.  *See Comcast,* 600 F.3d at 644 ("under Supreme Court and D.C. Circuit case law

16  statements of policy, by themselves, do not create 'statutorily mandated responsibilities'"

17  (citation omitted)); *id.* at 654 ("policy statements alone cannot provide the basis for the

---

18  [15] In *Capital Cities*, the Supreme Court explained that preemption could result "if the FCC
19  has resolved to pre-empt an area of cable television regulation and if this determination represents
   a reasonable accommodation of conflicting policies that are within the agency's domain."  467
20  U.S. at 700 (internal quotation marks and citation omitted).  The Supreme Court has found the
   FCC's authority over cable operators to be "reasonably ancillary to the effective performance of
21  the [FCC's] various responsibilities for the regulation of television broadcasting."  *United States
   v. Sw. Cable Co.*, 392 U.S. 157, 178 (1968).

22  [16] As the Supreme Court has described, "the analysis in *Ray* was governed by field-pre-
   emption rules because the rules at issue were in a 'field reserved for federal regulation' and
23  'Congress ha[d] left no room for state regulation of these matters.'"  *Sprietsma*, 537 U.S. at 69
   (citation omitted).  Because *Ray* involved a statutory scheme under which the federal agency had
24  authority to establish a comprehensive, nationally applicable regulatory regime, the Supreme Court
   concluded that the agency's decision not to impose a certain requirement was an exercise of the
25  agency's authority to comprehensively regulate that field.

26  [17] The United States' reliance on *Minnesota Public Utilities. Commission v. FCC*, 483
   F.3d 570, 580-581 (8th Cir. 2007) is misplaced.  U.S. Br. at 16.  The cited language, when viewed
27  in context, does not establish that "federal interests" are sufficient to preempt absent statutory
   authority, and the FCC's authority to regulate the interstate aspect of VoIP, a prerequisite for the
28  impossibility exception (*Mozilla*, 940 F.3d , at 77-78), was not contested.  *See id.* at 577.

1   Commission's exercise of ancillary authority," and are "not delegations of regulatory authority");

2   *id*. at 659 (rejecting the FCC's effort "to use its ancillary authority to pursue a stand-alone policy

3   objective, rather than to support its exercise of a specifically delegated power"); *accord Mozilla*,

4   940 F.3d at 79 (rejecting purported federal policy of nonregulation as a basis for express

5   preemption). As noted above, neither the 2018 Order nor Plaintiffs' papers identify any

6   additional statutory authority sufficient to support this purported "federal deregulatory policy."[18]

7       The FCC repeatedly recognized in the 2018 Order that, as a result of reclassification, it

8   lacked any statutory authority to promulgate net neutrality rules. *See* 2018 Order ¶ 267 (stating

9   that rulemaking record for 2018 Order does not identify "any source of statutory authority that

10  individually or in the aggregate" support net neutrality rulemaking); *id.* ¶¶ 267-283. As the FCC

11  explained, "had Congress wanted us to regulate ISPs' conduct we find it most likely that they

12  would have spoken to that directly. Thus, the fact that the Commission would be left here to

13  comb through myriad provisions of the Act in an effort to cobble together authority for ISP

14  conduct rules itself leaves us dubious such rules really are within the authority granted by

15  Congress." 2018 Order ¶ 293. Given the FCC's self-professed lack of statutory authority to

16  promulgate net neutrality protections, the FCC cannot preempt states from enacting them.

17                    **c.    No Conflict Preemption Results from the
                                   Transparency Rule**
18

19      The United States also argues that SB 822 poses an obstacle to the 2018 Order's

20  transparency rule (47 C.F.R. § 8.1(a)), because SB 822's transparency requirements "may

21  impermissibly impose more stringent requirements than the 2018 Order's transparency rule."[19]

22  _____

23      [18] ISP Plaintiffs invoke *Charter Advanced Services LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018), *cert. denied sub nom. Lipschultz*, 140 St. Ct. 6, for the proposition that "any state regulation of an information service conflicts with the federal policy of nonregulation." ISP Br.

24  at 21. *Charter* concerns interconnected VoIP services, a service over which the FCC has broad ancillary authority due to its interactions with traditional telephony. Any broader claims about

25  other information services would be dicta, and unsupported by any examination into whether such preemption would be supported by statutory authority. *See Lipschultz,* 140 S. Ct. at 7 (Thomas,

26  J., joined by Gorsuch, J. concurring in the denial of certiorari) ("It is doubtful whether a federal policy—let alone a policy of nonregulation—is 'Law' for purposes of the Supremacy Clause.").

27      [19] If the 2018 Order's transparency rule were to preempt SB 822's transparency rule, only that portion of SB 822 would be affected. *See* SB 822, Sec. 3 ("The provisions of this act are

28

24

1   U.S. Br. at 21 n.3.  In the 2018 Order, the FCC eliminated reporting obligations and guidance

2   adopted in 2015 and 2016, to revert the transparency rule to the reporting requirements of the

3   2010 Order.  2018 Order, ¶ 225.  Although there is very little daylight between the text of the

4   2018 Order's transparency rule[20] and the equivalent disclosure requirement in SB 822,[21] the

5   United States nonetheless finds a conflict based on SB 822's purported failure to incorporate "the

6   2018 Order's detailed guidance specifying what disclosures are and are not required."  U.S. Br. at

7   21 n.3.

8   This purported lack of "detailed guidance" is insufficient to present an obstacle to the

9   purposes and objectives of the FCC's transparency rule.  There is no basis for assuming that SB

10  822's disclosure requirements unmistakably conflict with disclosure requirements phrased in

11  nearly identical language.  When there is "a basic uncertainty about what the law means and how

12  it will be enforced," it would be "inappropriate to assume" that a state law "will be construed in a

13  way that creates a conflict with federal law."  *Arizona v. United States*, 567 U.S. 387, 415 (2012)

14  (citation omitted).

15  Not only would it be inappropriate to assume a conflict based on the absence of interpretive

16  guidance, there is no indication that compliance with SB 822 interferes with the purposes and

17  objectives of the transparency rule.  The ancillary authority supporting the FCC's adoption of the

18  transparency rule stems not from the FCC's authority to impose generally applicable

19  requirements on information services—which does not exist, *see Comcast*, 600 F.3d at 661—but

20

21  severable.  If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.").

22          [20] The FCC's transparency rule requires BIAS providers to "publicly disclose accurate

23  information regarding the network management practices, performance characteristics, and commercial terms of its broadband internet access services sufficient to enable consumers to make informed choices regarding the purchase and use of such services and entrepreneurs and

24  other small businesses to develop, market, and maintain internet offerings. Such disclosure shall be made via a publicly available, easily accessible website or through transmittal to the

25  Commission." 47 C.F.R. § 8.1(a).

        [21] SB 822's disclosure requirement is that BIAS providers serving customers in California

26  must "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for

27  consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings." Cal. Civ.

28  Code § 3101(a)(8).

25

1    rather from the FCC's obligation to report to Congress on "market entry barriers for entrepreneurs

2    and other small businesses in the provision and ownership of telecommunications services and

3    information services."  47 U.S.C. §§ 257(a), (c); *see Mozilla*, 940 F.3d at 47 ("the Commission's

4    reliance on 47 U.S.C. § 257 to issue the transparency rule was proper").  The objective of the

5    transparency rule is thus to gather information to report to Congress.

6          SB 822 does not interfere with the FCC's ability to gather such information.  The disclosure

7    requirements in SB 822, while applicable only to BIAS providers serving California customers,

8    do not impact the FCC's ability to give Congress information from BIAS providers nationwide.

9    In fact, Congress has actively encouraged state efforts to collect data about BIAS and BIAS

10   providers.  *See, e.g.* 47 U.S.C. § 1304 (setting aside federal funds for state studies regarding

11   broadband deployment).  Under these circumstances, there is no basis for finding a conflict.

12                        **d.    No Conflict Preemption Results from Purported**
                                  **"Factual Findings" in the 2018 Order**
13

14         The United States argues that this Court must presume the validity of the FCC's factual

15   findings in the 2018 Order, apparently because much of the 2018 Order was upheld in *Mozilla*,

16   which was the only avenue for challenging the validity of the 2018 Order.  U.S. Br. at 16.

