LETITIA JAMES
    Attorney General of the State of New York
BARBARA D. UNDERWOOD
    Solicitor General
STEVEN C. WU
    Deputy Solicitor General
ESTER MURDUKHAYEVA*
    Assistant Solicitor General
    *Admitted pro hac vice
OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
28 Liberty Street
New York, NY 10005
T: (212) 416-6279 | F: (212) 416-8692

*Counsel for Amici Curiae States of New York, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THE STATE OF CALIFORNIA, *et al.*,<br><br>　　　　Defendants. | No. 2:18-CV-02660-JAM-DB<br>No. 2:18-CV-02684-JAM-DB<br><br>**BRIEF OF THE STATES OF NEW YORK, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION** |
| AMERICAN CABLE ASSOCIATION, *et al.*,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>　　　　Defendants. | Judge: Honorable John A. Mendez<br>Actions Filed: October 1, 2018; October 3, 2018 |

BRIEF OF *AMICI CURIAE* STATES IN SUPPORT
OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INTERESTS OF AMICI CURIAE ...................................................................................1

ARGUMENT ....................................................................................................................2

FEDERAL LAW DOES NOT CATEGORICALLY PREEMPT  STATE REGULATION OF INTERNET SERVICE PROVIDERS ..........................................................................2

    A.    States Are Entitled to Regulate the Business Practices of Internet Service Providers Offering Services to Their Residents .......................................2

    B.    Plaintiffs' Sweeping Theories of Preemption Would Undermine the States' Ability to Protect Consumers ...................................................................8

CONCLUSION ...............................................................................................................13

1

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*ACA Connects–Am.'s Commc'ns Ass'n v. Frey*,
   No. 20-cv-00055, 2020 WL 3799767 (D. Me. July 7, 2020) ...........................................6

*Aguayo v. U.S. Bank*,
   653 F.3d 912 (9th Cir. 2011) .......................................................................................1

*Blatchford v. Native Vill. of Noatak*,
   501 U.S. 775 (1991).....................................................................................................7

*California v. FCC*,
   905 F.2d 1218 (9th Cir. 1990) .....................................................................................4

*Cipollone v. Liggett Group, Inc.*,
   505 U.S. 504 (1992).....................................................................................................4

*English v. General Elec. Co.*,
   496 U.S. 72 (1990).................................................................................................3, 5, 6

*Gonzalez v. Oregon*,
   546 U.S. 243 (2006).....................................................................................................1

*Graham v. R.J. Reynolds Tobacco Co.*,
   857 F.3d 1169 (11th Cir. 2017) ................................................................................ 6-8

*In re NOS Commc'ns, MDL No. 1357*,
   495 F.3d 1052 (9th Cir. 2007) .....................................................................................4

*In re Universal Serv. Fund Tel. Billing Practice Litig.*,
   619 F.3d 1188 (10th Cir. 2010) ...................................................................................4

*Johnson v. American Towers, LLC*,
   781 F.3d 693 (4th Cir. 2015) .......................................................................................4

*License Cases*, 46 U.S. (5 How.) 504 (1847)..................................................................1

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996).....................................................................................................2

*Metrophone Telecomms., Inc. v. Global Crossing Teles., Inc.*,
   423 F.3d 1056 (9th Cir. 2005) .....................................................................................3

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019)...................................................................................1, 5, 6

*Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983).....................................................................................................5

**Cases**                                                                    **Page(s)**

*People v. Charter Commc'ns, Inc.*,
  162 A.D.3d 553 (N.Y. App. Div. 2018) ...............................................................9

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
  485 U.S. 495 (1988)..................................................................................6, 7

*Sikkelee v. Precision Airmotive Corp.*,
  822 F.3d 680 (3d Cir. 2016).........................................................................6

*State v. CenturyLink, Inc.*,
  No. 19-2-32452-0SEA (King County Super. Ct. Dec. 9, 2019) ......................10

*State v. Charter Commc'ns*,
  No. 20-2-00460-04 (Chelan County Super. Ct. July 27, 2020) ......................10

*State v. Comcast Cable Commc'ns Mgmt.*,
  No. 16-2-18224-1 SEA (King County Super. Ct. June 6, 2019) ......................10

*State v. Frontier Commc'ns Corp.*,
  No. 20-2-01731-34 (Thurston County Super. Ct. July 20, 2020) ...................10

*Ting v. AT&T*,
  319 F.3d 1126 (9th Cir. 2003) ......................................................................4

*United States Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2015).......................................................................6

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014)........................................................................7

*Virginia Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019)..................................................................................6

*Wachovia Bank, N.A. v. Burke*,
  414 F.3d 305 (2d Cir. 2005)..........................................................................2

*Wyeth v. Levine*,
  555 U.S. 555 (2009)......................................................................................5

**Laws**

*Federal*

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 .........................8

Pub. L. No. 104-104, 110 Stat. 56 (1996)........................................................................3, 7

**Laws**                                                                    **Page(s)**

*Federal (cont'd)*

47 U.S.C.
    § 151.................................................................................................3
    § 152.................................................................................................3
    § 153.................................................................................................7
    § 253...........................................................................................3, 4, 7
    § 332.................................................................................................3
    § 414.................................................................................................2

*State (alphabetical)*

Cal. Bus. & Prof. Code
    §§ 22575-22578 .............................................................................11
    §§ 22580-22582 .............................................................................11

