1   Michael J. Burstein (pro hac vice pending)
    c/o Benjamin N. Cardozo School of Law
2   55 Fifth Avenue
    New York, NY 10003
3   (212)790-0307
    mburstei@yu.edu
4
    Phillip R. Malone (SBN 163969)
5   Juelsgaard Intellectual Property and Innovation
    Clinic
6   Mills Legal Clinic at Stanford Law School
    Crown Quadrangle, 559 Nathan Abbott Way
7   Stanford, CA 94305-8610
    (650) 724-1900
8   pmalone@stanford.edu

9   *Counsel for Amici Curiae*

10

11                  **IN THE UNITED STATES DISTRICT COURT**

12                **FOR THE EASTERN DISTRICT OF CALIFORNIA**

13

14  **THE UNITED STATES OF AMERICA,**          2:18-cv-02660-JAM-DB
                                                2:18-cv-02684-JAM-DB
15                              Plaintiff,
                                                **BRIEF OF PROFESSORS OF INTERNET
16       v.                                     LAW AS *AMICI CURIAE* IN SUPPORT OF
                                                OPPOSITION TO PRELIMINARY
17                                              INJUNCTION MOTIONS**
18  **THE STATE OF CALIFORNIA, et al.,**
                                                Judge:        The Hon. John A. Mendez
19                             Defendants.      Actions Filed: Oct. 1, 2018; Oct. 3, 2018

20  **AMERICAN CABLE ASSOCIATION,
    CTIA – THE WIRELESS ASSOCIATION, et
21  al.,**

22                             Plaintiffs,

23       v.

24  **XAVIER BECERRA, in his official capacity
    as Attorney General of California,**
25
                               Defendant.
26

27

28

1

## TABLE OF CONTENTS

2

INTEREST OF AMICI CURIAE ................................................................................... 1

3

INTRODUCTION ........................................................................................................... 1

4

ARGUMENT ................................................................................................................... 2

5

6

    I.     THE COMMUNICATIONS ACT DOES NOT PREEMPT
            THE FIELD OF INTERSTATE COMMUNICATIONS ............................................. 2

7

8

        A.  The Communications Act's grant of federal authority to
            regulate interstate communications does not divest the states
            wholesale of their own ability to regulate ............................................... 2

9

10

        B.  States' long-established role regulating interstate
            communications belies any claim to field preemption ........................... 6

11

    II.    THE COMMUNICATIONS ACT DOES NOT PREEMPT
           THE FIELD OF INFORMATION SERVICES ............................................................. 8

12

13

    III.   AT A MINIMUM, STATES RETAIN THE POWER TO
          REGULATE PURELY INTRASTATE ASPECTS OF
          BROADBAND INTERNET ACCESS SERVICE ..................................................... 14

14

15

CONCLUSION ............................................................................................................. 15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. City of Rancho Palos Verdes*,
    354 F.3d 1094 (9th Cir. 2004)............................................................11

*Aguayo v. U.S. Bank*,
    653 F.3d 912 (9th Cir. 2011)..............................................................5

*Arizona v. United States*,
    567 U.S. 387 (2012)............................................................2, 9

*AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*,
    349 F.3d 402 (7th Cir. 2003)............................................................11

*Bond v. United States*,
    572 U.S. 844 (2014)............................................................2

*California v. FCC*,
    905 F.2d 1217 (9th Cir. 1990)............................................................5, 6, 14

*Capital Cities Cable, Inc v. Crisp*,
    467 U.S. 691 (1984)............................................................4

*Charter Advanced Servs. (MN), LLC v. Lange*,
    903 F.3d 715 (8th Cir. 2018)............................................................12

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992)............................................................7

*City of Dallas, Tex. v. FCC*,
    165 F.3d 341 (5th Cir. 1999)............................................................11

*Comcast Corp. v. FCC*,
    600 F.3d 642 (D.C. Cir. 2010) ............................................................ *passim*

*Computer & Commn'cs Indus. Ass'n v. FCC*,
    693 F.2d 198 (D.C. Cir. 1982)............................................................6

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993)............................................................9

*Farina v. Nokia Inc.*,
    625 F.3d 97 (3d Cir. 2010)............................................................11

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014)............................................................5, 11, 13

*Head v. New Mexico Board of Examiners in Optometry,*
   374 U.S. 424 (1963) ................................................................................4

*Hillsborough County, Fla. v. Automated Med. Labs., Inc.,*
   471 U.S. 707 (1985) ................................................................................3

*Ivy Broad. Co. v. AT&T Co.,*
   391 F.2d 486 (2d Cir. 1968) ...................................................................4

*Kansas v. Garcia,*
   140 S. Ct. 791 (2020) .......................................................................2, 9, 13

*Kurns v. Railroad Friction Prods. Corp.,*
   565 U.S. 625 (2012) (Kagan, J., concurring) ........................................3

*Louisiana Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) (*Louisiana PSC*) ...............................................14

*Metrophones Telecommunications, Inc. v. Global Crossings,*
   423 F.3d 1056 (9th Cir. 2005) ...............................................................5

*Minnesota Pub. Utils. Comm'n v. FCC,*
   483 F.3d 570 (8th Cir. 2007) ................................................................12

*Mozilla Corp. v. FCC,*
   940 F.3d 1 (D.C. Cir. 2019) ...................................................... *passim*

*NARUC v. FCC,*
   746 F.2d 1492 (D.C. Cir. 1984) .............................................................4

