Scott H. Angstreich*
Leslie V. Pope*
Alex A. Parkinson*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
lpope@kellogghansen.com
aparkinson@kellogghansen.com

*Attorneys for Plaintiffs*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*

Jeffrey A. Lamken (CA SBN 154217)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff*
*American Cable Association*

* Admitted *pro hac vice*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. 2:18-cv-02684<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. John A. Mendez |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.    Plaintiffs Are Likely To Succeed on the Merits ............................................................. 2

      A.    Field Preemption Applies Because SB-822 Directly Regulates Interstate Communications Services .......................................................... 2

      B.    The Act Expressly Preempts SB-822's Regulation of Private Mobile Services ... 6

      C.    SB-822 Is Invalid Under the Conflict Preemption Doctrine ................................ 6

            1.    SB-822 Conflicts with Congress's Prohibition on Common Carrier Regulation of Information Services and Private Mobile Services ............................................................................................. 6

            2.    SB-822 Conflicts with the 2018 Order ..................................................... 8

II.    SB-822 Will Subject Plaintiffs' Members to Immediate and Irreparable Harm ............. 10

III.    The Equities and the Public Interest Favor an Injunction................................................ 14

CONCLUSION .................................................................................................................... 15

CASES

*ACA Connects v. Frey*, 2020 WL 3799767 (D. Me. July 7, 2020) .................................. 9

*Am. Cable Ass'n v. Scott*, No. 2:18-cv-167-cr (D. Vt. Sept. 25, 2020) ......................... 3

*Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009) ........................... 10, 11

*AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715 (3d Cir. 2015) ................................. 3

*Bofi Fed. Bank v. Erhart*, 2016 WL 4680291 (S.D. Cal. Sept. 7, 2016) ......................... 13

*California v. FCC*, 39 F.3d 919 (9th Cir. 1994) .................................................... 4

*California v. FCC*, 905 F.2d 1217 (9th Cir. 1990) .................................................. 4

*Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984) ..................................... 8, 10

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ..................... 13

*CCIA v. FCC*, 693 F.2d 198 (D.C. Cir. 1982) ................................................... 4

*Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) ............................................ 8

*Chamber of Commerce of U.S. v. Becerra*, 438 F. Supp. 3d 1078
  (E.D. Cal. 2020) ............................................................................... 11, 12

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011) ......................................... 8

*City of Dallas v. FCC*, 165 F.3d 341 (5th Cir. 1999) ........................................... 8

*Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) ......................... 11

*Farina v. Nokia, Inc.*, 625 F.3d 97 (3d Cir. 2010) .............................................. 7

*In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014) .............................................. 7

*Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069 (7th Cir. 2004) ............................... 6

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) ................................... 13

*Glob. Tel*Link v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ......................................... 2

*Greater L.A. Agency of Deafness, Inc. v. Cable News Network, Inc.*,
  742 F.3d 414 (9th Cir. 2014) .................................................................. 3

*Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424 (1963) ..................... 3

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239
  (9th Cir. 2013) ............................................................................... 13

*Int'l Ass'n of Indep. Tanker Owners v. Locke*, 159 F.3d 1220 (9th Cir. 1998) ............................ 9

*Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486 (2d Cir. 1968) ...................................................... 5

*Lipschultz v. Charter Advanced Servs. (MN)*, 140 S. Ct. 6 (2019) .......................................... 10

*Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307 (9th Cir. 1992) .......................................... 5

*Mason v. Granholm*, 2007 WL 734990 (E.D. Mich. Mar. 7, 2007) ........................................ 13

*Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*,
    423 F.3d 1056 (9th Cir. 2005) ........................................................................................ 3, 5

*Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007) ..................................... 4

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam) ......................... 1, 4, 9, 10, 14

*NARUC v. FCC*, 746 F.2d 1492 (D.C. Cir. 1984) ................................................................... 2

*NASUCA v. FCC*, 457 F.3d 1238 (11th Cir. 2006) ................................................................ 6

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir. 2016) .......................... 5

*NCTA v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ......................................................... 9

*In re NOS Commc'ns*, 495 F.3d 1052 (9th Cir. 2007) ............................................................ 3

*Olson v. California*, 2020 WL 905572 (C.D. Cal. Feb. 10, 2020) ......................................... 11

*Pac. Merch. Shipping Ass'n v. Cackette*, 2007 WL 2914961
    (E.D. Cal. Oct. 5, 2007) ................................................................................................. 12

*Parrish v. Mabus*, 679 F. App'x 620 (9th Cir. 2017) ............................................................ 7

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) .............................................. 13

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27 (1919) ............................. 5

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016) ......................................... 6

*Qwest Corp. v. Minnesota Pub. Utils. Comm'n*, 684 F.3d 721 (8th Cir. 2012) ........................ 7

*Ray v. Atl. Richfield Co.*, 435 U.S. 151 (1978) .................................................................... 10

*Sterling Commercial Credit-Mich., LLC v. Phoenix Indus. I, LLC*,
    762 F. Supp. 2d 8 (D.D.C. 2011) .................................................................................. 13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001) ...................... 12

*Telesaurus VPC, LLC v. Power*, 623 F.3d 998 (9th Cir. 2010) ............................................ 2, 6

*Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) ...................................................................... 3

*Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390
    (9th Cir. 2014) ........................................................................................................ 13

*Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*,
    474 U.S. 409 (1986) .................................................................................................. 8

*U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ....................................... 9

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ............................................ 11

*United States v. Locke*, 529 U.S. 89 (2000) ................................................................... 2

*United States v. Midwest Video Corp.*, 406 U.S. 649 (1972) .......................................... 3

*Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188 (10th Cir. 2010) ..................... 3

*Verizon Md. Inc. v. RCN Telecom Servs.*, 232 F. Supp. 2d 539 (D. Md. 2002) ...................... 7

*In re Verizon New England, Inc.*, 173 Vt. 327 (2002) ...................................................... 3

*Verizon New England, Inc. v. R.I. Pub. Util. Comm'n*, 822 A.2d 187 (R.I. 2003) ...................... 3

*Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921 (D.C. Cir. 1999) .................................... 7

*W. Union Tel. Co. v. Boegli*, 251 U.S. 315 (1920) .......................................................... 2

*Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651 (3d Cir. 2003) ...................................... 4


ADMINISTRATIVE DECISIONS

Decision Issuing Revised General Order 168, Market Rules to Empower
    Telecommunications Consumers and to Prevent Fraud, Decision 06-03-013
    (CPUC Mar. 2, 2006) ................................................................................................. 7

Declaratory Ruling & Third Report & Order, *Accelerating Wireless Broadband
    Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088
    (2018) ........................................................................................................................ 6

Declaratory Ruling, Report and Order, and Order, *Restoring Internet Freedom*,
    33 FCC Rcd. 311 (2018) .......................................................................... 2, 4, 8, 9, 13, 14, 15

Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and
    Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ...................................... 3, 13, 14, 15


CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. art. VI, cl. 2 (Supremacy Clause) .............................................................. 8, 9, 10, 11

Communications Act of 1934, 47 U.S.C. § 151 *et seq.* ....................................................... 1, 2, 7

47 U.S.C. § 152(a) ........................................................................ 2, 3, 7
47 U.S.C. § 152(b) ..................................................................... 1, 3, 4, 5
47 U.S.C. § 153(51) ................................................................... 6, 7, 10
47 U.S.C. § 223(f)(2) ........................................................................... 5
47 U.S.C. § 230(b)(2) ........................................................................... 8
47 U.S.C. § 230(e)(3) ........................................................................... 5
47 U.S.C. § 251 ................................................................................... 3
47 U.S.C. § 252 ................................................................................... 3
47 U.S.C. § 253 ................................................................................... 5
47 U.S.C. § 276(c) ............................................................................... 5
47 U.S.C. § 332 ................................................................................... 6
47 U.S.C. § 332(c)(3) ................................................................... 6, 7, 10
47 U.S.C. § 332(c)(3)(A) ....................................................................... 6
47 U.S.C. § 332(c)(7) ........................................................................... 5
47 U.S.C. § 414 ................................................................................... 2
47 U.S.C. § 543(a)(1) ........................................................................... 5
47 U.S.C. § 544(e) ............................................................................... 5
47 U.S.C. § 556(c) ............................................................................... 5

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, § 601(c)(1)
(codified in 47 U.S.C. § 152 note) ....................................................... 7

21 U.S.C. § 346a(n)(8) ......................................................................... 7

Cal. Const. Art. V, § 13 ....................................................................... 13

Cal. Civ. Code
§ 3100(b) ..................................................................................... 3
§ 3101(a)(1) ................................................................................. 12
§ 3101(a)(2) ................................................................................. 12
§ 3101(a)(3) ................................................................................. 13
§ 3101(a)(5) ................................................................................. 11
§ 3101(a)(6) ................................................................................. 11
§ 3101(a)(7) ................................................................................. 12
§ 3101(a)(9) ................................................................................. 13

Cal. Gov. Code
§ 12510 ....................................................................................... 13
§ 12511 ....................................................................................... 13
§ 12550 ....................................................................................... 13


LEGISLATIVE MATERIALS

SB-822 (Cal. 2018) ...................................................................... *passim*

**INTRODUCTION**

California and its amici argue that, after *Mozilla*, states are free to regulate Plaintiffs' members' interstate broadband services, including in ways Congress and the FCC expressly rejected. A century of federal precedent and *Mozilla* itself refute those arguments. The *Mozilla* majority explicitly recognized that "state practice[s] [that] actually undermine[]" the FCC's regulatory choices are subject to "conflict preemption." *Mozilla Corp. v. FCC*, 940 F.3d 1, 85 (D.C. Cir. 2019) (per curiam). Although the majority held that, in light of 47 U.S.C. § 152(b), the FCC could not "categorically" preempt all state regulation in advance, *id.* at 81-82, it rejected the "suggestion that [*Mozilla*] leaves no room for implied preemption" as incorrectly "confus[ing]" the limits on the FCC's "authority to expressly preempt" with the "preemptive effect of the [FCC's] regulatory choices." *Id.* at 85. The *Mozilla* majority did not reach whether the Communications Act itself provides a basis for field, express, or conflict preemption, considering only the FCC's express preemption authority.

With *Mozilla* read properly, Plaintiffs are likely to succeed on the merits. First, for more than a century, Congress has conferred on federal regulators exclusive jurisdiction to directly regulate *interstate* communications services. California does not dispute that SB-822 defines broadband in a manner that directly regulates interstate communications and neither it nor its amici point to a single prior instance of such direct regulation by any state. Second, SB-822 regulates and sets rates for mobile broadband in violation of Congress's express preemption of state interference with private mobile services. Third, Congress did not allow states to contradict its pre-1996 Act decision to prohibit common carrier regulation of information services and private mobile services. Instead, conflict preemption bars California's attempt to impose obligations on those services that federal law forbids. Fourth, SB-822 second guesses decisions the FCC made in exercising its statutory authority to classify broadband services and to adopt an enforceable transparency regime as the core of its regulatory approach. Conflict preemption exists to prevent states from acting at odds with such federal purposes.

Because SB-822 is unconstitutional, Plaintiffs' members would be irreparably harmed if subjected to it during the pendency of this litigation. Plaintiffs' members would also be faced

1 with the sort of specific "Hobson's choices" that are well-established to constitute irreparable

2 harm — either expose themselves to the risk of enforcement actions under an unconstitutional

3 law or suffer losses to their revenues, goodwill, and business reputation. In contrast, California

4 has not shown that any harm is likely if the enforcement of SB-822 is further delayed while this

5 Court considers its constitutionality. Despite a baker's dozen declarations and five amicus

6 briefs, California cannot point to a single harm since the 2018 Order took effect. Instead, those

7 declarations and briefs rehash facts and raise policy arguments the FCC already considered and

8 rejected. A preliminary injunction would thus preserve the status quo, under which the Internet

9 remains open and flourishing — even under the increased demands during the COVID-19

10 pandemic — thanks to Plaintiffs' members' enforceable commitments to preserve core

11 principles of Internet openness.

