| | |
|---|---|
| Scott H. Angstreich* <br> Leslie V. Pope* <br> Alex A. Parkinson* <br> KELLOGG, HANSEN, TODD, FIGEL, & FREDERICK, P.L.L.C. <br> 1615 M Street NW, Suite 400 <br> Washington, DC 20036 <br> (202) 326-7900 <br> sangstreich@kellogghansen.com <br> lpope@kellogghansen.com <br> aparkinson@kellogghansen.com <br><br> *Attorneys for Plaintiffs* <br> *CTIA – The Wireless Association and* <br> *USTelecom – The Broadband Association* <br><br> Jeffrey A. Lamken (CA SBN 154217) <br> MOLOLAMKEN LLP <br> The Watergate, Suite 600 <br> 600 New Hampshire Ave., NW <br> Washington, DC 20037 <br> (202) 556-2000 <br> jlamken@mololamken.com <br><br> *Attorney for Plaintiff American Cable Association* <br><br> * Admitted *pro hac vice* | Marc R. Lewis (CA SBN 233306) <br> LEWIS & LLEWELLYN LLP <br> 505 Montgomery Street, Suite 1300 <br> San Francisco, CA 94111 <br> (415) 800-0591 <br> mlewis@lewisllewellyn.com <br><br> *Attorney for Plaintiffs* <br> *American Cable Association,* <br> *CTIA – The Wireless Association,* <br> *NCTA – The Internet & Television Association,* <br> *and USTelecom – The Broadband Association* <br><br> Matthew A. Brill* <br> Matthew T. Murchison* <br> Ryan S. Baasch* <br> James A. Tomberlin* <br> LATHAM & WATKINS LLP <br> 555 Eleventh Street NW, Suite 1000 <br> Washington, DC 20004 <br> (202) 637-2200 <br> matthew.brill@lw.com <br> matthew.murchison@lw.com <br> ryan.baasch@lw.com <br> james.tomberlin@lw.com <br><br> *Attorneys for Plaintiff* <br> *NCTA – The Internet & Television Association* |

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, <br><br> Defendant. | Case No. 2:18-cv-02684 <br><br> **REPLY DECLARATION OF KEN KLAER OF COMCAST IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. John A. Mendez |

I, Ken Klaer, declare as follows.

1. My name is Ken Klaer. I am Executive Vice President of Comcast Technology Solutions, a division of Comcast Cable Communications ("Comcast"). I am responsible for overseeing Comcast's commercial Internet traffic exchange arrangements with hundreds of networks, edge providers, and other third parties, and am very familiar with Comcast's network infrastructure and practices. I previously submitted a declaration in support of Plaintiffs' Renewed Motion for Preliminary Injunction ("Klaer Decl."). I submit this reply declaration to respond to the declaration filed by Dave Schaeffer, CEO of Cogent Communications, Inc. ("Cogent Decl.") to correct the record on certain inaccurate or misleading claims therein,[1] as well as to address some points raised in the declaration of Dr. Scott Jordan, Professor of Computer Science at the University of California, Irvine ("Jordan Decl.").

2. At the outset, it is important to emphasize that there is no real-world interconnection problem for SB-822 to address. The interconnection marketplace has been operating well and is competitive, as I described previously. *See* Klaer Decl. ¶¶ 7-16. Nor will the interconnection-related provisions of SB-822 help consumers; instead, these provisions could result in Internet service providers ("ISPs") like Comcast bearing greater costs and many edge providers being deprived of an efficient competitive alternative to reliably transmit high-quality content and other services to millions of end users. Finally, while Cogent presents a skewed and misleading version of our companies' prior dealings (as discussed further below), the larger competitive context here is more illuminating. Because Cogent rightly views ISPs as rising competitors in its space that can continue to attract high-volume interconnection business away from third-party intermediary networks, it naturally would prefer to have an aggressively interpreted version of SB-822 as a tool to limit that competition.

---

[1] This reply declaration does not address every inaccurate or misleading statement in the Cogent declaration.

1
Reply Declaration of Ken Klaer in Support of Plaintiffs' Motion for Preliminary Injunction

**Comcast and Other ISPs Are Not "Terminating Access Monopolies"**

3. Cogent and Dr. Jordan claim that Comcast and other large ISPs have a so-called "terminating access monopoly" over access to their broadband customers. Cogent Decl. ¶ 37; Jordan Decl. ¶ 42. Cogent further argues that ISPs have the incentive and the ability to degrade their customers' broadband service as an interconnection bargaining tactic given the lack of competition in the broadband marketplace. *See* Cogent Decl. ¶ 37; *see also id.* ¶¶ 49, 61. These statements are incorrect and do not square with marketplace realities.

