| | |
|---|---|
| Scott H. Angstreich* <br> Leslie V. Pope* <br> Alex A. Parkinson* <br> KELLOGG, HANSEN, TODD, <br>   FIGEL & FREDERICK, P.L.L.C. <br> 1615 M Street, NW, Suite 400 <br> Washington, DC 20036 <br> (202) 326-7900 <br> sangstreich@kellogghansen.com <br> lpope@kellogghansen.com <br> aparkinson@kellogghansen.com <br><br> *Attorneys for Plaintiffs* <br> *CTIA – The Wireless Association and* <br> *USTelecom – The Broadband Association* <br><br> Jeffrey A. Lamken (CA SBN 154217) <br> MOLOLAMKEN LLP <br> The Watergate, Suite 500 <br> 600 New Hampshire Avenue, NW <br> Washington, DC 20037 <br> (202) 556-2000 <br> jlamken@mololamken.com <br><br> *Attorney for Plaintiff* <br> *American Cable Association* <br><br> * Admitted *pro hac vice* | Marc R. Lewis (CA SBN 233306) <br> LEWIS & LLEWELLYN LLP <br> 601 Montgomery Street, Suite 2000 <br> San Francisco, CA 94111 <br> (415) 800-0591 <br> mlewis@lewisllewellyn.com <br><br> *Attorney for Plaintiffs* <br> *American Cable Association,* <br> *CTIA – The Wireless Association,* <br> *NCTA – The Internet & Television Association,* <br> *and USTelecom – The Broadband Association* <br><br> Matthew A. Brill* <br> Matthew T. Murchison* <br> Ryan S. Baasch* <br> James A. Tomberlin* <br> LATHAM & WATKINS LLP <br> 555 Eleventh Street NW, Suite 1000 <br> Washington, DC 20004 <br> (202) 637-2200 <br> matthew.brill@lw.com <br> matthew.murchison@lw.com <br> ryan.baasch@lw.com <br> james.tomberlin@lw.com <br><br> *Attorneys for Plaintiff* <br> *NCTA – The Internet & Television Association* |

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members, <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, <br><br> Defendant. | Case No. 2:18-cv-02684 <br><br> **REPLY DECLARATION OF MICHAEL D. PARADISE OF AT&T IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Michael D. Paradise, declare as follows.

1. I, Michael D. Paradise, am Vice President–Network Operations at AT&T, a member of plaintiffs USTelecom and CTIA. I have worked in this position since 2004 and for AT&T since 1999. I have been personally involved in the administration of interconnection arrangements with other providers. I submit this declaration to respond to the declarations of Angie Kronenberg, Scott Jordan, and Dave Schaeffer (collectively "Declarants") in support of Defendants' Opposition to Motions for Preliminary Injunction. Although those declarations contain numerous inaccurate and misleading statements that previously have been rejected by the Federal Communications Commission ("FCC"),[1] I focus here on three claims that challenge points addressed in my initial declaration.

2. Specifically, I respond to claims: (1) that AT&T and other broadband providers have the incentive and ability to harm Internet openness by using their supposed "terminating access monopolies" to extract access fees or tolls from transit providers, content delivery