17   Similarly, ISP Plaintiffs contend that, with respect to the portions of the 2018 Order that were

18   upheld by *Mozilla*, the FCC's justifications for undertaking these actions are somehow "lawful

19   exercises of federal authority" that "necessarily preempt any state laws that actually conflict with

20   them."  ISP Br. at 20.  ISP Plaintiffs also contend the 2018 Order's "cost-benefit assessments

21   form a valid predicate for conflict preemption."[22]  *Id.*

22 ─────────────

   [22] The United States also invokes the 2018 Order's purported factual finding that "it is
23   impossible or impracticable for ISPs to distinguish between intrastate and interstate
     communications over the Internet or to apply different rules in each circumstance," U.S. Br. at 23
24   (quoting 2018 Order ¶ 200), and therefore concludes that "internet traffic cannot be disaggregated
     into interstate and intrastate components," *id*. at 25.  These are simply broad assertions about the
25   interconnectedness of the Internet, with no reference to the architecture of the Internet, nor any
     acknowledgement of ISPs' sophisticated technical capabilities, which allow them to tailor
26   services to different types of end users and maintain different policies for different parts of a
     network.  *See infra* at 46; Jordan Decl. ¶¶ 11-38.  In any event, the portions of the 2018 Order that
27   the United States relies on (¶¶ 199-200) are part of the Preemption Directive, which was vacated
     by *Mozilla*.  940 F.3d at 74 (defining "Preemption Directive" as ¶¶ 194-204 of the 2018 Order);
28   *id*. at 86 (in the "Conclusion" section, referring to "our vacatur of the Preemption Directive").  As

─────────────
26

These arguments fail for the same reasons that the attempt to preempt through a "federal policy of deregulation" fails.  Although an agency's factual findings might be relevant to determining the "purposes and objectives" of agency action, that agency action still must be authorized by statute.  As explained, because the FCC reclassified BIAS as a Title I information service, the FCC must identify ancillary authority sufficient to impose its policy preferences on the states.  Such authority does not exist.  *See supra* at 17.  Labeling the policy preferences and assumptions embodied in the 2018 Order as "factual findings" does not solve this problem.  An agency's ability to make factual findings during rulemaking does not mean that anything the agency finds has the force and effect of a validly enacted statute or regulation.  Otherwise, there would be nothing to prevent an agency from using its power to make factual findings to circumvent limitations on its statutory authority.  *See Mozilla*, 940 F.3d at 83 ("No matter how desirous of protecting their policy judgments, agency officials cannot invest themselves with power that Congress has not conferred.") (citations omitted).  Like the asserted federal policy of deregulation itself, any factual findings consistent with such a policy do not, in and of themselves, have preemptive effect sweeping more broadly than the agency's statutory authority.

Finally, any cost-effectiveness or cost-benefit judgment made by a federal agency is simply a type of factual finding that cannot have preemptive effect without the requisite connection to statutorily authorized agency action.[23]  And, the Supreme Court has declined to "infer from the mere existence of . . . a cost-effectiveness judgment that the federal agency intends to bar States from imposing stricter standards," as that "would treat all such federal standards as if they were maximum standards," a result that cannot be squared with principles of conflict preemption.  *Williamson*, 562 U.S. at 335.

---

such, no preemption can result from those provisions, nor should the Court credit them.

[23] The authorities ISP Plaintiffs cite for their cost-benefit argument are unavailing.  ISP Br. at 20.  One case, *Charter Advanced Servs. (MN), LLC*, 903 F.3d 715, does not contain any discussion of a cost-benefit analysis.  The other case is *Geier*, in which the agency unquestionably had authority to establish comprehensive safety regulations, such that preemption resulted from its determination that regulated entities should have a "mix of different devices" to choose from when complying with federal safety requirements.  *Geier*, 529 U.S. at 875.

27

1

### C. No Conflict Preemption Results from the Communications Act

Plaintiffs argue that SB 822 imposes common carrier regulation of BIAS, and that this conflicts with 47 U.S.C. section 153(51) (for fixed and mobile BIAS) and section 332(c)(2) (for mobile BIAS).[24]  ISP Br. at 14-18; U.S. Br. at 22.  These provisions state that common carrier treatment *under the Act* shall only apply to telecommunications services and commercial mobile services, and not to information services and private mobile services.  Plaintiffs' attempt to bootstrap these provisions into implied preemption fails because (1) the Act itself prohibits implied preemption in this context, and (2) the plain language of these provisions applies only to the FCC, not the states.[25]

First, the Act's prohibition on implied preemption forecloses this argument.  The Telecommunications Act specifically states that *none* of its provisions should be interpreted to authorize preemption unless an *express* provision so provides.  Section 601(c)(1), codified in 47 U.S.C. § 152 note, states: "(1) NO IMPLIED EFFECT.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly* so provided in such Act or amendments" (emphasis added).  This section thus prohibits any inference that amendments to the Communications Act that were made by the Telecommunications Act impliedly preempt state law, including through conflict preemption.  *See Ventress v. Japan Airlines*, 747 F.3d 716, 720 (9th Cir. 2014) ("Implied preemption comes in two forms: conflict preemption and field preemption.").

Courts have agreed that, by its plain terms, "[section] 601(c)(1) … prohibit[s] implied preemption."  *City of Dallas v. FCC*, 165 F.3d 341, 348 (5th Cir. 1999); *see also AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003) (section 601(c)(1)

---

[24] Section 153(51) defines "telecommunications carrier."  It provides, in part, that a "telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services."  Similarly, section 332(c)(1)(2) provides, "[a] person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter."

[25] Defendants do not concede that SB 822 enacts common carrier regulations, but the Court need not reach that issue in order to reject this conflict preemption claim.

28

1   "precludes a reading that ousts the state legislature by implication").  The legislative history of

2   section 601(c)(1) also makes clear that there can be no implied preemption from the

3   Telecommunications Act.  *See* H.R. Rep. No. 104-458, at 201 (1996) ("Conf. Rep.") (section

4   601(c)(1) "prevents affected parties from asserting that the bill impliedly preempts other laws").[26]

5        The Telecommunications Act amended the Communications Act to add section 153(51), as

6   well as the definition of "information services," 47 U.S.C. § 153(24).  Section 601(c)(1) therefore

7   precludes an inference that state regulation of "information services" is impliedly preempted, or

8   that section 153(51) impliedly preempts.

9        Second, this theory of conflict preemption fails because the provisions at issue plainly

10  restrict only the FCC's authority to impose common carrier regulation "under this chapter," that

11  is, in accordance with the Act.  *See Mozilla*, 940 F.3d at 79 (describing section 153(51) as "a

12  definitional provision," that "is a *limitation* on the Commission's authority," and rejecting that

13  provision as a statutory basis for express preemption (citation omitted, emphasis in original));

14  Conf. Rep. at 114 ("The definition amends the Communications Act to explicitly provide that a

15  'telecommunications carrier' shall be treated as a common carrier fo*r purposes of the*

16  *Communications Act . . .*" (emphasis added)).  There is no plausible reading of either section that

17  would limit a *state's* power to regulate BIAS.[27]  When states adopt laws under their traditional

18  police powers, they do not do so under the Act.

---

19  [26] Although the Third and Eighth Circuits have rejected this interpretation of section

20  601(c)(1), relying upon *Geier*, 529 U.S. 861, to conclude that conflict preemption principles still
    apply, these courts failed to acknowledge the differences between the text of section 601(c)(1)

21  and the savings clause at issue in *Geier*.  *See Farina v. Nokia Inc*., 625 F.3d 97, 131 (3d Cir.
    2010); *Qwest Corp. v. Minn. Pub. Util. Comm'n*, 684 F.3d 721, 731 (8th Cir. 2012).  Section

22  601(c)(1) includes the precise type of language one would expect Congress to use if it desired to
    foreclose the operation of ordinary principles of implied preemption.  In any event, there is

23  substantial reason to doubt whether the Court would reach the same conclusion today as it did in
    *Geier* on this point.  The Court significantly narrowed the reach of *Geier* in *Williamson*, and two

24  Justices wrote separately to underscore the problems that *Geier* had occasioned.  *See Williamson*,
    562 U.S. at 337 (Sotomayor, J., concurring) ("I wrote separately … to emphasize the Court's

25  rejection of an overreading of *Geier* that has developed since that opinion was issued."); *id*. at
    342 (Thomas, J., concurring in the judgment) (explaining that *Geier* illustrates "the utterly

26  unconstrained nature of purposes-and-objectives pre-emption").  Thus, *Geier*'s dubious reading
    of the savings clause at issue in that case should not extend to the different statutory text here that

27  more explicitly forecloses the operation of implied preemption principles.

    [27] *Computer and Communications Industry Association v. FCC*, 693 F.2d 198 (D.C. Cir.

28

29

1      The history of the Act also shows that Congress carefully considered the preemptive effect

2  of the different provisions of the Act, even as it failed to specify the effect of 153(51) on the

3  states.  In Conference, Congress strengthened some preemption provisions and removed others.[28]

4  This detailed consideration of the Act's preemptive effect suggests that if Congress had meant to

5  limit the states' authority by virtue of section 153(51), it would have said so explicitly.