Cal. Civ. Code
    § 1798.130(a)(5) .............................................................................11
    § 1798.135(a)(2)(A) ........................................................................11

Ch. 210, 2019 Colo. Laws ......................................................................8

Conn. Gen. Stat.
    § 21a-217 .........................................................................................9
    § 42-471 .........................................................................................11

Del. Code. Ann. tit. 6,
    tit. 6, ch. 12C ...............................................................................11
    tit. 6, ch. 24A .................................................................................9
    tit. 16, § 4741 et seq. ....................................................................11

815 Ill. Comp. Stat.
    518/1 et seq. ...................................................................................11
    530/1 et. seq. ....................................................................................9

Me. Rev. Stat. Ann.
    tit. 5, § 1541-B ...............................................................................8
    tit. 35-A § 9301 ..............................................................................9

Md. Code Ann., Com. Law § 14-3301 et. seq. ......................................9

Mass. Gen. L., ch. 71, § 94 ..................................................................11

Minn. Stat.
    ch. 325M ..........................................................................................9
    § 325F.693 .......................................................................................9

N.J. Stat. Ann. § 49:3-53 .......................................................................9

**Laws**                                                                                    **Page(s)**

*State (alphabetical) (cont'd)*

Nev. Rev. Stat.
  § 205.498............................................................................................................9
  § 603A.340.........................................................................................................11

Ch. 88, 2018 Or. Laws...........................................................................................8

Or. Rev. Stat.
  § 646A.800..........................................................................................................9
  § 646.607...........................................................................................................11

66 Pa. Cons. Stat. § 3019(d)(1)..............................................................................9

No. 169, 2018 Vt. Acts & Resolves.........................................................................8

Wash. Rev. Code ch. 19.385...................................................................................8

**Administrative Sources**

*In re City of Wilson*, 30 FCC Rcd. 2408 (2015) ....................................................7

*In re Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018)...................................5

*Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*,
  33 FCC Rcd. 12075 (2018)...............................................................................10

940 Mass. Code Regs. pt. 19...................................................................................9

37 Pa. Code ch. 301 ...............................................................................................9

**Miscellaneous Authorities**

iDevelopment & Econ. Ass'n, *Bill Trackers: Online Gaming and Sports Betting Bills by State, Including Mobile Provisions* (Mar. 2020), https://ideagrowth.org/legislative-tracking/ ................11

Kruger, Lennard G., et al., *The National Broadband Plan* (Cong. Research Serv. July 2010)...............8

Lestock, Jake, *Tackling Daily Fantasy Sports in the States*, 26 Legis Brief no. 1 (Nat'l Conf. of State Legs. Jan. 2018), https://www.ncsl.org/research/civil-and-criminal-justice/tackling-daily-fantasy-sports-in-the-states.aspx ................11

Malfitano, Nicholas, *AG'S Office settles shoddy service claims with Internet provider Frontier Communications for $200K*, Penn. Record (Mar. 20, 2020), https://pennrecord.com/stories/528157350-ag-s-office-settles-shoddy-service-claims-with-internet-provider-frontier-communications-for-200k ................10

**Miscellaneous Authorities**                                                                 **Page(s)**

Miller, Claire Cain, *Google to Pay $17 Million to Settle Privacy Case*, N.Y. Times (Nov. 18,
  2013), https://www.nytimes.com/2013/11/19/technology/google-to-pay-17-million-to-
  settle-privacy-case.html ...........................................................................................................12

National Conf. of State Legs., *2019-20 Privacy Legislation Related to Internet Service
  Providers* (June 29, 2020), https://www.ncsl.org/research/telecommunications-and-
  information-technology/2019-privacy-legislation-related-to-internet-service-
  providers.aspx .........................................................................................................................9

National Conf. of State Legs., *Net Neutrality 2020 Legislation*, (Mar. 27, 2020),
  https://www.ncsl.org/research/telecommunications-and-information-technology/net-
  neutrality-2020-legislation.aspx...............................................................................................8

Press Release, Colo. Office of the Att'y Gen., *Attorney General Phil Weiser Announces
  CenturyLink Will Pay $8,476,000 for Charging Hidden Fees, Overbilling Colorado
  Customers* (Dec. 19, 2019), https://coag.gov/press-releases/12-19-19/ .........................10

Press Release, Ill. Office of the Att'y Gen., *Madigan Announces Settlement with VoIP
  Provider Requiring Improved 911 Disclosures* (Dec. 14, 2006),
  https://illinoisattorneygeneral.gov/pressroom/2006_12/20061214c.html .........................12

Press Release, Mass. Office of the Att'y Gen., *AG Stops Online Auto Title Lender from
  Collection on Illegal Loans Made to Massachusetts Consumers* (Mar. 18, 2016),
  https://www.mass.gov/news/ag-stops-online-auto-title-lender-from-collection-on-illegal-
  loans-made-to-massachusetts ...................................................................................................12

Press Release, Mich. Office of the Att'y Gen., *AG Nessel Announces Significant Settlement
  with Telecom Carrier Focused on Innovative Robocall Mitigation Measures* (Sept. 11,
  2020), https://www.michigan.gov/ag/0,4534,7-359-92297_47203-539389--,00.html...................12

Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Record $174.2
  Million Consumer Fraud Settlement with Charter for Defrauding Internet Subscribers*
  (Dec. 18, 2018), https://ag.ny.gov/press-release/2018/ag-underwood-announces-record-
  1742-million-consumer-fraud-settlement-charter .....................................................................9

Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Settlements
  Establishing Industry-Wide Standards for Marketing Internet Speeds* (Dec. 22, 2018),
  https://ag.ny.gov/press-release/2018/ag-underwood-announces-settlements-establishing-
  industry-wide-standards-marketing .........................................................................................10

Press Release, N.Y. Office of the Att'y Gen., *Attorney General James Secures New
  Protections, Security Safeguards for All Zoom Users* (May 7, 2020),
  https://ag.ny.gov/press-release/2020/attorney-general-james-secures-new-protections-
  security-safeguards-all-zoom-users .........................................................................................12

**Miscellaneous Authorities**                                                                     **Page(s)**

Press Release, National Ass'n of Att'ys Gen., *Attorneys General Announce Settlement with America Online Regarding Cancellation Issues* (July 12, 2007), https://www.naag.org/naag/media/naag-news/attorneys_general_announce_settlement_with_america_online_regarding_cancellation_issues.php ...............................................................................................9

Press Release, Or. Office of the Att'y Gen., *AG Rosenblum Announces $4 Million Settlement with CenturyLink* (Dec. 31, 2019), https://www.doj.state.or.us/media-home/news-media-releases/ag-rosenblum-announces-4-million-settlement-with-centurylink/ ....................................10

Rizo, Chris, *VONAGE Agrees to $3 Million Multistate Settlement*, Legal Newsline (Nov. 16, 2009), https://legalnewsline.com/stories/510521856-vonage-agrees-to-3-million-multistate-settlement ...............................................................................................12

Robertson, Adi, *Google Settles Street View Privacy Case with 38 States for $7 Million*, The Verge (Mar. 12, 2013), https://www.theverge.com/2013/3/12/4094522/google-settles-street-view-privacy-case-with-states-for-7-million ...............................................................12

*Time Warner Cable to Pay $18.8m in California Internet Case*, U.S. News (Assoc. Press Feb. 20, 2020), https://www.usnews.com/news/best-states/california/articles/2020-02-20/time-warner-cable-to-pay-188m-in-california-internet-case ...............................................................10

Weiser, Philip, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692 (2001) ...............................................................2

*What Are the States Where You Can Play Daily Fantasy Sports*, Legal Sports Report (2020), https://www.legalsportsreport.com/daily-fantasy-sports-blocked-allowed-states/ ...............11

**INTERESTS OF AMICI CURIAE**

Amici States of New York, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia file this brief in support of California's opposition to plaintiffs' motions for a preliminary injunction against enforcement of the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Stats. 2018, ch. 976 ("SB 822"). Amici have a strong interest in defending the States' sovereign right to exercise their police powers against unwarranted assertions of federal preemption. A critical aspect of the States' sovereignty is the ability to pass laws aimed at "guard[ing] the lives and health of their citizens." *License Cases*, 46 U.S. (5 How.) 504, 582-83 (1847). Our federalist system is designed to "allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Gonzalez v. Oregon*, 546 U.S. 243, 270 (2006) (quotation marks omitted). The States' authority to protect their residents through robust consumer protection and public safety laws has long been considered a critical exercise of such historic police powers. *See Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011).

In this case, the United States and several telecommunications industry groups assert that broadband internet access service (BIAS) providers are uniquely entitled to immunity from state regulatory authority, even when they engage in activities that harm consumers and undermine public safety. To the contrary, a BIAS provider that chooses to offer goods or services in a State must comply with that State's laws. And States have the historic police power to pass laws targeting industry-specific abuses occurring within their boundaries. Nothing in federal law disables the States from exercising such authority here. Over the years, amici have exercised their sovereign authority to promulgate and enforce numerous laws and regulations applicable to BIAS providers, including laws that, like SB 822, are aimed at protecting their residents from abusive business practices. And many amici successfully challenged the Federal Communications Commission (FCC)'s effort to preempt laws such as SB 822 by regulation. *See Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).

Amici have and intend to continue to exercise their police powers to protect their residents' health, safety, and welfare by ensuring access to broadband internet without improper interference by BIAS providers. Amici thus have a strong interest in opposing plaintiffs' unjustified attempt to curtail the States' authority to enact and enforce state laws affecting BIAS providers, and support California in opposing plaintiffs' motions to preliminarily enjoin the enforcement of SB 822.[1]

## ARGUMENT

### FEDERAL LAW DOES NOT CATEGORICALLY PREEMPT STATE REGULATION OF INTERNET SERVICE PROVIDERS

**A.      States Are Entitled to Regulate the Business Practices of Internet Service Providers Offering Services to Their Residents.**

"[B]ecause the States are independent sovereigns in our federal system," preemption analysis must begin "with the assumption that the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (quotation marks omitted). "[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case." *Id.* at 485 (quotation marks omitted). "Preemption is always a matter of congressional intent," even in cases involving agency regulations. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005).