*National Association of Regulatory Utility Commissioners v. FCC,*
   533 F.2d 601 (D.C. Cir. 1976) ................................................5, 6, 12, 13

*New York State Dep't of Social Servs. v. Dublino,*
   413 U.S. 405 (1973) ..............................................................................3, 6

*O'Melveny & Myers v. FDIC,*
   512 U.S. 79 (1994) ..................................................................................6

*Pinney v. Nokia,*
   402 F.3d 430 (4th Cir. 2005) ................................................................11

*Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.,*
   251 U.S. 27 (1919) ..................................................................................4

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.,*
   485 U.S. 495 (1988) ............................................................................9, 10

*Quik Payday, Inc. v. Stork,*
   549 F.3d 1302 (10th Cir. 2008) ............................................................13

iii

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
  537 U.S. 51 (2002) ........................................................................................9

*State Corp. Comm'n of Kan. v. FCC*,
  787 F.2d 1421 (10th Cir. 1986) ....................................................................4

*Ting v. AT&T*,
  319 F.3d 1126 (9th Cir. 2003) ...................................................................5, 8

*Towery v. Brewer*,
  672 F.3d 650 (9th Cir. 2012) .......................................................................14

*United States v. Midwest Video Corp.*,
  406 U.S. 649 (1972) ......................................................................................5

*United States Telecom Ass.'n v. FCC*,
  825 F.3d 674 (2016) ....................................................................................12

*Verizon Md., Inc. v. Global NAPS, Inc.*,
  377 F.3d 355 (4th Cir. 2004) .......................................................................11

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) .....................................................................12

*Virginia Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019) ...................................................................7, 8, 10, 13

*In the Matter of Vonage Holdings Corp.*,
  19 F.C.C. Rcd. 22404 ...................................................................................12

*Western Union Tel. Co. v Boegli*,
  251 U.S. 315 (1920) ......................................................................................4

*Worldcom, Inc. v. Graphnet, Inc.*,
  343 F.3d 651 (3d Cir. 2003) ..........................................................................4

**Statutes**

47 U.S.C. § 153 ..................................................................................4, 8, 10

47 U.S.C. § 160 ..................................................................................................8

47 U.S.C. § 223(f)(2) ........................................................................................7

47 U.S.C. § 230 ...............................................................................7, 9, 11, 12

47 U.S.C. § 251(g) .............................................................................................9

47 U.S.C. § 253 ...................................................................................6, 7, 10

47 U.S.C. §303(v) ...................................................................................................10

Atomic Energy Act .....................................................................................................7

Communications Act............................................................................................ *passim*

Communications Decency Act....................................................................................11

Telecommunications Act of 1996 .........................................................................10, 11

**Other Authorities**

FCC, *Voice over Internet Protocol* (December 30, 2019),
    https://www.fcc.gov/consumers/guides/voice-over-internet-protocol-voip ............................12

H.R. Rep. No. 104-458 (1996).................................................................................10

**INTEREST OF AMICI CURIAE**

*Amici* are law professors who write about and teach internet law.[1] *Amici* take no or

varying positions on the merits of California's SB 822, the "California Internet Consumer

Protection and Net Neutrality Act of 2018." But they have a shared interest in ensuring the proper

balance between state and federal internet regulation that affects not only internet access but also

the full range of consumer protections for other online services that states like California may

extend to their citizens. *Amici* submit this brief to articulate their scholarly view of the proper

reach of federal preemption of interstate communications. *Amici* are (institutions are listed for

identification purposes only):

**Michael J. Burstein**, Vice Dean and Professor of Law, Cardozo Law School;

**Brett M. Frischmann**, Charles Widger Endowed University Professor in Law, Business

and Economics, Villanova University;

**Chris Jay Hoofnagle**, Professor of Law *In Residence*, University of California, Berkeley,

School of Law;

**Lawrence Lessig**, Roy L. Furman Professor of Law and Leadership, Harvard Law

School;

**Pamela Samuelson**, Richard M. Sherman Distinguished Professor of Law, University of

California, Berkeley, School of Law;

**Jason M. Schultz**, Professor of Clinical Law, New York University School of Law; and

**Barbara van Schewick**, Professor of Law and (by Courtesy) Electrical Engineering,

Helen L. Crocker Faculty Scholar, Stanford Law School.

**INTRODUCTION**

Plaintiffs argue that SB 822 is preempted because this is one of those "rare cases" in

which "Congress has 'legislated so comprehensively' in a particular field that it 'left no room for

supplementary state legislation.'" *Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020) (quoting *R.J.*

---

[1] Amici certify that that no counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1  *Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). "In order to determine

2  whether Congress has implicitly ousted the States from regulating in a particular field, [courts]

3  must first identify the field." *Id.* Both the United States and the ISP Plaintiffs identify the field as

4  "interstate communications." US Br. at 22; ISP Br. at 10-11. This is a sweeping claim. If

5  accepted, it would bar the states from regulating broad areas of traditional local concern—

6  including protecting consumers, public health, and public safety—with respect to providers of

7  interstate communications. In many cases, such preemption would leave both the FCC and the

8  states without authority to regulate. Neither the "text and structure of the statute at issue," *Kansas*,

9  140 S. Ct. at 804 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)), nor the

10  long history of judicial decisions interpreting the scope of federal preemption under the

11  Communications Act of 1934 ("Communications Act" or "Act") supports the Plaintiffs' argument

12  that the federal government has claimed the exclusive right to regulate all aspects of interstate

13  communication. Even if the Plaintiffs' claim were to be limited to "interstate information

14  services," which it does not appear to be, that narrower field is still not subject to "a framework of

15  regulation so pervasive that Congress left no room for the States to supplement it." *Arizona v.*

16  *United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and alterations omitted).