## ARGUMENT

### I. Plaintiffs Are Likely To Succeed on the Merits

#### A. Field Preemption Applies Because SB-822 Directly Regulates Interstate Communications Services

For more than a century Congress has drawn — and courts have enforced — a bright-line jurisdictional division: the FCC has (and the ICC before it had) exclusive jurisdiction over interstate communications services; states have jurisdiction over intrastate services. *See Glob. Tel*Link v. FCC*, 866 F.3d 397, 402 (D.C. Cir. 2017) (Communications Act "divides power between individual states and the FCC"); *NARUC v. FCC*, 746 F.2d 1492, 1498 (D.C. Cir. 1984) (Congress created a "dividing line between the regulatory jurisdictions of the FCC and states"); *see also* Internet Scholars Br. 6-9. Neither California nor its amici confront that more than 100-year history.[1] And notwithstanding California's dismissal (at 31) of 47 U.S.C.

---

[1] This extensive "history of significant federal presence" precludes any presumption against preemption. *United States v. Locke*, 529 U.S. 89, 108 (2000). Likewise, and notwithstanding the States' argument (at 2), 47 U.S.C. § 414 reserves to the states only "now existing" (in 1934) common law remedies or statutes. In the context of direct regulation over interstate communications, none existed: Congress had "tak[en] possession of the field" 24 years earlier. *See W. Union Tel. Co. v. Boegli*, 251 U.S. 315, 316 (1920). In all events, § 414 "preserves only those rights that are 'not inconsistent' with statutory requirements elsewhere in the" Communications Act. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1010 (9th Cir. 2010).

§ 152(a) as a "general statement," courts have *always* held that provision — like its intrastate corollary, § 152(b) — is jurisdictional. *See, e.g.*, *United States v. Midwest Video Corp.*, 406 U.S. 649, 661 (1972) (§ 152(a) provides the FCC exclusive "jurisdiction"); *AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 720 (3d Cir. 2015) (§ 152(a) gives FCC exclusive "jurisdiction").

California does not dispute that SB-822 defines the service it seeks to regulate directly to include interstate communications between California Internet users and servers located across the country. *See* Pls.' Mem. 12; Cal. Civ. Code § 3100(b). Yet California and its amici do not (because they cannot) identify a prior instance where any state has ever directly regulated how providers operate and manage their interstate communications services.[2] Instead California cites (at 36) a case concerning state regulation of a mandatory arbitration provision in consumer contracts, not a state attempt to regulate interstate long-distance service itself. *See Ting v. AT&T*, 319 F.3d 1126, 1136 (9th Cir. 2003). And it cites cases (at 36) where a state exercised the limited authority Congress granted states in 1996 in 47 U.S.C. §§ 251 and 252, which have no application here. *See Verizon New England, Inc. v. R.I. Pub. Util. Comm'n*, 822 A.2d 187, 193 (R.I. 2003); *In re Verizon New England, Inc.*, 173 Vt. 327, 342 (2002); Internet Scholars Br. 9-10.[3]

---

[2] The States point (at 8) only to other recent state statutes that attempt to reinstate some of the 2015 Order's rules. We have also challenged the Vermont statute — as another bellwether case — and Vermont has agreed not to enforce its law in light of these pending motions. *See* Order, *Am. Cable Ass'n v. Scott*, No. 2:18-cv-167-cr (D. Vt. Sept. 25, 2020) ECF No. 54. *See also infra* n.14 (discussing associations' challenges to Maine ISP privacy statute).

[3] Also inapposite are California's cases (at 35) about state laws prohibiting the inclusion of prices in ads broadcast over the radio (not regulating the radio station's service), *see Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 432 (1963), and compelling CNN to include closed captions in videos it transmits over the Internet (not regulating the ISPs' service), *see Greater L.A. Agency of Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 431 (9th Cir. 2014). Equally inapposite are cases the States cite (at 4) about line items on customers' bills, which have nothing to do with the management or operation of the service those customers buy. *See Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) (following *Ting*); *cf. In re NOS Commc'ns*, 495 F.3d 1052, 1057 (9th Cir. 2007) (rejecting claim for removal based on complete preemption). And *Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*, 423 F.3d 1056 (9th Cir. 2005), which California (at 34) and the

California also cites (at 35) instances in which a state regulated the *intra*state portion of a service that is jurisdictionally mixed, having both interstate and intrastate components. States may do so under § 152(b), unless those portions are inseverable so that *intra*state regulation "would interfere with achievement of a federal regulatory goal" as to the *inter*state portion, in which case "the [FCC's] jurisdiction is paramount." *CCIA v. FCC*, 693 F.2d 198, 214 (D.C. Cir. 1982). It was the FCC's effort in the 2018 Order to use its express preemption authority "to wipe out a broader array of state" laws than these "conflict preemption principles would allow" that led the *Mozilla* court to hold that the FCC had "tread[] into an area — State regulation of intrastate communications" — as to which § 152(b) "severely circumscribes" the FCC's power. *Mozilla*, 940 F.3d at 74, 76, 78; *see also id.* at 79-80, 85 (citing § 152(b)).[4]

But Congress's preservation in § 152(b) of state authority over *intra*state communications is irrelevant where, as here, a state law undisputedly seeks to directly regulate the jurisdictionally *inter*state aspects of a service. Such *inter*state services are "to be governed solely by federal law" because "Congress intended to occupy the field." *E.g.*, *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 654 (3d Cir. 2003).[5]

Congress's enactment of provisions expressly preempting specific categories of state regulation is entirely compatible with Congress's longstanding field preemption of direct state regulation of interstate communications services. The provisions California cites (at 34)

---

States (at 3) cite, involved payphones, which can be used to make intrastate calls, and Congress's express preemption of inconsistent state regulation of that intrastate service.