4. The broadband marketplace in which Comcast operates is competitive. The vast majority of our customers have access to at least two fixed broadband providers, as well as multiple mobile broadband options. According to data published by the Federal Communications Commission, 86.7 percent of Californians have access to two or more fixed broadband providers offering speeds of at least 25 Mbps downstream and 3 Mbps upstream as of June 2019.[2] Broadband providers of every technology – cable, telco/fiber, fixed and mobile wireless, and satellite – are heavily investing to bring high-quality competing service options to consumers. Given this competition, Comcast and other ISPs have strong incentives to ensure the high quality of their customers' broadband experience, including ubiquitous access to online video options.

5. Nor do Comcast and other ISPs have monopolies over access to their customers. Online video providers and other edge providers are not required to enter into direct paid interconnection arrangements with Comcast or other ISPs in order to reach ISP customers. There are dozens of alternative pathways for edge providers to interconnect to Comcast's

---

[2] Federal Communications Commission, Broadband Map, https://broadbandmap.fcc.gov/#/ (figure includes all fixed broadband services excluding satellite) (last visited Oct. 12, 2020).

network and reach Comcast's customers without paying Comcast directly (e.g., third-party transit providers, content distribution networks ("CDNs"), and other intermediary networks). Opting instead to pay for dedicated, direct interconnection arrangements is entirely optional for edge providers. In fact, the overwhelming majority of edge providers do *not* enter into such arrangements with Comcast or other ISPs (nor would they ever need to consider doing so), and instead utilize a wide variety of intermediary "transit" networks like Cogent that offer these alternative routes to deliver traffic to Comcast or other ISP networks. *See* Klaer Decl. ¶ 9. It is thus no surprise that, as Cogent itself repeatedly states, the transit marketplace is "competitive." *See* Cogent Decl. ¶¶ 62, 65.

6. At the same time, of course, certain edge providers and other interconnecting parties may decide it makes more sense to "cut out the middleman" and choose to enter into direct interconnection agreements with Comcast so that they can route their traffic directly to Comcast's network on a dedicated connection, and bypass paying intermediary, shared third-party networks like Cogent. Transit services, such as those provided by Cogent, use shared routes, so an edge provider using these services to reach Comcast's network could be impacted by large competing traffic demands of others sharing the same transit links. Direct, dedicated interconnection arrangements alleviate that issue and thus can provide more predictable and consistent delivery of the edge provider's traffic. To attract this business, Comcast's prices for interconnection must be competitive. In fact, average prices for transit/interconnection services have precipitously dropped year-over-year over the past decade and continue to fall on a per-megabit basis. A marketplace dominated by "terminating access monopolies" would not have these hallmarks of competition.

7. Importantly, Comcast does not utilize interconnection to extract tolls for *access* to its customers, since that access is available *without* any payment to Comcast. Payment

3

Reply Declaration of Ken Klaer in Support of Plaintiffs' Motion for Preliminary Injunction

simply reflects the benefits of acquiring a direct, dedicated routing path to Comcast's network, without the need for a middleman transit provider. Comcast can provide, and charge for, these direct links *not* because it has a large number of broadband customers, but because, as Cogent itself acknowledges, Comcast made substantial investments to build out its own backbone facilities. *See* Cogent Decl. ¶¶ 10-11 & n.5. It is the presence of that robust, geographically broad backbone that enables Comcast to offer edge providers and CDNs direct interconnection services. To be sure, such investments make the most sense for larger ISPs with more substantial networks, so smaller ISPs may not take this step; these smaller ISPs are thus reliant on transit providers for all connections into (and off) their network. But having made that substantial backbone infrastructure, Comcast *is* able to offer direct, dedicated interconnection services to interested interconnection customers.