---

[1] For example, Ms. Kronenberg and Mr. Schaeffer recycle at length old and debunked arguments that: (1) prior to the FCC's 2015 Order, in which it for the first time asserted authority over Internet traffic exchange, AT&T and other ISPs deliberately allowed their Internet traffic exchange points with Cogent to congest to extract fees for traffic it was delivering on behalf of edge providers like Netflix; (2) that adoption of the 2015 Order and the threat of complaints convinced these ISPs to enter new interconnection arrangements that alleviated the congestion; and (3) if the Court were to stay enforcement of SB-822, these ISPs would revert to their prior strategies of unilateral congestion when the current arrangements expire. *See* Kronenberg Decl. ¶¶ 12-31; Schaeffer Decl. ¶¶ 13-84. Cogent and INCOMPAS aired these arguments at length in the FCC proceeding that resulted in the 2015 Order, when they urged the FCC to adopt the very same internet traffic exchange rules adopted in SB-822. Those claims were wrong when Cogent and INCOMPAS made them before and they are wrong now. The FCC itself did not credit them, finding that the record "reflect[ed] competing narratives." 2015 Order ¶ 200. It therefore eschewed the prescriptive rules governing internet traffic exchange that Cogent and INCOMPAS proposed, deciding instead to monitor Internet traffic exchange developments and act on a case-by-case basis if problems arose. *Id.* ¶ 202. In the two years the 2015 Order was in effect, the FCC took no such action — indeed, the FCC noted that its "new case-by-case process ha[d] gone unused, even as [online video distribution services] — which ISPs presumably might view as competitors to affiliated video programming products or services — have proliferated." 2018 Order ¶ 168.

1
Reply Declaration of Michael D. Paradise in Support of Plaintiffs' Motion for Preliminary Injunction

networks ("CDNs"), and edge providers[2]; (2) that the cost to augment AT&T's interconnection facilities to accommodate additional traffic is minimal[3]; and (3) that implementing California-specific interconnection rules is technically and commercially feasible today.[4]

### ISPs Do Not Have a Terminating Access Monopoly

3. Claims that broadband providers' control over the last mile connection between their end user customers and the broader Internet create a terminating access monopoly that allows ISPs like AT&T to extract monopoly rents from edge providers seeking to deliver content to end users are incorrect for multiple reasons. First, the preconditions for terminating access problems do not apply to Internet access services. The concept of terminating access monopolies arose in the context of traditional phone services. In that context, some local telephone companies were able to charge long distance carriers high fees for traffic termination because the long distance providers were required by law to pay those fees, and prohibited by law from recovering them from the customers who were placing the calls that were generating those fees because of rules requiring them to charge averaged end user rates across the country. Because neither the end users of a local telephone company charging high access fees nor those placing calls to those end users had to bear the higher fees associated with those calls — indeed, they had no reason to be aware of those high fees and might benefit from them through a lower cost of service — the behavior of the local telephone company in setting such high fees could not give them a reason to switch to another local telephone company. In contrast, if a broadband provider were to try to block or throttle specific Internet content, its end users would be directly affected, and could switch providers. Similarly, if a broadband provider sought to

---

[2] *See* Kronenberg Decl. ¶¶ 12-31; Schaeffer Decl. ¶¶ 13-84; Jordan Decl. ¶¶ 7, 42-44. In my declaration, I observed that, given the multiplicity of paths into any ISPs network, no ISP can selectively degrade particular traffic exchange arrangements to harm particular content providers. *See* Paradise Decl. ¶ 24.

[3] *See* Kronenberg Decl. ¶¶ 13, 32-35; Schaeffer Decl. ¶¶ 19, 63; Jordan Decl. ¶¶56-57.

[4] *See* Schaeffer Decl. ¶¶ 66-74 (asserting that my declaration to the contrary is "not correct"); Jordan Decl. ¶¶ 38-54.

extract anticompetitive fees from particular content providers, those content providers would have no obligation to pay those fees or they could pass them along to the customers of the broadband providers who were charging them. In either case, those customers would be aware of the consequences of their provider's behavior and could react by switching broadband providers. In short, the terminating access monopoly problem that arose in the context of telephone services was the direct result of regulations that made it possible for telephone companies to charge excessive terminating access fees without adverse consequence. Those regulations don't apply to broadband, and the concept thus cannot be imported from the telephone context to the broadband context. To the contrary, end user customers of broadband providers would themselves face the consequence of anticompetitive conduct by their provider, and thus would have the knowledge, incentive and ability to switch providers in the event of such conduct.