6      Finally, as set forth above, a lack of federal authority does not, in and of itself, preempt

7  state authority on the same subject matter.[29]  *See supra* at 20-21; *see also City of Dallas*, 165 F.3d

8  at 348  (where FCC lacked authority to require cable franchise, no preemption of state

9  requirement for the same); *Whiting*, 563 U.S. at 608 (rejecting implied preemption based on

10 federal agency's lack of statutory authorization, finding "no language circumscribing state

11 action," as the provision "constrain[ing] federal action" simply "limits what the Secretary of

12 Homeland Security may do—nothing more").[30]

13

14

15

16 1982), and *California v. FCC*, 39 F.3d 919 (9th Cir. 1994) do not stand for the proposition that
Congress intended section 153(51) to apply to the states or otherwise limit state regulation.  Both
cases predate the enactment of section 153(51), and so do not interpret it.  *See* ISP Br. at 16 n.14.

17      [28] For example, in Conference, Congress revised section 601(c)(1) to apply to all

18 provisions in the Telecommunications Act and all amendments made by the Telecommunications
Act, as well as added "NO IMPLIED EFFECT" to the title.  Conf. Rep. at 197-198, 201.  It also

19 expanded the express preemption in section 502(f)(2) to include certain state and local content
regulation of non-commercial providers, *id.* at 191, and removed a provision empowering the

20 FCC to preempt state commissions with respect to measures fostering broadband deployment
under section 706, *id.* at 210.

21      [29] The single case ISP Plaintiffs cite for the contrary proposition is inapposite.  *See* ISP Br.

22 at 16 (citing *Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*, 474 U.S. 409, 422-
23 (1986)).  That case concerns field preemption, and involved "a comprehensive scheme of

23 federal regulation of all wholesales of natural gas in interstate commerce."  *Transcon. Gas Pipe
Line Corp.*, 474 U.S. at 419 (citation omitted).  The Supreme Court found that the statute

24 occupied the field and precluded state regulation.  *Id.* at 418.  Originally, Congress had charged a
federal agency with regulating prices under this exclusive federal regime.  A later statute,

25 however, adopted a market-based system of regulation and made other changes to the agency's
authority.  *Id.* at 420-21.  It was in the context of the field-preemptive nature of the federal

26 statutory scheme that the Supreme Court declined to infer that a removal of a specific type of
federal authority left room for state regulation.  *Id.* at 423.

27      [30] In *Alliance Shippers v. Southern Pacific Transport Company* (*see* ISP Br. at 15 n.12),
preemption resulted from agency action "pursuant to authority conferred by Congress," not from

28 a definitional provision of a statute.  858 F.2d 567, 569 (9th Cir. 1988).

1

**D.    No Field Preemption Results from the Act's General References to FCC Regulation of "Interstate Communications"**

2

3       Despite the Act's very clear limitations on FCC authority over information services,

4   Plaintiffs argue that the Act preempts the entire field of "interstate communications services,"

5   including any regulation of BIAS, U.S. Br. at 22; ISP Br. at 11, based on a general statement in

6   the statutory provision establishing the FCC and describing its purpose as "regulating interstate

7   and foreign commerce in communication by wire and radio."  47 U.S.C. § 151.  Plaintiffs also

8   invoke 47 U.S.C. section 152(a), which provides that "the provisions of this chapter shall apply to

9   all interstate and foreign communication by wire or radio," and 47 U.S.C. section 152(b), which

10  deprives the FCC of "jurisdiction with respect to . . . charges, classifications, practices, services,

11  facilities, or regulations for or in connection with intrastate communication service by wire or

12  radio."  U.S. Br. at 22-23; ISP Br. at 11.  Under Plaintiffs' theory, SB 822 necessarily intrudes

13  upon this domain of exclusive federal regulation because BIAS is inherently "interstate."[31]  U.S.

14  Br. at 22-24; ISP Br. at 11-13.  This would mean that the Act directly preempts state regulation of

15  all interstate information services and interstate private mobile services.  Indeed, under this

16  theory, states could not regulate any service subject to FCC jurisdiction.

17

18

---

19      [31] Arguing that the Act gives the FCC exclusive regulatory authority over all "interstate communications," the United States contends "[t]he dispositive question . . . is whether SB-822

20  regulates interstate communications," U.S. Br. at 23.  It then invokes the FCC's purported "factual findings" in the 2018 Order about the supposed impossibility of separating the interstate

21  and intrastate aspects of Internet communications, such that SB 822 necessarily infringes upon "interstate communications services" that only the FCC can regulate.  As explained above, these

22  "factual findings" receive no deference and cannot have preemptive effect, because, among other reasons, they were vacated by *Mozilla*, and Defendants do not concede they cannot be separated.

23  *See supra* at 26 n.21.  In addition, this argument is simply another attempt to use the "impossibility exception" from section 152 as a basis for preemption, i.e., the supposed

24  "impossibility" of separating interstate and intrastate aspects of Internet communications.  This attempt should be rejected for the same reasons as in *Mozilla*, 940 F.3d at 77-78: a lack of

25  underlying statutory authority for the agency action that purportedly preempts.

        Similarly, the Court should reject ISP Plaintiffs' argument that *Mozilla* limited

26  its rejection of the Preemption Directive to "intrastate broadband," thereby suggesting that states cannot regulate "interstate broadband."  ISP Br. at 19-20 (citing *Mozilla*, 940 F.3d at 81-

27  86).  *Mozilla* did not consider the limits of state authority.  Rather, it determined that the FCC lacked statutory authority to issue the Preemption Directive.  940 F.3d at 86.

28

31

1    This theory is inconsistent with the text and structure of the Act, and with the case law.

2    Notably, the FCC did not claim field preemption in the 2018 Order, although that certainly would

3    have been relevant to its attempted Preemption Directive. [32]

### 1. General References to FCC Regulation of "Interstate" Communications Do Not Result in Field Preemption

6    Under the doctrine of field preemption, "States are precluded from regulating conduct in a

7    field that Congress, acting within its proper authority, has determined must be regulated by its

8    exclusive governance." *Arizona*, 567 U.S. at 399 (citation omitted). "The intent to displace state

9    law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left

10   no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that

11   the federal system will be assumed to preclude enforcement of state laws on the same subject.'"

12   *Id.* (citations omitted); *see also Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 734

13   (9th Cir. 2016) ("The essential field preemption inquiry is whether the density and detail of

14   federal regulation merits the inference that any state regulation within the same field will

15   necessarily interfere with the federal regulatory scheme.").

16   The congressional intent necessary to preempt the field of *all* "interstate communications

17   services" cannot be distilled from the provisions Plaintiffs rely on here.  Sections 151 and 152,

18   which describe the purpose of the FCC and the scope of its jurisdiction under the Act, say nothing

19   about preemption.  The lack of explicit language preempting the states in sections 151 and 152

20   directly forecloses the United States' express preemption claim, *see* U.S. Br. at 23, which requires

21   "explicit preemptive language." *Fed. Sav. & Loan Ass'n*, 458 U.S. at 152. And while the Act

22   comprehensively regulates some services in various titles of the Act, the Act sharply limits the

---

25   [32] In the 2018 Order, the FCC did not claim that the Act itself evinces any clear and
     manifest intent to preempt state net neutrality laws.  2018 Order ¶ 203.  Instead, it stated that
26   preemption would further the FCC's *own* "policy of nonregulation for information services," and
     that other provisions of the Act impliedly "confirm Congress's approval" of that policy. *Id.* The
27   FCC's previous understanding—that the Act and the substantive provisions of the 2018 Order do
     not, in and of themselves, preempt—is correct.

32

1  FCC's authority over services that, like information services or cable services before the adoption

2  of Title IV of the Act, are within its jurisdiction, but are not expressly regulated by the Act.[33]

3      With respect to such services, the FCC has only authority that is "reasonably ancillary to

4  the effective performance of the Commission's various responsibilities" for which it has direct

5  regulatory authority. *FCC v. Midwest Video Corp.*, 440 U.S. 689, 697 (1979) (internal quotation

6  marks and citation omitted). *See supra* at 17. The FCC recognized the very real limits of its Title

7  I authority in the 2018 Order, when it determined that it was precluded from promulgating net

8  neutrality rules. *See* 2018 Order ¶ 267; *id*. ¶ 285 n.1042 ("We are not persuaded by claims that

9  section 1 of the Act is a grant of regulatory authority" for net neutrality rules).