Congress expressly acknowledged and sought to preserve the effect of state laws that, like SB 822, protect consumers and address unfair business practices by BIAS providers. In the Federal Communications Act of 1934 (the Communications Act) and the Telecommunications Act of 1996 (the 1996 Act), Congress endorsed active, affirmative, and meaningful state regulation of communications services, especially where such regulations fall within the States' traditional police powers. *See generally* Philip Weiser, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U. L. Rev. 1692, 1694 (2001). Among other things, the Communications Act preserves all state remedies available "at common law or by statute," 47 U.S.C. § 414, and embraces state authority in areas of traditional state concern—including state-law "requirements necessary to

---

[1] Amici focus here on preemption with respect to fixed BIAS, but fully support California's arguments with respect to why SB 822's provisions regarding mobile BIAS are not preempted. *See* Br. for Defendants (Def. Br.) at 37-40.

preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers," *id.* § 253(b). *See also id.* § 332(c)(3), (7). Congress reiterated its intent to preserve state regulation over communications providers in section 601(c)(1) of the 1996 Act, stating explicitly that the 1996 Act could not impair or modify state authority unless expressly provided. *See* Pub. L. No. 104-104, § 601(c)(1), 110 Stat. 56, 143 (1996) (codified at 47 U.S.C. § 152 note).

None of plaintiffs' meritless theories of preemption override these plain expressions of congressional intent to preserve rather than supplant state regulatory authority. First, the federal plaintiffs contend that Congress expressly preempted all state regulation of interstate communications in the Communications Act's jurisdictional provisions. *See* Br. for United States (U.S. Br.) at 22-24 (citing 47 U.S.C. §§ 151 and 152). The industry plaintiffs likewise argue that the entire field of interstate communications is preempted by federal law. *See* Br. for American Cable Association (ACA Br.) at 10-13. Neither version of this argument can be reconciled with the applicable statutes or case law.

The federal plaintiffs' express preemption argument has no basis in the text of the relevant statutes. To be sure, sections 151 and 152 confer jurisdiction upon the FCC with respect to interstate communications, while section 152(b) further denies the FCC jurisdiction over intrastate communications. But statutory provisions defining the scope of a federal agency's jurisdiction do not, standing alone, displace state authority—and especially not with respect to exercises of the States' historic police powers. *See English v. General Elec. Co.*, 496 U.S. 72, 87 (1990) ("[T]he mere existence of a federal regulatory or enforcement scheme . . . does not by itself imply pre-emption of state remedies."). Accordingly, federal regulation of communications "in general, does not completely preempt state law." *Metrophone Telecomms., Inc. v. Global Crossing Teles., Inc.*, 423 F.3d 1056, 1072-73 & n.10 (9th Cir. 2005). The federal plaintiffs point to no specific language in the Communications Act's definitional provisions that is expressly preemptive. Indeed, these statutes focus entirely on federal authority and are silent about state authority. In sharp contrast, other portions of the Communications Act contain carefully cabined express preemption clauses pertaining to specific interstate

communications services. *See, e.g.*, 47 U.S.C. § 253(a). Those more specific preemption clauses would be superfluous if the definitional provisions had already preempted all state regulation.

The industry plaintiffs' field preemption argument is equally flawed. Field preemption requires a showing that "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quotation marks omitted). But as explained *supra* (at 2-3), far from crowding States out of the field, Congress affirmatively embraced state authority over communications services in both the Communications Act and the 1996 Act. And the States, including amici, have routinely exercised their regulatory authority with respect to BIAS providers and other internet-based communications services, as Congress intended. See *infra* at 8-12. The Ninth Circuit has expressly held that the extensive role played by states in the regulation of interstate communications "preclude[s] a finding that Congress intended to completely occupy the field." *Ting v. AT&T*, 319 F.3d 1126, 1136-37 (9th Cir. 2003); *see also In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052, 1058 (9th Cir. 2007) (stating that the Communications Act "is fundamentally incompatible with complete field preemption"). Other courts of appeal have likewise rejected comparably sweeping claims of field preemption. *See, e.g., Johnson v. American Towers, LLC*, 781 F.3d 693, 703 (4th Cir. 2015); *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) ("[B]ecause state law expressly supplements federal law in the regulation of interstate telecommunications carriers, field preemption does not apply."). Notably, these cases rejected field preemption in the context of state regulation of interstate *telecommunications* services—services over which the FCC indisputably has more regulatory authority than the "information service" at issue here.[2]

Plaintiffs are also wrong to suggest (ACA Br. at 2, 9-11, 13; U.S. Br. at 17-18 & n.2) that their novel theories of express or field preemption were endorsed by the D.C. Circuit in *Mozilla*—a decision that instead rejected the FCC's attempt to preempt state regulatory authority. At issue in *Mozilla* was

---

[2] As explained in California's brief (at 8-9), the FCC in 2018 classified BIAS as an "information service" subject to Title I of the Communications Act, rather than as a "telecommunications service" subject to Title II. Unlike Title II, "Title I is not an independent source of regulatory authority . . . ." *California v. FCC*, 905 F.2d 1218, 1240-41 n.35 (9th Cir. 1990).