17  **ARGUMENT**

18  **I.    THE COMMUNICATIONS ACT DOES NOT PREEMPT THE FIELD OF**
    **INTERSTATE COMMUNICATIONS**
19

20        Plaintiffs attempt to manufacture preemption from the Communications Act's grant of

21  jurisdiction over interstate communications to the FCC. But there is nothing in the Act that

22  suggests that jurisdiction is exclusive as to the entire field, and much to affirm that it is not. Like

23  most federal laws, the Act leaves intact the states' preexisting police powers – the "broad

24  authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854

25  (2014). The states' exercise of these powers is, of course, limited by express preemption – in the

26  Act itself or through FCC actions within the scope of its delegated authority; by ordinary

27  principles of field (with respect to certain narrower fields) and conflict preemption, as applicable;

28  and by the Dormant Commerce Clause.

2

**A.**    **The Communications Act's grant of federal authority to regulate interstate communications does not divest the states wholesale of their own ability to regulate**

The Communications Act grants the FCC authority to regulate interstate communications. Plaintiffs contend that this statutory authorization simultaneously ousts the states from regulating in the field. But the Supreme Court has long held that authority to regulate does not, standing alone, give rise to preemption. *See, e.g.*, *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985) (holding that FDA authority to regulate does not preempt the field); *New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415 (1973) ("We reject…the contention that pre-emption is to be inferred merely from the comprehensive character of the [regulatory scheme]."); *see also Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring) (noting that "[u]nder our more recent cases," "Congress must do much more to oust all of state law from a field" than "grant[] regulatory authority over that subject matter to a federal agency"). Instead, the "text and structure" of the Act belie any claim that the statute impliedly preempts the entire field of "interstate communications."

Contrary to the federal government's argument (US Br. at 22), §§ 151 and 152 of the Communications Act, 47 U.S.C. §§ 151, 152, do not suggest that Congress intended federal law to occupy the entire field of interstate communications. Section 151 is a bare statement of policy, which describes the Act's "purpose of regulating interstate and foreign commerce in communication by wire and radio." *See Comcast Corp. v. FCC*, 600 F.3d 642, 652 (D.C. Cir. 2010) (holding that § 151 is a "statement of policy that . . . delegate[s] no regulatory authority"). Section 152(a) defines the scope of the Act, stating that the Act's provisions "shall apply to all interstate and foreign communication by wire or radio." Similarly, § 152(b) is a limitation on the FCC's jurisdiction, precluding it from regulating intrastate communications except in certain circumstances.[2] None of these provisions can be read to suggest that any authority they convey is

---

[2] The United States asserts that its preemption argument can be "understood as a form of express preemption, with the Communications Act explicitly precluding state regulation over interstate communications." US Br. at 23. The government provides no support for this assertion. Nor can it. Sections 151 and 152 say nothing about preemption. As described above, that statutory silence does not even give rise to an *inference* of preemption; it certainly does not constitute an expression of preemption.

1    to be exclusive of the states. Similarly, none of the cases that Plaintiffs cite to interpret these

2    provisions holds that they work to preempt the entire field of "interstate communications."

3    Instead, they merely use §§ 151-152 to describe the reach of the FCC's *jurisdiction*, while

4    reaching far more limited preemption holdings,[3] or no preemption holdings at all.[4]

5         This reading of the statutory text is supported by the structure of the Communications Act.

6    There *are* some aspects of interstate communications that Congress has seen fit to regulate

7    pervasively. When the FCC applies Title II tariff regulations to common carriers for example, it

8    arguably preempts the field of ratemaking with respect to those carriers' services. *See, e.g.*, *Ivy*

9    *Broad.*, 391 F.2d at 490. But even in those cases, courts have been careful to delimit the scope of

10   field preemption. In *Ivy Broadcasting*, the Court held only that "the *duties, charges and liabilities*

11   of telegraph or telephone companies with respect to interstate communications are to be governed

12   solely by federal law." 391 F.2d at 491 (emphasis added). The "liability of communications

13   carriers [i.e., of "common carriers," 47 § U.S.C. 153(11)] with respect to interstate services," *id*.

14   at 492, is far narrower than the whole of "interstate communications."

15        Indeed, courts interpreting the Communications Act have been skeptical of field

16   preemption claims in much narrower fields narrower than "interstate communications." In *Head*

17   *v. New Mexico Board of Examiners in Optometry*, 374 U.S. 424 (1963), the Supreme Court

18   rejected field preemption of radio broadcast—a subset of interstate communications—despite the

19   broad and comprehensive authority granted the FCC to issue broadcast licenses. *See id*. at 429-32.

20   _____

21        [3] A number of cases uphold express preemption decisions by the FCC based on its statutory authority (as opposed to claims of field preemption arising from the Act). *See, e.g.*,

22   *Capital Cities Cable, Inc v. Crisp*, 467 U.S. 691, 701-02 (1984) (express preemption by FCC based on ancillary authority); *State Corp. Comm'n of Kan. v. FCC*, 787 F.2d 1421, 1427 (10th Cir. 1986) (express preemption by FCC based on direct authority); *NARUC v. FCC*, 746 F.2d 1492,

23   1498-1501 & n.6 (D.C. Cir. 1984) (express preemption by FCC based on authority over interstate telecommunications services). Others find field preemption of different, much narrower fields

24   that are more pervasively regulated than the field of interstate communications. *See, e.g.*, *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968) (field preemption of tariff filing

25   requirements for interstate telephone services); *Postal-Tel. Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919) (field preemption of interstate business of telegraph companies under

26   Mann-Elkins Act of 1910); *Western Union Tel. Co. v Boegli*, 251 U.S. 315 (1920) (same).

27        [4] *E.g., Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003) (federal question jurisdiction over contract dispute between telecommunications carriers).