[4] California erroneously suggests (at 34) that *Mozilla* is incompatible with field preemption. The only state authority the *Mozilla* court identified was over "intrastate broadband" (a service the court simply assumed existed), which § 152(b) preserved. 940 F.3d at 80-81. California's suggestion (at 35 n.34) that field preemption would conflict with limits on the FCC's express preemption authority is the same kind of "confus[ion]" between agency express and implied preemption the *Mozilla* majority criticized. *Id.* at 85.

[5] Our position is not, as California claims (at 37), that there is *no* "state authority to regulate information services." It is settled that some state regulation of *intra*state information (formerly called enhanced) services is not preempted. *See California v. FCC*, 39 F.3d 919, 932-33 (9th Cir. 1994); *California v. FCC*, 905 F.2d 1217, 1242-45 (9th Cir. 1990). The States overreach (at 9) in making similar claims, ignoring that courts have already held they are preempted from regulating other interstate services, *e.g.*, Voice over Internet Protocol. *See*, *e.g.*, *Minnesota Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 580-81 (8th Cir. 2007).

preempt state laws regarding the sending of obscene or indecent communications or the publishing of offensive material, *see* 47 U.S.C. §§ 223(f)(2), 230(e)(3), rights of way and zoning, *see id.* §§ 253, 332(c)(7), or cable television equipment and local franchising, *see id.* §§ 544(e), 556(c). None addresses state laws that directly regulate an interstate service. Other provisions California cites (at 34) expressly preempt state regulation of *intra*state communications services, thus reducing the state authority § 152(b) preserved. *See id.* §§ 276(c) (preempting inconsistent state regulation of *intra*state payphone service); 332(c)(3) (preempting state regulation of intrastate mobile services, "[n]otwithstanding sections 152(b) and 221(b)"); 543(a)(1) (preempting inconsistent state regulation of intrastate cable rates). They have no bearing here.[6]

California also suggests incorrectly (at 33) that the degree of "power" an agency may exercise within a field is relevant to field preemption. It is not. The question is whether a statute reflects Congress's intent to exclude state regulation from that field. *See Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733-34 (9th Cir. 2016). On that question, the Supreme Court has been clear since Congress first regulated interstate communication services: that legislation "was an occupation of the field by Congress which excluded state action." *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 31 (1919); *see* Pls.' Mem. 11 n.6.[7] Because SB-822 concededly treads upon that assignment of exclusive jurisdictional authority by directly regulating interstate communications services, it is field preempted.

---

[6] "[A]n express provision does not categorically preclude courts from applying principles of implied preemption," *Metrophones*, 423 F.3d at 1072, but is a suggestion to be taken no further than "logic and common sense" permit, *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992).

[7] California notes (at 36) that certain cases we cited (at 11) did not apply field preemption to hold a state law regulating an interstate communications service preempted. But that is because there is no history of states attempting to directly regulate the provision of an interstate communications service. And in each of the cases we cited, the court recognized the Communications Act's comprehensive, "broad scheme for the regulation of interstate service" indicates "intent on the part of Congress to occupy the field." *Ivy Broad. Co. v. AT&T Co.*, 391 F.2d 486, 490 (2d Cir. 1968). (While *Ivy* applied this reasoning to hold that state regulation of rates and charges is preempted, it did not suggest, as the Internet Scholars claim (at 4), that the Communication Act's preemptive effect is limited to rates and charges.)

## B.    The Act Expressly Preempts SB-822's Regulation of Private Mobile Services

California does not dispute (at 37-39) that SB-822 regulates private mobile services. SB-822 is therefore subject to Congress's express preemption of state attempts "to regulate the entry of or the rates charged by" such a service.  47 U.S.C. § 332(c)(3)(A).[8]

*First*, SB-822 regulates the "entry" of private mobile services.  Courts and the FCC have recognized that § 332 preempts not only state laws that affect literal market entry, but also "conditions" on or obstacles to the *continued* provision of mobile services.  *Fedor v. Cingular Wireless Corp.*, 355 F.3d 1069, 1072 (7th Cir. 2004); *see Telesaurus*, 623 F.3d at 1008 (post-entry tort liability); Declaratory Ruling & Third Report & Order, *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088, ¶ 36 n.84 (2018) (§ 332 means that states lack "authority to require that providers offer certain types or levels of service") (subsequent history omitted).

*Second*, SB-822's ban on certain zero-rating is expressly preempted because it regulates "the rates charged" by an ISP by making it unlawful to charge customers $0 for some data, while charging a non-zero rate for other data.  California's assertion (at 39) that ISPs "can charge as much or as little as they like" ignores that SB-822 prohibits such differential pricing.  *See* Roden Decl. ¶¶ 10-15.  That is rate regulation because it "affect[s] the amount that a user is charged."  *NASUCA v. FCC*, 457 F.3d 1238, 1254 (11th Cir. 2006).

## C.    SB-822 Is Invalid Under the Conflict Preemption Doctrine

### 1.    SB-822 Conflicts with Congress's Prohibition on Common Carrier Regulation of Information Services and Private Mobile Services

As we showed (at 14-18), SB-822 also is preempted because it imposes common carrier obligations on providers of "information services" and "private mobile services" in direct conflict with the Communications Act's prohibitions on such regulation.  *See* 47 U.S.C. §§ 153(51), 332(c)(3).  California and its amici do not dispute that SB-822 imposes common carrier regulation,[9] that ISPs offer information and private mobile services, or that federal law

---

[8] This express preemption provision defeats "any presumption against pre-emption." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016).