**Comcast Offers a Competitive Option for Edge Providers and Others That Wish To Connect Directly**

8. Given the importance of ensuring a quality broadband experience for its customers, Comcast proactively works with its interconnection partners on network and capacity planning in order to ensure sufficient interconnection port capacity to help avoid network congestion. Contrary to Cogent's claims, Comcast did not and does not "let" unpaid settlement-free interconnection ports congest in order to "incentivize" edge providers into uneconomical paid peering arrangements. *See* Cogent Decl. ¶¶ 13-20, 25 n.14. Doing so would jeopardize Comcast's relationship with its own broadband customers, a relationship far more important and remunerative than any payment Comcast receives from direct interconnection partners that agree to share the costs of interconnection and upgrading port capacity. The network congestion Cogent describes in its declaration was a problem of Cogent's own creation

– one that Cogent attempted to leverage in order to obtain greater interconnection capacity for free from Comcast so that it could then sell this capacity to edge providers for Cogent's benefit.

9. As I explained previously, *see* Klaer Decl. ¶¶ 11-12, Comcast provides settlement-free interconnection – i.e., where no monetary payment is made in either direction – primarily to other large backbone providers and providers like Cogent that offer a generally balanced exchange of traffic (within a reasonable ratio) with Comcast. These settlement-free links are necessary for Comcast to connect to the rest of the Internet. During the 2012-2015 period Cogent references in its declaration, *see* Cogent Decl. ¶¶ 13-20, Cogent sold transit service to Netflix and other content providers at a significant discount, which resulted in these providers sending extremely large amounts of traffic over Cogent's interconnection ports with Comcast. Cogent's traffic into Comcast's network grew by nearly *500 percent* over a very short time period. This completely overwhelmed Cogent's existing spare capacity into Comcast's network, resulting in a highly unbalanced exchange of traffic. *See* Klaer Decl. ¶ 27. Put simply, Cogent sold more capacity to Netflix and other content providers than was actually available on the routes it had arranged into Comcast's network – capacity that Cogent did not pay for – which led to congestion at Cogent's interconnection ports into Comcast and other ISP networks. This also all happened very quickly, and outside of any cooperative capacity planning process. During this time, Comcast did not "simply continue[] to allow congestion to occur." Cogent Decl. ¶ 18. Comcast could not – and does not – ever knowingly allow all its settlement-free links to congest, as this would severely impair the performance of Comcast's broadband network overall and impact its customers' Internet experience.[3] Because of this, Cogent had the

---

[3] Comcast in fact pointed out during this dispute that it had multiple other non-congested routes into its network, including settlement-free links, that had ample spare capacity to carry the additional traffic of the edge providers that were routing their traffic through Cogent.

leverage to try to force Comcast's hand. Thus, while Comcast repeatedly offered to enter into discussions with Cogent about increasing its port capacity, and even supplied additional capacity on a complimentary basis in the hopes of reaching a commercial solution, Cogent refused to discuss any kind of commercial arrangement with Comcast. *See* Klaer Decl. ¶ 27. And *Cogent* later admitted to deliberately slowing traffic from several of its largest customers, including Netflix, during this specific period.[4]

10. Cogent also claims that Comcast stopped upgrading Cogent's interconnection ports after the FCC's 2018 Order went into effect and was only willing to expand interconnection capacity in October 2018 right after SB-822 passed. Cogent Decl. ¶ 80. Neither of these claims is accurate. In fact, Comcast consistently upgraded Cogent's ports throughout the 2015-2018 period, several times each year. The parties' capacity discussions in 2017 and 2018 were not prompted by SB-822 and instead were related to traffic management issues involving a third party that is both a Cogent customer and Comcast interconnection partner, which Comcast was able to resolve with that party in 2018. Notably, the software download issue that another Cogent customer, Panic, experienced on Comcast's network in early 2018 – which Cogent points to as an example of congestion at Cogent ports – confirms that Comcast's willingness to expand capacity for Cogent was unrelated to the passage of SB-822. *See id.* As the March 5, 2018 Panic blog post explains, Comcast worked cooperatively with Panic and even connected Panic with Cogent to resolve the issue by adding more capacity

---

[4] *See* Dan Rayburn, *Cogent Now Admits They Slowed Down Netflix's Traffic, Creating a Fast Lane & Slow Lane*, STREAMING MEDIA BLOG (Nov. 5, 2014), https://www.streamingmediablog.com/2014/11/cogent-now-admits-slowed-netflixs-traffic-creating-fast-lane-slow-lane.html; *see also* Jon Brodkin, *During Netflix Money Fight, Cogent's Other Big Customers Suffered Too*, ARS TECHNICA (Nov. 5, 2014), https://arstechnica.com/information-technology/2014/11/during-netflix-money-fight-cogents-other-big-customers-suffered-too/.

for Cogent – all months before SB-822 was enacted.[5] This occurred even though Panic is a Cogent customer with whom Comcast does not have a direct contractual relationship.