4. Declarants, however, assert that broadband providers face limited competition, and, even where they do, consumers may be reluctant to switch providers due to purportedly high switching costs.[5] But Declarants and others raised these same arguments to the FCC in the proceeding that led to the 2018 Order, and the FCC rightly rejected them, finding that providers of both fixed and mobile broadband services face significant competitive pressures that prevent them from engaging in anticompetitive conduct, such as by blocking or degrading traffic unless edge providers agree to pay for delivery of their content to end users.[6]

5. In the case of fixed broadband services, the FCC found the vast majority of households have a choice between two or more fixed broadband providers,[7] providing ample

---

[5] *See* Kronenberg Decl. ¶ 21.

[6] *See* 2018 Order ¶¶ 123-132.

[7] *See id.* ¶¶ 124-126. The most recent available FCC data, from December 2018, show that 91% of residential census blocks have at least three providers offering fixed broadband services with a minimum of 10 Mbps downstream and 1 Mbps upstream, and fully *100%* have at least two such providers. *See* FCC, *Internet Access Services: Status as of December 31, 2018*, at 6, Fig. 4 (Sept. 2020), https://docs.fcc.gov/public/attachments/DOC-366980A1.pdf.

1 competition to discipline prices and preserve an open internet.  As the FCC correctly
2 recognized, the high fixed and low marginal costs of providing fixed broadband services ensure
3 that competitive conditions persist even in areas with few competitors because a provider will
4 save little in the way of costs but lose substantial revenues for every customer it loses to the
5 competition.[8]  As a consequence, even in areas with few competitors, AT&T and other
6 providers of fixed broadband services vigorously compete to attract new and retain existing
7 customers through advertising, low prices and other attractive offers for new customers, and
8 they try to convince subscribers seeking to cancel service to continue their subscriptions at
9 discounted rates.

      6.     Competition for mobile broadband is even greater.  Virtually all Americans (approximately 98 percent) have a choice of three or more mobile broadband service providers, including from among three nationwide providers and nearly 100 regional or local mobile broadband providers nationwide.[9]  Consumers can choose from among nearly 700 different smartphone plans, hundreds of devices, and millions of apps and services.[10]  Given this array of options, consumers routinely switch providers.  For example, in 2019, approximately 14 percent of AT&T's postpaid wireless subscribers left AT&T.[11]  As a consequence, AT&T and other mobile broadband providers cannot realistically impose limits on their customers' access to the content, applications, and online services of their choice for fear of losing customers.

      7.     Mobile broadband competition protects against anticompetitive conduct not only by providers of mobile broadband services, but also by providers of fixed broadband services.  While fixed and mobile broadband have different characteristics and capabilities, the line between them has become increasingly blurred, and likely will disappear altogether with the

---

[8] *See* 2018 Order ¶ 126.

[9] *See* CTIA, The Wireless Industry:  An American Success Story, available at https://www.ctia.org/the-wireless-industry/wireless-industry (last visited Oct. 5, 2020).

[10] *Id.*

[11] *See* AT&T Inc., 2019 10-K, at 31 (average monthly postpaid churn rate of 1.18%).

deployment of 5G networks and services, which will enable mobile broadband providers to compete directly with fixed broadband rivals. Under these competitive market conditions, no broadband provider, fixed or mobile, can afford to block or degrade its customers' access to popular content or deprive them full access to the internet because doing so would devalue its service and cause it to lose customers to rivals.

8. Second, the Declarants' claim that, absent regulation, broadband providers can unilaterally maintain congested interconnection links to degrade the service of edge providers is plainly incorrect. The web of interconnection arrangements among broadband networks, and the thriving market for transmission alternatives, provides many efficient paths through which edge providers can reach a broadband provider's customers. AT&T, for example, peers in the U.S. with 19 different networks (other ISPs and Internet Backbone Network Operators) at 9 geographically diverse interconnection points across the country. It also provides transit services to edge providers at hundreds of locations across the country. Edge providers thus can, and do, choose from among many different routes into and out of AT&T's and other broadband providers' networks, and readily can obtain indirect interconnection by purchasing transmission services from third-party CDNs or transit service providers at low, and still falling, rates. Transit providers (like Cogent) and their customers typically rely on multiple redundant paths into any broadband provider's network, and edge providers dynamically shift between transit providers to avoid congestion. As a consequence, a broadband provider could not degrade a particular edge provider's service by allowing its interconnection links to congest without limiting capacity across *all* its peering points for an extended period, radically degrading the broadband internet access service provided to its mass market and business customers generally. In these circumstances, AT&T and other broadband providers have no ability to extract inefficiently high payments from any other broadband network or their customers.