10      This lack of power over vast swaths of the field of "interstate communications" cannot be

11  squared with the requirement for a regulatory system "so pervasive" that there is "no room for the

12  States to supplement it," thus demonstrating an implicit congressional intent to displace all state

13  law. *Arizona*, 567 U.S. at 399 (internal quotation marks and citation omitted). *See also Virginia*

14  *Uranium, Inc.*, 139 S. Ct. at 1903 (plurality) (rejecting field preemption of "private uranium

15  mining" where agency had expressly disavowed authority over private uranium mining, finding it

16  "more than a little unlikely" that "both state and federal authorities would be left unable to

17  regulate"); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S.

18  190, 207-08 (1983) (rejecting field preemption claim, explaining that it "is almost inconceivable

19

20  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [33] The Supreme Court and other courts have long rejected the view that sections 151 and
   152 give the FCC blanket authority to regulate any service providing "interstate communications

21  by wire or radio." *See Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932,
   936 (D.C. Cir. 2017) ("Section 1 [47 U.S.C. § 151] by its terms does not impose an affirmative

22  obligation on the FCC to take any particular action."); *Comcast*, 600 F.3d at 652 (describing and
   accepting Comcast Corporation's argument that section 151 is "nothing more than [a]

23  congressional 'statement[]of policy,'" which is "not an operative part of the statute, and do[es]
   not enlarge or confer powers on administrative agencies"); *Nat'l Ass'n of Regulatory Utility*

24  *Comm'rs v. FCC*, 533 F.2d 601, 612 (D.C. Cir. 1976) ("*NARUC II*") ("The language of § 152(a)
   is quite general and is not unambiguously jurisdictional in character."); *id*. at 612 n.68 (statutory

25  authority to regulate that was putatively said to arise from section 152(a) is "really incidental to,
   and contingent upon, specifically delegated powers under the Act"; and that this section

26  "differs . . . from some other sections of the Act which, in conferring powers on the Commission,
   state in terms what the Commission is obligated and empowered to do."); *United States v.*

27  *Midwest Video Corp.*, 406 U.S. 649, 661 (1972) (section 152(a) "does not in and of itself
   prescribe any objectives for which the Commission's regulatory power . . . might properly be

28  exercised").

33

1  that Congress would have left a regulatory vacuum; the only reasonable inference is that

2  Congress intended the states to continue to make these judgments").

3          **2.     Numerous Provisions of the Act Assume or Recognize State**
              **Regulation**

4

5          A finding of field preemption would also be inconsistent with other provisions of the Act

6  authorizing express preemption and creating savings clauses to preserve other types of state

7  regulation.  *See, e.g.*, 47 U.S.C. §§ 223(f)(2), 230(e)(3), 253(a), 253(d), 276(c), 332(c)(3),

8  332(c)(7), 543(a)(1), 544(e), 556(c).  There would be no need for these provisions if Congress

9  had intended to occupy the field of "interstate communications services," as Plaintiffs argue.  ISP

10  Br. at 10.  *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment

11  of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach

12  are not pre-empted."); *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 613 (1991) (express

13  preemption provision "would be pure surplusage if Congress had intended to occupy the entire

14  field"); *Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072

15  (9th Cir. 2005) (rejecting field preemption claim under the Act, reasoning that "by expressly

16  limiting federal preemption to state requirements that are *inconsistent* with the federal regulations,

17  Congress signaled its intent not to occupy the entire field of payphone regulation") (emphasis in

18  original) (citing 47 U.S.C. § 276), *aff'd*, 550 U.S. 45 (2007).

19          In addition to various savings clauses, the Act also expressly contemplates the affirmative

20  exercise of State regulatory power, as recognized by *Mozilla*.  940 F.3d at 81 (recognizing "the

21  Communication Act's vision of dual federal-state authority and cooperation in this area

22  specifically"); *see, e.g.*, 47 U.S.C. § 254(i) ("The Commission and the States should ensure that

23  universal service is available at rates that are just, reasonable, and affordable."); *id*. § 1302(a)

24  (referring to "[t]he Commission and each State Commission with regulatory jurisdiction" in a

25  chapter titled "Broadband"); *id*. § 1304 ("[e]ncouraging State initiatives to improve broadband").

26

27

28

1    These provisions also undermine any suggestion that Congress intended for the Act to preempt

2    the field of "interstate communications services."[34]

3         Finally, as explained, the Act affirmatively prohibits implied preemption—including field

4    preemption—with respect to information services.  Section 601(c)(1) prohibits implied

5    preemption from provisions of the Act added or amended by the Telecommunications Act.  *See*

6    *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 428

7    (9th Cir. 2014) (in action over closed captioning of videos posted to website, finding that section

8    601(c)(1) "signifies that Congress did not intend to occupy the entire legislative field of closed

9    captioning").  Section 601(c)(1), which was added to the Communications Act by the

10   Telecommunications Act, squarely forecloses Plaintiffs' field preemption claim with respect to

11   information services, which is the current classification for BIAS.  *See* 2018 Order ¶¶ 26-64; 47

12   U.S.C. § 153(24).

13        **3.    The Field Preemption Claim Is Incompatible with the Case Law**

14        Plaintiffs' field preemption claim is incompatible with the case law. Mindful of the drastic

15   effect of field preemption on state powers, courts have emphasized the importance of defining the

16   field narrowly.  *See Nat'l Fed'n of the Blind*, 813 F.3d at 734 (stressing importance of properly

17   defining the field allegedly preempted and concluding that Airline Deregulation Act preempted

18   only the field of "accessibility of airport kiosks").  Courts have evaluated (and often rejected)

19   field preemption claims under the Act with respect to fields that are much narrower than the field

20   of "interstate communications" claimed by the Plaintiffs.  *See Head v. New Mexico Bd. of*

21   *Exam'rs in Optometry*, 374 U.S. 424, 432 (1963) (Act does not occupy the field of broadcast

22   television); *Greater Los Angeles Agency on Deafness, Inc.*, 742 F.3d at 428 (state regulation of

23   broadcast video captioning not field preempted): *Metrophones Telecomms., Inc.*, 423 F.3d 1056 at

24

25        [34] Any finding of field preemption would also conflict with previous judicial
     determinations that the FCC must identify direct or ancillary authority when undertaking specific
26   attempts to preempt.  *See Comcast*, 600 F.3d at 650-51, 653 (statutory authority to preempt
     required in *NARUC II*, 533 F.2d 601); *id*. at 656 (statutory authority to preempt required in
27   *Computer and Communications Industry Ass'n*, 693 F.2d 198); *id*. at 656-57 (ancillary authority
     to preempt required in *New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804 (D.C.
28   Cir. 1984)).

                                          35

1072 (no field preemption precluding state regulation of payphones); *Ting*, 319 F.3d at 1136

("[F]ield preemption is not an issue because state law unquestionably plays a role in the

regulation of long-distance contracts.") (collecting cases); *In re Verizon New England, Inc.*, 173

Vt. 327, 342 (Vt. 2002); *Verizon New England, Inc. v. R.I. Pub. Util. Comm'n*, 822 A.2d 187, 193

(R.I. 2003).

The cases that Plaintiffs rely on do not support field preemption.  Although Plaintiffs

selectively quote language, mostly dicta, from various cases to create the impression that courts

have already determined that the FCC has exclusive authority to regulate "interstate

communication," none of these cases establishes such field preemption—indeed, none of them

are about field preemption.  *See* ISP Br. at 22-23, U.S. Br. at 11.  Rather, these cases all arise in

contexts in which the Act pervasively regulates a *subset* of such communications, including

common carrier long-distance telephone service (*Ivy v. Broadcasting Co. v. American Tel. & Tel.

Co*, 391 F.2d 486 (2d Cir. 1968); *California v. FCC*, 567 F.2d 84 (D.C. Cir. 1977); *Nat'l Ass'n of

Regulatory Utility Comm'rs v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984)); common carrier two-way

telex transmissions service (*Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003)); and

cable television service (*Capital Cities Cable Inc.*, 467 U.S. 691).[35]  And while all of these cases

involved services subject to much more extensive FCC regulation than information services are,

none actually found field preemption, nor did they purport to address a regulatory field as broad

as "interstate communications."

> **4.    Under Plaintiffs' Sweeping Theory of Field Preemption, All State
> Regulation of Information Services Would Be Preempted, but That Is
> Not the Law**

Finally, under Plaintiffs' overly expansive reading of the Act, preemption of "interstate

communications services" also entails preemption of all state regulation of "information

services."  This would be an unprecedented expansion of the Act, as "information services" can

---

[35] Plaintiffs also cite cases that predate the 1934 enactment of the Communications Act, which are therefore of little relevance.  *See* ISP Br. at 11 n.6 (citing *Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co*., 251 U.S. 27 (1919) (common carrier telegraph service); *Western Union Tel. Co. v Boegli*, 251 U.S. 315 (1920) (common carrier telegraph service).