the legality of a 2018 FCC order which, among other things, withdrew certain federal net neutrality regulations and preempted "any state or local measures that would effectively impose rules or requirements that [the FCC] repealed or decided to refrain from imposing in th[e] order or that would impose more stringent requirements for any aspect of broadband service that [the FCC] address[ed] in this order." *See In re Restoring Internet Freedom*, 33 FCC Rcd. 311, 428 (2018) ("2018 Order"). While the D.C. Circuit upheld other aspects of the order, it vacated the FCC's preemption order in its entirety. *Mozilla*, 940 F.3d at 74-86. *Mozilla* did not hold, as industry plaintiffs contend (ACA Br. at 9-10), that the preemption order was unlawful only because it touched upon *intrastate* communications. Rather, *Mozilla* found that the preemption order's intrusion on state regulation of intrastate communications was *especially* egregious because such "preemption treads into an area . . . over which Congress expressly denied the Commission regulatory authority." *Id.* at 78-79 (quotation & alteration marks omitted). But *Mozilla* vacated the preemption order in its entirety, principally based on the conclusion that the FCC has no "authority to displace state laws" regulating information services because the FCC has no substantive regulatory authority over those services under Title I. *Id.* at 76. Moreover, *Mozilla* expressly noted "the Communications Act's vision of dual federal-state authority and cooperation in this area" including with respect to state laws governing business practices and commercial dealings, "categories to which broadband regulation is inextricably connected." *Id.* at 81. Thus, neither the relief nor the reasoning of *Mozilla* was limited to intrastate communications.

Plaintiffs' conflict preemption arguments fare no better. Conflict preemption requires a showing that state law "actually conflicts with federal law." *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). More specifically, a defendant must demonstrate either that "it is impossible for a private party to comply with both state and federal requirements," *English*, 496 U.S. at 79, or that the application of state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (quotation marks omitted). Neither standard is met here.

Conflict "[p]re-emption is ordinarily not to be implied absent an '*actual* conflict.'" *English*, 496 U.S. at 90 (emphasis added). This principle "enjoins seeking out conflicts between state and federal

regulation where none clearly exists." *Id.* (quotation and alteration marks omitted). As explained in California's brief (at 14-27), the 2018 Order cannot itself serve as the basis for conflict preemption because that order reflects the FCC's *absence* of regulatory authority over BIAS resulting from the agency's reclassification decision. The 2018 Order "is not an instance of affirmative deregulation, but rather a decision by the FCC that it lacked authority to regulate in the first place." *ACA Connects–Am.'s Commc'ns Ass'n v. Frey*, 20-cv-00055, No. 2020 WL 3799767, at *4 (D. Me. July 7, 2020). "[T]he FCC's abdication of authority" does not have preemptive effect and cannot be the basis of an impermissible conflict. *Id.*

It is immaterial that the 2018 Order was motivated by the FCC's current policy objective of immunizing BIAS providers from regulation through a purported "light touch" framework. ACA Br. at 18-23; U.S. Br. at 18. The Supreme Court has been clear that a national policy of deregulation cannot be enacted silently or by administrative fiat. The preemption of state laws represents "a serious intrusion into state sovereignty." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1904 (2019) (op. of Gorsuch, J.) (quotation marks omitted). Accordingly, "any [e]vidence of pre-emptive purpose, whether express or implied, must therefore be sought in the text and structure of the *statute* at issue." *Id.* at 1907 (op. of Gorsuch, J.) (emphasis added) (quotation marks omitted). "Without a [statutory] text that can . . . plausibly be interpreted as *prescribing* federal preemption it is impossible to find that a free market was mandated by federal law." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988) (emphasis added). Plaintiffs point to no such text here.

As an initial matter, the classification of BIAS as an information service is not mandated by Congress. Indeed, the D.C. Circuit has previously found that the statutory definitions governing classification support the treatment of BIAS as a telecommunications service subject to extensive regulation under Title II. *See United States Telecom Ass'n v. FCC*, 825 F.3d 674, 701-06 (D.C. Cir. 2015). To be sure, the D.C. Circuit has also upheld the reclassification of BIAS as an information service in light of the ambiguity in the relevant statutes. *Mozilla*, 940 F.3d at 23-35. But statutory ambiguity cannot evidence Congress's intent to preempt state law, and therefore cannot overcome the presumption against preemption. *See Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 693 (3d Cir. 2016). The

1  FCC's own "unenacted approvals, beliefs, and desires" with respect to classification are insufficient to

2  preempt. *See Isla Petroleum*, 485 U.S. at 501.

3       Moreover, there is no evidence that Congress intended to preempt state regulation of information

4  services, even if it had intended to subject information services to fewer regulations on the federal level.

5  Congress is well aware of how to preempt state laws. For example, while the 1996 Act expressly

6  authorizes preemption with respect to certain types of state regulation of *telecommunications* services,

7  *see*, *e.g.*, 47 U.S.C. § 253(a), the Act includes no such provision regarding *information* services. And in

8  section 601(c)(1) of the 1996 Act, Congress provided that there should be "no implied effect" from the

9  provisions of the 1996 Act, and that the legislation should not be construed "to modify, impair, or

10  supersede Federal, State, or local law unless expressly so provided." Pub. L. No. 104-104, 110 Stat. at

11  143. As then–FCC Commissioner (and now Chairman) Ajit Pai noted in 2015, "section 601(c) counsels

12  against any broad construction of the 1996 Act that would create an implicit conflict with state law." *In*

13  *re City of Wilson*, 30 FCC Rcd. 2408, 2512 (2015) (dissenting statement) (quotation and alteration marks

14  omitted), *order rev'd*, *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016). As California explains in its

15  brief (at 28-29), section 601(c)(1) thus "precludes an inference that state regulation of 'information

16  services' is impliedly preempted."