28

4

1    More recently, the Ninth Circuit has held that the field of online video closed captioning is not

2    preempted despite extensive regulation of television and online captioning. *See Greater L.A.*

3    *Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 428-29 (9th Cir. 2014)

4    (*GLAAD*). To the same effect are *Metrophones Telecommunications, Inc. v. Global Crossings*,

5    423 F.3d 1056, 1072 (9th Cir. 2005), with respect to payphones, and *Ting v. AT&T*, 319 F.3d

6    1126, 1136-37 (9th Cir. 2003), with respect to long-distance consumer contracts. If federal law

7    does not preempt those narrow fields—radio broadcast, online video captioning, payphones, and

8    long-distance contracts—then *a fortiori* it does not preempt the broader field of interstate

9    communications.

10       The Communications Act, moreover, does not pervasively regulate *all* aspects of interstate

11   communications. Plaintiffs thus cannot show that "the mere volume and complexity of federal

12   regulations demonstrate an implicit congressional intent to displace all state law" in the field.

13   *Aguayo v. U.S. Bank*, 653 F.3d 912, 918 (9th Cir. 2011). Some aspects of interstate

14   communications are subject to little or no affirmative regulation. It has long been established, and

15   the court in *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), reaffirmed, that the FCC's

16   "ancillary authority" to fill these gaps where it lacks express authority to regulate is limited. *See*

17   *id.* at 75-76 (citing *California v. FCC*, 905 F.2d 1217 (9th Cir. 1990)). Outside of regulating

18   telecommunications services (Title II of the Act), radio transmissions (Title III), or cable services

19   (Title VI), the FCC has no "independent source of regulatory authority." *California*, 905 F.2d at

20   1240 n.35. Instead, in areas of interstate communications not covered by those sections of the

21   Act, such as cable services prior to the enactment of Title VI, *see United States v. Midwest Video*

22   *Corp.*, 406 U.S. 649 (1972), the FCC can only act to the extent that doing so "is reasonably

23   ancillary to the Commission's effective performance of its statutorily mandated responsibilities."

24   *Mozilla*, 940 F.3d at 76 (quotation marks omitted).

25       Because the authority to preempt is the flip side of the authority to regulate, *see Mozilla*,

26   940 F.3d at 75 ("[I]n any area where the Commission lacks the authority to regulate, it equally

27   lacks the power to preempt state law."), the scope of the FCC's ancillary authority has often been

28   determined in the context of preemption disputes. In *National Association of Regulatory Utility*

5

1    *Commissioners v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) (*NARUC II*), for example, the court

2    vacated the FCC's preemption of state regulations of two-way, non-video uses of cable systems,

3    because the FCC lacked ancillary authority to regulate these services. If the Act actually

4    preempted the field of interstate communications, the court would have upheld the preemption of

5    state regulation of the interstate aspects of these services.[5] *See also California*, 905 F.2d at 1240

6    n.35; *Computer & Commn'cs Indus. Ass'n v. FCC*, 693 F.2d 198, 214-18 (D.C. Cir. 1982);

7    *Comcast*, 600 F.3d at 650-51, 653, 654-658 (discussing and affirming cases); Brief of Professors

8    of Communications Law as Amici Curiae in Support of Petitioners 6-10, 18-21, *Mozilla Corp. v.*

9    *FCC*, 940 F.3d 1 (D.C. Cir. 2019) (Nos. 18-1051 et al.) (discussing cases) [Mozilla Professors'

10   Br.]. The careful examination of ancillary authority in these cases would have been unnecessary if

11   the Act already preempted the field of interstate communications.

12          Finally, the fact that Congress chose pervasively to regulate only some but not all aspects

13   of interstate communications suggests that Congress did not intend federal law to occupy the

14   field. Quite the opposite, it suggests that Congress knew how to engage in pervasive regulation

15   and affirmatively chose not to do so with respect to the entire field of interstate communications.

16   It is not for courts to "adopt a court-made rule to supplement federal statutory regulation that is

17   comprehensive and detailed; matters left unaddressed in such a scheme are presumably left

18   subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85

19   (1994).

20          **B.      States' long-established role regulating interstate communications belies any
                      claim to field preemption**

21

22          The Communications Act has long incorporated a "vision of dual federal-state authority

23   and cooperation" in interstate communications, *Mozilla*, 940 F.3d at 81, that precludes a finding

24   of field preemption. "Where coordinate state and federal efforts exist within a complementary

25   administrative framework, and in the pursuit of common purposes, the case for federal pre-

26          _____

            [5] The majority in *NARUC II* held that the entire preemption was invalid because it was not
27   "reasonably ancillary" to the FCC's statutory responsibilities. *Id.* at 612-614, 621-622. Only one
     judge found that the FCC also lacked authority to preempt because it was preempting state
28   regulation of intrastate services. Contra id. at 621-23 (Lumbard, J., concurring).