[9] California asserts in a footnote (at 28 n.25) that it "do[es] not concede" this point, but

prohibits common carrier regulation of those services. And California's arguments that it may

regulate those providers as common carriers even though the FCC may not are unavailing.[10]

California stumbles out of the gate in arguing (at 28-29) that § 601(c)(1) of the

Telecommunications Act of 1996 prevents a finding of conflict preemption. First, by its terms,

§ 601(c)(1) has nothing to do with preemption of post-1996 state enactments like SB-822

because it directed courts not to interpret the 1996 Act to implicitly override *then-existing* state

or federal law.[11] Because "[a] 'savings clause' can only save what already exists," § 601(c)(1)

only saves state regulation that existed "prior to the 1996 Act." *Verizon Md. Inc. v. RCN

Telecom Servs.*, 232 F. Supp. 2d 539, 557 (D. Md. 2002). Second, and by contrast, the

Communications Act's limitations on common carrier obligations pre-date the 1996 Act, and the

savings clause thus confirms those limitations were meant to be carried forward. *See* 47 U.S.C.

§ 332(c)(3) (enacted in 1993); *Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921, 926-27 (D.C.

Cir. 1999) (upholding FCC conclusion that then-§ 153(44) (now § 153(51)) carried forward pre-

existing law). Third, even when construing provisions of the 1996 Act, courts have refused to

read § 601(c)(1) broadly to "upset the regulatory scheme [Congress] envisioned." *In re FCC

11-161*, 753 F.3d 1015, 1120 (10th Cir. 2014); *see Qwest Corp. v. Minnesota Pub. Utils.

Comm'n*, 684 F.3d 721, 730 (8th Cir. 2012); *Farina v. Nokia, Inc*., 625 F.3d 97, 131 (3d Cir.

2010). Under that scheme, information and private mobile service providers are not to be

regulated as common carriers.

California also misfires in arguing (at 29-30) that § 153(51) "restrict[s] only the FCC's

---

that is "insufficient to avoid waiver." *Parrish v. Mabus*, 679 F. App'x 620, 621 (9th Cir. 2017).

[10] California's own expert agency agrees with us: "[A]ll enhanced or information services (in layman's terms, services relating to the Internet) are not subject to Title II common carrier regulations and, as a result, are broadly exempt from state communications regulations." Decision Issuing Revised General Order 168, Market Rules to Empower Telecommunications Consumers and to Prevent Fraud, Decision 06-03-013, at 38 (CPUC Mar. 2, 2006). California's assertion (at 20) that Congress intended otherwise does not square with the Communications Act, which specifies that it "shall apply to *all* interstate . . . communication by wire or radio." 47 U.S.C. § 152(a) (emphasis added).

[11] Congress preserves state *authority* using materially different language. *See, e.g.*, 21 U.S.C. § 346a(n)(8) ("Nothing in this chapter preempts the authority of any State or political subdivision to [take certain action]."). Here, there was no authority to preserve.

authority to impose common carrier regulation."  Plaintiffs have not argued that the statutory provisions prohibiting common carrier regulation of information and private mobile service providers *expressly* preempt SB-822.  Rather, the problem is that SB-822 unavoidably *conflicts with* Congress's decision to make those services "statutorily immune . . . from treatment as common carriers." *Cellco P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012).  California (at 1) and the States (at 2) cannot sidestep that conflict by invoking their "traditional police power."  The Supreme Court has made clear that, "when federal officials [including the FCC] determine . . . that restrictive regulation of a particular area is not in the public interest, States are not permitted to use their police power to enact such a regulation." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984).[12]  California's contrary assertions lack merit.[13]

### 2. SB-822 Conflicts with the 2018 Order

We also demonstrated (at 18-23) that SB-822 is preempted because it conflicts with the valid and statutorily authorized methods the FCC adopted to regulate broadband.  This preemption arises not through any express preemption ruling by the FCC, but by virtue of the Supremacy Clause.  California's arguments (at 14-27) all misapprehend this distinction.

California repeatedly asserts (*e.g.,* at 14-15) that, although the FCC had statutory authority to classify broadband as an information service and private mobile service and eliminate prescriptive regulations, it did not have "authority to preempt" states from re-imposing them.  But that argument improperly conflates *express* preemption and *conflict* preemption,

---

[12] California's cases (at 30) are inapposite. *City of Dallas v. FCC*, 165 F.3d 341, 345, 347-48 (5th Cir. 1999), which dealt with traditional state authority over access to local rights of way, does not suggest that states can regulate communications services in ways the FCC cannot.  And in *Chamber of Commerce v. Whiting*, the Court found Arizona's law did "not conflict with the federal scheme," because its "requirement [was] entirely consistent with federal law." 563 U.S. 582, 608 (2011).  In contrast, SB-822 directly conflicts with federal law.

[13] California fails (at 30 n.29) to meaningfully address *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd. of Miss.*  It latches on to the "field-preemptive nature of the federal statutory scheme" in that case, but that is a distinction without a difference.  In that case, Congress prohibited the federal agency from "regulat[ing] affirmatively particular" aspects of a product that Congress wanted to leave to "market forces," preempting contrary state regulation. 474 U.S. 409, 422 (1986).  The same preference for market forces is evident here. *See* 47 U.S.C. § 230(b)(2).

making the same mistake *Mozilla* expressly warned *against*: "confus[ing] (i) the scope of the Commission's authority to expressly preempt, with (ii) the (potential) implied preemptive effect of the regulatory choices the Commission makes that are within its authority." 940 F.3d at 85. And precisely because these issues are distinct, the *Mozilla* court did "not consider whether" the 2018 Order "ha[d] preemptive effect under principles of conflict preemption." *Id.*; *see id.* ("If the Commission can explain how a state practice actually undermines the [2018] Order, then it can invoke conflict preemption."). California's repeated statements (at 16, 20, 22) that conflict preemption cannot apply because "the FCC lacks statutory authority to impose net neutrality conduct rules" cannot be squared with the *Mozilla* court's explicit recognition that conflict preemption *would* apply where a state law actually undermines the 2018 Order. The *Mozilla* majority characterized the theory California now advances as a "straw man." 940 F.3d at 85.[14]