11. More generally, Cogent presents no evidence that the edge providers that choose to pay Comcast instead of paying Cogent or other intermediaries for interconnecting with Comcast's network are paying more or getting inferior service. In fact, the opposite is true. As noted, Comcast's interconnection prices are competitive; on a per-megabit basis, interconnection prices overall continue to decline year-over-year, as they have over the past decade. And these direct, dedicated interconnection arrangements can reduce the number of "hops" over which the traffic must travel, which minimizes the risk of congestion and improves the delivery of edge provider content. Comcast also offers its direct interconnection partners the ability to interconnect deeper into the Comcast network at our regional hubs, closer to the end user customers than the large settlement-free interconnection points, which are spread out more sparsely at a few sites across the country. *See* Klaer Decl. ¶ 15. Direct interconnection also creates longer-term stability because Comcast works with its direct interconnection partners to cooperatively plan for their capacity needs over the term of an agreement. These dedicated arrangements are altogether voluntary and mutually beneficial. As Cogent forthrightly acknowledges in its most recent annual report, "as some of our customers grow larger *they may decide* to build their own Internet backbone networks or enter into direct connection agreements with telephone and cable companies that provide Internet service to consumers."[6] In short, as a result of edge provider demand – especially large edge providers that send substantial traffic –

---

[5] Cabel Sasser, *The Mystery of the Slow Downloads*, PANIC BLOG, https://panic.com/blog/mystery-of-the-slow-downloads (Mar. 5, 2018). According to Panic, the congestion also was caused by Cogent's traffic engineering choices. *Id.*

[6] Cogent Communications, Inc., 2019 Annual Report (Form 10-K), at 10 (Feb. 28, 2020), https://cogentco.com/files/docs/about_cogent/investor_relations/reports/10k_report_2019.pdf (emphasis added).

and Comcast's own ability to accommodate and service that demand, Comcast is offering edge providers an attractive competitive alternative to middlemen like Cogent. And this is really the concern animating Cogent's advocacy for regulatory interference with ISPs' interconnection arrangements: As Cogent goes on to note in its annual report, "[a] migration of a few very large Internet users to their own networks, or to special networks that may be offered by major telephone and cable providers of last mile broadband connections to consumers . . . could impair our growth, cash flow and profitability."[7] It is not surprising that Cogent views SB-822 as a potential regulatory avenue to reduce or hamstring this newfound competition.

**The Costs of Ever-Increasing Free Port Capacity Are Not Trivial**

12. Cogent asserts that, in 2014, it offered to pay for Comcast's costs for upgrading port capacity and suggests that these costs are "minimal" and "small." *See* Cogent Decl. ¶¶ 16, 28. According to Cogent, the capital cost to upgrade a port is "less than $10,000." *Id.* ¶ 14. However, the costs of upgrading ports – i.e., adding new hardware and establishing additional cross-connects – are not the primary issue. They are a drop in the bucket relative to the full cost to Comcast of supplying greater interconnection capacity to settlement-free partners whose traffic is out of reasonable balance with our traffic. As Dr. Jordan acknowledges, "[t]he cost of the equipment located at interconnection points constitutes a very small percentage of each party's costs for transporting traffic between the two parties. Overall costs are dominated by the costs of having and running content servers and transporting traffic across networks, rather than the cost of the physical equipment at interconnection points." Jordan Decl. ¶ 56. Invariably, if transit providers like Cogent had substantial excess capacity to sell to edge providers, that capacity would be used to deliver much greater volumes of traffic to our network in inefficient

---

[7] *Id.*

8

ways – for example, handing off traffic in New York that is bound for California because that is more convenient for Cogent (but not necessarily for its edge provider or CDN customers), or shifting traffic to certain ports to make them capacity constrained in order to leverage further capacity upgrades even while other ports remain underutilized.

13. Cogent depicts the issue as the broadband provider merely making its "doors" (i.e., ports) "large enough" to handle all the traffic sent by an interconnecting party like Cogent. Cogent Decl. ¶ 5. Switching analogies, Cogent says "[t]hink of two fast-moving eight-lane highways that are connected by only one lane – the congestion is caused by the connecting road, not the highways." *Id.* ¶ 17. Cogent also claims that, from the point of interconnection, broadband providers "only ha[ve] to pay for transporting the traffic [across] the last step – from the interconnection point closest to the customer to the customer." *Id.* ¶ 52. These statements, individually and taken together, paint an overly simplistic picture of our network and related costs that ISPs incur to manage the network.