**Declarants Significantly Understate the Cost to Augment Interconnection Capacity**

9. Ms. Kronenberg and Mr. Schaeffer attempt to downplay the cost of augmenting interconnection arrangements. Typically, settlement free peering agreements establish traffic

5

exchange ratios that permit networks to continue exchanging traffic on a settlement free basis so long as the traffic exchanged does not exceed a set ratio (i.e., so long as the traffic sent by one party does not exceed that it receives from the other party by a ratio of, for example, 2-to-1). After Cogent began providing transiting service to Netflix (that is, to deliver Netflix traffic to other broadband providers), its ratio exceeded that set in its interconnection agreements several times over. It was at that point that AT&T and other Cogent interconnection partners declined to augment their interconnection arrangements with Cogent until it either came into compliance with its interconnection agreements or agreed to cover the cost of accommodating the excess traffic.

10. Mr. Schaeffer and Ms. Kronenberg claim that the payments AT&T and other large broadband providers demanded to accommodate that traffic far exceeded the costs to upgrade the connections between their networks and Cogent. Specifically, they claim that the cost of upgrading the connections between networks are "minimal,"[12] "rang[ing] in the tens of thousands of dollars for a significant capacity increase at a major point of interconnection."[13] They further claim that INCOMPAS and Cogent offered to pay[14] those costs, and argue that the refusal by the large broadband providers to accept its offer demonstrates their power to exploit their purported terminating access monopolies.[15]

11. AT&T's refusal to accept Cogent's offer reflects nothing of the kind. Cogent's offer extended only to covering the costs of augmenting the capacity of equipment at the points

---

[12] Schaeffer Decl. ¶ 16.

[13] Kronenberg Decl. ¶ 13.

[14] *Id.* ¶13 ("Indeed, although traditionally both parties have shared these upgrade costs, our members offered to pay the entire cost of the upgrades in order to ensure that sufficient capacity was available. But the large BIAS providers refused."); Schaeffer Decl. ¶ 18 ("In fact, in March of 2014, Cogent offered to pay not just its own, but also the ISPs' capital costs associated with adding capacity to the connections between Cogent and the networks of AT&T, Comcast, Time Warner Cable and Verizon. None accepted the offer, underscoring the absence of any cost justification for their decisions.").

[15] *See* Kronenberg Decl. ¶¶ 13-15; Schaeffer Decl. ¶¶ 15-18.

of interconnection themselves. But, for every $1 of capital AT&T spends to augment the capacity of equipment at the points of interconnection to accommodate additional traffic, AT&T must spend an additional $2,200 to augment its Internet backbone and local metro network capacity to deliver that traffic to its subscribers across the United States. Cogent's offer thus covered a miniscule fraction of AT&T's costs to carry Cogent's traffic to AT&T's broadband Internet access service subscribers, and certainly nowhere near the "entire cost of the upgrades" as Ms. Kronenberg claims.[16]

12. Ms. Kronenberg also seeks to minimize these costs by asserting that, because edge providers and their transit suppliers consistently offer to hand off traffic to broadband providers at points of interconnection reasonably close to those providers' subscribers, broadband providers only bear the cost of carrying that traffic over a small part of their networks (from the point where it is handed off to the point where the subscriber is located), which she asserts "is not a large burden."[17] She further claims that, insofar as such traffic is requested by broadband providers' subscribers, those providers should recover those costs from those subscribers rather than their interconnection partners.[18]