1   include almost anything offered over the Internet, including websites and e-mail services.  *See*

2   *Brand X*, 545 U.S. at 999.  Given the FCC's very limited statutory authority over information

3   services, *see supra* at 17, Plaintiffs' field preemption theory would foreclose virtually any

4   substantive regulation of information services, including but not limited to BIAS.[36]  There is no

5   indication that Congress desired such an extreme result; in fact, section 601(c)(1) demonstrates

6   that it did not.  Plaintiffs' theory is also at odds with numerous cases in which courts have

7   expressly recognized state authority to regulate information services.  *See, e.g.*, *Greater Los*

8   *Angeles Agency on Deafness, Inc.*, 742 F.3d at 428 (state regulation of captioning of video posted

9   on website not field preempted); *Nat'l Fed'n of the Blind v. Target*, 452 F. Supp. 2d 946, 959

10   (N.D. Cal. 2006) (collecting cases).

11        Field preemption is also inconsistent with the FCC's recognition in the 2018 Order of the

12   states' important role in "policing such matters as fraud, taxation, and general commercial

13   dealings," "remedying violations of a wide variety of general state laws," and "enforcing fair

14   business practices."  2018 Order ¶ 196 & n.732.  As the *Mozilla* court noted, these are "categories

15   to which broadband regulation is inextricably connected."  940 F.3d at 81.  And, there are

16   numerous areas involving information services in which California (and other states) already

17   regulate so as to protect Internet users (*e.g.* internet gambling, data breaches, consumer privacy).

18   *See supra* at 9-10.  Given the enormous implications of such a far-reaching interpretation of the

19   Act, field preemption should not be inferred absent explicit statutory text, which is lacking here.

20       **E.**    **The Communications Act Does Not Expressly Preempt SB 822's**

21             **Regulation of Mobile BIAS**

22        Finally, ISP Plaintiffs' attempt to establish express preemption—by framing SB 822's

23   mobile BIAS provisions as regulating "the entry of or the rates charged" by a mobile service—

24   fall far short.  ISP Br. at 13-14 (citing 47 U.S.C. § 332(c)(3)(A)).  As an express preemption

25   provision, section 332(c)(3)(A) must be construed narrowly.  *See Air Conditioning &*

26

27               [36] Although the 2018 Order refers to the Federal Trade Commission's authority to

28   "prohibit unfair and deceptive practice" with respect to BIAS, 2018 Order ¶ 140, that agency does
not have authority to regulate the vast majority of practices governed by SB 822.

1  *Refrigeration Inst. v. Energy Res. Conservation & Dev Comm'n*, 410 F.3d 492, 496 (9th Cir.

2  2005).  ISP Plaintiffs' interpretation conflicts with the plain meaning of, and case law

3  interpreting, "entry of" and "rates charged."

**1.      SB 822's Mobile Broadband Provisions Do Not Regulate the Entry of
Any Mobile Service**

6       ISP Plaintiffs argue that SB 822 "imposes conditions on the manner in which [mobile

7  service] is provided," and is thus preempted by 47 U.S.C. section 332(c)(3)(A).  ISP Br. at 14.

8  Under this approach, any state law that "imposes conditions" on the way in which a mobile BIAS

9  provider conducts business would be preempted, but that cannot be correct.

10       The prohibition on state regulation of "entry of" a mobile service simply means that states

11  cannot prevent mobile carriers from entering the market.  *See Telesaurus VPC LLC v. Power*, 623

12  F.3d 998, 1001, 1006-08 (9th Cir. 2010) (section 332(c)(3)(A) refers to "market entry"); *id.* at

13  1008-09 (section 332(c)(3)(A) preempts state actions that require a court to substitute its

14  judgment with regard to a licensing decision, which is "the FCC's core tool in the regulation of

15  market entry").  And SB 822 does not regulate any mobile broadband carrier's "entry" into the

16  market.  Nothing in SB 822 prevents any mobile carrier from entering any market in California,

17  or requires a state license to enter the market, or requires a court to pass on the validity of a

18  federal license to enter the market.

19       None of the cases cited by ISP Plaintiffs support their expansive reading of "entry."  To the

20  contrary, the claims in *Bastien v. AT&T Wireless Services, Inc*., 205 F.3d 983 (7th Cir. 2000),

21  "required the state court to determine the infrastructure appropriate to market entry."  *Fedor v.

22  Cingular Wireless Corp*., 355 F.3d 1069, 1073 (7th Cir. 2004) (discussing *Bastien*); *see id.* at

23  1074 (rejecting wireless provider's argument that claims alleging improper billing would

24  "mandat[e] changes in its infrastructure and thereby impact[] market entry" because calls at issue

25  were handled by cellular towers outside its service area).  Similarly, *Johnson v. American Towers,

26  LLC*, 781 F.3d 693 (4th Cir. 2015), is about state law's impact on "the FCC's authority in

27  granting licenses to provide wireless service."  *Id.* at 706; *id.* at 703, n.5 (referring to "state-law

28  barriers to market entry").  These cases have nothing to do with SB 822's provisions addressing

1    business practices of mobile broadband service providers that manipulate and undermine their

2    customers' access to an open Internet.

3        **2.    SB 822's Zero-Rating Provisions Do Not Regulate the Rates Charged
            by Any Mobile Service**

4

5        Nothing in SB 822 regulates the "rates charged" by any mobile service.  The zero-rating

6    provisions provide that, as with paid prioritization, mobile broadband providers cannot

7    manipulate their subscribers' Internet access experience to favor paid or affiliated content over

8    other content on the Internet.  These provisions do not regulate how much providers can charge

9    their customers; because providers can charge as much or as little as they like, there is no conflict

10   with the Act.[37]  *See Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057, 1058 (9th Cir. 2008)

11   (finding 47 U.S.C. § 332(c)(3)(A) did not preempt "state consumer protection statute" that "does

12   not purport to dictate how much businesses may charge for their goods or services," when

13   provider "remains free to charge its customers as much, or as little, as the market will bear").

14   Although ISP Plaintiffs cite *NASUCA v FCC*, 457 F.3d 1238, 1254 (11th Cir. 2006), for the

15   proposition that any regulation that "affects" a customer's rate is preempted, that case does not

16   support such a sweeping conclusion.  There, the court determined that a "straightforward" reading

17   of the "normal meaning[]" of the term "rates" as used in in 47 U.S.C. § 332(c)(3)(A) is "the

18   amount that a user is charged for service."  *Id.*  The court rejected the FCC's contention that

19   "rates" refers to "rate levels" and "rate structures."  *Id.* at 1253-54.  Similarly, it would stretch the

20   meaning of "rates" well beyond the plain meaning of the term to apply it to rules that do not limit

21   what mobile BIAS providers can charge.  SB 822 simply prohibits mobile BIAS providers from

22   dictating, influencing, or otherwise interfering with the Internet content accessed by their

23   customers.

24

25

26

27        [37] The United States does not press this interpretation here.  The FCC has previously
     interpreted section 332's reference to "rates charged" in accordance with its plain meaning.  *See*,
28   *e.g.*, *Telesaurus*, 623 F.3d at 1007; *Fedor*, 355 F.3d at 1072-73.

## II.   PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM

### A.   A Presumption of Irreparable Harm Is Not Appropriate

Because Plaintiffs have failed to demonstrate a likelihood of success on the merits, they have also failed to demonstrate that they will suffer irreparable harm absent an injunction. *See Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (no presumption of constitutional injury where "the organization has not demonstrated a sufficient likelihood of success on the merits"); *United States v. California*, 314 F. Supp. 3d 1077, 1112 (E.D. Cal. 2018) ("The Court will not find an irreparable injury where it has not found an underlying constitutional infringement.").

Even if Plaintiffs had established a likelihood of success on the merits, the Court should not presume the existence of irreparable harm. The Supreme Court has "warned against reliance on presumptions or categorical rules . . . in issuing injunctive relief," which "would constitute 'a major departure from the long tradition of equity practice,' and 'should not be lightly implied.'" *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 393 (2006)).