17       Plaintiffs also erroneously argue that the Communications Act precludes the States from

18  imposing "common carrier" regulations on information services. *See* ACA Br. at 14-18 (citing 47 U.S.C.

19  § 153(51)); U.S. Br. at 22. Section 153(51) provides that the FCC may impose common carrier

20  regulations on such an entity "only to the extent that [a carrier] is engaged in providing

21  telecommunications services." In *Verizon v. FCC*, the D.C. Circuit interpreted this statute to bar the FCC

22  from imposing regulations on information services that would prohibit blocking, throttling, and paid

23  prioritization. 740 F.3d 623, 656 (D.C. Cir. 2014). But Congress's apparent decision to bar *the FCC*

24  from promulgating certain types of regulations with respect to information services does not, standing

25  alone, prohibit *the States* from so acting. Because the States "entered the federal system with their

26  sovereignty intact," *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991), they do not require

27  Congress's authority or approval to exercise their historic police powers. *See Graham v. R.J. Reynolds*

28

BRIEF OF *AMICI CURIAE* STATES IN SUPPORT          7
OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

*Tobacco Co.*, 857 F.3d 1169, 1190 (11th Cir. 2017) ("Although federal agencies have only the authority granted to them by Congress, states are sovereign."). As sovereigns, States have their own inherent police powers to protect consumers, promote public health and safety, and regulate businesses operating within their borders. A "clear and manifest purpose" to preempt a state law that derives from the State's own sovereign authority cannot be derived solely from a congressional decision to strip a federal agency of jurisdiction. *Id*. at 1191.

**B.   Plaintiffs' Sweeping Theories of Preemption Would Undermine the States' Ability to Protect Consumers**

Plaintiffs ask this Court to recognize a sweeping preemption of state regulation that would leave BIAS almost completely unregulated, notwithstanding Congress's recognition of "broadband as a critical public infrastructure, increasingly important to the nation's economic development." Lennard G. Kruger et al., *The National Broadband Plan* 1 (Cong. Research Serv. July 2010). It is inconceivable that Congress would silently block States from regulating BIAS—a service that it has described as fundamental to, among other things, "consumer welfare, civic participation, public safety and homeland security, community development, health care delivery, energy independence and efficiency, education, worker training, private sector investment, entrepreneurial activity, job creation and economic growth." *See* American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001(k)(2)(D), 123 Stat. 115, 516. And the consequences of leaving BIAS unregulated would be especially stark now, as millions of Americans are entirely dependent on broadband internet access to work, study, and obtain food and other essential goods in light of the COVID-19 pandemic.

Contrary to plaintiffs' representations, BIAS providers are not entitled to special status among businesses offering goods or services in the States. States have ample authority to prohibit or regulate business practices by BIAS providers that harm consumers or jeopardize public health and safety. Several States have appropriately relied on this authority to promulgate net neutrality statutes, many of which plaintiffs have not challenged.[3] Maine, Nevada, and Minnesota have all enacted laws that require

---

[3] *See, e.g.*, Ch. 210, 2019 Colo. Laws; 5 Me. Rev. Stat. Ann. § 1541-B; Ch. 88, 2018 Or. Laws; No. 169, 2018 Vt. Acts & Resolves; Wash. Rev. Code ch. 19.385. More than twenty other States introduced net neutrality legislation in the 2020 legislative sessions alone. *See* Nat'l Conf. of State

BIAS providers to obtain permission from consumers before sharing data such as their web browsing history, application usage, or geographic location,[4] while other States have extended their data privacy laws to BIAS providers.[5] These types of regulations are akin to many other types of tailored industry-specific laws that States have enacted to protect the public.[6]

In addition to legislation, States have also used enforcement actions to police unfair, deceptive, or otherwise harmful business practices by internet service providers. In 2007, for example, 48 States and the District of Columbia reached a $3 million settlement agreement with America Online (AOL) regarding the company's cancellation policies, which had made it extremely challenging for customers to cancel their service. As part of the agreement, AOL was required to reform its cancellation practices and issue refunds to consumers who continued to be charged fees after trying to cancel their services.[7] In 2018, New York reached a $174 million settlement agreement with Charter Communications in a lawsuit involving the company's misrepresentations about the speed and reliability of their internet service.[8] Notably, Charter settled the case after unsuccessfully moving to dismiss the State's claims as preempted. *See People v. Charter Commc'ns, Inc.*, 162 A.D.3d 553 (N.Y. App. Div. 2018) (FCC regulation "does not preempt state laws that prevent fraud, deception and false advertising" (quotation

---

Legs., *Net Neutrality 2020 Legislation*, (Mar. 27, 2020) (internet) (For authorities available on the internet, URLs are listed in the table of authorities. All sites were last visited September 30, 2020.)

[4] *See* 35-A Me. Rev. Stat. Ann. § 9301; Minn. Stat. ch. 325M; Nev. Rev. Stat. § 205.498. More than a dozen States are considering comparable legislation. *See* Nat'l Conf. of State Legs., *2019-20 Privacy Legislation Related to Internet Service Providers* (June 29, 2020) (internet).