6

Brief of Amici Curiae Internet Law Scholars in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)

1   emption becomes a less persuasive one." *Dublino*, 413 U.S. at 421

2          For one thing, numerous provisions of the Act specifically preserve a role for the states in

3   interstate communications. *See, e.g.*, 47 U.S.C. §§ 253(b) ("Nothing in this section shall affect the

4   ability of a State to impose . . . requirements necessary to preserve and advance universal service,

5   protect the public safety and welfare, ensure the continued quality of telecommunications

6   services, and safeguard the rights of consumers"), 253(c) ("Nothing in this section affects the

7   authority of a State or local government to manage the public rights-of-way or to require fair and

8   reasonable compensation from telecommunications providers . . . for use of public rights-of-

9   way"). Even with respect to broadband internet access service (BIAS), the FCC has recognized

10  the states' role in "policing such matters as fraud, taxation, and general commercial dealings,"

11  Declaratory Ruling, Report, and Order, and Order, *Restoring Internet Freedom*, 33 FCC Rcd. 311

12  ¶ 196 (2018), "remedying violations of a wide variety of general state laws," *id.* ¶ 196 n.732, and

13  "enforcing fair business practices," *id.* ¶ 196.

14         For another, the Act contains numerous express preemption provisions. *See, e.g.*, 47

15  U.S.C. §§ 223(f)(2), 230(e)(3), 253(a), 253(d), 276(c), 543(a)(1), 544(e), 556(c). "Congress's

16  enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond

17  that reach are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992). Some

18  of these express preemption provisions, moreover, are predicated on the assumption that states

19  generally have the concurrent authority to regulate interstate communications, even if the Act

20  displaces that authority in specific cases. For example, the Act prohibits state laws that "prohibit

21  or have the effect of prohibiting the ability of any entity to provide any interstate […]

22  telecommunications service" in 47 U.S.C. § 253(a) and grants authority to the FCC to preempt

23  such laws on a case-by-case basis in 47 U.S.C. § 253(d). These provisions would be unnecessary

24  if states were already categorically precluded from regulating any interstate communications,

25  which includes interstate telecommunications services.

26         Concurrent federal and state authority to regulate interstate communications is also

27  consistent with the general principle of federal preemption law that state authority is maintained

28  when Congress decides to regulate some aspects of a field but not others. In *Virginia Uranium,*

7

1    *Inc. v. Warren*, 139 S. Ct. 1894 (2019), for example, the Atomic Energy Act gave the Nuclear

2    Regulatory Commission (NRC) broad authority to regulate the nuclear power industry, including

3    the "milling, transfer, use, and disposal of uranium." *Id.* at 1900. The NRC nevertheless

4    concluded, as the FCC did in this case, that its authority did not extend to one aspect of the

5    field—uranium mining on private land. The Supreme Court declined to find the field preempted

6    in part because it concluded that Congress would not likely have left "both state and federal

7    authorities . . . unable to regulate." *Id.* at 1903 (plurality); *see also id.* at 1912 (Ginsburg, J.,

8    concurring in the judgment) ("[I]f Congress did not provide for regulation of private conventional

9    mining, it is hard to see how or why state law on the subject would be preempted."). The Ninth

10   Circuit reached a similar conclusion with respect to the Communications Act in *Ting*. In that case,

11   the FCC exercised its forbearance authority under 47 U.S.C. § 160 to relieve long distance

12   carriers of the obligation to file tariffed rates. The court rejected the argument that such

13   deregulation *also* ousted the states from regulating to protect consumers, reasoning that state law

14   always operated in the background of federal regulation, and the FCC's act of forbearance

15   therefore "created a much larger role for state law." *Id.* at 1137. The court found "th[at] fact

16   sufficient to preclude a finding that Congress intended completely to occupy the field." *Id.*

17          So too in this case, state consumer protection and other state laws co-exist with federal

18   regulation of various aspects of interstate communications. Were this Court to find the entire field

19   of interstate communications preempted, California and other states would be powerless to

20   safeguard public health and public safety and protect their citizens from a wide range of potential

21   harms, from garden-variety fraud to sophisticated violations of their state law privacy rights.

22   There is no evidence that Congress intended to divest the states of such a wide swath of

23   regulatory authority and create regulatory voids—where neither the FCC nor the states could

24   regulate—in areas not expressly regulated by the Act.

25   **II.    THE COMMUNICATIONS ACT DOES NOT PREEMPT THE FIELD OF**
26   **        INFORMATION SERVICES**

            Even if Plaintiffs' field preemption claim were limited to a narrower field—and it is not—

27

28   the claim still fails. There is no evidence that the Act preempts the fields of interstate information

8

1    services or interstate broadband internet access service, and significant evidence to the contrary.

2         Information services, "offering[s] of a capability for generating, acquiring, storing,

3    transforming, processing, retrieving, utilizing, or making available information via

4    telecommunications," 47 U.S.C. § 153(24), are subject to regulation only under Title I of the Act.