Under conflict preemption, the relevant question is whether the agency had authority to take the action with which the state law conflicts; if it did, the Supremacy Clause mandates that state law yield. *See Int'l Ass'n of Indep. Tanker Owners v. Locke*, 159 F.3d 1220, 1226 (9th Cir. 1998) (for conflict preemption, "an administrative agency's regulations have preemptive effect whenever Congress has authorized the agency to enact such regulations, not merely when Congress expressly has authorized the agency to preempt state law"). And here, there is no question that the FCC had power not only to reclassify broadband and adopt a transparency-based regime in lieu of heavy-handed conduct rules, but also to take policy considerations into account when doing so. *See NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 997 (2005) (holding that the FCC's decision to classify cable broadband as an information service was "a reasonable policy choice for the [Commission] to make"); *U.S. Telecomm. Ass'n v. FCC*, 825 F.3d 674, 707 (D.C. Cir. 2016) (affirming FCC determination that it was "necessary" to

---

[14] California also cites (at 18) *ACA Connects v. Frey*, 2020 WL 3799767 (D. Me. July 7, 2020), which wrongly suggested that *Mozilla* foreclosed conflict preemption, *see Mozilla*, 940 F.3d at 85 (allowing for the possibility of "conflict preemption"). We did not raise a field preemption argument in that case, because regulating the use of customer data obtained while a customer uses a service is not direct regulation of the provision of that service itself; the regulation in that case did not restrict in any way what kinds of interstate communications services an ISP could provide. *But see* States' Br. 9.

reclassify broadband as a telecommunications service to advance agency policy objectives);

*Mozilla*, 940 F.3d at 26 (upholding FCC's construction of "ambiguous statutory phrase in a way

that tallies with its policy judgment, as is its prerogative").  Indeed, the crux of "obstacle"

preemption as applied to federal agency rulings is that state law must yield when at odds with

the "full purposes and objectives" of the federal government.  *Capital Cities*, 467 U.S. at 699.

Thus, the FCC's statutorily authorized and judicially validated actions provide a valid basis for

*conflict* preemption under the Supremacy Clause.  *See, e.g.*, *Ray v. Atl. Richfield Co.*, 435 U.S.

151, 178 (1978) ("[W]here failure of federal officials affirmatively to exercise their full

authority takes on the character of a ruling that no such regulation is appropriate or approved

pursuant to the *policy* of the statute, States are not permitted to use their police power to enact

such a regulation." (emphasis added)).[15]

## II.     SB-822 Will Subject Plaintiffs' Members to Immediate and Irreparable Harm

Plaintiffs' showing that they are likely to succeed on their Supremacy Clause challenges

establishes irreparable harm.  A "constitutional violation alone, coupled with the damages

incurred, can suffice to show irreparable harm."  *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559

F.3d 1046, 1058 (9th Cir. 2009); *see* Pls.' Mem. 23.  California claims (at 40) that a

constitutional violation so qualifies only if it concerns "*personal* constitutional rights."  Other

district courts in this Circuit have rejected this same argument, explaining that this "distinction

between personal and structural constitutional rights is not recognized in the Ninth Circuit."

---

[15] California attempts to distinguish *Ray* by claiming (at 23) that the Court "beg[a]n with the premise that the [agency] has the authority to establish" regulations that the state had enacted.  But the same is true here:  as noted, *Mozilla* upheld the FCC's authority to classify broadband as an information service and private mobile service and to adopt a transparency-based regime.  *See Mozilla*, 940 F.3d at 35, 47.  For similar reasons, California's reliance (at 18 & 24 n.18) on Justice Thomas's concurrence in the denial of certiorari in *Lipschultz v. Charter Advanced Servs. (MN)*, 140 S. Ct. 6, 7 (2019), is misplaced, as the FCC's classification decision under §§ 153(51) and 332(c)(3) and imposition of a transparency requirement under § 257 are not "self-made agency policy" (Calif. Br. at 18), but rather exercises of statutory authority the *Mozilla* court held Congress had delegated.  In any event, Justice Thomas's concurring opinion calls for a *change* to existing precedent, including cases such as *Ray* and *Capital Cities*, which hold that federal agency policy *does* create a proper predicate for conflict preemption and are binding on this Court.

*Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 538 (N.D. Cal. 2017).[16]

Moreover, Plaintiffs' members are faced with precisely the sort of dilemma that courts regularly find constitutes immediate and irreparable harm. *See Am. Trucking*, 559 F.3d at 1057-58. Where, as here, "plaintiffs are faced with 'Hobson's choice' of continually violating a law and exposing themselves to potentially huge liability or suffering the injury of obeying the law during the pendency of the proceedings and any further review, the Ninth Circuit has found imminent harm" sufficient for injunctive relief. *Olson v. California*, 2020 WL 905572, at *14 (C.D. Cal. Feb. 10, 2020). As we explained (at 23-28), our members face "a very real penalty . . . regardless of how they proceed," *Am. Trucking*, 559 F.3d at 1057-58. They can continue with current practices and face the threat of enforcement actions and interference in ongoing contracts, or discontinue practices that might be prohibited by SB-822 and suffer monetary losses, forgone business opportunities and innovative offerings, and loss of customer goodwill.[17]

**California Civil Code § 3101(a)(5), (6).** We established (at 26-27) — and California does not dispute (at 45-46) — that SB-822's prohibition on certain zero-rating arrangements will require Plaintiffs' members to risk enforcement actions or cancel existing zero-rating offerings and suffer a loss to their reputation and goodwill. *See* Roden Decl. ¶¶ 21-23. California claims (at 46) that it is speculative whether Plaintiffs' members will suffer a loss in reputation and goodwill if millions of customers are suddenly deprived of a feature of their existing contracts that gives more data for the same amount of money. But it is well-accepted

---

[16] California suggests (at 41 & n.39) that *United States v. California* changes the analysis. Not so. The Ninth Circuit observed that this Court's conclusion — that showing the California law likely violated the Supremacy Clause would also satisfy the irreparable harm requirement — was "consistent" with precedent. 921 F.3d 865, 893 (9th Cir. 2019). The Ninth Circuit's discussion of the federal government's failure to "present compelling evidence" of "harm[]" arose in the context of balancing the equities — not irreparable harm. *Id.* at 894.