14. First, it is not just one "door" but dozens of doors that need to be enlarged constantly. As noted, a great deal of that added capacity will be used inefficiently. Interconnecting parties like Cogent have wide leeway as to how they route traffic and can drop traffic off in different locations at different times, with no notice to the receiving ISP. The volumes of traffic that Cogent and other transit providers send to our network ebb and flow; Cogent's position appears to be that ISPs must keep all ports open for any notional maximum of traffic in all locations, and at all times. But it cannot be the responsibility of ISPs like Comcast to ensure that there is always and immediately sufficient capacity to handle any possible traffic spike from an interconnecting network no matter where it is delivered – and to bear those enormous, unpredictable costs alone. To do so would require maintaining vastly excessive

9
Reply Declaration of Ken Klaer in Support of Plaintiffs' Motion for Preliminary Injunction

spare capacity at every port and would create serially stranded facilities where excess capacity is not needed.

15. Second, while Cogent's network may be accurately characterized as a wide highway, Comcast's network is more properly thought of as dozens of interconnected regional networks, comprised of hundreds of metro networks. In short, Comcast's network is the whole highway system within its footprint, plus all the city streets and blocks. Thus, depending on where a party like Cogent drops off its traffic, the so-called "last step" may involve carrying that traffic *thousands* of miles along many different routes. If all the settlement-free ports into our network were large enough for Cogent and others to send as much traffic as they may wish, without regard to overall balance of traffic, our ability to efficiently manage traffic within our network would be severely impaired, resulting in poor quality and reliability for millions of our customers. For this reason, having rational direct agreements with large traffic-sending parties that pay some consideration makes sense, as it promotes reasonable planning and cooperation and responsible capacity forecasts. Otherwise, the burdens to Comcast's network management of unlimited free capacity for everyone could be significant to the point of shifting some of the added costs to end-user customers. This would not be an acceptable outcome.

### It Is Not Realistically Feasible for Comcast and Other ISPs To Isolate California Internet Traffic

16. Cogent and Dr. Jordan suggest that Comcast and other ISPs can readily comply with SB-822's interconnection provisions by simply isolating and measuring traffic to and from customers in California, or, according to Cogent, by just upgrading interconnection ports in California as it would to accommodate normal growth in Internet traffic. *See* Cogent Decl. ¶¶ 67, 74; Jordan Decl. ¶¶ 52-53. But separating out California traffic from all other Comcast Internet traffic is not realistically feasible. As a contractual matter, Comcast's direct interconnection arrangements with edge providers generally are based on the total amount of

traffic exchanged, and do not separate out traffic delivery on a state-by-state basis. Given how these agreements are structured, complying with SB-822's interconnection requirements is not "merely a billing issue." *See* Jordan Dec. ¶ 54. As a technical matter, as I explained in my prior declaration, Comcast, as well as its interconnection partners, would likely need to re-route traffic to ensure it is exchanged regionally within the state, which would require costly changes to regional traffic exchange facilities. Klaer Decl. ¶ 33. A simple measurement of California traffic would not allow for the adequate separation of California traffic and all other Comcast Internet traffic necessary to comply with SB-822's interconnection provisions. *See* Jordan Decl. ¶ 54. And even if Comcast and other ISPs were forced to implement these costly changes to separate California traffic, such a mandate would provide an opportunity for arbitrage as intermediary networks would be incentivized to route substantial amounts of Internet traffic, even traffic destined for customers outside of California, to interconnection points within the State. This too would impose costly network upgrades on Comcast and other ISPs in order to accommodate the artificial surge in interconnection demands within California and avoid a degradation of service for Comcast customers as well as those of other ISPs. *See* Klaer Decl. ¶¶ 34-35. Although Cogent and Dr. Jordan claim that, under SB-822, transit providers like Cogent and other interconnecting parties would not have the incentive to route *non*-California bound traffic to interconnection points in California, *see* Cogent Decl. ¶ 72; Jordan Decl. ¶ 55, nothing in that law or otherwise prevents Cogent and others from attempting to do so. Our experience is that Cogent routes traffic to specific geographic locations to increase its leverage to obtain greater capacity; it is highly probable that SB-822 will significantly amplify that practice.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 13th day of October 2020 in Denver, Colorado.

Ken Klaer
EVP, Comcast Technology Solutions
Comcast Cable Communications