13. However, as I explained in my opening declaration, and as Ms. Kronenberg fails to acknowledge, as a general rule, traffic is exchanged between Internet peers utilizing a "hot potato" routing model. Under that model, Internet traffic is handed off by one peer to the other at the interconnection point closest to the *origin* of the traffic, regardless of where the traffic ultimately is destined, and the other peer is then obligated to carry that traffic on its own network to the destination. If there is return traffic, the other peer hands it off to the first peer at the nearest interconnection point and the first peer is then obligated to carry that traffic on its own network to its destination. Moreover, a party that sends traffic to a broadband provider's end users (not the provider itself) is the one that decides where and how to exchange that traffic

---

[16] Kronenberg Decl. ¶ 13.
[17] *Id.* ¶ 32.
[18] *Id.*

7
Reply Declaration of Michael D. Paradise in Support of Plaintiffs' Motion for Preliminary Injunction

with the broadband provider — the receiving broadband provider has no control over how the traffic comes into its facilities.  As a consequence, Ms. Kronenberg's claim that edge providers and their transit suppliers consistently offer to hand off traffic to broadband providers at points of interconnection reasonably close to those providers' subscribers is both factually incorrect and fails to ensure that a broadband provider can recover its costs of carrying traffic to its end users insofar as edge providers and their transit suppliers can change the point at which they deliver such traffic whenever they choose.  For the same reason, if a broadband provider were to augment its interconnection facilities at a particular point, there would be nothing to prevent an edge provider or transit supplier from shifting traffic to another traffic exchange point, stranding the broadband provider's investment to accommodate that traffic both in equipment to accept the traffic into its network and in backhaul facilities to carry the traffic to its subscribers.

14. Moreover, because AT&T and other broadband providers lack the ability to recover directly from subscribers the costs of carrying specific content (such as Netflix or YouTube video traffic) requested by them, broadband providers would be forced to recover the costs of carrying such content and services from all of their subscribers (many of whom do not use or access such content) by increasing their broadband internet access service rates across the board.  Therefore, *all* subscribers would be forced to subsidize those services, even though many do not subscribe to them.  Recovering those costs from the content and transit providers delivering such content and services to broadband providers ensures that countless low-volume Internet users are not forced to pay more for their broadband service, and that content and transit providers price their own services to recover those costs and send appropriate price signals to the consumers requesting their content and services.

**Implementing California Specific Rules at Interconnection Points Would Be Difficult and Costly**

15. Both Mr. Jordan and Mr. Schaeffer claim that implementing California-specific net neutrality requirements at interconnection points would be technologically and

8
Reply Declaration of Michael D. Paradise in Support of Plaintiffs' Motion for Preliminary Injunction

commercially feasible.[19] Mr. Schaeffer asserts that Internet access service already is subject to different net neutrality laws in different countries, and broadband providers supplying broadband Internet access service to customers in different countries have no problem complying with these laws.[20] He facilely claims that "[h]aving to comply with a net neutrality law in California — the fifth largest economy in the world — is no different."[21]

16. These claims are incorrect. The fact that broadband providers can and do comply with different net neutrality laws and regimes in different countries does not mean that it would be commercially feasible — or "no problem," as Mr. Schaeffer puts it — for AT&T and other broadband providers to implement different network management practices, or to offer broadband Internet access services with different terms and conditions, to comply with disparate *state* net neutrality laws across the country. Although AT&T does not sell mass market broadband services in other countries (other than mobile broadband in Mexico), AT&T can apply different rules outside the United States than it applies inside. But that is because AT&T utilizes different autonomous system numbers (ASN) inside and outside the United States. ASNs are Internet protocol routing prefixes used to control routing for traffic exchanged on the internet. By using different ASNs, AT&T ensures that all traffic destined for AT&T's subscribers in the United States is delivered to AT&T in the United States, enabling it to differentiate between U.S. and non-U.S. traffic.