To the extent that courts have relied upon a presumption of irreparable injury stemming from a likelihood of success on the merits of a constitutional claim, it is confined to violations of *personal* constitutional rights involving liberty or dignity interests that give rise to intangible, but very real injuries. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Rodriguez v. Robbins*, 715 F.3d 1127, 1144-45 (9th Cir. 2013) (applying presumption to unconstitutional detentions); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (applying presumption to unconstitutional seizures). Thus, such a presumption is not appropriate in the context of preemption.[38] *See, e.g.*, *American Trucking Ass'n, Inc. v. City of Los Angeles*, 559

---

[38] "[T]he Supremacy Clause is not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 324 (2015) (internal quotation marks and citation omitted). Instead of establishing individual rights, the Supremacy Clause "creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuance thereof,' as 'the supreme Law of the Land'" and "must not give effect to state laws that conflict with federal laws.'" *Id.* (quoting U.S. Const. Art. VI, cl. 2; *Gibbons v. Ogden*, 22 U.S. 1, 210 (1824)).

40

1    F.3d 1046, 1058 (9th Cir. 2009) (likelihood of success on preemption claim, "*coupled with the*

2    *damages incurred*, can suffice to show irreparable harm") (emphasis added).  While Plaintiffs

3    claim that a violation of the Supremacy Clause alone can establish irreparable injury, *see* ISP Br.

4    at 3; U.S. Br. at 25, courts require evidence of actual harm.  *See United States v. California*, 921

5    F.3d at 894 (finding lack of "compelling evidence" of harm, aside from "general pronouncements

6    that a Supremacy Clause violation alone constitutes sufficient harm to warrant an injunction," and

7    urging the district court to "reexamine the equitable *Winter* factors in light of the evidence in the

8    record").[39]  Plaintiffs must therefore establish irreparable harm flowing from the alleged

9    Supremacy Clause violation in order to obtain a preliminary injunction.  They have failed to do so

10   here, for several reasons.

11        **B.    ISP Plaintiffs Have Failed to Establish Irreparable Harm**

12        ISP Plaintiffs claim irreparable harm will result from specific provisions of SB 822,

13   independent of the alleged Supremacy Clause violation.  *See* ISP Br. at 23.  However, Plaintiffs

14   have failed to "*demonstrate* immediate threatened injury" from any of these particular provisions.

15   *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).

16        **1.    The Alleged Harms Relating to Interconnection, the General
               Conduct Rule, and the Prohibitions on Blocking and Throttling Are
17             Entirely Speculative**

18        ISP Plaintiffs' attempts to show irreparable harm from the ban on charging edge providers

19   fees for access to users, Cal. Civil Code § 3101(a)(3), the interconnection provision, *id.*

20   § 3101(a)(9), as well as from the prohibitions on blocking and throttling and the general conduct

21   rule, *id.* § 3101(a)(1), (2), (7), fail on several fronts.  First, the claim of irreparable harm is belied

22   by the lack of any harm during the period in which the federal net neutrality protections were in

23   effect nationwide from 2015-2018.  In fact, after the 2015 Order went into effect, some large

24   _____

        [39] The United States cites dicta from *United States v. California* in which the Ninth Circuit
25   noted that the district court's irreparable harm determination was consistent with the Ninth
     Circuit's recognition that preventing Supremacy Clause violations is in the public interest, a
26   different equitable *Winter* factor than irreparable harm.  U.S. Br. at 25 (quoting *United States v.
     California*, 921 F.3d at 893).  The Ninth Circuit, however, made clear that more was required to
27   establish irreparable harm and remanded the matter for the district court's consideration of the
     evidence.  *See United States v. California*, 921 F.3d at 894.

28

                                                    41

ISPs, including Comcast, stated publicly that the Order's restrictions did not alter or disrupt their companies' business operations.[40]  With respect to blocking and throttling in particular, "[m]any of the largest ISPs have committed not to block or throttle legal content"—a fact that was expressly relied upon by the FCC when it issued the 2018 order.  2018 Order ¶ 142.[41]  Those providers cannot be irreparably harmed by prohibitions on practices that they say they have no intention of committing.

Second, the claims that SB 822's requirements regarding interconnection will result in a loss of revenue, reputational harm, and loss of goodwill are grounded in speculation upon speculation.[42]  As ISP Plaintiffs acknowledge, SB 822 has yet to be interpreted by courts or those charged with enforcing the law.  *See* Klaer Decl. ¶¶19-21; Paradise Decl. ¶¶ 31-32.  Thus, it has not yet been determined what constitutes a violation of Civil Code sections 3101(a)(3) or 3101(a)(9).  Still, based on the possibility that their existing practices could be found to violate

---

[40] *See* Thomson Reuters Streetevents, Edited Transcript CMCSA – Q1 2015 Comcast Corp. Earnings Call (May 4, 2015) (stating "[o]n Title II, it really hasn't affected the way we have been doing our business or will do our business" and, "while we don't necessarily agree with the Title II implementation, we conduct our business the same we always have"), *available at* https://www.cmcsa.com/static-files/785af0f7-9fa7-4141-983a-556de09b8a71 (last visited Sept. 16, 2020); Shalini Ramachandran & Michael Calia, *Cablevision CEO Plays Down Business Effect of FCC Proposal*, Wall St. J., Feb. 25, 2015 (quoting Cablevision Systems Corp. CEO as stating "we don't see at least what the [FCC] Chairman has been discussing [regarding the 2015 Order] as having any real effect on our business"), *available at* https://www.wsj.com/articles/cablevision-net-neutrality-fcc-proposal-earnings-subscribers-1424872198 (last visited Sept. 16, 2020).

[41] The FCC cited numerous BIAS provider comments to this effect, including comments by AT&T and Comcast.  2018 Order ¶ 142 n. 511 (citing AT&T Comments at 1 ("[R]egardless of what regulatory regime is in place, we will conduct our business in a manner consistent with an open Internet."); *id.* at 2 ("No ISP engages in blocking or throttling without a reasonable network-management justification . . . a baseline prohibition on blocking and throttling merely codifies standard industry practice."); *id.* at 101 (AT&T "would support a set of bright-line rules that require transparent disclosures of network-management practices and prohibit blocking and throttling of Internet content without justification."); and Comcast Comments at 52-53 ("To be clear, we continue to strongly support a free and Open Internet and the preservation of modern, strong, and legally enforceable net neutrality protections.  We don't block, throttle, or discriminate against lawful content delivered over the Internet, and we are committed to continuing to manage our business and network with the goal of providing the best possible consumer experience. . . .  Comcast will continue to support the principles of ensuring transparency and prohibiting blocking, throttling, and anticompetitive paid prioritization.")).

[42] Defendants have submitted multiple declarations explaining in detail the inaccuracies in ISP Plaintiffs' declarations regarding interconnection, technical considerations relating to compliance with SB 822, and other matters, which rebut ISP Plaintiffs' assertions of irreparable harm.  *See*, *e.g.*, Jordan Decl.; Kronenberg Decl.; Schaeffer Decl.

42

1    one of these provisions, ISP Plaintiffs contend that existing interconnection agreements will be

2    under a "legal cloud," Klaer Decl. ¶ 22, that ISPs and edge providers will have to cease

3    negotiations for new interconnection agreements, *see id.* ¶¶ 21-23; Paradise Decl. ¶¶ 33, 38, and

4    that "some" edge providers will "undoubtedly" claim that they are entitled to free interconnection

5    and may engage in "arbitrage" to the detriment of the ISPs, *see* Paradise Decl. ¶ 29.

6         These sorts of hypothetical harms are insufficient to demonstrate irreparable harm.  *See In*

7    *re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the

8    basis for a finding of irreparable harm."); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240

9    F.3d 832, 841 (9th Cir. 2001) (noting that "*evidence* of threatened loss of prospective customers

10   or goodwill" can support a finding of irreparable harm (emphasis added)).[43]  The mere possibility

11   that parties to a commercial transaction might change their expectations or adopt different

12   negotiating strategies in response to a change in law is not a basis for enjoining that law, because

13   such possibilities are too attenuated to support a finding that irreparable injury will *likely* result

14   absent an injunction.  *See Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390,

15   391 (9th Cir. 2014) ("The fact that [plaintiff's] reputation *might* be harmed by the marketing of

16   [defendant's] products did not establish that irreparable harm to [plaintiff]'s reputation is *likely*."

17   (emphasis in original, citing *Winter,* 555 U.S. at 22)); *Herb Reed Enters., LLC v. Fla. Entm't*

18   *Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (observing that "[e]vidence of loss of control

19   over business reputation and damage to goodwill could constitute irreparable harm," but finding

20   that district court's analysis was "grounded in platitudes rather than evidence").

21        Moreover, ISP Plaintiffs' complaints that they will suffer significant harm by providing

22   interconnection services without being compensated by edge providers and others is unfounded.