[5] *See, e.g.*, 815 Ill. Comp. Stat. 530/1 et. seq. (requiring data collector whose security system has been breached to notify Illinois Attorney General); 66 Pa. Cons. Stat. § 3019(d)(1) (prohibiting carriers from disclosing "information relating to any customer's patterns of use, equipment and network information and any accumulated records about customers" except name, address, and telephone number).

[6] *See, e.g.,* Conn. Gen. Stat. § 21a-217 (health club contracts); Del. Code Ann. tit. 6, ch. 24A (debt management services); Md. Code Ann., Com. Law § 14-3301 et. seq. (immigration consultants); 940 Mass. Code Regs. pt. 19 (retail marketing and sale of electricity); Minn. Stat. § 325F.693 (prohibiting telephone companies from slamming); N.J. Stat. Ann. § 49:3-53 (investment advisers); Or. Rev. Stat. § 646A.800 (regulating late fees for cable service); 37 Pa. Code ch. 301 (automotive industry trade practices).

[7] Press Release, National Ass'n of Att'ys Gen., *Attorneys General Announce Settlement with America Online Regarding Cancellation Issues* (July 12, 2007) (internet).

[8] Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Record $174.2 Million Consumer Fraud Settlement with Charter for Defrauding Internet Subscribers* (Dec. 18, 2018) (internet).

marks omitted)). Following the Charter settlement, New York reached agreements with four other BIAS providers—Altice, Frontier Communications, RCN, and Verizon—to reform their marketing and business practices regarding internet speed claims.[9] In March 2020, Pennsylvania reached a settlement agreement with Frontier involving similar allegations of false and deceptive speed claims.[10] Washington State has likewise brought numerous enforcement actions against major BIAS providers, including Charter, Comcast, Century Link, and Frontier, involving, among other things, claims of hidden or misleading fees.[11] In December 2019, Colorado and Oregon reached separate settlements with Century Link regarding the company's abusive marketing practices, including hidden fees and failure to provide promised discounts and refunds.[12]

Plaintiffs' preemption arguments would threaten such traditional and reasonable regulation of internet-based businesses. The 1996 Act's definition of "information service" could include not only BIAS providers but also entities such as email providers, text messaging systems, VoIP providers, video conferencing services, online gambling platforms, websites, and more.[13] Taken to its logical conclusion, plaintiffs' argument would preclude the States from regulating anything about these businesses because a federal agency purportedly desired a "light-touch approach" for all information services. *See* ACA Mem. at 6; U.S. Br. at 18. Plaintiffs offer no limiting principle that would avoid this absurd result, and the potential consequences of accepting plaintiffs' arguments could be substantial.

---

[9] Press Release, N.Y. Office of the Att'y Gen., *A.G. Underwood Announces Settlements Establishing Industry-Wide Standards for Marketing Internet Speeds* (Dec. 22, 2018) (internet).

[10] Nicholas Malfitano, *AG'S Office settles shoddy service claims with Internet provider Frontier Communications for $200K*, Penn. Record (Mar. 20, 2020) (internet). In February 2020, several California district attorneys resolved similar claims against Time Warner Cable (now owned by Charter). *See Time Warner Cable to Pay $18.8m in California Internet Case*, U.S. News (Assoc. Press Feb. 20, 2020) (internet).

[11] *State v. Frontier Commc'ns Corp.*, No. 20-2-01731-34 (Thurston County Super. Ct. July 20, 2020); *State v. Charter Commc'ns*, No. 20-2-00460-04 (Chelan County Super. Ct. July 27, 2020); *State v. CenturyLink, Inc.*, No. 19-2-32452-0 SEA (King County Super. Ct. Dec. 9, 2019); *State v. Comcast Cable Commc'ns Mgmt.,* No. 16-2-18224-1 SEA (King County Super. Ct. June 6, 2019).

[12] Press Release, Colo. Office of the Att'y Gen., *Attorney General Phil Weiser Announces CenturyLink Will Pay $8,476,000 for Charging Hidden Fees, Overbilling Colorado Customers* (Dec. 19, 2019) (internet); Press Release, Or. Office of the Att'y Gen., *AG Rosenblum Announces $4 Million Settlement with CenturyLink* (Dec. 31, 2019) (internet).

[13] *See, e.g.*, *Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 FCC Rcd. 12075 (2018) (classifying text messaging as information service).

States have passed numerous statutes and regulations addressed at the business practices of internet-based companies where those practices could potentially harm consumers or threaten public safety. Approximately twenty States have statutes or regulations governing daily fantasy sports games, which are provided over the internet or by smartphone application to customers in particular States.[14] Six States have legalized online casino gaming subject to affirmative state regulation, and several others are actively considering such legislation.[15] Many States have laws aimed at other types of electronic practices and internet-based industries. For example, Massachusetts regulates public virtual schools "whose teachers primarily teach from a remote location using the internet or other computer-based methods."[16] Delaware's "Safe Internet Pharmacy Act" regulates internet sites that dispense prescription drugs to patients within the State.[17] Illinois requires internet-based dating, child care, senior care, and home care services to disclose whether they perform criminal background checks on candidates listed on their sites and, if so, what types of background checks.[18] Multiple states including California, Connecticut, Delaware, Nevada, and Oregon have statutes governing the privacy policies and practices for websites or other online services.[19] California and Delaware also have specific statutes governing children's online privacy.[20]

States also routinely use their enforcement authority to regulate harmful business practices engaged in by internet-based companies. In 2006, Florida, Illinois, Massachusetts, Michigan, North Carolina, and Texas entered into a settlement agreement with Vonage regarding the company's failures

---

[14] Jake Lestock, *Tackling Daily Fantasy Sports in the States*, 26 Legis Brief no. 1 (Nat'l Conf. of State Legs. Jan. 2018) (internet); *see also What Are the States Where You Can Play Daily Fantasy Sports*, Legal Sports Report (2020) (internet).