5    *See Comcast*, 600 F.3d at 645-46. This category includes online content, and many applications

6    and services, such as email, websites, social media, online gaming, various online video services,

7    and, since 2018, broadband internet access service. As described above, *see supra* at 5-6, the

8    FCC's regulatory authority under that title is limited to that which is "reasonably ancillary to the

9    Commission's effective performance of its statutorily mandated responsibilities." *Id.* at 646

10   (quoting *American Library Ass'n v. FCC*, 406 F.3d, 689, 691-92 (D.C. Cir. 2005)). That limited

11   authority is hardly the kind of "comprehensive[]," *Kansas*, 140 S. Ct. at 804, or "pervasive,"

12   *Arizona*, 567 U.S. at 399, regulation that ordinarily gives rise to an inference that Congress has

13   intended wholly to occupy the field. It is, in fact, the opposite—a congressional abdication of

14   regulatory authority.[6]

15        To believe that Congress preempted the field of interstate information services, then, one

16   must believe that Congress intended *neither* the federal government *nor* the states to have

17   authority to regulate them. Although "congressional creation of such a regime" may be possible,

18   "to say that it can be created is not to say that it can be created subtly." *Puerto Rico Dep't of*

19   *Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 501 (1988). Courts will not lightly infer

20   congressional intent to mandate that a field be unregulated by anyone. *See id.* at 503-04 (rejecting

21   the argument that Congress's repeal of federal regulation left in place field preemption that

22   precluded state regulation to fill regulatory void); *Sprietsma v. Mercury Marine, a Div. of*

23   *Brunswick Corp.*, 537 U.S. 51, 68-70 (2002) (finding no field preemption in federally unregulated

24   field absent "clear and manifest" evidence of congressional purpose). As in any case, "[e]vidence

25   _____

26        [6] The only express references in the 1996 Act to information services are found in the
     context of regulating *other* aspects of interstate communications. *See, e.g.*, 47 U.S.C. §§ 251(g)
     (interconnection); 259(a) (local loop unbundling); 1002(b)(2) (assistance to law enforcement).
27   One section, 47 U.S.C. § 230(c), (d), regulates interactive computer services, which can in some
     cases include information services, *see id.* § 230(f)(2).

28

9

1    of pre-emptive purpose is sought in the text and structure of the statute at issue," *CSX Transp.,*

2    *Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), and not in hypothesized "abstract and unenacted

3    legislative desires" that cannot be found in the statute itself. *Virginia Uranium*, 139 S. Ct. at 1907

4    (plurality op.). Plaintiffs can point to no convincing evidence—subtle or otherwise—that

5    Congress intended to leave information services completely free from state or federal regulation,

6    leaving behind "a pre-emptive grin without a statutory cat." *Isla Petroleum*, 485 U.S. at 504.

7            We begin with the text, structure, and history of the Telecommunications Act of 1996,

8    Pub. L. 104-104, 110 Stat. 56 ("1996 Act"), which defined "information services" for the first

9    time in federal law, *see* 47 U.S.C. § 153(24), but does not directly regulate them or give the FCC

10   any direct authority over them. Nothing in the text or legislative history of the 1996 Act says

11   anything about preemption with respect to information services.

12           This statutory silence speaks volumes compared to the range of express preemption

13   provisions elsewhere in the 1996 Act, which carefully calibrate federal-state responsibilities,

14   often striking different balances. Some provisions give the FCC "exclusive jurisdiction," *e.g.*, 47

15   U.S.C. §303(v). Others couple an express preemption provision with multiple savings clauses,

16   *e.g.*, *id.* §§ 223(f)(2), 253(a)-(d). Some directly preempt state law, *e.g.*, *id.* § 303(v), while others

17   authorize the FCC to do so case by case after notice and comment, *e.g.*, *id.* § 253(d). Legislative

18   history suggests that these provisions were extensively negotiated. *See, e.g.*, Def. Br. 30 & n.28.

19   Against this statutory backdrop, Congress's silence on preemption of state regulation of

20   information services forecloses any inference that Congress meant to preclude the states from

21   using their preexisting regulatory authority to regulate them.

22           Indeed, the 1996 Act went even farther, specifically forbidding courts and agencies from

23   implying preemption by anything in the 1996 Act other than its express preemption provisions. In

24   a section entitled "No implied effect," the 1996 Act states: "This Act and the amendments made

25   by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law

26   unless *expressly* so provided in such Act or amendments." Pub. L. No. 104-104 § 601(c)(1), 110

27   Stat. 56, 143 (codified at 47 U.S.C. § 152 note) (emphasis added). As the conference report

28   accompanying the bill explains, § 601(c)(1) "prevents affected parties from asserting that the bill

10

1    impliedly preempts other laws." H.R. Rep. No. 104-458, at 201 (1996).

2          Consistent with the statutory text and legislative history, courts have held that § 601(c)(1)

3    prohibits implied preemption, of which field preemption is one variety. In *GLAAD*, for example,

4    the Ninth Circuit held that even though the 1996 Act enacted several requirements related to

5    closed captioning of video, § 601(c)(1) "signifies that Congress did not intend to occupy the

6    entire legislative field of closed captioning." 742 F.3d at 428. Other courts are in accord. *See, e.g.*,

7    *Farina v. Nokia Inc.,* 625 F.3d 97, 121 (3d Cir. 2010); *Pinney v. Nokia,* 402 F.3d 430, 458, 459

8    (4th Cir. 2005); *Verizon Md., Inc. v. Global NAPS, Inc.*, 377 F.3d 355, 372, 378, 380 (4th Cir.

9    2004); *AT&T Comm'cns of Ill. v. Ill. Bell Tel. Co.*, 349 F.3d 402, 410 (7th Cir. 2003); *City of

10   Dallas, Tex. v. FCC*, 165 F.3d 341, 348 (5th Cir. 1999); *cf. Abrams v. City of Rancho Palos

11   Verdes*, 354 F.3d 1094, 1099 (9th Cir. 2004) (holding that § 601(c)(1) precludes finding that 1996

12   Act forecloses remedies under 42 U.S.C. § 1983), *rev'd on other grounds*, *City of Rancho Palos

13   Verdes v. Abrams*, 544 U.S. 113 (2005). In this case, any preemption of information services must

14   arise solely from the operation of the 1996 Act that added the term and its accompanying

15   regulatory scheme. But as the Ninth Circuit has held, that statute precludes any such implied field

16   preemption.