[17] *See also*, *e.g.*, *Chamber of Commerce of U.S. v. Becerra*, 438 F. Supp. 3d 1078, 1105 (E.D. Cal. 2020) (irreparable harm requirement satisfied; plaintiffs faced a "Hobson's choice" between "the risk of potential criminal and civil penalties if they are found to have violated the new [California] law" or abandoning arbitration agreements with employees); *Cty. of Santa Clara*, 250 F. Supp. 3d at 537-38 (the Supreme Court and Ninth Circuit have "indicated that plaintiffs suffer irreparable injury" "by being forced to comply with an unconstitutional law or else face financial injury or enforcement action").

— and good sense — that a company that is prevented from fulfilling a promise to its customers is likely to suffer a loss in reputation and goodwill and, therefore, irreparable harm. *See*, *e.g.*, *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (safe manufacturer would suffer irreparable harm if unable to deliver safes as promised). California attempts to minimize this harm by claiming (at 46) that "all providers serving customers in California" will suffer the same loss. But irreparable harm is no less irreparable because it is experienced by many companies, rather than a few.[18]

***California Civil Code § 3101(a)(1), (2), (7)***. We showed (at 28) that SB-822 creates substantial legal uncertainty about network-management practices that will force Plaintiffs' members to choose between the risk of enforcement actions and taking active steps to manage network congestion for the benefit of their entire customer base. *See* McCormick Decl. ¶¶ 18-20. California never addresses this factual showing or the amorphous Internet conduct standard, instead arguing (at 41-42) only that SB-822 will not cause harm because Plaintiffs' members have committed not to block or throttle content. But we showed that, even as to those provisions, harms arise from the significant uncertainty regarding whether California will interpret them broadly to encompass practices well beyond what the industry understands as blocking or throttling. *See* McCormick Decl. ¶ 21. California's only response is to assert (at 44-45) that whether it will bring such actions is "purely speculative." But Plaintiffs' members will suffer irreparable harm regardless of how California ultimately decides to enforce SB-822. The threat of enforcement and "uncertainties surrounding [the law's] implementation" create a "Hobson's choice" between risking non-compliance and assuming the costs of ensuring compliance with an unconstitutional law. *Becerra*, 438 F. Supp. 3d at 1103-04.[19]

---

[18] California also attempts (at 46) to dismiss the costs of complying with SB-822 as "incidental." But these economic losses — unrecoverable due to sovereign immunity — contribute to the irreparable harm Plaintiffs' members will suffer. *See Pac. Merch. Shipping Ass'n v. Cackette*, 2007 WL 2914961, at *3 (E.D. Cal. Oct. 5, 2007) ("irreparable harm" from "complying with the regulations" where "Eleventh Amendment" prohibits recovery). In any event, as we showed, compliance costs are far more than "incidental." *See* Pls.' Mem. 25-26.

[19] None of the cases California cites (at 44-45) addresses a party facing the threat of an enforcement action. Three suggest the possibility of future *private* lawsuits is insufficient to

*California Civil Code § 3101(a)(3), (9)*.  We argued (at 24-26) that SB-822's restrictions on interconnection go beyond the 2015 Order and are likely to interfere with ongoing commercial negotiations and existing contracts, resulting in lost revenues, business reputation, and goodwill.  California disputes this, claiming that SB-822's restrictions are coextensive with the limits the FCC placed on interconnection in the 2015 Order.  *Compare* Defs' Mem. 44 *with* Pls.' Mem. 22.  Because the Attorney General is "the chief law officer" charged with ensuring "the laws of the State are uniformly . . . enforced," this construction should be applied in all future enforcement actions.  *See* Cal. Const. Art. V, § 13.[20]  But even if SB-822 only imposes the same "utility-style regulation" as the 2015 Order, re-imposing this regulation will cause irreparable harm by disrupting what has long been, and is again today, a well-functioning unregulated commercial marketplace.  *See* 2018 Order ¶ 169; Klaer Decl. ¶¶ 4-16, 39; Paradise Decl. ¶¶ 4, 25, 28; Klaer Reply Decl. ¶¶ 2, 4-6; Paradise Reply Decl. ¶¶ 6-7.

California contends (at 43) that these harms are uncertain.  But Plaintiffs are not required to do the impossible and show that, if California enforces SB-822, every one of these harms is absolutely certain to occur.  Rather, as California's own cases (at 43) confirm, Plaintiffs need only show that harm is likely.  *See Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (no irreparable harm; plaintiff "simply asserted" harms and offered *no evidence* indicating "irreparable harm . . . is *likely*"); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (no irreparable harm where record contained *no evidence* supporting a "likelihood of irreparable harm").  Plaintiffs have met that

establish irreparable harm.  *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Mason v. Granholm*, 2007 WL 734990, at *2 (E.D. Mich. Mar. 7, 2007); *Bofi Fed. Bank v. Erhart*, 2016 WL 4680291, at *8 (S.D. Cal. Sept. 7, 2016).  But government enforcement actions carry a materially greater risk of irreparable harm than private litigation.  Another case finds that a plaintiff's need to file private lawsuits, absent an injunction, is not irreparable harm.  *See Sterling Commercial Credit-Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 17 (D.D.C. 2011).  The fifth case does not address future litigation at all.  *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011).

[20] *See also* Cal. Gov. Code §§ 12510, 12511, 12550; *cf. Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (considering local government's "authoritative constructions" of the law) (collecting cases).

standard here.  *See* Klaer Decl. ¶¶ 16, 21-23, 39; Paradise Decl. ¶¶ 30-35, 37-38.[21]

## III.    The Equities and the Public Interest Favor an Injunction

In contrast to the foregoing harms, California cannot show that any harm would result if SB-822 remains suspended, as it has been since January 1, 2019.  Notwithstanding its litany of declarations and multiple amicus briefs — and even though the FCC's light-touch framework has been in effect since June 2018 — California points to no harm that has occurred during the last two-plus years.  California instead relies on warmed-over policy objections that the FCC rejected in the 2018 Order and speculative theories about what broadband providers might do.  Far from causing any harm to competition or consumers, the status quo has been characterized by exemplary broadband performance — even in the face of extraordinary network demands associated with COVID-19.  This Court thus should preserve the status quo.