17. The same is not true for traffic routed wholly within the United States. AT&T utilizes a single ASN for its fixed broadband infrastructure the United States. And, while AT&T does assign different IP addresses in different areas (and thus knows which IP addresses it has assigned in California), the ability to identify and apply different rules/treatment to packets bound to or from those addresses in AT&T's peering infrastructure is operationally

---

[19] *See* Jordan Decl. ¶¶ 3, 13-24, 38; Schaeffer Decl. ¶¶ 66-71.
[20] Schaeffer Decl. ¶ 66.
[21] *Id.*

impractical.[22] While it might be "technically feasible" to do so, it would require AT&T to completely restructure the way in which we offer broadband services today, such as logically separating consumer broadband subscribers into a separate ASN and treating California as another country. This will introduce additional operational complexities such as managing traffic separate policies and network DDOS detection and mitigation. Even if AT&T were to do so, it could not use IP addresses to identify California *mobile* broadband customers accessing the Internet while they are in California and treat them differently them from non-Californians using their phones while in California. The same goes for customers in neighboring states that are serviced from mobility data centers located in California, as IP addressing pools associated with a mobile packet core are shared and not geography specific.

18. Mr. Jordan's assertion that "it would not be a problem to implement throttling only in access networks outside of California, but not in access networks in California"[23] is inaccurate on several levels. As an initial matter, Mr. Jordan mischaracterizes certain conduct as "throttling," inconsistent with both industry and FCC understandings of the term; even the 2015 Order, which imposed a bright line rule prohibiting throttling, acknowledged that "a broadband provider may offer a data plan in which a subscriber receives a set amount of data at one speed tier and any remaining data at a lower tier."[24] Moreover, Mr. Jordan is wrong about where traffic is managed. Because traffic management must be done in conjunction with centralized provisioning systems — not in the access network — traffic management occurs within the Evolved Packet Core infrastructure that serves all mobile customers in California *and* in nearby states. While some of this infrastructure is physically situated in California, it manages traffic occurring entirely outside of California — *i.e.*, trafficking within and between neighboring states — and it does not enable any means to distinguish between that traffic and

---

[22] Notably, for the same reason, AT&T also is incapable of applying different rules, practices, etc. in different regions, provinces, or states in other countries.

[23] Jordan Decl. ¶ 21.

[24] 2015 Order ¶ 122.

traffic occurring entirely inside of (or even directed into) California specifically for separate treatment.

19. In any event, the suggestion that implementing a prohibition against charging for interconnection (if that is how SB-822 is interpreted) would be simple because AT&T could just not charge for packets destined for or originating in California misapprehends the nature of the charges AT&T assesses to edge providers that want to interconnect directly with AT&T or to interconnection partners that fail to meet AT&T's criteria for settlement-free peering. AT&T does not charge on a per-packet or per-megabit basis for carrying those providers traffic from the point of interconnection to AT&T's subscribers. Rather, AT&T charges for a set amount of interconnection capacity (such as for a 1 Gigabit per second (Gbps) port) at the point of traffic exchange, which an edge provider or interconnection partner can use to transmit as much or as little traffic as it may choose. It would be extremely inefficient to reserve certain capacity for California traffic.

20. Finally, when AT&T provides interconnection directly to CDNs and other large edge providers, it does so through AT&T Dedicated Internet Service ("ADI"), a commercial offering that provides guaranteed capacity and edge-to-edge quality of service guarantees, rather than "best-efforts" routing and service, which applies to settlement-free peering arrangements. If SB-822 were interpreted to require AT&T to interconnect directly with CDNs and other large content providers for free, AT&T could be forced to cease offering ADI in California and direct such providers to deliver traffic via best-efforts peering arrangements, which could degrade their service. Otherwise, CDNs and edge providers currently delivering traffic to AT&T at interconnection points outside California might decide to host their content in California, or otherwise reroute their traffic to interconnection points in California, in order to demand ADI at no charge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of October 2020 in Bartlett, IL.

_Michael D. Paradise_ (signature)
Michael D. Paradise

Reply Declaration of Michael D. Paradise in Support of Plaintiffs' Motion for Preliminary Injunction