23   *See* Kronenberg Decl. ¶ 32 (explaining how BIAS providers only bear the cost of a small part of

24   their networks and that last-mile transit is "not a large burden"); Schaeffer Decl. ¶¶ 46-65

---

25        [43] SB 822's requirements relating to interconnection will not burden ISP Plaintiffs by

26   motivating transit providers and edge providers to overwhelm their networks with free
     interconnection.  *See* Klaer Decl. ¶ 30.  Edge providers only send traffic when specifically

27   requested by a subscriber and have ample incentives to keep traffic volumes efficient.  *See*
     Kronenberg Decl. ¶ 35; Schaeffer Decl. ¶¶ 64-65.

28

1  (rebutting claims of financial and nonfinancial harms that allegedly result if SB 822 is interpreted

2  to prohibit BIAS providers from charging for interconnection).[44]  SB 822 simply restores

3  protections that governed BIAS providers' interconnection practices from 2015 to 2018, by

4  expressly prohibiting BIAS providers from evading SB 822's net neutrality protections at the

5  point of interconnection.[45]  But even if SB 822 would result in financial harm, and even if there

6  would be no recovery of monetary damages from the State due to sovereign immunity, "the fact

7  that economic losses may be unrecoverable does not absolve the movant from its considerable

8  burden of proving that those losses are *certain, great and actual,*" and "the mere fact that

9  economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable

10  harm."  *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015)

11  (emphases in original, internal quotation marks and citation omitted).

12      Third, ISP Plaintiffs cannot establish irreparable harm based on alleged ambiguities in SB

13  822 and the potential for litigation.  *See* Klaer Decl. ¶¶19-21; Paradise Decl. ¶¶ 31-32.  The

14  potential for future litigation is purely speculative and, thus, insufficient to establish a *likelihood*

15  of irreparable harm.  *See Caribbean Marine Servs. Co.*, 844 F.2d at 674 ("Speculative injury does

16  not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); *Mason*

17  *v. Granholm*, 2007 WL 734990, at *2 (E.D. Mich. Mar 7, 2007) ("Nor have Defendants

18  articulated the *irreparable* harm caused by the potential of future lawsuits" (emphasis in

19  original)); *Perfect 10, Inc.*, 653 F.3d at 982 (affirming denial of preliminary injunction for lack of

20  "sufficient causal connection between irreparable harm" to plaintiff from defendant's conduct).[46]

21  Indeed, as a general matter, litigation costs do not amount to irreparable harm warranting

22  injunctive relief, and even if they could, ISP Plaintiffs have failed to provide any evidence of the

23  ───────────────
        [44] ISP Plaintiffs will not need to increase prices for BIAS because the costs of upgrading

24  networks have fallen considerably.  *See* Kronenberg Decl. ¶ 34.  In addition, the lack of
        competition in the BIAS market means BIAS providers have no incentive to pass any savings on

25  to subscribers.  *See* Schaeffer Decl. ¶ 60.
        [45] *See supra* at 7-8 (discussing 2015 Order and the FCC's determination that BIAS

26  providers were prohibited from evading the 2015 Order's net neutrality protections via
        interconnection); *see also* Kronenberg Decl. ¶ 22; Schaeffer Decl. ¶¶ 40, 43.

27      [46] The claims of *amici curiae* that allegedly ambiguous provisions of SB 822 "may" result
        in liability and "may" result in inconsistent enforcement, US Chamber of Commerce Br. at 11,

28  13, are similarly speculative and fail to establish a likelihood of irreparable harm.

likelihood and nature of such litigation.  *See Bofi Fed. Bank v. Erhart*, 2016 WL 4680291, at *8-9

(S.D. Cal. Sept. 7, 2016) (noting that plaintiff's "argument that it may be subject to future

lawsuits . . . does not demonstrate irreparable harm," and that "even if additional lawsuits

constituted irreparable harm, [plaintiff] would need to demonstrate a likelihood of them being

filed"); *Sterling Commercial Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8,

17 (D.D.C. 2011) (finding no irreparable harm where plaintiff "simply asserted a '*likelihood* of

protracted or multiple lawsuits' sometime in the future, without any discussion of how many

accounts [may be subject to litigation] or how many parties may be subject to liability," because

such "bare allegations, without more, do not establish an [irreparable] injury").

Finally, ISP Plaintiffs vaguely assert that SB 822 will create "a patchwork of inconsistent

and burdensome regulation and immediately impair [the ISPs'] ability to provide Internet services

in California and other parts of the country."  Klaer Decl. ¶ 38.  This falls far short of establishing

concrete, non-speculative, imminent irreparable harm.  Comcast and AT&T already operate in

multiple states, each of which has its own consumer protection laws.  *See* Klaer Decl. ¶ 2;

Paradise Decl. ¶ 2.  And, it is entirely feasible for ISPs to comply with a variety of network

operational requirements in different states, including the SB 822 provisions regulating

interconnection.  *See* Jordan Decl. ¶¶ 11-38, 52-55; Schaeffer Decl. ¶¶ 66-74.  Indeed, most

interconnection arrangements will not be affected by SB 822.  While some large BIAS providers

have sufficient leverage to charge for interconnection, an overwhelming majority of BIAS

providers either pay for transit services or exchange traffic without compensation.  *See*

Kronenberg Decl. ¶ 11; Jordan Decl. ¶ 51; Schaeffer Decl. ¶¶ 8-9, 49.

### 2. The Harms Alleged from the Zero-Rating Provisions Are Also Entirely Speculative

ISP Plaintiffs have also failed to demonstrate that SB 822's prohibition on certain anti-

competitive forms of zero-rating, *see* Cal. Civil Code § 3101(a)(5), (6), will result in irreparable

harm.[47]  Zero-rated data is exempted from subscribers' data caps, while all other traffic continues

---

[47] SB 822 explicitly allows so-called application-agnostic zero-rating that does not require
edge providers to pay, in order to be zero-rated (e.g., zero-rating all content accessed during

45

1    to count against the cap.  ISP Plaintiffs assert that zero-rating offerings make their services more

2    attractive to potential customers in the "highly competitive marketplace for mobile broadband."

3    ISP Br. at 26.  But a statewide prohibition on certain forms of zero-rating will not place any ISPs

4    at a competitive disadvantage, because all providers serving customers in California will be

5    subject to the same requirements.  And pure supposition that customers "will" be "frustrated"

6    with providers and "will express their dissatisfaction to their friends and acquaintances," which

7    "will likely also attract widespread, negative media attention," Roden Decl. ¶ 23, cannot justify

8    the equitable remedy of an injunction.  *See Caribbean Marine Servs. Co.*, 844 F.2d at 674.

9        Second, the incidental costs of complying with SB 822, such as promptly informing

10   customers about changes to their services, *see* Roden Decl. ¶ 24, are insufficient to establish

11   *irreparable* harm to their businesses.  *Cf. Standard Havens Prods, Inc. v. Gencor Indus., Inc.*, 897

12   F.2d 511, 515 (Fed. Cir. 1990) (finding irreparable harm based on "employee layoffs, immediate

13   insolvency, and, possibly, extinction").  ISP Plaintiffs' further speculation that, depending on how

14   SB 822 is interpreted, they may be required to absorb significant additional costs in constructing a

15   purportedly non-existent system to comply with the zero-rating provisions of SB 822 is just

16   that—speculation.  *See* Roden Decl. ¶ 18 (identifying statutory provisions yet to be interpreted);

17   ¶ 19-20.  Large ISPs have the capability to tailor services to different types of end users and

18   maintain different policies for different parts of a network.[48]  *See* Dolgenos Decl. ¶ 10; Jordan

19   Decl. ¶ ¶ 11-38; 52-55.

20       **C.    The Irreparable Harm Alleged by the United States Is Legally Irrelevant
               and Has Not Been Established**

21

22       The United States has failed to demonstrate that it will suffer particular irreparable harm

23   unless a preliminary injunction is issued.  The irreparable harm alleged is that the FCC has

24   adopted an "affirmative 'deregulatory policy' and 'deregulatory approach' to Internet

25

26   certain times of day).  Cal. Civ. Code § 3101(a)(6).

27       [48] AT&T's zero-rating plan currently permits users to turn their zero-rating on and off.
     Thus, contrary to AT&T's assertions, it already has the capability to switch off zero-rating for
     users who opt out, and can simply use that functionality to disable zero-rating for California

28   users.  *See* Jordan Decl. ¶ 37.

1   regulation"—the effects of which are borne by BIAS providers, edge providers, other network

2   providers, and end users—and SB 822 would purportedly "nullify federal law across the county."

3   U.S. Br. at 24.  But harm to BIAS providers or others is not the same thing as harm to the United

4   States.  Nor has Congress authorized the FCC to impose such a policy on the states, so no

5   nationwide nullification of federal law can result.