[15] iDevelopment & Econ. Ass'n, *Bill Trackers: Online Gaming and Sports Betting Bills by State, Including Mobile Provisions* (Mar. 2020) (internet).

[16] Mass. Gen. L., ch. 71, § 94.

[17] Del. Code tit. 16, § 4741 et seq.

[18] 815 Ill. Comp. Stat. 518/1 et seq.

[19] *See* Cal. Bus. & Prof. Code §§ 22575-22578; Cal. Civ. Code §§ 1798.130(a)(5), 1798.135(a)(2)(A); Conn. Gen. Stat. § 42-471; Del. Code. Ann. tit. 6, ch. 12C; Nev. Rev. Stat. § 603A.340; Or. Rev. Stat. § 646.607.

[20] *See* Cal. Bus. & Prof. Code §§ 22580-22582; Del. Code Ann. tit. 6, ch. 12C.

to adequately disclose limitations in its 9-1-1 service provided through VoIP.[21] In 2009, 32 States reached a $3 million settlement with Vonage that required the company to change its marketing and cancellation policies with respect to VoIP service.[22] In 2013, 37 States and the District of Columbia reached settlements with Google regarding data and privacy abuses.[23] In 2016, Massachusetts obtained a preliminary injunction against an online auto title lender who had been making and collecting on illegal short-term loans in violation of state usury laws.[24] In May 2020, New York reached an agreement with Zoom Video Communications to provide security protections for users of its video conference platform.[25] In September 2020, Michigan reached a settlement with All Access Telecom, Inc., requiring that the VoIP provider substantially alter its practices with respect to robocalls.[26]

These are only a few examples of the critical state regulation and enforcement that could be jeopardized by plaintiffs' sweeping preemption theories. What these examples confirm is that the internet and internet-based services are integral to how people live, work, study, and entertain themselves. State regulation of BIAS is an example of the States' routine exercise of their historic police powers to protect consumers and ensure public safety. And contrary to plaintiffs' claims here, those powers have not been displaced by federal law.

---

[21] Press Release, Ill. Office of the Att'y Gen., *Madigan Announces Settlement with VoIP Provider Requiring Improved 911 Disclosures* (Dec. 14, 2006) (internet).

[22] Chris Rizo, *VONAGE Agrees to $3 Million Multistate Settlement*, Legal Newsline (Nov. 16, 2009) (internet).

[23] *See* Claire Cain Miller, *Google to Pay $17 Million to Settle Privacy Case*, N.Y. Times (Nov. 18, 2013) (internet); Adi Robertson, *Google Settles Street View Privacy Case with 38 States for $7 Million*, The Verge (Mar. 12, 2013) (internet).

[24] Press Release, Mass. Office of the Att'y Gen., *AG Stops Online Auto Title Lender from Collection on Illegal Loans Made to Massachusetts Consumers* (Mar. 18, 2016) (internet).

[25] Press Release, N.Y. Office of the Att'y Gen., *Attorney General James Secures New Protections, Security Safeguards for All Zoom Users* (May 7, 2020) (internet).

[26] Press Release, Mich. Office of the Att'y Gen., *AG Nessel Announces Significant Settlement with Telecom Carrier Focused on Innovative Robocall Mitigation Measures* (Sept. 11, 2020) (internet).

BRIEF OF *AMICI CURIAE* STATES IN SUPPORT                    12
OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION

## CONCLUSION

For these reasons, as well as the reasons stated in California's brief, the court should deny plaintiffs' motions for a preliminary injunction.

Dated:     New York, NY
           September 30, 2020

                                        Respectfully submitted,

                                        LETITIA JAMES
                                         *Attorney General*
                                         *State of New York*
                                        BARBARA D. UNDERWOOD
                                         *Solicitor General*
                                        STEVEN C. WU
                                         *Deputy Solicitor General*

                              By:    */s/ Ester Murdukhayeva*
                                        Ester Murdukhayeva*
                                        Assistant Solicitor General

                                        28 Liberty Street
                                        New York, NY 10005
                                        (212) 416-6279


                                        *Admitted pro hac vice*

*(Counsel list continues on next page.)*

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT  06106

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

CLARE E. CONNORS
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 W. Randolph Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
    *Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King
Jr. Blvd
Saint Paul, MN 55101

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice
Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street, N.E.
Salem, OR 97301

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
Strawberry Square, 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *Rhode Island*
150 South Main Street
Providence, RI 02903

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609-1001

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA KAUL
  *Attorney General*
  *State of Wisconsin*
P.O. Box 7857
Madison, WI 53707

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 30, 2020, I served the accompanying document on all parties by filing the document with Clerk's Office using the U.S. District Court for the Eastern District of California's Electronic Document Filing System.

By:   _/s/ Ester Murdukhayeva_
      Ester Murdukhayeva