17         To the extent Plaintiffs suggest that preemption can be found in policy statements in the

18   1996 Act that are unmoored from specific authority, *see* ISP Br. 4 (citing 47 U.S.C. § 230(b)),

19   section 601(c)(1) applies *a fortiori* to bar such preemption. But even on their own terms, those

20   policy statements do not give rise to any inference of preemption. Section 230(b) states that it is

21   "the policy of the United States" "to preserve the vibrant and competitive free market that

22   presently exists for the Internet and other interactive computer services, unfettered by Federal or

23   State regulation." 47 U.S.C. § 230(b). That statement of policy says nothing about preemption. It

24   is found, moreover, in the Communications Decency Act, a portion of the 1996 Act, in a

25   provision focused on blocking and screening of offensive material by providers of "interactive

26   computer services," *id.* § 230(f)(2), and states the policies that animate the substantive provisions

27   of that section, *see id.* § 230(c), (d), (e). It is implausible that Congress would choose a provision

28   about regulations on blocking and screening of offensive material by providers of one service—

1    interactive computer services—to express an intent categorically to preempt any state regulation

2    of a different service—information services.[7] Moreover, as the D.C. Circuit has held, net

3    neutrality rules are entirely consistent with the policies announced in section 230(b), which also

4    include "promot[ing] the continued development of the Internet and other interactive computer

5    services" and "encourag[ing] the development of technologies which maximize user control."[8]

6           Finally, field preemption of interstate information services is inconsistent with the long

7    line of cases limiting the scope of the FCC's preemption authority for both "enhanced services,"

8    the non-statutory forerunner to "information services," and "information services" to instances in

9    which the FCC had ancillary authority to regulate these services. *See, e.g.*, *NARUC II*, 533 F.2d at

10   615-17; *Mozilla*, 940 F.3d at 75-86; *see also* Mozilla Professors' Br., at 6-10, 18-21.[9] In *Mozilla*,

11          [7] *Amici Curiae* Communications Law Scholars in support of Petitioners' reliance (Br. at
12   14-15) on section 706 of the 1996 Act, Pub. L. No. 104-104 § 706, 110 Stat. 153 (codified at 47
     U.S.C. § 1302), fares no better. Section 706 too is subject to § 601(c)(1) and says nothing about
13   preemption. It states only that state and federal agencies shall "encourage the deployment on a
     reasonable and timely basis of advanced telecommunications capability to all Americans,"
14   "promote competition in the local telecommunications market," and "remove barriers to
     infrastructure investment." None of these evince congressional intent to occupy the field of
15   interstate information services, and net neutrality rules are consistent with these policies. See
     *infra* note 8.

16          [8] As the D.C. Circuit has held, net neutrality rules fulfill these objectives by fostering
17   investment in broadband infrastructure and in internet content, applications, and services and
     prevent broadband internet access service providers from distorting competition among internet
18   content, applications, and services. *See United States Telecom Ass.'n v. FCC*, 825 F.3d 674, 707-
     08 (finding the FCC's 2015 *Open Internet Order* consistent with policies of § 230), *id.* at 734
19   (same with respect to § 706); *Verizon v. FCC*, 740 F.3d 623, 628, 634, 644 (D.C. Cir. 2014)
     (holding that net neutrality rules are consistent with § 706).

20          [9] The Eighth Circuit cases upholding preemption of interconnected voice-over-IP (VoIP),
21   which the FCC has declined to classify, are not to the contrary. Unlike most information services,
     the FCC has broad statutory authority (under Title II) or ancillary authority (under Title I) over
22   the service, since interconnected VoIP competes with traditional telephony. The FCC has used
     that authority to impose extensive regulations. *See, e.g.,* FCC, *Voice over Internet Protocol*
23   (December 30, 2019), https://www.fcc.gov/consumers/guides/voice-over-internet-protocol-voip.
     In *Minnesota Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007), which upheld the FCC's
24   express preemption of certain state VoIP regulations, no party contested the FCC's assertion of
     authority over the interstate aspects of the service. *See In the Matter of Vonage Holdings Corp.,*
25   19 F.C.C. Rcd. 22404, 22425 n.118, 22411 n.46 (2004). The holding itself addressed the other
     requirements of the impossibility exception, 47 U.S.C. § 152(b), with respect to that service. *See*
26   *id.* at 577-581. Based on a misreading of this precedent, *Charter Advanced Servs. (MN), LLC v.*
     *Lange*, 903 F.3d 715 (8th Cir. 2018) concluded that state regulation of interconnected VoIP was
27   preempted, and observed, without further analysis, that "state regulation of an information service
     conflicts with the federal policy of nonregulation." *Id.* at 719. Despite the sweep of that *dictum*,
28   the holding of the case is specific to conflict preemption of interconnected voice-over-IP. Neither
                                                                                          (continued…)

12

the D.C. Circuit vacated the entirety of the FCC's 2018 preemption order, which covered both interstate and intrastate broadband internet access service. *See* 940 F.3d at 74 (describing scope of FCC's preemption order). In so doing, the court reaffirmed the proposition that the FCC could only preempt the states based on ancillary authority, which was lacking in that case. *See id.* at 75; *see also Comcast*, 600 F.3d at 654. If the 1996 Act had impliedly preempted the field of interstate information services, the FCC would not have needed ancillary authority to preempt state regulation of the interstate aspects of broadband internet access service.[10]