In essentially seeking to relitigate its unsuccessful appeal of the FCC's 2018 Order, California relies overwhelmingly (at 48) on recitations of alleged ISP misconduct that took place before *2015*.[22]  In the 2018 Order, the FCC explicitly rejected the same arguments on which the State now relies, and it accordingly abrogated the 2015 Order the State seeks to reanimate.  The FCC found instead that a light-touch regulatory regime was optimal — as the transparency-based regime and market forces would promote increased investment and innovation while effectively deterring any abusive conduct — and the D.C. Circuit held that its policy judgments were reasonable.  *See* Pls.' Mem. 9, 21-22; *Mozilla*, 940 F.3d at 47-49, 50-52, 56, 73.  Critically, the 2018 Order also found that the claimed pre-2015 abuses were illusory and did not support imposing restrictive conduct obligations on ISPs.  *See* 2018 Order ¶¶ 109-116; *see also* 2015 Order ¶¶ 200-201 (finding that the "record reflects competing narratives"

---

[21] While California incorrectly suggests (at 42 n.42) that its declarations identify unspecified "inaccuracies" in Plaintiffs' declarations, the Court need not resolve these inessential purported factual disputes to decide Plaintiffs' Motion.  In any event, it is California's declarants that have provided inaccurate or incomplete information.  *See*, *e.g.*, Klaer Reply Decl. ¶¶ 8-11, 13-16; Paradise Reply Decl. ¶¶ 8, 10-13, 15-18.

[22] *See*, *e.g.*, Schaeffer Decl. ¶¶ 13-30, 42 (describing events "prior to the adoption of the 2015 Open Internet Order"); Márquez Decl. ¶ 20 (describing a 2009 incident); Kronenberg Decl. ¶¶ 12-20 (describing events "[p]rior to the FCC's *2015 Open Internet Order*"); Nakatani Decl. ¶ 9 (describing a 2015 event and a 2016 event).

14

regarding interconnection for the exchange of Netflix traffic); 2018 Order ¶ 168 (finding the record "devoid of evidence of consumer harm" regarding interconnection in recent years). The 2015 Order's policy statements and factual findings are therefore irrelevant to this case, which comes to the Court five years later and under a different regulatory regime, which *Mozilla* upheld, that has resulted in today's well-functioning broadband marketplace.[23]

Unable to point to actual harms, California posits (at 50) *the mere possibility* that Plaintiffs' members will now — suddenly and more than two years after the 2018 Order took effect — choose to engage in some allegedly harmful conduct that SB-822 would prevent. Of course, this is groundless speculation founded (again) on a mischaracterization of the regulatory regime in place.[24] California also ignores Plaintiffs' members' enforceable commitments to preserve core principles of Internet openness, just as the States (at 9-10) and Internet Scholars (at 2, 7) ignore that the 2018 Order confirmed those commitments are enforceable by the FTC and state attorneys general. *See* Pls.' Mem. 7, 29 (citing 2018 Order ¶¶ 141-142 & n.511, 196, 244). At bottom, California's brief is a transparent attempt to relitigate policy determinations the FCC made in the 2018 Order, which the D.C. Circuit upheld on appeal, rejecting arguments California and others made against them.

### CONCLUSION

The Court should grant Plaintiffs' motion and preliminarily enjoin SB-822.

---

[23] The only alleged instance California cites that post-dates the 2018 Order comes from the Bowden Declaration. But California presented the same declaration in *Mozilla* in a brief conceding that Bowden described events "unrelated to net neutrality" that "would not have been prevented" under the 2015 Order. Chamber Br. at 7 (quoting Gov't Petitioner *Mozilla* Brief).

[24] The supposed harms identified in the State's numerous declarations likewise are nothing more than conjecture. *See*, *e.g.*, Kronenberg Decl. ¶¶ 29-31 (asserting that pre-2015 "problems are likely to reappear" but not citing any instances of recurrence since 2018 Order); Dolgenos Decl. ¶ 5 (asserting that ISPs "will be able to charge higher fees" absent expanded conduct rules without identifying any instance where an ISP has done so or explaining how SB-822 would regulate rates (contrary to its avowed scope)); Nakatani Decl. ¶ 8 (asserting without evidence that changed conduct by ISPs "*could* slow emergency assistance" (emphasis added)). Similarly, Philo's claim that it faces "ongoing" threats based on the speculative prospect that Charter might introduce data caps, McCollum Decl. ¶ 16, falls far short of establishing any concrete harm — Philo fails to point to any existing or planned measure in the marketplace, let alone show that it will cause harm to Philo or anyone else.

Dated: October 14, 2020

Respectfully submitted,

/s/     *Marc R. Lewis*

Scott H. Angstreich*
Leslie V. Pope*
Alex A. Parkinson*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
lpope@kellogghansen.com
aparkinson@kellogghansen.com

*Attorneys for Plaintiffs*
*CTIA – The Wireless Association and*
*USTelecom – The Broadband Association*

Jeffrey A. Lamken (CA SBN 154217)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff*
*American Cable Association*

* Admitted *pro hac vice*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
601 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs*
*American Cable Association,*
*CTIA – The Wireless Association,*
*NCTA – The Internet & Television Association,*
*and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Ryan S. Baasch*
James A. Tomberlin*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
ryan.baasch@lw.com
james.tomberlin@lw.com

*Attorneys for Plaintiff*
*NCTA – The Internet & Television Association*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that, on October 14, 2020, I electronically submitted the attached

3  document to the Clerk's Office using the U.S. District Court for the Eastern District of

4  California's Electronic Document Filing System (ECF).

5

6

7                                              /s/      *Marc R. Lewis*
                                               Marc R. Lewis (CA SBN 233306)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28