6          The United States also invokes ISPs' purported inability to "comply with one set of

7   standards in this area for California and another for the rest of the Nation—especially when

8   Internet communications frequently cross multiple jurisdictions."  U.S. Br. at 25.  But ISPs can

9   and do comply with the laws of different states on a daily basis, whether in their business

10  operations generally or in their treatment of Internet traffic specifically.  Indeed, ISPs with

11  operations in different countries already comply with different net neutrality regimes

12  internationally.  ISP Plaintiffs do not contend that they lack the technological capacity to do so,

13  and Defendants have rebutted such claims.[49]  *See* Jordan Decl. ¶¶ 11-60; Schaeffer Decl. ¶¶ 66-

14  74.  Irreparable injury to the United States should not be assumed based on speculative purported

15  harms to ISP Plaintiffs.

16  **III.    THE BALANCE OF EQUITIES WEIGHS STRONGLY AGAINST AN INJUNCTION**

17         The balance of hardships and the public interest factors merge when the government is a

18  party.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, these factors are overwhelmingly in

19  Defendants' favor.  Plaintiffs offer only speculative harms, but the harm to California from an

20  injunction would be enormous.  "Any time a State is enjoined by a court from effectuating

21  statutes enacted by representatives of its people, it suffers a form of irreparable injury."

22  *Maryland v. King*, 133 S. Ct. 1, 3 (2012).  This is especially true of SB 822, which provides

23  crucial protections for California's economy, democracy, and society as a whole.  *See* SB 822,

24  Sec. 1(a)(2).

25

26

27         [49] In addition, the purported harm that SB 822 will allegedly have an effect beyond
    California is more properly considered under ISP Plaintiffs' dormant commerce clause claim,
28  which is not raised in their preliminary injunction motion.

47

SB 822 is needed to protect consumer choice, as well as the competition that allows for growth and job creation in industries that are critical to California.  Independent local BIAS providers in California offer fast and reliable BIAS to low-income people who cannot afford service from the large BIAS providers.  *See* Dolgenos Decl. ¶¶ 3-7.  Numerous businesses based or operating in California offer the same types of services that BIAS providers' corporate affiliates also offer, such as Philo (streaming television service) and ADT (home security systems).  These businesses are likely to be squeezed out by ISPs' desire to promote their own affiliates' services, whether through blocking, throttling, paid prioritization, zero-rating, or other practices prohibited by SB 822.  *See* McCollum Decl. ¶¶ 4, 5, 12, 17; Nakatani Decl. ¶ 8.  Absent SB 822, all of these California businesses will be severely and unfairly disadvantaged when competing with large ISPs offering similar services.

Without SB 822, California businesses and consumers will be at the mercy of the large BIAS providers, who will no longer be prohibited from allowing congestion at interconnection points, or entering into interconnection agreements as a means of engaging in the other practices prohibited by SB 822, such as blocking, throttling, and paid prioritization.  This is not a speculative harm; it is well-documented that BIAS providers allowed congestion at interconnection points before 2015, in order to pressure edge providers and content distribution networks to pay interconnection fees.[50]  *See* Kronenberg Decl. ¶¶ 12-21; Schaeffer Decl. ¶¶ 11-30.  For providers who refused to pay these fees, the problems only ended after the FCC adopted the 2015 Open Internet Order.  *See* Kronenberg Decl. ¶¶ 22-23; Schaeffer Decl. ¶¶ 21-22, 40-41.  And, since the repeal of federal net neutrality, ISPs have entered into an unspecified number of interconnection agreements that they believe might conflict with SB 822.  *See* Klaer Decl. ¶¶19-21; Paradise Decl. ¶¶ 31-33.

---

[50] Indeed, the D.C. Circuit recognized that "[b]roadband providers . . . have powerful incentives to accept fees from edge providers, either in return for excluding their competitors or for granting them prioritized access to end users," and that the FCC's conclusion that broadband providers possessed such incentives was "based firmly in common sense and economic reality." *Verizon*, 740 F.3d at 645-46.  The D.C. Circuit further observed that "at oral argument Verizon's counsel announced that 'but for [the net neutrality rules issued in the FCC's 2010 Order] we would be exploring those commercial arrangements.'"  *Id.* at 646.

48

1       Given its high concentrations of technology companies, creative capital, and communities

2   of color, California has a uniquely strong need for net neutrality protections.  Silicon Valley's

3   combination of abundant investment capital, engineering talent, and entrepreneurial spirit grew up

4   against the background of an open Internet.  *See* Ohanian Decl. ¶¶ 4-6, 8, 12-15; McCollum Decl.

5   ¶ 20.  That environment has allowed technology startups, entrepreneurs, and small businesses to

6   flourish, and it would be severely compromised without the open Internet on which these

7   businesses rely.  *See* Ohanian Decl. ¶¶ 9-11; McCollum Decl. ¶ 20.  Content creators who depend

8   on the Internet for more open and competitive distribution opportunities, beyond the confines of

9   the major networks (some of which are affiliated with the largest ISPs), would also be severely

10  disadvantaged by a lack of net neutrality.  *See* Blum-Smith Decl. ¶¶ 5, 8.  And it is indisputable

11  that communities of color and low-income communities need fair access to the open Internet.  *See*

12  Breed Decl. ¶¶ 2, 11-12; Dolgenos Decl. ¶ 3, 8; Renderos Decl. ¶¶ 5-10, 27-31, 35-39, 41.  But

13  the zero-rated plans to which these communities disproportionately subscribe cannot supply this,

14  because zero-rating allows ISPs to set artificially low data caps for these plans, and leaves these

15  customers with insufficient access for everyday needs.  *See* Renderos Decl. ¶¶ 34-39.  Nor are

16  these communities' interests served by a regime in which ISPs can discriminate against political

17  movements or messages, or be pressured by others into doing so.  *Id*. ¶¶ 7-8.

18      SB 822's net neutrality protections are also critical for the public health and safety of

19  California's residents.  Blocking, throttling, and prioritization of certain Internet traffic can

20  severely hamper emergency response efforts.  *See* Bowden Decl. ¶¶ 6-12 (describing throttling

21  that actively impeded crisis-response and essential emergency services).  As the *Mozilla* court

22  noted in determining that the FCC failed to consider the 2018 Order's impact on public safety,

23  "the harms from blocking and throttling during a public safety emergency are irreparable.  People

24  could be injured or die."  *Mozilla*, 940 F.3d at 62; *see also id.* at 61 ("Any blocking or throttling

25  of these Internet communications during a public safety crisis could have dire, irreversible

26  results.").  Such practices are also detrimental to activities that, even before the COVID-19 crisis,

27  were already increasingly taking place online, including distance learning, working from home,

28  political participation and organizing, healthcare, and basic public health coordination efforts.

49

1 | *See* Breed Decl. ¶¶ 2-9, 11-12; Márquez Decl. ¶¶ 18, 20-25, 30-31, 33, 43; Renderos Decl. ¶¶ 7-

2 | 10, 14, 19-20, 30, 42.

3 |     Even if some of the harms described above have not yet come to pass during the period

4 | when SB 822 has not yet been enforced, California cannot simply assume that ISPs will never

5 | engage in the conduct prohibited by SB 822.  Indeed, they already have, *see supra* at 3-4, and if

6 | SB 822 were enjoined, ISPs would be free to use their positions as terminating access

7 | monopolists to promote their own corporate affiliates' services and extract additional fees.  *See*

8 | Kronenberg Decl. ¶¶ 8-10, 13-15, 25, 28; McCollum Decl. ¶ 15; Schaeffer Decl. ¶¶ 75-86.

9 |     Given the vital importance of open and fair Internet access to every part of modern life, the

10 | balance of equities weighs decisively in Defendants' favor.  Plaintiffs have offered only

11 | speculation about potential impacts on their preferred business models, whereas Defendants have

12 | shown that an injunction would pose concrete, serious harms to the tens of millions of people in

13 | California.

14 | **CONCLUSION**

15 |     Plaintiffs' motions for preliminary injunctive relief should be denied.

16 |

17 | Dated:  September 16, 2020      XAVIER BECERRA
Attorney General of California

18 | PAUL STEIN
Supervising Deputy Attorney General

19 | SARAH E. KURTZ
Deputy Attorney General

20 | JONATHAN M. EISENBERG
Deputy Attorney General

21 | JOHN D. ECHEVERRIA
Deputy Attorney General

22 |

23 | */s/ P. Patty Li*

24 |

25 | P. PATTY LI
Deputy Attorney General
*Attorneys for Defendants the State of*

26 | *California, Governor Gavin C. Newsom,*
*and Attorney General Xavier Becerra*

27 |

28 |

50