   Similarly unpersuasive is any claim that Congress could not have intended to subject information services—or even broadband internet access service, specifically—to a patchwork of state regulations. For one thing, that argument can be made in nearly every field of interstate commerce, and yet courts find field preemption only "rare[ly]." *Kansas*, 140 S. Ct. at 804. Courts routinely refuse to imply field preemption simply from the fact that uniformity may be preferable. *See, e.g.*, *Virginia Uranium*, 139 S. Ct. at 1907 (plurality op.); *NARUC II*, 533 F.2d at 619 ("It matters not whether we or the FCC believe that one national laboratory would be better than 50 separate schemes of regulation."). For another, to the extent that one state's rules interfere with another's, the Dormant Commerce Clause is a backstop; it limits the extraterritorial reach and interstate effect of all state laws, ensuring that a state's regulations go no further than necessary to vindicate its sovereign interests in protecting its economy and citizens. *See, e.g.*, *GLAAD*, 742 F.3d at 428 (analyzing validity of state law regulating interstate communications under the Dormant Commerce Clause); *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1307-13 (10th Cir. 2008) (same).

---

case suggests field preemption of *all* information services.

  [10] Contrary to Plaintiffs' claims, neither *Mozilla*'s holding nor its reasoning was limited to intrastate service. *Mozilla* vacated the FCC's entire preemption order because the FCC lacked ancillary authority to preempt the states and could not rely on the impossibility exception for lack of ancillary authority over the interstate aspects of BIAS. That the FCC also preempted state regulation of intrastate BIAS in violation of §152(b) was an *additional* problem with its preemption order, not the only or dispositive problem.

III.    **IT IS IRRELEVANT WHETHER THE INTERSTATE AND INTRASTATE ASPECTS OF BROADBAND INTERNET ACCESS SERVICE CAN BE SEPARATED**

As described above, the Communications Act does not impliedly preempt the field of interstate communications or interstate information services. Instead, it leaves the states' preexisting police powers in these areas intact—subject to express preemption by the Act or the FCC acting within the scope of its delegated authority, subject to preemption of narrower fields and to actual conflicts with federal law, and subject to the Dormant Commerce Clause. It therefore is irrelevant whether it would be impossible for California to regulate only the intrastate aspects of broadband internet access services.[11] Plaintiffs, moreover, have not submitted sufficient evidence at this stage of the litigation to support the factual premise—that intrastate and interstate aspects of broadband internet access service cannot be separated. *See Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) ("A preliminary injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (citation and quotation marks omitted). The only source of evidence the US cites are the FCC's declarations in the express preemption portion of its order, which the D.C. Circuit vacated. *See* FCC Br. 22. Accordingly, at the very least, this Court cannot determine at this early stage that Plaintiffs are likely to succeed in avoiding the strictures of section 152(b).[12]

---

[11] Congress expressly limited the FCC's authority to regulate intrastate communications in 47 U.S.C. § 152(b), preserving the states' preexisting authority to regulate in this area. This jurisdictional bar is subject to a judicially created doctrine called the "impossibility exception." *See, e.g.*, *Mozilla*, 940 F.3d at 76-77. Plaintiffs attempt to invoke the "impossibility exception" to overcome this limitation on the FCC's authority, arguing that it would be impossible for the Commission to separately regulate only the interstate aspects of broadband internet access service. US Br. 24. This position is directly contradicted by the case law. Starting with the Supreme Court in *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) (*Louisiana PSC*), courts applying the impossibility exception have consistently held that lawful authority to act is a perquisite to applying this exception. As *Mozilla* held, this requirement is missing here. *See* 940 F.3d at 77-78. *See also*, *e.g.*, *Louisiana PSC*, 476 U.S. at 375 n.4 (noting that FCC "acted within its authority"); *Mozilla*, 940 F.3d at 76-78 ("[T]he impossibility exception presupposes the existence of statutory authority to regulate; it does not serve as a substitute for that necessary delegation of power from Congress."); *California*, 905 F.2d 1217, 1239, 1240 n.35 (holding that FCC has to act within "its own lawful authority over interstate communications" for impossibility exception to apply and evaluating that FCC's ancillary authority existed. *See id.* at 1239, 1240 n.35);Mozilla Professors' Br. 11-18.

[12] The US claims "[o]n its face, SB-822 does not purport to limit its reach only to

(continued…)

14

**CONCLUSION**

The Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: September 30, 2020

                                      Respectfully submitted,


                                     /s/ Michael J. Burstein

Michael J. Burstein (pro hac vice pending)
c/o Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, NY 10003
(212)790-0307
mburstei@yu.edu

Phillip R. Malone (SBN 163969)
Juelsgaard Intellectual Property and
Innovation Clinic
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott
Way
Stanford, CA 94305-8610
(650) 724-1900
pmalone@stanford.edu

*Counsel for Amici Curiae*

---

intrastate matters."  US Br. 23. But that leaves open whether the statute would be susceptible to a saving construction if the Court ultimately determined that California is entitled to regulate only the intrastate aspects of broadband internet access service.

1

**CERTIFICATE OF SERVICE**

2

I certify that on September 30, 2020, I electronically filed the foregoing via the Court's

3

CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF

4

users.

5

6
/s/ Phillip R. Malone
Phillip R. Malone

7
(SBN 163969)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brief of Amici Curiae Internet Law Scholars in Support of Opposition to Preliminary Injunction Motions
(2:18-cv-02660-JAM-DB) (2:18-cv-02684-JAM-DB)